KENNETH D. SULZER (SBN 120253)
ksulzer@constangy.com
SARAH KROLL-ROSENBAUM (SBN 272358)
skroll-rosenbaum@constangy.com
MATTHEW A. SCHOLL (SBN 301560)
mscholl@constangy.com
**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
2029 Century Park East, Suite 1100
Los Angeles, California 90067
Telephone: (310) 909-7775
Facsimile:  (424) 276-7410

TAZAMISHA H. IMARA (SBN 201266)
timara@constangy.com
**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
600 Anton Boulevard, 11th Floor
Costa Mesa, California 92626
Telephone: (949) 743-3979
Facsimile:  (949) 743-3934

Attorneys for Defendant **AMN SERVICES, LLC**

**[Counsel of Record Continues on Next Page]**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT SHAW, SHARON DAVIS, JENNIFER CORONA TEITELBAUM, LORENZO HOLMES, and CANDY KUCHARSKI, individually and on behalf of all others similarly situated, and as a proxy for the State of California on behalf of aggrieved employees,<br><br>        Plaintiffs,<br><br>vs.<br><br>AMN HEALTHCARE, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., and THE PERMANENTE MEDICAL GROUP, INC.<br><br>        Defendants. | Case No. 3:16-cv-02816 JCS<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:   June 8, 2018<br>Time:  9:30 a.m.<br><br>Judge: Honorable Joseph C. Spero<br>Ctrm:  15/G |

1  CHRISTIAN J. ROWLEY (SBN 187293)
   crowley@seyfarth.com
2  ANDREW MCNAUGHT (SBN 209093)
   amcnaught@seyfarth.com
3  ERIC RUEHE (SBN 284568)
   eruehe@seyfarth.com
4  **SEYFARTH SHAW LLP**
   560 Mission Street, 31st Floor
5  San Francisco, California 94105
   Telephone: (415) 544-1001
6  Facsimile:  (415) 397-8549
7
8  Attorneys for Defendants **KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC. and THE PERMANENTE MEDICAL GROUP, INC.**
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

Page

3

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ........................................... 1

4

II.   FACT SUMMARY ............................................................................................................. 3

5

    A.  Defendants' Businesses and Proposed Representative Plaintiffs' Employment. ...................... 3

6

    B.  Written Policies Provided to Clinicians. ................................................................................... 5
        1.  Clinicians Are Prohibited from Working Off-the-Clock. ................................................... 5
        2.  Meal Period and Rest Break Policies. ................................................................................. 6

7

8

9

    C.  AMN Timekeeping Procedures. ................................................................................................ 7

10

    D.  Relevant Kaiser Practices. ........................................................................................................ 9
        1.  Clinicians May "Float" During Shifts Depending on Facility Needs. ............................... 9
        2.  Clinicians May Attend Start of Shift "Huddles." .............................................................. 9
        3.  The Frequency and Length of Handoffs Varies. .............................................................. 10

11

12

13

14

    E.  Resources Available to Assist Clinicians With Relevant Concerns. ....................................... 11

15

    F.  Consultant Marliese Bartz's Work for AMN. .......................................................................... 12

16

    G.  Plaintiffs' Expert Report Provides No Credible Basis for Class Certification. ...................... 13

17

III.  PLAINTIFFS' CLAIMS. ................................................................................................ 15

18

19

IV.   ARGUMENT ..................................................................................................................... 17

20

    A.  Plaintiffs Fail to Identify a Common Question of Law or Fact. ............................................. 17
        1.  Clinicians Are Permitted to Work Overtime. ................................................................... 18
        2.  Procedures for Reporting and Verifying Unscheduled Overtime and Noncompliant Breaks Are Neither Illegal Nor Uniformly Applied. ................................................................. 21
        3.  There is No Policy Requiring Clinicians to be On-Call During Meal Periods and Rest Breaks. ................................................................................................................................. 22
        4.  The Use of Break Nurses with Duties Other Than Relieving Clinicians is Unconnected to Any Alleged Meal Period or Rest Break Violations. .................................................... 24

21

22

23

24

25

26

    B.  Plaintiffs' Claims are Not Typical of Those of Putative Class Members. .............................. 26

27

28

1

## TABLE OF CONTENTS

2

Page

3

C.  Plaintiffs Nor Their Counsel Can Adequately Represent the Proposed Class.........................28

4

   1.  Plaintiffs are Inadequate Representatives. .........................................................................28

   2.  Plaintiffs' Counsel Improperly Put Their Own Interests Above the Interests of the Putative

5

Class....................................................................................................................................................28

6

D.  Neither the Predominance nor the Superiority Requirements of Rule 23(b)(3) are Met

7

Because Plaintiffs Identify no Common Issues, and Liability Turns on the Resolution of Multiple

Individual Issues. ................................................................................................................................29

8

   1.  Plaintiffs' Overtime Claim Raises Multiple Individual Issues.............................................30

9

   2.  Meal Periods and Rest Breaks............................................................................................33

   3.  Plaintiffs Fail to Cite Relevant Case Law in Support of the Predominance Factor. ............35

10

   4.  A Class Action is Not the Superior Method of Resolving Plaintiffs' Claims......................36

11

12

E.  Rule 23(b)(2) Certification Cannot be Granted. ....................................................................37

13

F.  Certification of Plaintiffs' Derivative State Law Claims Should be Denied. .........................38

14

V.  CONCLUSION.............................................................................................................................39

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
[Case No. 3:16-cv-02816 JCS]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................... 28, 36

*American Express Co. v. Italian Colors Restaurant*,
  133 S. Ct. 2304 (2013).................................................................................... 17

*Arredondo v. Delano Farms Co.*,
  301 F.R.D. 493 (E.D. Cal. 2014) ................................................................... 26

*Blackwell v. SkyWest Airlines, Inc.*,
  245 F.R.D. 453 (S.D. Cal. 2007) ................................................................... 26

*Braun v. Safeco Co. of America*,
  2014 WL 9883831 (C.D. Cal. Nov. 7, 2014)................................................. 32

*Brinker Restaurant Corp. v. Superior Court*,
  53 Cal. 4th 1004 (2012) ........................................................................... 32, 33

*Burnell v. Swift Trans. Co, of Arizona, LLC*,
  2016 WL 2621616 (C.D. Cal. May 4, 2016) ................................................. 38

*Chavez v. AmeriGas Propane*,
  2015 WL 12859721 (C.D. Cal. Feb. 11, 2015).............................................. 25

*Chavez v. AmeriGas Propane,  Inc.*,
  2015 WL 12859721 (C.D. Cal. Feb. 11, 2015)......................................... 21, 25

*Civil Rights Education and Enforcement Center v. Hospitality Properties Trust*,
  867 F.3d 1093 (9th Cir. 2017) ....................................................................... 25

*Cleveland v. Groceryworks.com*,
  200 F. Supp.3d 924 (N.D. Cal. 2016) ............................................................ 16

*Cole v. CRST, Inc.*,
  317 F.R.D. 141 (C. D. Cal. 2016) .................................................................. 34

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).................................................................................... 17

*Cox v. Delmas*,
  99 Cal. 104 (1893) .......................................................................................... 29

*Del Valley v. Global Exchange Vacation Club*,
  320 F.R.D. 50 (S.D. Cal. 2017) ............................................................... 28, 31

*Duran v. U.S. Bank*,
  59 Cal. 4th 1 (2014) ....................................................................................... 37

*Elliot v. Spherion Pac. Work, LLC*,
  572 F. Supp. 2d 1169 (C.D. Cal. 2008) ......................................................... 38

*Ellis v. Costco Wholesale Corp.*,
  657 F. 3d 970 (9th Cir. 2011) ........................................................................ 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*In re Wells Fargo Home Mort. Overtime Pay Litigation*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) ............................................................... 37

*In re Wells Fargo Home Mortgage Overtime Pay Litigation*,
  571 F.3d 953 (9th Cir. 2009) .............................................................................. 25

*Jimenez v. Allstate Ins. Co.*,
  2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) ................................................... 38

*Kamm v. Cal. City Dev. Co.*,
  509 F.2d 205 (9th Cir. 1975) .............................................................................. 36

*Kenny v. Supercuts, Inc.*,
  252 F.R.D. 641 (N.D. Cal. 2008) ................................................................. 33, 34

*Koike v. Starbucks Corp.*,
  378 Fed.Appx. 659 (9th Cir. 2010) .................................................................... 16

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) .............................................................................. 28

*Local Jt. Exec. Board Culinary/ Bartender Trustee Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ...................................................................... 30, 32

*Marlo v. United Parcel Service, Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008) ....................................................................... 30

*MGIC Indemnity Corp. v. Weisman*,
  803 F. 2d 500 (9th Cir. 1986) ............................................................................. 29

*Nordstrom v. Ryan*,
  762 F.3d 903 (9th Cir. 2014) .............................................................................. 25

*Rai v. Santa Clara Valley Transportation Authority*,
  308 F.R.D. 245 (N.D. Cal. 2012) ................................................................. 35, 36

*Roth v. CHA Hollywood Medical Center, L.P.*,
  2013 WL 5775129 (C.D. Cal. Oct. 23, 2013) ................................................... 38

*Sullivan v. Chase Int. Services of Boston, Inc.*,
  79 F.R.D. 246 (N.D. Cal. 1978) ......................................................................... 29

*Thomas v. Baca*,
  231 F.R.D. 397 (C.D. Cal. 2005) ....................................................................... 36

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) .............................................................................. 36

*Wal-Mart v. Dukes*,
  131 S. Ct. 2541 (2011) ....................................................................................... 17

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (9th Cir. 2013) .............................................................................. 18

*Washington v. Joe's Crab Shack*,
  271 F.R.D. 629 (N.D. Cal. 2010) .................................................................. 26, 34

iv

# TABLE OF AUTHORITIES

Page

**Cases**

*Willner v. Manpower Inc.*,
  35 F. Supp. 3d 1116 (N.D. Cal. 2014) ........................................................................ 38

*Woods v. Vector Marketing Corp.*,
  2015 WL 5188682 (N.D. Cal. Sept. 4, 2015) .............................................................. 36

*Wren v. RGIS Inventory Specialists*,
  256 F.R.D. 180 (N.D. Cal. 2009) ........................................................................... 35, 37

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ............................................................................... 36, 37

**Statutory Authorities**

Cal. Bus. & Prof. Code § 17200 ............................................................................... 15, 38

Cal. Lab. Code § 201.3 ................................................................................................... 38

Cal. Lab. Code § 203 ...................................................................................................... 38

Cal. Lab. Code § 98 ........................................................................................................ 36

**Rules and Regulations**

F.R.C.P. Rule 23(a)(3) .................................................................................................... 26

Fed. R. Evid. 401, 402 ................................................................................................... 31

Fed. R. Evid. 602 ........................................................................................................... 31

Fed. R. Evid. 701 ........................................................................................................... 31

Fed. R. Evid. 801, 802 ................................................................................................... 31

## I.       INTRODUCTION AND SUMMARY OF ARGUMENTS

Plaintiffs utterly fail to meet *their* burden to show that the Court should certify a proposed class of nurses currently and formerly employed by Defendant AMN and assigned to hospitals operated by Defendant Kaiser Foundation Hospitals ("Kaiser").[1]  Relying on anecdotal evidence and *post hoc* conclusory declarations, Plaintiffs make broad assertions that *every* AMN nurse with a Kaiser assignment is forced to work off-the-clock and is not offered compliant meal and rest breaks.  But the testimony of putative class members, Kaiser nurse managers and administrators, Defendants' expert, and Plaintiffs themselves—as well as the documentary evidence and time and payroll data—contradict Plaintiffs' claims and confirm that individualized inquiries overwhelm any liability determination.

Far from orchestrating a Wild West environment in which wage-and-hour requirements are uniformly ignored, as Plaintiffs would have the Court believe, AMN and Kaiser partner to establish and deliver on a compliant wage-and-hour regime.  Each of the Defendants has established lawful wage-and-hour policies that Plaintiffs have not sought to challenge, and that AMN and Kaiser go to great lengths to promulgate. And importantly, these lawful policies are strictly enforced. AMN nurses assigned to Kaiser facilities routinely and systematically are paid for overtime beyond their scheduled shifts, provided meal periods, and authorized and permitted to take rest breaks.  During the proposed class period, 33.9% of total workweeks worked by clinicians at Kaiser facilities included payment of doubletime.[2] (Larson Dec. ¶ 40.)  Reported missed or otherwise noncompliant meal periods and rest breaks result in appropriate premium payments. During the same time, putative class members also received at least 4,710 meal period premiums and 2,639 rest break premiums.  (Larson Dec. ¶ 55.)

Beyond Defendants' clear record of wage-and-hour compliance, this case is wholly inappropriate for class certification.  The named plaintiffs, and the approximately 6,772 members of the putative class, worked more than 11,000 different assignments at more than 70 different Kaiser facilities throughout California, in many hundreds of different units, and reporting to thousands of individual supervisors.  These units and facilities employed a variety of practices to afford clinicians

---

[1] Three Kaiser-affiliated entities have been named as defendants; however, with the exception of Kaiser Foundation Hospitals, they do not operate hospitals.

[2] Most clinicians assigned to Kaiser facilities work 12-hour shifts and receive daily overtime.  At issue in this case is doubletime for hours worked in excess of 12 in a day.

their wage-and-hour rights, and varied throughout the proposed class period by size, patient population, volume, and acuity.  Against this complex and diverse backdrop, Plaintiffs have failed to identify common policies or practices applicable to the proposed class, or to explain how any purported common issue is susceptible to classwide resolution or resulted in the violations of law they claim to have suffered.  Plaintiffs' evidence provides no systemic explanation as to why some clinicians record unscheduled overtime, while others allegedly do not, or why some clinicians report noncompliant breaks and are paid premiums, while others allegedly do not report noncompliant breaks.  To the contrary, the evidence demonstrates that profound differences exist among even the named Plaintiffs with respect to issues that are critical to a liability determination.

Among other things, clinicians report, and Plaintiffs' expert admits, that the scope and burden of end-of-shift handoffs—which Plaintiffs identify as a key driver of Defendants' alleged liability for off-the-clock overtime—vary based on the number and acuity of assigned patients and other factors.  Thus, the amount of time required to complete such handoffs, and whether they are completed within scheduled shift hours, varies from shift to shift.  The same variation affects clinicians' receipt of breaks during shifts, and the amount of time clinicians spend attending start-of-shift huddles, if any.  Due to these and other unique factual issues that characterize clinicians' individual assignments, a series of mini-trials would be necessary in order to determine whether individual putative class members are entitled to recovery.

Indeed, the three proposed class representatives were exposed to just a small fraction of the relevant hospital units, and a comparison of just *their* limited experiences reveals inconsistencies.  Moreover, Plaintiffs' claims regarding clinicians working on other shifts, in other units, or at other Kaiser facilities—that these clinicians systematically worked off-the-clock, were not paid for hours reported on their AMN timesheets, or were denied breaks—are pure supposition.  In fact, evidence shows that putative class members routinely reported and were paid for time worked outside of their scheduled shifts.  If there were individuals who did not, they plainly are outliers.

Additionally, proposed class counsel's agreement with class counsel in another case pending against AMN creates an express conflict between the interests of the proposed class and proposed class counsel.  This renders Plaintiffs' proposed counsel inadequate.

1    Given the fatal flaws with their arguments under the class certification standard, Plaintiffs have

2    sought to mislead and distract the Court with shiny objects.  First, they present inaccurate and out-of-

3    context sound bites from the report of a consultant who offered AMN advice intended to streamline

4    business operations—even though the consultant's work had nothing to do with wage-and-hour

5    compliance.  Second, they offer purported "expert" testimony regarding supposed "best practices" and

6    the challenges of a presumptively heavy nursing workload.  But there is no basis to assess classwide

7    liability simply because a so-called expert considers certain lawful procedures to be outdated or

8    otherwise less than optimal.  Lastly, Plaintiffs fixate on a single sentence from a letter received by

9    Plaintiff Shaw to falsely assert that AMN does not permit overtime at Kaiser San Diego—and

10   unspecified other Kaiser facilities.  Not only is this contention belied by the thousands of overtime

11   hours worked by putative class members (and properly paid for by AMN) at these very facilities, it is

12   contradicted by the rest of the letter itself.

13   Plaintiffs therefore cannot meet their burden to demonstrate a classwide policy or practice to

14   deny meal periods and rest breaks or permit off-the-clock-work.  There is no common evidence of

15   missed breaks or off-the-clock work.  Plaintiffs cannot adduce common proof to answer, for example,

16   *why* any given break may have been missed, or *why* a nurse chose not to record overtime on any given

17   shift.  It follows that liability for alleged unpaid break premiums and overtime also cannot be

18   determined on a classwide basis.  Because there is no way to determine the answers to these questions

19   based on common proof or by review and analysis of employee time records, the Court should deny

20   Plaintiffs' motion.

21   **II.    FACT SUMMARY**

22       **A.    Defendants' Businesses and Proposed Representative Plaintiffs' Employment.**

23   AMN is one of the country's leading healthcare staffing companies. (Larson Dec. ¶ 2.)[3]  AMN

24   contracts with healthcare facilities to deliver short-term staffing solutions by providing skilled

25   healthcare professionals ("clinicians"), including the registered nurses ("RNs") and Licensed Practical

26   Nurses ("LPNs") who make up the proposed class in this case.  (*Id.*)  Between September 11, 2013

27

28   [3] The Declaration of Lisa Larson and other cited evidence are attached as exhibits to Defendants'
     Compendium of Evidence filed herewith.

and December 4, 2017,[4] AMN employed approximately 11,612 RNs and LPNs at nearly four hundred healthcare facilities in California.  Approximately 6,772 of those clinicians worked at least one assignment at one of more than 70 Kaiser facilities in California.[5]  (Larson Dec. ¶ 5.)  Putative class members worked more than 11,000 Kaiser assignments during the proposed class period, which ranged from a few weeks to over one year.  (Larson Dec. ¶ 8.)

Each of the named plaintiffs is a licensed RN or LPN, and a current or former employee of AMN.[6]  The named plaintiffs each worked at least one assignment at a California Kaiser facility during the proposed class period, with the exception of Sharon Davis—who was never assigned to a Kaiser facility and should not be a representative plaintiff.  (Larson Dec.  ¶ 9.)  None of the three proposed class representatives had assignments at any Northern California Kaiser facility. In fact, among them, they have experience at only three Kaiser facilities: Kaiser San Diego Medical Center, Kaiser Los Angeles Medical Center, and Kaiser West Los Angeles Medical Center.[7][8]

---

[4] Due to the resolution of prior litigation against AMN, the class period begins on September 11, 2013. (SAC ¶ 19.)

[5] Plaintiffs assert that AMN and Kaiser are joint employers for purposes of the wage and hour claims alleged in the Complaint.  Defendants dispute that such a finding is supported by the evidence. Nonetheless, as this legal issue is not necessary to the resolution of the class certification question, and Plaintiffs do not pursue it with authority in the Motion, it is not addressed here.

[6] The Motion proposes that three of the named plaintiffs—Shaw, Teitelbaum, and Kucharski, be appointed class representatives.  (Mot. 32:22-23.) Sharon Davis apparently proceeds solely in her individual capacity.  (Id.)  No mention is made of named plaintiff Lorenzo Holmes.  As used in this Opposition, "Plaintiffs" refers to the proposed class representatives, unless otherwise noted.

[7] Plaintiff Shaw worked an assignment at Kaiser Permanente San Diego Medical Center from approximately December 2015 to March 2016, where he was assigned to the Med-Surg / Telemetry Unit.  (Shaw Depo. 19:15-20:2, 20:6-12; Larson Dec. ¶ 10, Ex. 2.)  Plaintiff Teitelbaum worked assignments at Kaiser Permanente Los Angeles Medical Center from approximately June 2013 to March 2014, July 2014 to January 2015, and January 2015 to April 2015, and at the Kaiser Permanente West Los Angeles Medical Center from approximately June 2014 to July 2014. (Larson Dec. ¶ 11, Ex. 3.)  She was assigned to the CCU during her assignment at Los Angeles Medical Center and to the ICU during her assignment at West Los Angeles Medical Center.  (Teit. Depo. 56:2-5, 67:2-8, 71:7-9.)  Plaintiff Kucharski was assigned to Kaiser Permanente San Diego Medical Center from approximately October 2013 to December 2013 and January 2015 to May 2015.  (Larson Dec. ¶ 12, Ex. 4.)  She was assigned to the ICU.  (Kucharski Depo. 84:19-85:3, 97:25-98:5.)

[8] Plaintiffs' lack of experience and knowledge about other facilities makes them inadequate representatives of clinicians assigned to Kaiser facilities outside of Southern California, or any facility or unit other than the three to which they were specifically assigned.

## B.      Written Policies Provided to Clinicians.

AMN provides clinicians with policies, including an employee handbook and a Meal Period Form for California Healthcare Employees ("Meal Period Waiver"). (Larson Dec. ¶ 13.) It is undisputed that these written policies are distributed and made available to clinicians, and comply with the requirements of California law.

### 1.      Clinicians Are Prohibited from Working Off-the-Clock.

AMN policy requires clinicians to record all hours they work during their assignments. An explicit policy prohibiting off-the-clock work is included in the handbook and instructs clinicians to contact Customer Support immediately if they are "told not to report all hours worked … or are otherwise prevented or discouraged from accurately reporting all time worked." (2014 American Mobile Health ("AMH") Handbook ("Handbook"),[9] p. 13, Ex. 9 to Larson Dec.)

AMN's overtime policy instructs clinicians to obtain a verbal preapproval to work any unscheduled overtime, and a facility signature once the work is completed. (Larson Dec. ¶¶ 16, 43, Ex. 9, Handbook, p. 9.) In practice, clinicians may obtain approval after the time is worked.[10] (Mira Dec. ¶ 12; Larson Dec. ¶ 44.) The policy also reflects that some AMN clients do not permit AMN clinicians to work outside of scheduled hours and prefer to utilize permanent staff for such work if it is needed. (Larson Dec. ¶ 15.) Kaiser facilities permit unscheduled overtime, and clinicians assigned to Kaiser facilities regularly work hours outside of their scheduled shifts. [11] (Alexopoulos Dec. ¶¶ 11-12; Kelly Dec. ¶¶ 8-9.) Plaintiffs' declarants concede they recorded and were paid for unscheduled overtime.[12] Moreover, even at facilities that have a general "no overtime" policy, AMN clinicians

---

[9] AMN's nurse staffing operation utilizes brand names, including American Mobile Healthcare and NursesRX—the brands associated with Shaw, Kucharski, and Teitelbaum's Kaiser assignments. (Larson Dec. ¶ 14.) The handbook policies referred to in the Opposition are taken from American Mobile Healthcare Handbooks issued throughout the class period and are attached to the Larson Declaration as Exhibits 8 through 12. AMN clinicians acknowledge receipt of an AMN handbook labeled with one of the AMN brand names electronically. (Larson Dec. ¶ 13, Exs. 5-7.) Despite the cosmetic difference between handbooks labeled with different brand names, the same substantive policies are included in the handbooks provided to AMN clinicians. (Larson Dec. ¶ 14.)

[10] McMurrian Dec. ¶ 12; Giffin Dec. ¶ 24.

[11] Nguyen Dec. ¶ 12; Williams Dec. ¶ 23; Litz Dec. ¶¶ 12-14.

[12] Nava Depo. 101:6-105:24, Exs. 3-4; Parks Depo. 71:15-77:25, Exs. 8-11; Boyd Depo. 63:11-64:6; 74:5-8.

who work outside of their scheduled hours are paid at the applicable overtime rate.  (Larson Dec. ¶ 39.)   Contrary to Plaintiffs' baseless conjecture, during the proposed class period, 33.9% of all workweeks included recorded doubletime, and 91.8% included recorded overtime.  (Expert Report of Robert W. Crandall "Crandall Rpt." ¶ 6.)  Plaintiffs' own pay records show they worked and received payment for unscheduled overtime.  (Larson Dec. ¶ 41, Exs. 16-17.)  Other clinicians report working unscheduled overtime, which they record on their timesheets and for which they are paid, even without facility signatures.[13]  (Alexopoulos Dec. ¶ 13; Adineh Dec. ¶ 5.)  Variation in the need for clinicians to obtain preapproval—or any approval—to work unscheduled overtime demonstrates the lack of uniform practices across Kaiser facilities.

### 2. Meal Period and Rest Break Policies.

Meal period and rest break policies in the Handbook affirm AMN's compliance with legal requirements, while noting that individual facilities will utilize different practices for scheduling, providing breaks, and documenting meal periods and rest breaks.  The Handbook advises clinicians to "check with your manager at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks."  (Handbook, p. 13, Ex. 8 to Larson Dec.)  Clinicians are instructed to report all instances in which they are not "provided with the opportunity to take a meal break," or "not authorized or permitted rest breaks."  (Handbook, p. 14, Ex. 8 to Larson Dec.)  In compliance with California law, AMN pays an additional hour of wages to clinicians who report non-compliant breaks.  (Larson Dec. ¶ 21.)

Instances of non-compliant breaks are routinely documented in the "Comments" section of the timesheet.  (Larson Dec. ¶ 21, Ex. 13.)  During the proposed class period, AMN has paid approximately 11,408 meal period premiums totaling $338,445.00, and 5,150 rest break premiums totaling $164,399.00 to AMN clinicians in California.  (Larson Dec. ¶ 55.)  Of those, 4,710 meal period premiums totaling $160,958.00 and 2,639 rest breaks premiums totaling $88,954.00 were paid to clinicians for claimed non-compliant meal periods and rest breaks during Kaiser assignments.  (*Id*.)  Clinicians, including Kucharski, received premium payments for non-compliant breaks.  (Larson Dec.

---

[13] Nguyen Dec. ¶ 12; Williams Dec. ¶ 23; Parks Depo. 80:11-81:2, Exs. 8-9.

¶ 22, Ex. 14.)  Plaintiffs have produced no evidence indicating that the premiums paid to clinicians during the relevant period are not reflective of what is accurate for either Kaiser or non-Kaiser facilities.

### C.   AMN Timekeeping Procedures.

Plaintiffs, and most AMN clinicians assigned to Kaiser during the proposed class period recorded their time on paper timesheets.  (Larson Dec. ¶ 36; Kucharski Depo. 146:9-15; Teit. Depo. 77:11-25; Reese Dec. ¶ 10; Thorne Dec. ¶ 4; Adineh Dec. ¶ 5.)  AMN's paper timesheets contain an attestation in which the AMN nurse states, "I affirm that the time recorded above is accurate and all required approvals have been obtained."[14]  (Larson Dec. ¶ 38.)  Timesheets are usually kept in the facility staffing office.  (Reese Dec. ¶ 10; Heading Dec. ¶ 12; Adineh Dec. ¶ 4; Mira Dec. ¶ 12.) Clinicians complete timesheets daily by recording the date, their start time, and the time they ended their shift.  (Thorne Dec. ¶ 4; Carreon Dec. ¶ 12; Mira Dec. ¶ 12; Kelly Dec. ¶ 10; Heading Dec. ¶ 12; Shaw Depo. 134:20-23; Teit. Depo. 82:3-14.)   There is also space on the timesheet for clinicians to note the length of their meal period and whether any meal period or rest break was missed or interrupted.  (Reese Dec. ¶ 10; Larson Dec. ¶ 37.)  Rest breaks are not recorded.  (Larson Dec. ¶ 37.)

Clinicians generally must obtain a signature from authorized facility personnel verifying missed or interrupted breaks and confirming that any unscheduled overtime was worked.  (Larson Dec. ¶ 43; Mira Dec. ¶ 14; Heading Dec. ¶ 14.)  While charge nurses often provide signatures, records and testimony indicate that signatures were also obtained from Kaiser nurse managers, house managers, staffing office personnel and other facility employees.[15]  (Larson Dec. ¶ 45; Adineh Dec. ¶ 5; Hasinsky Dec ¶ 18; Shaw Depo. 99:12-15.)  In some units, time worked outside of scheduled hours, and any missed or otherwise non-compliant breaks may be recorded on an Overtime/Break Form or similar document.[16]   (Kelly Dec. ¶ 10; Larson Dec. ¶ 47.)   At other facilities and units the

---

[14] Plaintiffs' proposed "expert" Dr. Crowninshield, admitted in her deposition that this affirmation was the type she recommended to avoid needing to ask nurses individually why they did not report their time.  (Crowninshield Depo. 196:1-197:7.)

[15] Giffin Dec. ¶ 24; Nguyen Dec. ¶ 12; Demirovic Dec, ¶ 11; McMurrian Dec. ¶ 14; Thai Dec. ¶ 18.
[16] McMurrian Dec. ¶ 13; Litz Dec. ¶ 13.

Overtime/Break Form is not used.[17]  (Adineh Dec. ¶ 5; Heading Dec. ¶13; Larson Dec. ¶ 47.)  The signatures for unscheduled overtime and missed breaks are collected either on the timesheet or on the Overtime/Break Form.[18]  (Larson Dec. ¶ 4.)  In some units, clinicians do not need signatures verifying unscheduled overtime or noncompliant breaks, if the unscheduled overtime does not exceed a certain limit.[19]  (Id.)  Sometimes no approval is obtained at all prior to Kaiser submitting timesheets to AMN.  (Alexpoulos Dec. ¶ 11.)

At the end of the weekly pay period, a Kaiser employee—often a Kaiser staffing office manager or other designated Kaiser facility personnel—is responsible for signing and submitting the clinicians' timesheets to AMN.  (Adineh Dec. ¶ 5; Thorne Dec. ¶ 7; Larson Dec. ¶ 50.)  The signature of the individual approving the timesheet at Kaiser requires no additional effort on the part of clinicians.  (Adineh Dec. ¶ 5; Thorne Dec. ¶ 7.)  Nor is the need for a facility signature on the timesheet universal, and in some units, clinicians are authorized to sign one another's timesheets prior to submission.  (Larson Dec. ¶ 51.)  At some facilities, the staffing office does not submit clinician timesheets to AMN, but rather clinicians do so themselves.[20]  (Id.)

AMN's Time Processing Department is responsible for reviewing the submitted timecards and entering clinicians' time into AMN's Kofax system for payment.  (Larson Dec. ¶ 52.)  Time Processing Department personnel also work to confirm the accuracy of any unscheduled overtime and non-compliant breaks that appear on submitted timesheets without approval signatures.  (Larson Dec. ¶ 53.)  The clinician may be asked to obtain a missing signature, or Customer Support may contact facility personnel directly for confirmation.  (Id.)  AMN records show that regardless of approvals, reported unscheduled overtime is paid by AMN.  (Larson Dec. ¶ 54, Ex. 20.)

/ / /

/ / /

---

[17] Williams Dec. ¶ 23; Giffin Dec. ¶ 2.

[18] Plaintiffs incorrectly contend that clinicians were required to obtain more than one signature on both timesheets and Overtime/Break forms in order to be paid for unscheduled overtime or non-compliant breaks.  (Thorne Dec. ¶ 5; Adineh Dec. ¶ 5; Larson Dec. ¶ 48.)

[19] Foster Dec. ¶ 30; Williams Dec. ¶ 23.

[20] Thai Dec. ¶ 11.

### D.  Relevant Kaiser Practices.

Kaiser does not employ Plaintiffs or putative class members.  It is undisputed, however, that like AMN Kaiser maintains lawful policies that prohibit off-the-clock work, require nurses to be provided with meal periods, and authorize and permit rest breaks. Kaiser's policies are applicable to the unionized Kaiser staff nurses with whom the AMN clinicians work during their assignments. (Alexopoulos Dec. ¶ 14.)  Kaiser policies also require the payment of premiums to Kaiser staff nurses for noncompliant meal periods and rest breaks.  (*Id*.)  Kaiser's compliance with California wage-and-hour laws, including by providing meal periods and rest breaks to AMN clinicians assigned to Kaiser facilities, is an express term of Defendants' contractual agreement with AMN.  (Larson Dec. ¶ 7, Ex. 1.)  AMN clinicians may also participate in the following practices at Kaiser facilities.

### 1.  Clinicians May "Float" During Shifts Depending on Facility Needs.

During shifts, clinicians may occasionally be moved from their assigned unit to another unit with a temporary need for additional staff, a process known as "floating," provided they possess the required skills, certifications, and experience.  (Larson Dec. ¶ 27.)  The extent to which any clinician is asked to float during an assignment varies greatly based on facility and unit practice, patient acuity, and need at any particular time.  (Larson Dec. ¶ 28; Mira Dec. ¶ 8.)  Shaw, for example, testified that he floated just twice during his assignment at Kaiser San Diego, while Kucharski testified that she floated nearly every day.  (Shaw Depo. 21:10-16; Kucharski Depo. 78:7-21.)  Other clinicians report that they were rarely or never asked to float during Kaiser assignments.[21]  Collective bargaining agreements applicable to Kaiser staff nurses generally require that qualified contract nurses, including AMN clinicians, be utilized to fill any floating needs.  (Mussman Depo. 156:15-25.)

### 2.  Clinicians May Attend Start of Shift "Huddles."

Clinicians often participate in a start of shift meeting called a "huddle."[22]  (Mira Dec. ¶ 9.)

---

[21] McMurrain Dec. ¶ 29; Demirovic Dec. ¶ 19; Williams Dec. ¶ 21; Kravitz Depo. 14:1-14; Mottola Depo. 17:14-18:9; Litz Dec. ¶ 20.  Like Shaw, McMurrian is assigned to the Telemetry unit at Kaiser San Diego.

[22] The nurse manager of the Kaiser San Leandro Med-Surg/Telemetry unit reports huddles there lasting between five and ten minutes.  (Mira Dec. ¶ 9.); *also see,* Heading Dec. ¶ 10 (5-10 minutes); Thai Dec. ¶ 13 (10 minutes); Demirovic Dec. ¶ 7 (7 minutes); Williams Dec. ¶ 8 (no huddle requirement); McMurrain Dec. ¶ 18 (5 minutes); Foster Dec. (5 or 10 minutes depending on facility).

Huddles occur on the clock, are generally conducted by nurse managers or charge nurses, and can cover a range of topics.  Areas of discussion may include the introduction of new equipment, patient safety reminders, and information regarding events occurring during the previous shift or expected during the upcoming shift.  (Mira Dec. ¶ 10; Expert Report of Suzanne M. Boyle ("Boyle Rpt.") ¶ 24.)  Clinicians' attendance at the huddle is reflected on their timesheets.[23]  (Kucharski Depo. 129:14-22.)  The huddle attendance requirement is not universal, and differs depending on the facility and unit.  Some AMN clinicians do not attend huddles, either because huddles are not held or because the attendance of AMN clinicians is excused.[24]  (Shaw Depo. 144:9 – 145:16.)

### 3.  The Frequency and Length of Handoffs Varies.

Kaiser generally schedules nurse shifts to incorporate a 30-minute overlap during which patients are transferred from departing to arriving nurses.  (Carreon Dec. ¶ 8.)  The handoff occurs after the oncoming shift nurses attend the huddle, if huddle attendance is required of them.  (Carreon Dec. ¶ 10.)  The amount of time needed to complete the patient handoff—and whether the handoff is completed prior to the scheduled end of the departing nurse's shift—are dependent on the unit specialty, the number of patients assigned to the particular nurse, patient acuity, and the type and number of topics required to be covered.  (Reese. Dec. ¶ 9; Heading Dec. ¶ 11; Boyle Rpt. ¶ 22.)  Plaintiffs have confirmed that the amount of time it takes to complete a handoff varies.[25]  (Kucharski Depo. 133:8-22; Shaw Depo. 186:15-188:24; Teit. Depo. 110:14-18.)  The 30-minute window provided is often sufficient.[26]  To the extent that a departing clinician incurs unscheduled overtime because a handoff extends beyond the scheduled end of his or her shift, the time should be included on the clinician's timesheet for payment.  (Overtime Policy, Handbook, p. 13, Larson Dec. ¶ 14, Ex. 9; Reese Dec. ¶ 10; Thorne Dec. ¶ 5.)  Plaintiff Shaw and putative class members have been paid for unscheduled overtime they incurred as result of handoffs that were completed after the scheduled end of their shifts, contradicting any claim that participation in end of shift handoffs resulted in systemic

---

[23] Nguyen Dec. ¶ 7; Parks Depo. 20:9-15.

[24] Williams Dec. ¶ 8; Parks Depo. 24:7-17, 25:2-5.

[25] Kravitz Depo. 24:13-25:12; Parks Depo. 30:2-16.

[26] Thai Dec. ¶ 15; Nguyen Dec. ¶ 11.

unpaid overtime.[27]  (Shaw Depo. 99:8-100:3.)

**E.   Resources Available to Assist Clinicians with Relevant Concerns.**

AMN clinicians have several resources available to them to address any issues that arise during their assignments.  All clinicians are assigned a recruiter, who is available by text, telephone, and email.  (Larson Dec. ¶ 29; Shaw Depo 20:16-20; Teit. Depo. 46:18-20.)   A recruiter may be a clinician's first point of contact for a range of issues, such as assignment dates and extensions, pay, housing arrangements, and timesheet submission. (Larson Dec. ¶ 29.)   Recruiters refer clinicians to Customer Support as needed.  (*Id.*)

AMN's Customer Support Department is responsible for assisting clinicians with a variety of issues that may arise during their employment. Customer Support representatives routinely respond to clinician questions about time recording and various issues relating to pay.  (Larson Dec. ¶ 31.) Customer Support personnel are available to answer calls from clinicians between the hours of 5:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday.  (Larson Dec. ¶ 34.)  Contrary to Plaintiffs' assertions that the department is inaccessible, clinicians are able to leave voicemails which are returned by the next business day.  *(Id.)*   Records show that Shaw contacted Customer Support to inquire about various issues, such as per diems, errors in timesheet submissions, and pay dates.  (Larson Dec. ¶ 35, Ex. 15.)

Depending on the issue, Customer Support will involve other AMN resources, including the Clinical, Credentialing, and Time Processing Departments.  (Larson Dec. ¶ 32.)  Time Processing assists with issues such as verbal time submissions from clinicians who failed to submit a weekly timesheet and time entry corrections.  (Larson Dec. ¶ 33.)  The Clinical Department addresses any issues related to patient care, such as clinician concerns about facility medical equipment or patient protocols.  (*Id.*)  The Credentialing Department helps clinicians with questions about credentials and skills training required for assignments.  (*Id.*)

/ / /

/ / /

---

[27]  Nava Depo. 101:6-105:24, Exs. 3-4; Parks Depo. 71:17-77:25, Exs. 8-11; Boyd Depo. 63:11-64:6; 74:5-8.

**F.      Consultant Marliese Bartz's Work for AMN.**

Plaintiffs rely extensively and improperly on the deposition testimony of Marliese Bartz ("Bartz"), a former AMN consultant, to argue that certain practices were uniformly applied to putative class members and resulted in systemic overtime, meal, and rest break violations.[28]   To do so, Plaintiffs misrepresent Bartz's deposition testimony, as well as the focus, scope, and outcomes of the project she completed for AMN.   For example, Plaintiffs cite Bartz's testimony to suggest that she conducted an audit of wage-and-hour policies applicable to clinicians assigned to Kaiser facilities and made recommendations based on her analysis.[29]   In fact, Bartz's consulting project did not concern issues raised by the instant lawsuit—she conducted no quantitative analysis of purported off-the-clock work, unscheduled overtime, or meal period and rest break violations.  (Larson Dec. ¶¶ 57-59.)  She was instead asked to make recommendations for simplifying the timekeeping processes used by AMN clinicians placed at Kaiser locations—and for transitioning to an electronic timekeeping system in the long term[30]—to streamline AMN's business process to lower expenses and increase profits, not to opine on AMN's compliance with legal requirements.  As she summarized the project at deposition, "[t]he main…[process improvement] that we were chartered for was to eliminate the paper timecard. So, the majority of recommendations surrounded the elimination of the paper timecard itself."  (Bartz Depo. 19:19-25.)  Bartz testified that she was not asked to review "anything beyond the collection of the timecard," and was not asked to review payments to the clinicians.  (Bartz Depo. 17:20-18:8.)

Plaintiffs attempt to use Bartz's work for AMN to buttress unsupported assertions that alleged classwide policies and practices are uniformly applied and experienced by the putative class. However, Bartz made no examination of clinician timesheets or other records, and she did not survey the experiences of clinicians or Kaiser staff who interact with clinicians during their assignments.

---

[28] *See e.g.*, Mot. 25:25-26:2 (Claiming that Bartz's "internal analysis" provides "common evidence" that corroborates Plaintiffs' claim that AMN's overtime preapproval policy resulted in clinicians working off-the-clock.)

[29] *See e.g.*, Mot. 26:3-10 (Claiming that Bartz recommended implementation of electronic timekeeping and other changes specifically to address off-the-clock work by AMN clinicians.)

[30] Kaiser staff nurses utilize Kaiser's electronic timekeeping system to clock in and out.  AMN clinicians are not in Kaiser's Time and Attendance systems as these systems are linked to Kaiser staff payroll.  (Larson Dec. ¶ 36.)

1   (Bartz Depo. 22:23-23:18.)  She testified she never saw a completed AMN timesheet.  (Bartz Depo.

2   51:4-11.)  She interviewed just two AMN clinicians.  (Bartz Depo. 22:23-23:12.)  The interviews

3   lasted less than 30 minutes each, and Bartz focused her questions on the task assigned to her.  (Bartz

4   Depo. 82:18-83:19.)   Bartz's project and the resulting recommendations do not provide the

5   "substantive evidence" necessary to support certification of any of Plaintiffs' claims.   Plaintiffs'

6   misdirection and attempts to confuse based on Bartz's work simply highlight the lack of admissible

7   evidence supporting their certification arguments.

8        **G.    Plaintiffs' Expert Report Provides No Credible Basis for Class Certification.**

9        Plaintiffs submit a report by Dr. Elsie Crowninshield,[31] in which she purports to identify a

10   number of areas in which Defendants' practices vis a vis AMN clinicians allegedly do not meet some

11   ill-defined "minimum" or "community" standards.  Dr. Crowninshield, whose qualifications to offer

12   expert opinions with respect to Defendants' practices are dubious at best, does not describe in her

13   report the source of the "standards" she applies.  Indeed, she admitted in deposition that her opinions

14   were based on no particular methodology.  (Crowninshield Depo. 77:24-78:1)

15        With respect to the "community standards" she purportedly measured AMN and Kaiser

16   against, Dr. Crowninshield admitted in deposition that the Kaiser hospitals in California were not part

17   of a "single community."  (Crowninshield Depo. 80:7-20.)  And she could not state that in her opinion

18   AMN traveling nurses were part of a single community.  (Crowninshield Depo. 81:9-16.)  Rather, she

19   testified in her deposition:

20             A    What I mean is, is that -- I told you, I'll go back to my original

21             statement.  If you walk into any hospital within a 25-mile radius, you know,

22             25-mile radius -- we consider Los Angeles is very big, so you wouldn't take a

23             50-mile radius, right?  You would take a 25 smaller radius.  Any community

24             hospital within 25 miles, what are they doing?

25             Q    Okay.

26

27

28   _____

     [31] Dr. Crowninshield is a Doctor of Nursing Practice.  (Crowninshield Depo. 20:14-18.)  Contrary to
     Plaintiffs' assertion in the Motion, Dr. Crowninshield is not a medical doctor.  (*Id.*)

1        A     That's the standard.  That's what I refer to as the community

2  standard.

3  (Crowninshield Depo. 82:6-83:4.)  Dr. Crowninshield did not rely on *any* specific information about

4  the myriad "community standards" that would theoretically apply in this case, if such "standards" were

5  even applicable.

6        Nonetheless, Dr. Crowninshield's overall critique is that the manner in which AMN clinicians

7  with Kaiser assignments record their time and are relieved for breaks, among other things, is not in

8  line with what *she* considers to be the best practice.  (Crowninshield Rpt., pp. 5-6, 9.)  Doubling down

9  on Plaintiffs' effort to seize upon irrelevant business process improvements analyzed by Bartz, Dr.

10  Crowninshield also opined that AMN nurses should use electronic timekeeping rather than paper time

11  cards.  (Crowninshield Rpt., p. 5.)  In her deposition, however, she admitted, "I don't believe there's

12  a law or written standard anywhere that says you actually have to [use electronic time keeping]" and

13  that she was basing her evaluation on her experience working at Dignity Health hospitals in Glendale

14  and Northridge California. (Crowninshield Depo. 177:16-178:1.)  And, while she opines in her report

15  that an AMN supervisor should be staffed at Kaiser facilities where clinicians are assigned, or else

16  "unpaid overtime, missed rest and meal breaks" will result ([Crowninshield Rpt., p. 8]), she revoked

17  this opinion in her deposition.  (Crowninshield Depo. 208:8-14; 209:2-7.)  Indeed, there is no legal

18  obligation for an employer to implement electronic timekeeping systems, or for temporary service

19  providers to staff client sites with additional supervisory personnel.

20        Dr. Crowninshield speculates in her report that requiring clinicians to obtain a facility signature

21  verifying overtime "will deter and prevent the traveling nurses from reporting overtime."

22  (Crowninshield Rpt., p. 6.)  She nonetheless admitted in deposition that there are multiple reasons why

23  a nurse might not report all time worked and one would have to ask the individual nurse why she did

24  not obtain approval for all time worked.  (Crowninshield Depo. 199:1-13.)

25        Dr. Crowninshield focuses a substantial portion of her report upon AMN nurses being floated

26  to other units.  She clarified in her deposition, however, that her only concern was AMN nurses floating

27  multiple times in a shift, and she further testified that other than the declarations submitted in support

28  of the Plaintiffs' motion, she did not actually know how frequently nurses float to multiple units within

a single shift.  (*Id.* at 135:20-24, 146:1-24.)  Contrary to the statements in her report that floating causes nurses to have more patients (Crowninshield Rpt., p. 5), Dr. Crowninshield admitted in deposition that "[f]loating doesn't equal more patients."[32] (Crowninshield Depo. 140:14.)  As AMN's nursing expert, Dr. Suzanne Boyle, observed, "It is unclear why plaintiffs claim the hand-off to a new unit, which is brief in nature, would necessitate overtime. Testimony also indicates floating was limited.  Floating to another unit would not necessarily increase workload leading to overtime.  In fact, the new unit workload might be even lighter than the original unit."  (Boyle Decl. 9:5-9.)

It is immaterial that Dr. Crowninshield would prefer that AMN employ different timekeeping or staffing practices, or that she might manage clinicians differently.  Her report provides no factual basis for her conclusions that particular practices result in clinicians working off-the-clock or not receiving payment for hours worked during their assignments.  She has made no analysis concerning the frequency of such occurrences beyond the testimony of Shaw, Kucharski, and Teitelbaum.  Nor can she reliably opine about the consistency with which any purported practice, such as Kaiser staff refusing or being unavailable to provide approval signatures for unscheduled overtime, has been applied to the thousands of members of the putative class.

## III.   PLAINTIFFS' CLAIMS.

The Second Amended Complaint ("Complaint") asserts three substantive claims for failure to pay overtime (claim one), failure to provide meal periods (claim six), and failure to provide rest breaks (claim seven.)[33]  Plaintiffs' overtime claim is premised on their assertion that they worked hours outside of their scheduled shifts and did not record them on their timesheets.[34]  Plaintiffs contend they

---

[32] Dr. Crowninshield conceded in her deposition that she was unaware whether AMN nurses who missed a meal period or rest break as a result of a floating assignment received a meal or rest penalty. (Crowninshield Depo. 145:19-25.)  The evidence is plain that AMN regularly provides nurses with meal and rest penalties if the record missed meal or rest breaks.  (Larson Dec. ¶¶ 21, 55.)

[33] The Complaint also includes a number claims that are derivative of the overtime, meal period and rest break claims.  These additional claims are for failure to pay all earned wages (claim two), failure to keep accurate pay records (claim three), failure to furnish accurate wage statements (claim four), waiting time penalties (claim five), unfair competition and unlawful business practices in violation of Business and Professions Code section 17200 (claim eight), and violation of the Private Attorneys General Act (claim nine).

[34] The motion makes passing reference to a belated claim that, although not pursued in the litigation thus far, Plaintiffs may later assert that unpaid overtime resulted from discrepancies between time reported on clinician timecards, and the wages paid by AMN.  (Mot., fn 10.)  Plaintiffs offer no

---

15

1    were required to work beyond the scheduled end of their shifts to complete handoffs to nurses from

2    the oncoming shift or to complete charting and other job tasks.   The Complaint also contains

3    allegations that Plaintiffs recorded unscheduled overtime on timesheets, but Kaiser personnel refused

4    to provide the needed approval signature and the time was unpaid as a result.   (Complaint ¶¶ 54-55.)

5    However, with just one exception, Plaintiffs did not testify that Kaiser personnel ever refused to sign

6    off on unscheduled overtime recorded on their timesheets.  (Teit. Depo. 122:4-124:13.)

7         Plaintiffs also assert that they did not receive compliant meal periods and rest breaks because

8    their workload precluded them from taking them, no relief coverage was available, or they were

9    subject to interruption.   However, Plaintiffs admit that they failed to accurately record allegedly

10   noncompliant breaks on their timesheets.  (Shaw Depo. 130:24-131:4, 215:6-11; Teit. Depo. 82:15-

11   24; Kucharski Depo. 148:16-25.)

12        Plaintiffs allege that pressure to complete job tasks within scheduled shifts is part of unspoken

13   nursing culture and necessitated both working through breaks and working off-the-clock.   However,

14   any purported pressure or concern of Plaintiffs was self-generated.   Kucharski states that she worried

15   about competition for assignments and speculates that Kaiser or AMN would not want her to work

16   other assignments if she accurately recorded her hours.  (Kucharski Dec. ¶ 22.)  She also states that

17   she was concerned she might be "scolded or reprimanded" for doing so.  (*Id.*)   Plaintiffs' speculative

18   claims that they felt "pressure" or were "afraid" that they could be disciplined if they accurately

19   recorded overtime or noncompliant breaks do not give rise to wage and hour violations in the absence

20   of specific evidence that Defendants impeded their compliance.  *Cleveland v. Groceryworks.com,* 200

21   F. Supp.3d 924, 946-948 (N.D. Cal. 2016); *Koike v. Starbucks Corp.*, 378 Fed.Appx. 659, 660 (9th

22   Cir. 2010) (Evidence that "business pressures" *might* exist that lead plaintiff employees to work off-

23   the-clock was insufficient to support request for certification.)   Shaw confirms that he was never

24   disciplined, and that he has never heard of any clinician being disciplined, for recording unscheduled

25   _____

26   evidence of any such practice affecting Plaintiffs or the putative class, and the data does not support
     such a claim.  Analysis of the time records of Shaw, Kucharski, Teitelbaum, and Davis show that the

27   time recorded on the timesheet matched the time entered for payment on 94.25% of shifts.  More time
     was entered for payment then reflected on the timecard for 4.14% of shifts.  The time entered was less

28   than what was recorded on just 1.61% of the shifts.  (Crandall Rpt. ¶ 46, Tbl. 3.)  Plaintiffs' overtime
     claim is based on alleged uncompensated off-the-clock work.  (Mot. 38:22-23.)  It is that claim that
     Defendants address here.

1   overtime.  (Shaw Depo. 178:7-11, 178:24-179:2, 185:10-19.)  Testimony of Plaintiffs' declarants is in

2   accord.[35]  Putative class members attest to working and recording overtime, and they confirm that they

3   were never discouraged from doing so.[36]

4   **IV.   ARGUMENT**

5       **A.   Plaintiffs Fail to Identify a Common Question of Law or Fact.**

6       "[Rule 23] imposes stringent requirements for certification that in practice *exclude most*

7   *claims.*"  *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (emphasis

8   added); *Comcast Corp. v. Behrend,*  133 S. Ct. 1426, 1432 (2013) (class action litigation is the

9   "exception to the usual rule that litigation is conducted by and on behalf of the individual named

10  parties only").   The Court must conduct a "*rigorous analysis*" to determine that the Rule 23

11  prerequisites have been met before allowing the case to proceed as a class action.  *Comcast*, 133 S. Ct.

12  at 1432.  Rule 23(a) requires Plaintiffs to show that "the class has common 'questions of law or fact,'"

13  and that their claims are typical of the class.  Rule 23(a)(2) and (a)(3); *Wal-Mart v. Dukes,* 131 S. Ct.

14  2541, 2550-51 (2011).  Plaintiffs meet neither standard.  Plaintiffs fail to identify a common policy or

15  practice capable of classwide resolution, or demonstrate that any alleged common practice caused

16  putative class members to suffer violations of overtime, meal period, or rest break requirements.

17      Plaintiffs posit several alleged AMN policies in support of commonality, none of which

18  presents a common question—or answer—applicable to the proposed class.  With reference to the

19  overtime claim, Plaintiffs assert that Defendants maintain a written policy uniformly prohibiting

20  clinicians assigned to Kaiser facilities from working more than 12 hours in a workday.  (Mot. 25:6-7.)

21  Regarding meal period and rest break claims, Plaintiffs assert AMN clinicians (1) are required to

22  remain on duty and available to respond to patient needs during breaks and (2) are not provided

23  dedicated "break nurses" whose sole duty is to provide coverage for nurses during breaks.  In support

24  of both the overtime and break claims, Plaintiffs additionally rely upon an allegedly uniform (but non-

25

26  [35] Boyd Depo. 73:17-75:25; Jennings Depo. 39:18-23, 41:9-14, 191:21-193:10, 213:12-20; Kravitz
    Depo. 54:11-16; Mottola Depo. 48:5-22; Nava Depo. 86:16-87:20; Parks Depo. 83:25-84:13; Sampim
27  Depo. 89:24-90:4.

28  [36] Foster Dec. ¶¶ 30-31; Demirovic Dec. ¶¶ 11-12; Giffin Dec. ¶¶ 24-25; Williams Dec. ¶¶ 23-24;
    McMurrain Dec. ¶¶ 11-12, 17; Litz. Dec. ¶¶ 12-14; Kravitz Depo. 54:11-16; Nava Depo. 101:6-
    105:24, Exs. 3, 4.

existent) requirement that clinicians obtain both preapproval and a signed Overtime/Break Form when working outside of their scheduled shift hours, as well as separate approval signatures once the unscheduled overtime is worked.[37][38]

In order for the Court to certify their claims, Plaintiffs must present "significant proof" of an employer policy or practice applicable to the members of the class. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 543 (9th Cir. 2013), citing *Dukes,* 564 U.S. at 353. Plaintiffs fall far short of meeting their burden. Further, class certification based on alleged uniform policies is proper only if the alleged uniform policies violated California law and, therefore, the violations could be proved (or disproved) through common facts and law. *Hadjavi v. CVS Pharmacy, Inc.*, 2011 WL 3240763, at *4 (C.D. Cal. Jul. 25, 2011) (No commonality where "Plaintiffs have failed to demonstrate that Defendants had a uniform or common policy in place that 'prevented' employees from taking meal and rest breaks.") Plaintiffs cannot show that here either.

### 1.    Clinicians Are Permitted to Work Overtime.

Plaintiffs' abjectly false assertion that Defendants prohibit clinicians from working overtime during Kaiser assignments relies on a single sentence from a letter dated December 30, 2015 that was included among the materials that Shaw received before beginning his assigned at Kaiser San Diego, and that Plaintiffs take completely out of context.[39] (Konecky Dec., Ex. 19.) The letter states in

---

[37] There is no requirement that clinicians obtain two approval signatures for unscheduled overtime. Though not universally applied, AMN's policy contemplates a single signature on the timesheet or the Overtime/Break Form verifying that the additional time was worked. (Larson Dec. ¶ 48.) A second signature is sometimes required on the timesheet—from the staffing office—but this does not require a request or other affirmative steps by the clinician. (Larson Dec. ¶ 50.)

[38] Again improperly relying on the work of Marliese Bartz, Plaintiffs also assert a "common deficiency" of uncompensated travel time based on clinicians walking between the staffing office and their assigned unit. (See, Mot. 3:25-4:2; 26:1-2, 7-8; 13:4-6.) There is no evidence that any such time was not included on clinician timesheets. Moreover, the contention mischaracterizes Bartz's testimony; her unambiguous testimony was that *she made no such finding*. She repeatedly testified that while "unpaid travel time" was listed as a potential "pain point" by participants in the consulting project, she did not know to what this referred: "I don't know what they mean by 'unpaid travel time,'" "I wasn't involved in this particular recommendation directly, so I can't speak to its origin or all of its intent," "I don't know about this piece." (Bartz Depo. 68:17-69:23.) She further testified that she never visited a Kaiser facility, had no knowledge of how far staffing offices are from units, and had no knowledge of whether clinicians were required to clock in at their shift start time or be at their unit at the shift start time. (Bartz Depo. 46:25-51:11.)

---

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
[Case No. 3:16-cv-02816 JCS]

relevant part:

> OT is not permitted at this facility.  If the clinician is required to work OT or misses a meal period, then, OT/Missed Meal & Rest Period Justification Form must be completed ON THE DAY that the missed meal/rest period or OT occurred.  The form can be found in (sic) staff office and is clinicians (sic) responsibility to complete & have signed by the asst. clinical director, nurse manager or charge nurse.  Again, this form is MANDATORY.

(*Id.*)

Plaintiffs cite only the first sentence of this provision and then absurdly claim it somehow establishes a blanket "no overtime" policy for thousands of assignments in hundreds of units worked at over 70 Kaiser facilities during the putative class period.  (Mot. 10:8-11.)  However, the very next sentence confirms that Shaw may be required to work unscheduled overtime during his single assignment at this one facility and cites the process for obtaining approval.  (Larson Dec. ¶ 23.)  Read in context, the document refutes Plaintiffs' asserted common issue as to "no overtime," even as to this one assignment, in one unit, at one facility.   Moreover, nowhere does the letter indicate that Shaw would not be paid for any unscheduled overtime he worked—and of course, it is the alleged failure to *pay* clinicians for hours worked that is the ultimate merits issue.[40]

Furthermore, the supposed "no overtime" policy fails to support the commonality prong of Rule 23 because there is no evidence that such a policy was applicable to any clinician at all, much less the entire putative class.  The letter, together with written policies maintained by AMN, time and pay records, Kaiser manager declarations, the testimony of Plaintiffs and their own declarants, and declarations of putative class members make clear that clinicians are expected to work unscheduled overtime, do so with regularity and are paid for the reported time consistently.[41]

/ / /

---

[39] Shaw could not recall during his deposition whether he had even reviewed the materials provided to him by AMN, including the letter, prior to beginning his assignment.  (Shaw Depo. 52:22-53:4.)

[40] At deposition, Shaw could not recall reading any specific documentation he received from AMN, or whether he read language in the overtime policy stating that some facilities did not authorize overtime.  (Shaw Depo. 52:17-54:24.)  He testified that based on statements made during orientation, it was his understanding that he could work beyond his scheduled shift with preapproval.  (Shaw Depo. 58:3-61:6.)  His testimony shows he was fully aware that AMN clinicians were permitted to work unscheduled overtime.

[41] AMN also instructs clinicians to contact Customer Support if they are discouraged or prevented from recording all hours worked.

1   Even if the letter received by Shaw established a "no overtime" policy at Kaiser San Diego,

2   there is nothing illegal about such a practice—as long as clinicians are paid for all of the hours they

3   *do* work.  The evidence clearly shows that the well-recognized *practice* at Kaiser San Diego was to

4   permit and pay unscheduled overtime.  Shaw recorded unscheduled overtime during his assignment

5   there.  He obtained a single signature *after* he had already worked the additional time and was paid for

6   it.  (Shaw Depo. 88:1-89:5; 90:6-91:23, Ex. 13.)  Kucharski—also at Kaiser San Diego—and

7   Teitelbaum also recorded and were paid for unscheduled overtime during their Kaiser assignments.

8   (Larson Dec. ¶ 41, Exs. 16-17.)  Other putative class members, including those who were assigned to

9   Kaiser San Diego, confirm that they recorded unscheduled overtime, for which they were paid.[42]

10  (Larson Dec. ¶ 42, Ex. 18.)  In fact, between September 11, 2013 and December 4, 2017, 33.9% of

11  workweeks completed by clinicians at Kaiser facilities included payment of doubletime, and 71.3%

12  of the putative class received payment for unscheduled overtime (doubletime) during workweeks

13  completed at Kaiser facilities.  (Larson Dec. ¶ 40.)  The amount of overtime recorded varies

14  significantly both across and within facilities.[43]

15  None of the Plaintiffs testified to receiving any explicit or implicit instruction not to record or

16  request payment for unscheduled overtime.  Shaw testified that he does not recall being told he could

17  not work hours outside of his scheduled shift, but rather that he concluded from the "body language

18  and…tone of voice" of the staffing office employee conducting orientation, that there was a "general

19  consensus" that clinicians would not need to work overtime.[44]  (Shaw Depo. 95:16-96:3.) The same

20  Kaiser staffing office employee later signed the unscheduled overtime Shaw entered on his timecard.

21  (Shaw Depo. 99:8-100:3.)  Kucharski testified that an AMN recruiter, whom she could not identify,

22

23  ─────────────────────

24  [42] Giffin Dec. ¶¶ 24, 28; McMurrain Dec. ¶ 15; Johnson ¶¶ 21, 25.

25  [43] At Kaiser Los Angeles Medical Center for instance, clinicians "recorded doubletime between 0% to 100% of their workweeks, with many…falling somewhere in between.)  (Crandall Rpt. ¶ 43.)

26  Crandall found for instance, a clinician who recorded doubletime on 75% of shifts worked at Kaiser Los Angeles, while another recorded doubletime on 25% of shifts.  (*Id.*)

27  [44] Both Shaw and Kucharski also testified that they incurred additional unscheduled overtime by starting to work before their scheduled start time but denied that anyone instructed them to do so or prohibited them from recording the time.  (Kucharski Depo. 88:8-11; Shaw Depo. 167:10-170:20

28  [Testifying that he began reviewing patient records in advance of shift start time, based on a "general consensus" and "culture" that he surmised by observing another nurse.])

1    told her on a single occasion "not to do overtime because Kaiser doesn't want to pay for it."

2    (Kucharski Depo. 191:13-192:6.)  There is no evidence establishing that other putative class members

3    purportedly heard similar comments.

4                   2.      **Procedures for Reporting and Verifying Unscheduled Overtime and**

5                           **Noncompliant Breaks Are Neither Illegal Nor Uniformly Applied.**

6            Plaintiffs incorrectly contend that a written policy requiring clinicians to obtain preapproval

7    of overtime and clinicians' use of paper timecards and justification forms together create a "common

8    policy" rendering the overtime claim suitable for class treatment.  (Mot. 25:17-22.)  This is not so.

9    AMN's overtime policy states that clinicians should obtain preapproval of overtime if possible.

10   (Larson Dec. ¶ 16; Boyle Rpt. ¶ 19.)  The preapproval policy, which is perfectly lawful,[45] is in place

11   to reduce the instances of unauthorized or unnecessary overtime, and to give hospital personnel the

12   opportunity to assess the need for overtime and redistribute work as needed.  (Larson Dec. ¶ 17.)  The

13   approval described in the policy is preferred, but due to the nature of the work performed at

14   hospitals, not always practicable.  (Larson Dec. ¶ 18.)  Approval is commonly obtained after the time

15   is worked and sometimes not at all.  (*Id.*)  Whether or not approval is obtained, reported unscheduled

16   overtime is paid.  (Larson Dec. ¶ 54.)

17           Evidence also demonstrates that the preapproval and signature procedure in place varies across

18   Kaiser facilities and individual assignments.   AMN records show that approval of unscheduled

19   overtime can be recorded directly on the timesheets; that same time need not also be recorded on a

20   separate form.  (Larson Dec. ¶ 47.)  Other members of the putative class attest that the practice within

21   their unit is to not require preapproval or signature for unscheduled overtime, unless it exceeds a

22   specified daily limit.[46]  (*Id.*)  Plaintiffs' claim that a "common policy" requiring preapproval and

23   submission of an Overtime/Break Form was uniformly applied to even the named plaintiffs, let alone

24   the entire putative class, lacks evidentiary support.

25   / / /

26   _____

27   [45] *See, Chavez v. AmeriGas Propane, Inc.*, 2015 WL 12859721, *21 (C.D. Cal. Feb. 11, 2015)
     ("[C]ourts in this circuit have regularly rejected a contention that a…requirement that overtime be pre-
28   approved necessarily constitutes a policy that requires employees to work off-the-clock.")

     [46] Giffin Dec. ¶ 26; Williams Dec. ¶ 25.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
[Case No. 3:16-cv-02816 JCS]

1   Moreover, there is no evidence that the purported need to obtain preapproval and a facility

2   signature for unscheduled overtime resulted in Plaintiffs and other putative class members not being

3   paid for all the hours they worked.  To support certification, the common question must be one

4   "capable of classwide resolution."  *Dukes,* 242 S. Ct. at 2551; *Ellis v. Costco Wholesale Corp.*, 657

5   F.3d 970, 981 (9th Cir. 2011).  When decided, its answer must resolve the claims asserted on behalf

6   of the class "in one stroke."  *Dukes* at 2551.  Since the hundreds of units to which clinicians were

7   assigned utilized various procedures for documenting and verifying unscheduled overtime, there can

8   be no classwide resolution of the overtime claim based on the supposed approval process

9   mischaracterized in the Motion.

10   ### 3.   There is No Policy Requiring Clinicians to be On-Call During Meal Periods

11   ### and Rest Breaks.

12   Plaintiffs contend that clinicians are required to remain on-call during meal periods and rest

13   breaks, either due to a requirement they carry radios or other communications devices, or because they

14   are generally subject to interruptions.  (Mot. 19:12-15.)  Neither Plaintiffs nor Kaiser's 30(b)(6)

15   witness testified that AMN clinicians are required to carry communication devices during breaks,

16   contrary to false assertions in the Motion.  Shaw testified that he was not required to carry a device

17   during his breaks.  (Shaw Depo. 224:12-25.)  Teitelbaum also testified that no one instructed her to

18   carry a device during her breaks.  (Teit. Depo. 100:9-11.)  Kucharski confirmed that no one told her

19   to take a phone with her while she was taking meal periods or rest breaks.  (Kucharski 176:21-177:12.)

20   Other clinicians and Kaiser managers affirm that there is no requirement that they carry or respond to

21   devices during meal periods or rest breaks.[47]  (Heading Dec. ¶ 8; Carreon Dec. ¶ 5; Kelly Dec. ¶ 6;

22   Mira Dec. ¶ 7.)  They instead report that they are required to either turn off the device or leave it with

23   the person who is caring for their assigned patients during the break.[48]

24   Plaintiffs' suggestion that Defendants' 30(b)(6) witnesses confirmed that clinicians must carry

25   and answer devices during breaks again relies on bald misrepresentations of testimony.  Kaiser's

26   

---

27   [47] Giffin Dec. ¶ 26; Williams Dec. ¶ 25; McMurrain Dec. ¶ 28; Johnson Dec. ¶ 23; Litz Dec. ¶ 17; Boyd Depo. 87:17-88:19, 89:8-90:12, 90:19-91:7; Mottola Depo. 54:7-22.

28   [48] Thai Dec. ¶ 22; Johnson Dec. ¶ 24; Giffin Dec. ¶ 27; Williams Dec. ¶ 26; McMurrain Dec. ¶ 28; Boyd Depo: 89:24-90:3; Mottola Depo. 54:19-22.

30(b)(6) witness, Kristen Mussman, testified that she did not know whether AMN clinicians are even issued wearable communications devices that are sometimes used in Kaiser facilities, and that can alert the wearer to a patient event.  (Mussman Depo. 63:3-64:1.)  Contrary to Plaintiffs' continued efforts to mislead, she did not testify that clinicians are required to carry devices at all, much less respond to them or answer patient calls during breaks.[49]

AMN's 30(b)(6) witness, Lisa Larson, testified that whether clinicians carry pagers is "very specific to the facility and, again, potentially to the unit," and that she could not testify as to which AMN clients might require clinicians to carry a device.  (Larson Depo. 101:2-7.)  When asked whether she is aware of the "extent to which traveling nurses for AMN have pagers on them during their meal periods," Larson responded that she does not.  (Larson Depo. 175:1-4.)  Nothing in the cited testimony establishes a common policy requiring clinicians to carry and respond to communication devices while on breaks.[50]  And evidence submitted by Defendants in opposition demonstrates the opposite is true.[51]

Plaintiffs similarly fail to support their claim that during breaks, clinicians were subject to being recalled for patient care, or for other reasons.  Plaintiffs and putative class members confirm that they received uninterrupted duty-free breaks during their shifts.[52]  (Shaw Depo. 132:9-10, 210:16-22, 212:9-213:2.)  Clinicians also confirmed that they were free to leave their assigned units during breaks, and that some did so—making them inaccessible to facility personnel during their breaks.[53]

/ / /

/ / /

---

[49] Nor could Ms. Mussman make any such specific representations since she does not work in a medical role providing patient care in Kaiser facilities, nor does she manage nurses in any facilities. She instead is a high level manager who oversees Kaiser's relationships and contracts with companies like AMN, which provide contingent services to Kaiser.  (Mussman Depo. 6:11-7:6.)

[50] Plaintiffs also cite a Kaiser policy in place at Kaiser Los Angeles Medical Center that simply provides that "designated employees in specified areas" shall wear a Vocera badge "while on duty." (Kaiser Los Angeles Medical Center, Wireless Communication System, Ex. 29 to Plaintiffs' Attorney Declaration.)  There is no evidence that this policy was applied to Plaintiffs during the putative class period, or that any of the Plaintiffs were required to wear a communication device during breaks.

[51] Giffin Dec. ¶¶ 26-27; Williams Dec. ¶¶ 25-26; McMurrain Dec. ¶ 28; Johnson Dec. ¶¶ 23-24; Thai Dec. ¶ 22; Litz Dec. ¶ 17; Boyd Depo. 87:17-88:19; 89:8-90:12, 90:19-91:7; Mottola Depo. 54:7-22.

[52] Thai Dec. ¶¶ 20-21; Giffin Dec. ¶ 19; Johnson Dec. ¶ 18; Litz Dec. ¶¶ 18-19.

[53] Thai Dec. ¶ 20; Demirovic Dec. ¶ 14; McMurrain Dec. ¶ 27; Johnson Dec. ¶ 16; Litz Decl. ¶ 18; Foster Dec. ¶ 25

4.       **The Use of Break Nurses with Duties Other Than Relieving Clinicians is Unconnected to Any Alleged Meal Period or Rest Break Violations.**

In support of the meal and rest period claims, Plaintiffs assert that Defendants fail to staff clinicians' assigned units with break nurses who have no duties other than to provide coverage for clinicians (and staff nurses) during meal periods and rest breaks.  (Mot. 18:15-19.)  Defendants do not dispute that there is no uniform policy requiring only relief nurses without other duties to relieve AMN clinicians during breaks.  Some units are staffed with break nurses who are not assigned patients and are responsible only for relieving nurses during breaks.  (Mira Dec. ¶ 4.)  There is no requirement that break nurses be assigned, however, and other effective methods of providing meal period and rest break coverage are available.  (Boyle Rpt. ¶ 28.)  The evidence shows that break coverage was provided by various personnel, including charge nurses and administrative nurses (who do not have patient assignments), Kaiser staff nurses, and other AMN clinicians.[54]  (Mira Dec. ¶ 5; Hasinsky Dec. ¶ 6.)  These varied break relief practices violate no law, and Plaintiffs produce no evidence suggesting they negatively impact clinicians' receipt of compliant breaks.[55]

Plaintiffs essentially contend, without any foundation, that "systemic understaffing" results in clinicians not receiving duty-free and otherwise compliant breaks.  But nurse to patient ratios are dictated by provisions of state law.  (Larson Dec. ¶ 26.)  Plaintiffs provide no actual evidence of understaffing, nor can they.  As Crandall notes, a staffing analysis would require shift by shift and unit by unit information about the numbers of staff and traveling nurses present, as well as patient acuity.  (Crandall Rpt. ¶ 15.)  It would also force Plaintiffs to confront the inconsistency between a claim of systematic understaffing and the fact that Kaiser complies with staffing ratio requirements that are as stringent as any in the country.

/ / /

---

[54] Thai Dec. ¶ 19; Giffin Dec. ¶¶ 14-15; Williams Dec. ¶ 13; McMurrain Dec. ¶ 23; Kravitz Depo. 41:7-18, 42:9-13.

[55] Dr. Crowninshield baselessly opines that adequate breaks can only be provided in a hospital setting if break nurses are free of other duties and patient assignments.  She offers no data to support her conclusion.  (Crowninshield Rpt., p. 9,)  AMN's nursing expert, who has been responsible for managing nurses at large hospitals including New York Presbyterian, confirms that it is in fact common practice for nurses providing break relief to have other job duties.  (Boyle Rpt. ¶ 17.)

24

Class claims for meal period and rest break violations do not turn on the question of whether break nurses had patient assignments or other job duties, and this issue therefore cannot support the commonality requirement.  In *Chavez v. AmeriGas Propane*, the plaintiff alleged that the employer maintained a rounding policy that resulted in putative class members not receiving payment for all hours worked.  2015 WL 12859721, *26 (C.D. Cal. Feb. 11, 2015).  The alleged policy did not support the commonality requirement of Rule 23(a), because the plaintiffs could not "adduce sufficient evidence that such a policy, if it exists, failed properly to compensate employees."[56]  *Id*.

In short, Plaintiffs have failed to adduce admissible evidence to support their assertions regarding the purported improper "policies," *e.g.* onerous OT preapproval process, on-call meal periods and rest breaks, and improper or failed utilization of break nurses.  They present no credible evidence these supposed policies even exist, much less that they are unlawful.   And even if the Court were to accept Plaintiffs' wholly unsupported allegations that the proposed class members were subject to any unlawful policy, it is *still* not enough to meet the burden for class certification in the absence of substantial evidence showing that the allegedly unlawful policies were interpreted and applied uniformly.  A district court may not "rely on such [uniform] policies to the near exclusion of other relevant factors."  *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F.3d 953, 955 (9th Cir. 2009).  As *Dukes* clarified, to find commonality a district court must determine whether there was "significant proof that [the employer] 'operated under a general [unlawful] policy…'" *Dukes*, 131 S. Ct. at 2553.  Defendants' evidence by contrast, plainly demonstrates that meal periods and rest breaks were provided in conformance with state law, and that all recorded time worked was properly paid.  As such, there was no uniform application of any unlawful policy.

Post-*Brinker*, plaintiffs seeking class certification must establish that the employer had a uniform "policy or routine practice" that deprived *all* putative class members of the opportunity to take compliant meal periods and rest breaks such that the case can be tried with common proof as to

---

[56] *See also, Civil Rights Education and Enforcement Center v. Hospitality Properties Trust,* 867 F.3d 1093, 1104 (9th Cir. 2017) (Holding that the commonality prong of 23(a) was not met.  "While commonality may be established based on a 'pattern of officially sanctioned [illegal] behavior' merely pointing to a pattern of harm, untethered to the defendant's conduct is insufficient." citing, *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014).)

1   liability.  Put another way, where class certification is based upon the alleged uniform application of

2   a common policy, that policy must itself be unlawful.  *Washington v. Joe's Crab Shack*, 271 F.R.D.

3   629, 641 (N.D. Cal. 2010) (denying certification due to the absence of a facially unlawful policy).

4   Here, Plaintiffs fail to identify *any* unlawful meal period, rest break, or overtime policy or practice

5   that could establish classwide liability with common proof.

6        The evidence establishes that more often than not, putative class members took compliant

7   breaks consistent with Defendants' lawful policies, and that if they did not, it was due to some

8   unplanned or unexpected event—or their own choice—not any uniform unlawful policy.  Further, as

9   Defendants' evidence makes clear, clinicians were routinely trained on and reminded about the meal

10  and rest break policies, and they took compliant breaks.  When clinicians alerted AMN that they were

11  not able to take a break, they were paid break premiums, just like they were paid for any overtime they

12  recorded on their timesheets.  The time records on which Plaintiffs seek to rely do not and cannot

13  resolve the issue of liability.  Instead, to determine liability the trier of fact would need to conduct an

14  individualized inquiry as to *why* each employee took a potentially non-compliant break and/or failed

15  to record overtime if it was worked.

16      **B.      Plaintiffs' Claims are Not Typical of Those of Putative Class Members.**

17      The typicality prong of the Rule 23 analysis requires that the "claims or defenses of the

18  representative parties are typical of the claims or defenses of the class."  (F.R.C.P. Rule 23(a)(3));

19  *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 503 (E.D. Cal. 2014).  Plaintiffs fail to meet the

20  typicality standard because the violations they allege resulted from circumstances unique to them and

21  their particular Kaiser assignments.  The "test of typicality is whether other members have the same

22  or similar injury, whether the action is based on conduct that is not unique to the named plaintiffs, and

23  whether other class members have been injured by the same course of conduct."  *Ellis,* 657 F.3d at

24  984.  Although the claims of proposed class representatives need not be identical to those of putative

25  class members, their "situations [must] share a common issue of law or fact, and [be] sufficiently

26  parallel to insure a vigorous and full presentation of all claims for relief."  *Blackwell v. SkyWest*

27  *Airlines, Inc.*, 245 F.R.D. 453, 462 (S.D. Cal. 2007).

28  / / /

While Teitelbaum and Kucharski both allege relief nurse coverage for breaks was lacking during their assignments, their testimony is flatly contradicted—not only by putative class members, but co-plaintiff Shaw. (Teit. Depo. 133:6-10; Kucharski Depo. 161:4-162:13, 209:18-212:12.) Shaw testified that during his assignment at Kaiser San Diego, break nurses were provided for all meal periods, and he has no recollection of ever being interrupted during a rest break. (Shaw 76:16-22; 212:9-213:7.) Other putative class members confirm the availability of break nurses, and that they often received uninterrupted breaks.[57] While some indicate that they occasionally were interrupted or missed breaks due to a patient emergency, to the extent they recorded the noncompliant break on their timesheet, they received break premiums.[58] Kucharski and Teitelbaum's allegations do not reflect a common experience of clinicians and are unconnected to any common practice affecting members of the putative class.

Similar divergent situations attend the Plaintiffs' overtime claims. Shaw's claim for unpaid overtime arises wholly from his vague feeling that generalized "culture" within the nursing profession required him to work unscheduled overtime without reporting it. (Shaw Depo. 167:10-170:20.) Shaw also testified to his understanding that without preapproval, he was not permitted to record unscheduled overtime. (Shaw Depo. 102:12-17.) Kucharski and Teitelbaum report that they found the process of obtaining the necessary signature on their timesheets so burdensome that they opted to work off-the-clock.[59] (Kucharski Depo. 137:2-16, 145:6-13; Teit. Depo. 114:9-115:11, 116:3-117:18.) Various declarations submitted by the Plaintiffs state that individual clinicians did not report overtime because they claimed to be afraid of getting in trouble.[60] By contrast, putative class members and Kaiser managers report that clinicians routinely worked unscheduled overtime and obtained the facility approval signature sometimes before, and sometimes after, the time was worked, and

---

[57] Giffin Dec. ¶¶ 19, 21; Foster Dec. ¶¶ 18. 21; Thai Dec. ¶ 20; Giffin Dec. ¶ 19; Litz Dec. ¶¶ 17-19.

[58] Giffin Dec. ¶¶ 20-21; Williams Dec. ¶ 20.

[59] Kucharski also asserts that during evening shifts there was never a charge nurse present from whom she could request an approval signature. This claim, even if true, is an anomaly and not indicative of an issue that affects other members of the putative class. Kaiser units, including those in which Kucharski worked, are routinely staffed with charge nurses. ( Heading Dec., ¶ 5,)

[60] See, e.g. Jennings Dec. ¶ 27; Joiner Dec. ¶ 18; Luzzo Dec. ¶ 14.

1    sometimes not at all.[61]  (Hasinsky Dec. ¶ 14; Carreon Dec. ¶ 11.)  AMN records show that clinicians

2    were paid for both approved and unapproved overtime, suggesting that Kucharski and Teitelbaum's

3    claimed experiences were likely the result of unit-specific and clinician-specific issues unique to them.

4    **C.    Plaintiffs Nor Their Counsel Can Adequately Represent the Proposed Class.**

5    The adequacy requirement of Rule 23(a) requires a showing that the party seeking certification

6    demonstrate the ability to "fairly and adequately protect the interests" of the proposed class.  *Amchem*

7    *Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997).  The adequacy standard is met if proposed class

8    counsel is qualified and competent and the class representatives are not disqualified by interests

9    antagonistic to the remainder of the class.  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512

10   (9th Cir. 1978).[62]

11   **1.    Plaintiffs are Inadequate Representatives.**

12   None of the Plaintiffs worked assignments at any of the Kaiser facilities in Northern California.

13   They therefore have no knowledge of practices, policies, or procedures applicable to clinicians

14   assigned to those locations, or indeed anywhere outside the locations of their own assignments.

15   Plaintiffs' claims are dependent on facility and unit specific practices such as alleged methods of

16   providing coverage to clinicians during meal periods and rest breaks, and clinician attendance at start

17   of shift huddles.  Plaintiffs' lack of knowledge disqualifies them from representing clinicians assigned

18   to any Kaiser facilities outside of those to which they were assigned.

19   **2.    Plaintiffs' Counsel Improperly Put Their Own Interests Above the**

20   **Interests of the Putative Class.**

21   Actual conflicts between class counsel and putative class members, including conflicting

22   representations in unrelated litigation, can also defeat the adequacy prong of the Rule 23 analysis.

---

24   [61] Thai Dec. ¶ 24; Demirovic Dec. ¶ 11; Giffin Dec. ¶ 24; Williams Dec. ¶ 23; McMurrain Dec. ¶¶ 11-14; Johnson Dec. ¶ 21.

25   [62] In a supporting declaration, plaintiff Davis states that she is willing to serve as a class representative
26   in the event the Motion is granted.  During the class period, Davis worked a single assignment for
     AMN in the post-partum mother and baby unit at Glendale Adventist Hospital, a non-Kaiser facility.
27   (Davis Depo. 21:22-22:12, 25:12-14.)  She testified at deposition that she was unaware of the
     timekeeping methods used by other AMN travelers, and did not know to what facilities putative class
     members were assigned.  (Davis Depo. 209:24-211:10.)  Her lack of knowledge means that she is not
28   a member of, and cannot represent, the proposed class.  *Del Valley v. Global Exchange Vacation Club,*
     320 F.R.D. 50, 58 (S.D. Cal. 2017).

1    *Sullivan v. Chase Int. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978.)

2    Plaintiffs' counsel should not be permitted to represent the proposed class because they entered

3    into a written agreement that expressly prohibits them from agreeing to resolve claims in this lawsuit

4    absent a carve out that preserves the claims asserted in another class action involving AMN nurses,

5    *Clarke v. AMN Services, LLC,* which is currently pending in the Central District of California.

6    (Declaration of Tazamisha Imara ¶ 2, Comp. Ex. 1.)  Under the agreement, a release of claims by the

7    proposed *Shaw* class is only authorized if class counsel in the *Clarke* case provides its "prior written

8    consent." (*Id.*, p. 2.)  Further, any settlement is contingent upon Shaw's proposed counsel and counsel

9    for the *Clarke* class "work[ing] out an equitable allocation pertaining to these particular claims before

10   executing any settlement agreement…" (*Id.*)  Thus, the agreement bars putative class counsel in this

11   case from accepting a settlement that is in the client's best interest simply because a third-party, class

12   counsel in *Clarke*, would prefer that they reject it.  This agreement pits the interests of members of the

13   putative *Shaw* class against the obligations of their proposed counsel, and gives counsel in an unrelated

14   case the ability to veto resolution of their claims without their knowledge or assent.

15   Such an agreement undermines the fiduciary duty class counsel has to a class.  *See, e.g. Cox v.*

16   *Delmas,* 99 Cal. 104, 123 (1893) ("The relation back between and attorney and client is a fiduciary

17   relation of the very highest character, and binds the attorney to most conscientious fidelity, *--uberrima*

18   *fides.*"); *MGIC Indemnity Corp. v. Weisman,* 803 F. 2d 500, 504 (9th Cir. 1986) ("A lawyer like a

19   trustee is bound to higher standards that the morals of the marketplace.")  Proposed class counsel may

20   have even violated California Rule of Professional Conduct 3-310(c): "A member shall not, without

21   the informed written consent of each client: (1) Accept representation of more than one client in a

22   matter in which the interests of the clients potential conflict; or (2) Accept or continue representation

23   of more than one client in a matter in which the interests of the clients actually conflict."

24   **D.    Neither the Predominance nor the Superiority Requirements of Rule 23(b)(3)**

25   **are Met Because Plaintiffs Identify no Common Issues, and Liability Turns on**

26   **the Resolution of Multiple Individual Issues.**

27   Even if Plaintiffs could meet their burden to satisfy all of the requirements of Rule 23(a), they

28   still cannot meet their burden to show that "questions of law and fact common to class members

29

predominate over any questions affecting only individual members," as required under Rule 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding that Rule 23(a)," and compels a close assessment of whether "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast,* 133 S. Ct. at 1432. Thus, Rule 23(b) necessarily requires the Court to examine the substantive issues raised and the evidence offered to prove each issue. Where, as here, a multitude of individualized inquiries are necessary to determine if there could be liability in the first instance (e.g. *why* a meal period or rest break was non-complaint or *why* off-the-clock work may have occurred and was not recorded), certification is improper.

Plaintiffs identify two specific allegedly common issues in support of predominance: the supposed "No Overtime" policy and the alleged requirement that clinicians remain on call and respond to patient needs during breaks. Because Plaintiffs have identified no method of common proof that would resolve the question of liability as to any of these claims on a classwide basis, certification should be denied. *Marlo v. United Parcel Service, Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008); *Local Jt. Exec. Bd. Culinary/ Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (Proceeding on representative basis is only appropriate if common issues "can be *resolved* for all members of the class in a single adjudication.") A trial would necessarily devolve into thousands of mini-trials on various issues crucial to the determination of liability to individual class members. Indeed, even as to the named plaintiffs themselves, distinct questions and answers exist as to why they may or may not have off-the-clock, meal, or rest claims. Plaintiffs incorrectly argue that any individual issues strictly concern damages and need not be addressed at the liability stage. However, issues such as whether and in what amounts employees worked off-the-clock, and whether they were prevented from taking meal periods and rest breaks, or skipped them as a matter of personal choice, are all central to determining Defendants' potential liability *in the first instance*.

### 1.    Plaintiffs' Overtime Claim Raises Multiple Individual Issues.

Plaintiffs' off-the-clock claim presents all of the following individual issues, each critical to determining liability (not damages): (1) whether the clinician worked off-the-clock during his or her Kaiser assignment; (2) when any off-the-clock work was performed; (3) the amount of any off-the-clock work performed; (4) the reasons any off-the-clock work was performed; (5) whether Defendants

knew or had reason to know that the clinician worked off-the-clock; and (6) whether the clinician received payment.

Whether any individual clinician worked off-the-clock is not discernable from AMN records. Individual testimony would be required to determine if a clinician worked off-the-clock during his or Kaiser assignment, and if so, during which shifts, and why.[63]  If a clinician is found to have worked off-the-clock, a determination would have to be made as to when and in what amounts off-the-clock work was performed.  The magnitude of this task is highlighted by the fact that none of Plaintiffs' declarations include information about how often, when, or how much off-the-clock work declarants claim to have performed.[64]  The Motion also includes no explanation of how these determinations can be made at trial short of gathering the information on an individual basis.

Why any instance of off-the-clock work occurred is also relevant.  Clinicians who worked off-the-clock by their own choice are not entitled to payment unless AMN knew or should have known the unscheduled overtime was worked.  As a result, further inquiry would be required to determine why any off-the-clock work was performed, and whether circumstances demonstrate that Defendants had actual or constructive knowledge.  Plaintiffs' "expert" admitted as much in her deposition, agreeing that whether a nurse did not report all of their time on their timecard because she thought it was too cumbersome, or because she could not track down a manager for approval, would be an individualized inquiry.  (Crowninshield Depo. 199:1-13.)

---

[63] Even individual inquiry might not resolve this issue.  Plaintiffs uniformly admit that they kept no records of any off-the-clock work they now claim to have performed. They could provide only speculative estimates of the amount time for which they claim to be owed compensation. (Shaw Depo. 126:7-127:4; Kucharski Depo.178:16-179:11; Teit. Depo. 114:9-115:11.)

[64] Defendants object to the declarations attached to the Compendium of Class Member Declarations (Dkt. No. 105-3, 34 Declarant Declarations). Declarants provide no foundation to who said what and when, offering only generalized and conclusory statements.  *See e.g.* Dec. of Sandra Boyd, Para. 7-33.  For example, Declarants' testimony concerning generalized statements made by "AMN," "Kaiser," or undisclosed "manager/s," such as what an entity "required" of the declarant, or what a declarant "had to" do, lacks foundation, is hearsay, irrelevant, and is inadmissible opinion testimony. *See e.g. id*., Para. 9-33, Hearsay, Fed. R. Evid. 801, 802; Relevance, Fed. R. Evid. 401, 402; Inadmissible opinion, Fed. R. Evid. 701; Lack of Foundation, Fed. R. Evid. 602.  Similarly, Declarants testimony as to other employees' understandings is improper and objectionable as hearsay. *See e.g.* Boyd Decl. Para 11, 21, 33.  As the declarations are wholly objectionable, Defendants preserve these and all other general and specific objections to the Declarants' declarations.

1    Courts have declined to certify similar claims where the individual questions would swamp

2    common questions at the liability phase and require the court to conduct a succession of "mini-trials"

3    to determine whether class members are entitled to recovery based on off-the-clock work.  In *Brinker*

4    *Restaurant Corp. v. Superior Court*, certification was not warranted because plaintiffs had identified

5    no uniform policy that would provide common proof of employee claims that they worked off-the-

6    clock during meal periods.  53 Cal. 4th 1004, 1052 (2012).  In that case, plaintiffs offered "anecdotal

7    evidence of a handful of individual instances in which employees worked off-the-clock, with or

8    without knowledge or awareness by …supervisors."  *Id.*  Liability would unavoidably turn on

9    individual determinations of when employees worked off-the-clock, and with respect to each instance,

10   whether supervisors knew or should have known work was being performed.  *Id.*

11   In *Braun v. Safeco Co. of America,* the plaintiff sought to certify a class of insurance company

12   employees based on a claim that they worked off-the-clock.  2014 WL 9883831, *1 (C.D. Cal. Nov.

13   7, 2014).  The court found that predominance was not established because evidence showed that the

14   circumstances in which putative class members worked off-the-clock was extremely variable.  *Id.* at

15   14.  A putative class member stated that she worked off-the-clock despite never being instructed to do

16   so, another that he or she sometime recorded overtime and other times did not based on her

17   supervisor's "mood," another that off-the-clock work was occasioned by feelings of inadequacy based

18   on an inability to complete assignments during the scheduled shift.  *Id.*  Under these circumstances,

19   "whether and to what extent" any class member worked off-the-clock, issues critical to liability,

20   precluded certification.  *Id.*

21   To the extent that Plaintiffs contend they were denied payment for unscheduled overtime

22   because Kaiser personnel refused to sign timesheets or Overtime/Break Forms, individual issues also

23   predominate.  It would have to be determined whether in any individual instance the clinician sought

24   a signature and was refused, or like Kucharski and Teitelbaum claim, declined to request signatures in

25   the first instance.  Individual inquiries also would be necessary to determine whether any recorded,

26   unscheduled overtime submitted to AMN without signature was ultimately paid.  As discussed at

27   section II.C., AMN's Time Processing Department's responsibilities include submitting reported

28   unscheduled overtime for payment.  If it is determined that an instance of unsigned overtime was not

1    paid, an individual determination would be needed to determine why.  For instance, an investigation

2    by AMN may have resulted in a determination that the time was not actually worked and no additional

3    wages were owed.  The right to recovery would only arise once each of these individual questions was

4    resolved.

5                    **2.       Meal Periods and Rest Breaks.**

6            Individual issues also pervade Plaintiffs' claim for missed, interrupted, and uncompensated

7    meal periods.  Plaintiffs suggest no common methods of proof that will establish whether liability for

8    noncompliant breaks exists on a classwide basis (because there are none).  Although AMN's lawful

9    policy clearly instructs Plaintiffs to document noncompliant breaks, consultation of individual

10   timesheets and Overtime/Break forms for recorded missed, short or otherwise non-compliant breaks

11   would not establish liability.  Clinicians are free to voluntarily forego or shorten meal periods so long

12   as they are under no employer pressure or instruction to do so.  *Brinker*, 53 Cal. 4th at 1040.

13           California and federal courts have consistently held the obligation to "provide" a meal period

14   requires only that employers make meal periods available, not that employers mandate or ensure the

15   taking of compliant periods.  *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008) (Rule

16   23(b)(3) cannot be satisfied for meal or rest violations where there is evidence meal or rest breaks

17   were provided *at least some of the time*; "[t]his disparity [shows] that 'the availability' of meal breaks

18   'varied from employee to employee;'" "the Court finds that individual issues predominate.  Liability

19   cannot be established without individual trials to determine *why* each class member did not clock out

20   for a 30-minute meal period on any given day.") (Emphasis supplied).

21           Thus, the reason why any particular meal period was missed or short would have to be

22   determined on a clinician by clinician basis.  Further inquiry would be required to determine whether

23   the clinicians received pay for the time worked during what would otherwise have been a meal period,

24   and whether he or she received a premium payment.  This would not be the end of the inquiry since

25   even if no premium was paid, "some explanations [for nonpayment] can lead to liability and others do

26   not, [but] neither question can be answered by the data."  (Crandall Rpt. ¶ 36.)

27            The determination of whether there is a violation based upon the timing of the meal period

28   poses additional individual issues.  Shaw testified that he could recall receiving his meal break late

---

33

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
[Case No. 3:16-cv-02816 JCS]

only once during his assignment at Kaiser San Diego.  (Shaw Depo. 209:1-23.)   In many units, clinicians are provided with a written break schedule that allows them to select the time when they will be relieved for meal periods and rest breaks, and some clinicians prefer to take their breaks at later times.[65]  (Mira Dec. ¶ 6.)

AMN's expert found that of 1,464 randomly selected shifts worked by clinicians during the putative class period, 97.4% documented meal periods of 30 minutes or more.  (Crandall Rpt. ¶ 8.) The timecards for the randomly selected sample of clinicians analyzed by Crandall, which included approximately 800 shifts worked by AMN clinicians at Kaiser facilities, also "show a high degree of compliance in terms of the percentage of eligible shifts with recorded meal breaks."  (*Id.,* ¶¶ 8, 14.) Plaintiffs' own timesheets similarly reflect that they took 30-minute meal periods during their Kaiser shifts.  To the extent Plaintiffs' meal period claim is premised on a theory that clinicians received short and otherwise non-compliant meal periods notwithstanding the fact that they submitted timesheets showing otherwise, liability will depend solely on resolution of individual issues.

Rest breaks are not reflected on timesheets or otherwise documented.  The records of putative class members therefore would be of no assistance in determining whether any clinician took rest breaks on any shift.  A person by person, shift by shift inquiry would be the only way to answer the question.  Even so, a finding that a clinician did not take a rest break, or ended a rest break early, would still not end the inquiry.  A missed or short rest break does not necessarily constitute a violation or entitle the clinician to premium pay.  To answer these liability questions, the Court would need to individually analyze whether Kaiser personnel failed to authorize or permit the clinician to take the rest break or the break was voluntarily skipped or shortened by the clinician.  *Cole v. CRST, Inc.,* 317 F.R.D. 141, 145 (C. D. Cal. 2016); *Joe's Crab Shack,* 271 F.R.D. at 640.  Even if a potential violation were established, because AMN pays premiums for noncompliant breaks, the court would also need to determine whether the clinician had previously received compensation.

---

[65] Foster Dec. ¶¶ 18-19; Giffin Dec. ¶ 14; Williams Dec. ¶ 12; McMurrain Dec. ¶ 23; Johnson Dec. ¶ 14; Litz Dec. ¶ 15; Foster Dec. ¶18-19.

1          3.          **Plaintiffs Fail to Cite Relevant Case Law in Support of the Predominance**

2                      **Factor.**

3          Inapposite case law cited by Plaintiffs in support of the predominance factor relies on a finding

4   that one or more specific uniform policies were maintained and applied to the class, a situation not

5   present in the instant case.  In *Wren v. RGIS Inventory Specialists*, this court certified a class of hourly

6   employees with respect to travel time, off-the-clock work, and inaccurate wage statements but notably,

7   denied certification of the plaintiffs' meal period claim.  256 F.R.D. 180, 211 (N.D. Cal. 2009).  It was

8   undisputed that during some portion of the class period, the employer had no written policy requiring

9   payment for certain pre-shift donning and waiting time.  *Id.* at 205.  The employer presented some

10  evidence that its actual practice was to pay for the pre-shift activities.  However, in an admittedly

11  "close case," this court found that whether the employer policy was to pay for donning and waiting

12  was an issue common to the class, and that common issues predominated as to the claim.  *Id.* at 205-

13  206.  The court reasoned that there was sufficient evidence that the employer had decided not to require

14  payment for pre-shift activities, and "from which a jury [could] conclude that this policy has resulted

15  in a widespread practice on the part of [the employer] of failing to compensate class members for this

16  time."  *Id.* at 206.  By contrast, the plaintiffs had identified no policy or practice to which non-

17  compliant meal periods could be attributed, and individual issues were necessary to the liability

18  determination.  *Id.* at 208-209.  In the instant case, lawful written policies have been in place

19  throughout the class period and the evidence shows that clinicians have been paid for unscheduled

20  overtime and provided with compliant meal periods and rest breaks, or payment in lieu thereof.

21  Accordingly, unlike in Wren, individual issues predominate over common issues.

22          In *Rai v. Santa Clara Valley Transportation Authority,* transit drivers were compensated based

23  on a predetermined daily pay calculation based on their assigned routes.  308 F.R.D. 245, 252 (N.D.

24  Cal. 2012). The court found that this calculation did not factor in time spent "waiting or walking," or

25  time spent on expected pre-shift and post-shift tasks.  *Id.* at 255.  These pay practices were common

26  to the class and resulted in a failure to compensate the drivers for all hours worked.  *Id.* at 257-258.

27  No such common pay practice allowing classwide resolution of liability has been shown to exist in

28  this case.

1          **4.      A Class Action is Not the Superior Method of Resolving Plaintiffs' Claims.**

2          In addition to finding that common questions "predominate," the Court must also find that the

3   class action device is superior to individual lawsuits for resolving the dispute.  *Amchem*, 521 U.S. at

4   615.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th Cir. 1996).  A class action is not

5   "superior" if each class member has to litigate numerous and substantial separate issues to establish

6   his or her right to recover individually.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192

7   (9th Cir. 2001).  Here, highly individualized inquiries undermine superiority because each clinician

8   (and their managers) would need to testify about, on any given shift, their individual schedules and

9   workload, meal and rest breaks, patient demands, ratios, acuity, patient handoffs, huddles, break nurse

10  practices, overtime approval practices, and floating, among other issues.  Certification also should be

11  denied where, as here, preferable alternatives exist.  *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 211-

12  12 (9th Cir. 1975).[66]

13         Plaintiffs completely ignore the manageability issue in their discussion of superiority, and

14  blithely state without explanation that "trial will not impose any unique case management problems."

15  (Mot. 39:3-4.)  Apart from the baselessness of this assertion, the cases Plaintiffs cite in support of it

16  are inapposite because they involved common issues capable of classwide resolution.  In *Thomas v.*

17  *Baca*, the court found that the plaintiffs' 42 U.S.C. section 1983 claims were joined by the common

18  question of whether the Los Angeles Sheriff Department unlawfully required detainees to sleep on

19  cell floors.   231 F.R.D. 397, 400 (C.D. Cal. 2005).   *Rai*, supra, involved driver claims for

20  uncompensated split shift travel time, and pre and post shift activities not factored into a compensation

21  system that calculated daily pay in predetermined amounts based on assigned runs.  308 F.R.D. at 255-

22  56.  In *Woods v. Vector Marketing Corp.*, the court agreed with all parties that the specific question of

23  whether prospective sales representatives were properly compensated as trainees or employees during

24  training turned on a standard set of factors under the Department of Labor's Portland Terminal test.

25  2015 WL 5188682 *3, 13 (N.D. Cal. Sept. 4, 2015).

26

27  _____

28  [66] If clinicians believes they were denied breaks, or were not compensated for all time worked, they
    can pursue their claims in a fee-eligible individual proceeding or an expedited "Berman" hearing with
    the Labor Commissioner.  (*see* Cal. Lab. Code section 98.)  Plaintiffs have failed to show that class
    treatment is superior given these alternatives.

1   Critically, plaintiffs have also failed to articulate *any* trial plan at all, let alone a manageable

2   trial plan.  This is despite the U.S. Supreme Court's disapproval in *Dukes* of "trial by formula"—e.g.

3   trial by representative sampling—to determine liability.  It is also contrary to the California Supreme

4   Court's direction in *Duran v. U.S. Bank*, 59 Cal. 4th 1, 28-50 (2014), that (a) plaintiffs seeking class

5   status should proffer a rigorous, reliable, and manageable statistical trial plan *at the class certification*

6   *stage*, rather than vaguely alluding to one eventually being developed, and (b) in all cases, named

7   plaintiffs cannot rely on "sampling" to gloss over individualized liability issues and deprive a

8   defendant of its due process rights by precluding it from litigation its individual defenses to each

9   putative class member's claim.

10   Plaintiffs offer no specifics whatsoever regarding how a trial of a certified class in this case

11   could be fairly managed.  But even if they were to suggest that trial could be managed by statistical

12   sampling, and were able to present a specific proposal as to how that could be done without denying

13   Defendants' due process rights, federal courts in California have routinely held, consistent with *Dukes*,

14   that sampling to determine liability is improper.[67]  This is especially true where, as here, so much

15   evidence in the record (including Plaintiffs' own evidence) proves that breaks were provided and all

16   recorded time was paid pursuant to Defendants' completely lawful policies.

17   **E.   Rule 23(b)(2) Certification Cannot be Granted.**

18   Cases that primarily seek injunctive or declaratory relief are appropriate for Rule 23(b)(2)

19   certification.  *In re Wells Fargo Home Mort. Overtime Pay Litigation,* 527 F. Supp. 2d 1053, 1069

20   (N.D. Cal. 2007).  Rule 23(b)(2) certification of cases requesting both damages and injunctive relief

21   is proper if the damages claims are "merely incidental to primary claim for injunctive relief."  *Zinser,*

22   253 F.3d at 1195.  Monetary damages are not incidental to the instant case, particularly because the

23   named plaintiffs are not currently working assignments for AMN at Kaiser and would thus be

24   unaffected by injunctive relief.  *Wren*, 256 F.R.D. at 210 (Denying Rule 26(b)(2) certification where

25   the "vast majority of the named plaintiffs…are not current employees and are not entitled to injunctive

26   relief.")

27

28   [67] *See Cruz v. Dollar Tree Stores*, 2011 WL 2682967, at **4, 7-8 (N.D. Cal. July 8, 2011) ("[proof
through]…representative testimony…is now untenable [post-*Dukes*].")

1

**F.      Certification of Plaintiffs' Derivative State Law Claims Should be Denied.**

2      Plaintiffs' motion does not include a specific request for or argument in support of certification

3  of derivative claims alleged in the Complaint.  Certification should be denied as to these claims since

4  they turn on the viability of Plaintiffs' primary claims for alleged overtime, meal period, and rest break

5  violations.  *Roth v. CHA Hollywood Medical Center, L.P.*, 2013 WL 5775129, at *8 (C.D. Cal. Oct.

6  23, 2013); *Burnell v. Swift Trans. Co, of Arizona, LLC*, 2016 WL 2621616, at *7 (C.D. Cal. May 4,

7  2016).

8      Certification of Plaintiffs' state law claims under California Business and Professions Code

9  § 17200 (the "UCL") and for waiting time penalties under California Labor Code § 203 ("section

10  203") should also be denied.  They are both wholly derivative of the substantive claims in this lawsuit,

11  which are not amenable to class treatment. *Jimenez v. Allstate Ins. Co.*, 2012 WL 1366052, at *16

12  (C.D. Cal. Apr. 18, 2012), (aff'd 765 F.3d 1161 (9th Cir. 2014)) ("[T]he determination whether [a

13  UCL claim] should be certified for class treatment depends on, and is governed by, the [c]ourt's

14  determinations with respect to each of the[] underlying claims.")

15      Plaintiffs' claim for waiting time penalties under section 203 independently fails because AMN

16  is exempt from liability for these penalties under the Labor Code.  AMN is a temporary services

17  employer pursuant to California Labor Code § 201.3, and thus owes waiting time penalties only when

18  an employee is terminated or quits, not upon the completion of an individual assignment.  *Elliot v.*

19  *Spherion Pac. Work, LLC*, 572 F. Supp. 2d 1169, 1174-77 (C.D. Cal. 2008) (aff'd 368 Fed. Appx. 761

20  (9th Cir. 2010)) (holding that temporary employees whose assignments end with their employer are

21  not entitled to section 203 penalties because such temporary employees are not "discharged" within

22  the meaning of section 201); *Willner v. Manpower Inc.*, 35 F. Supp. 3d 1116, 1127 (N.D. Cal. 2014)

23  (same).  An individualized inquiry therefore would be necessary to determine the eligibility of

24  individual class members for waiting time penalties.  Accordingly, Plaintiffs have failed to describe a

25  certifiable class.

26  / / /

27  / / /

28  / / /

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
[Case No. 3:16-cv-02816 JCS]

1

## V.     CONCLUSION

2          For each of the foregoing reasons, Defendants respectfully request that Plaintiffs' Motion

3    be denied in its entirety.

4

5    Dated: April 3, 2018                   **CONSTANGY BROOKS SMITH & PROPHETE LLP**

6                                           By:     s/Kenneth D. Sulzer
                                                    KENNETH D. SULZER
7                                                   SARAH KROLL-ROSENBAUM
                                                    TAZAMISHA H. IMARA
8                                                   MATTHEW A. SCHOLL
                                                    Attorneys for Defendant
9                                                   AMN SERVICES, LLC

10   Dated: April 3, 2018                   **SEYFARTH SHAW LLP**

11
                                           By:     s/Christian Rowley
12                                                  CHRISTIAN ROWLEY
                                                    ANDREW MCNAUGHT
13                                                  ERIC RUEHE
                                                    Attorneys for Defendants
14                                                  KAISER FOUNDATION HOSPITALS;
                                                    SOUTHERN CALIFORNIA PERMANENTE
15                                                  MEDICAL GROUP; and THE PERMANENTE
                                                    MEDICAL GROUP, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28