1    KENNETH SULZER (SBN 120253)
     ksulzer@constangy.com
2    SARAH KROLL-ROSENBAUM (SBN 272358)
     skroll-rosenbaum@constangy.com
3    MATTHEW SCHOLL (SBN 301560)
     mscholl@constangy.com
4    **CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
     2029 Century Park East, Suite 1100
5    Los Angeles, California 90067
     Telephone: (310) 909-7775
6    Facsimile: (424) 465-6630

7

8    TAZAMISHA IMARA (SBN 201266)
     timara@constangy.com
9    **CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
     600 Anton Boulevard, 11th Floor
10   Costa Mesa, California 92626
     Telephone: (949) 743-3979
11   Facsimile: (949) 743-3934

12   Attorneys for Defendant **AMN SERVICES, LLC**

13   **(Additional Attorneys listed on next page)**

14            **UNITED STATES DISTRICT COURT**

15           **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 16   ROBERT SHAW, SHARON DAVIS, JENNIFER CORONA TEITELBAUM, LORENZO HOLMES, and CANDY KUCHARSKI, individually and on behalf of all others similarly situated, and as a proxy for the State of California on behalf of aggrieved employees,<br><br>Plaintiffs,<br><br>v.<br><br>AMN HEALTHCARE, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., and THE PERMANENTE MEDICAL GROUP, INC.<br>Defendants. | Case No. 3:16-cv-02816 JCS<br><br>**DECLARATION OF TAZAMISHA H. IMARA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: June 8, 2018<br>Time: 9:30 a.m.<br><br>Judge: Honorable Joseph C. Spero<br>Ctrm: 15/G |

DECLARATION OF TAZAMISHA H. IMARA i/s/o DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION [Case No. 3:16-cv-02816 JCS

C1

1 | CHRISTIAN J. ROWLEY (SBN 187293)
crowley@seyfarth.com
2 | ANDREW MCNAUGHT (SBN 209093)
amcnaught@seyfarth.com
3 | ERIC RUEHE (SBN 284568)
eruehe@seyfarth.com
4 | **SEYFARTH SHAW LLP**
560 Mission Street, 31st Floor
5 | San Francisco, California 94105
Telephone: (415) 544-1001
6 | Facsimile: (415) 397-8549

7 | Attorneys for Defendants **KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC. and THE PERMANENTE MEDICAL GROUP, INC.**

## DECLARATION OF TAZAMISHA H. IMARA

I, Tazamisha H. Imara, declare as follows:

1. I am Senior Counsel at the law firm Constangy, Brooks, Smith & Prophete, LLP ("Constangy Brooks"), counsel of record for Defendant AMN Services, LLC. I am admitted to practice in the State of California and the United States District Court for the Northern District of California. I have personal knowledge of the facts stated in this declaration, and if called upon to testify I could and would testify competently to these facts.

2. On March 8, 2018, Plaintiff Robert Shaw produced an agreement between proposed class counsel and Hayes Pawlenko LLP, counsel of record for plaintiff and the putative class in *Clarke v. AMN Services, LLC*, currently pending in the United States District Court for the Central District of California, Case No. 2:16-cv-04132-DSF-KS. A true and correct copy of the agreement, titled "Class Claim Preservation and Mutual Carve-Out Agreement" is attached as **Exhibit 1** to this Declaration.

3. On September 11, 2017, I took the deposition of Plaintiff Robert Shaw before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 3** to the Compendium of Evidence in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (the "Compendium") are true and correct copies of excerpts from that certified deposition transcript.

/ / /

2
DECLARATION OF TAZAMISHA H. IMARA i/s/o DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [Case No. 3:16-cv-02816 JCS]

C2

4.      On September 22, 2017, Sarah Kroll-Rosenbaum took the deposition of Plaintiff Jennifer Corona Teitelbaum before a certified court reporter, duly authorized to administer oaths in the State of California.  Attached as **Exhibit 4** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

5.      On October 5, 2017, Sarah Kroll-Rosenbaum took the deposition of Plaintiff Candy Kurchaski before a certified court reporter, duly authorized to administer oaths in the State of California.  Attached as **Exhibit 5** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

6.      On April 20, 2017, I took the deposition of Sharon A. Davis before a certified court reporter, duly authorized to administer oaths in the State of California.  Attached as **Exhibit 6** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

7.      On April 25, 2017, Joshua Konecky took the deposition of AMN's Fed. R. Civ. P. 30(b)(6) witness, Lisa Larson.  Ms. Larson is the Vice President of Customer Solutions for AMN Healthcare.  Attached as **Exhibit 7** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

8.      On October 20, 2017, Joshua Konecky took the deposition of Kaiser Permanent's Fed. R. Civ. P. 30(b)(6) witness, Kristen Mussman.  Ms. Mussman is the Director of Kaiser's Contingent Talent Management Program.  Attached as **Exhibit 8** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

9.      On November 7, 2017, Matthew Scholl took the deposition of Marliese Bartz before a certified court reporter, duly authorized to administer oaths in the State of California.  Attached as **Exhibit 9** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

10.     On March 19, 2018, Sarah Kroll-Rosenbaum took the deposition of Elise Crowninshield, RNP, NE-BC, before a certified court reporter, duly authorized to administer oaths in the State of California.  Attached as **Exhibit 10** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

C3

11.     On March 8, 2018, Philip Smith took the deposition of Bobby Ann Jennings before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 11** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

12.     On March 9, 2018, Matthew Scholl took the deposition of Celena Parks before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 12** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

13.     On March 9, 2018, Fabian Ruiz took the deposition of Kimberly Sampim before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 13** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

14.     On March 13, 2018, Philip Smith took the deposition of Olivia Nava before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 14** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

15.     On March 14, 2018, Matthew Scholl took the deposition of Howard J. Kravitz before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 15** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

16.     On March 28, 2018, Matthew Scholl took the deposition of Sandra Boyd before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 16** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

17.     On March 30, 2018, Matthew Scholl took the deposition of Amber Mottola before a certified court reporter, duly authorized to administer oaths in the State of California. Attached as **Exhibit 17** to the Compendium are true and correct copies of excerpts from that certified deposition transcript.

**C4**

1    18.    I declare under penalty of perjury under the laws of the United States of America

2    and the State of California that the foregoing is true and correct to the best of my knowledge and

3    belief and that this declaration was executed this 3rd day of April 2018 in Los Angeles,

4    California.

5

6                                                    _Tazamisha H. Imara_

7                                    _____
                                           TAZAMISHA H. IMARA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TAZAMISHA H. IMARA i/s/o DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION [Case No. 3:16-cv-02816 JCS]

C5

# EXHIBIT 1

## CLASS CLAIM PRESERVATION AND MUTUAL CARVE-OUT AGREEMENT

This Class Claim Preservation and Mutual Carve-out Agreement ("Agreement") is made this 5th day of October 2016 by and between Hayes Pawlenko LLP, counsel of record for plaintiff and the putative class in *Clarke v. AMN Services, LLC*, Case No. 2:16-cv-04132-DSF-KS pending in the United States District Court for the Central District of California ("*Clarke*"), on the one hand, and Schneider Wallace Cottrell Konecky Wotkyns LLP, and Berger & Montague, P.C., counsel of record for plaintiffs and the putative class in *Osuegbu v. AMN Healthcare, Inc.* and *Kaiser Permanente International*, Case No. 3:16-cv-02816-JCS pending in the United States District Court for the Northern District of California ("*Osuegbu*"), on the other hand (together "Class Counsel"). The purpose of this Agreement is to ensure that putative class members' rights are fully protected in each of these simultaneously pending putative class actions, which involve potentially overlapping classes and causes of action, but concern distinct alleged underlying wrongs.

WHEREAS, the currently operative Second Amended Complaint in the *Clarke* matter alleges the following six causes of action on behalf of plaintiff and all non-exempt hourly employees employed by AMN Services, LLC in California (regardless of the "doing business as" name used) since September 11, 2013: (1) failure to pay overtime in violation of California Labor Code § 510; (2) failure to furnish accurate itemized wage statements in violation of California Labor Code § 226; (3) unfair business practices in violation of California Business & Professions Code § 17200 *et seq.*; (4) waiting time penalties pursuant to California Labor Code § 203; (5) civil penalties pursuant to California Labor Code § 2698 *et seq.*; and (6) failure to pay overtime in violation of the Fair Labor Standards Act, 29 U.S.C. § 207. The factual predicate for the class and collective action claims in *Clarke* is AMN Services, LLC's failure to include the value of per diem benefits paid, including meals, incidentals, and lodging, whether paid in cash or in kind, in employees' regular rates of pay when calculating the amount of overtime wages due, and its failure to furnish employees with accurate itemized wage statements because its paystubs show the incorrect overtime and doubletime rates.

WHEREAS, the currently operative First Amended Complaint in the *Osuegbu* matter alleges the following eight causes of action on behalf of plaintiffs and all current or former traveling nurses employed by AMN Healthcare, Inc. and Kaiser Permanente International in California since October 23, 2011: (1) failure to pay overtime in violation of California Labor Code §510, 1198 and IWC Wage Order No. 5; (2) failure to pay for all hours worked in violation of California Labor Code §201, 202, 204, and 221-223; (3) failure to keep accurate payroll records in violation of California Labor Code § 1174 and 1174.5; (4) failure to furnish accurate wage statements in violation of California Labor Code §226; (5) waiting time penalties pursuant to California Labor Code § 203; (6) failure to provide meal periods or compensation in lieu thereof in violation of California Labor Code §226.7, 512, and Title 8 of the California Code of Regulations § 11050; (7) failure to provide rest periods or compensation in lieu thereof in violation of California Labor Code §226.7 and Title 8 of the California Code of Regulations § 11050; and (8) unfair competition and unlawful business practices in violation of California Business & Professions Code §17200 *et seq.* The factual predicate for the class claims in *Osuegbu* is that traveling nurses routinely work overtime and doubletime off-the-clock because they receive too much work to complete within their scheduled shifts, traveling nurses are not

1

SHAW000596

C7

provided with uninterrupted, thirty-minute meal periods during which they are completely relieved of any duty by the end of the fifth hour of work, and again by the end of the tenth hour of work, and traveling nurses are not permitted to take rest breaks of at least ten minutes by the end of every fourth hour of work or major fraction thereof.

WHEREAS, discovery and investigation in the *Clarke* action is focused upon the specific theories of recovery and factual predicates supporting the putative class and collective action claims alleged in the *Clarke* action and discovery and investigation in the *Osuegbu* action is focused upon the specific theories of recovery and factual predicates supporting the putative class claims alleged in the *Osuegbu* action, making counsel of record in each action best-suited to evaluate the risks and potential recoveries for the class based on the facts and theories alleged in the respective action that they are prosecuting.

WHEREAS, Class Counsel have met and conferred about the possibility of a settlement in one case affecting the claims and theories of liability alleged in the other case and have agreed that it would not be in the best interest of class members for any settlement in one case to release AMN Services, LLC and/or AMN Healthcare, Inc. (together "AMN") from claims and/or theories of liability alleged in the other case without the prior express written consent of the counsel of record in the other case.

NOW, THEREFORE, IT IS HEREBY AGREED AND STIPULATED BY AND BETWEEN CLASS COUNSEL AS FOLLOWS:

1.     Unless Schneider Wallace Cottrell Konecky Wotkyns LLP and Berger & Montague, P.C., have given their prior written consent to release claims based on the factual predicates for liability alleged in the First Amended Complaint in the *Osuegbu* matter, any settlement in the *Clarke* matter shall expressly carve-out the claims based on the factual predicates for liability alleged in the *Osuegbu* matter from any release of claims against AMN in the *Clarke* matter.

2.     Unless Hayes Pawlenko LLP has given its prior written consent to release claims based on the factual predicates for liability alleged in the Second Amended Complaint in the *Clarke* matter, any settlement in the *Osuegbu* matter shall expressly carve-out the claims based on the factual predicates for liability alleged in the *Clarke* matter from any release of claims against AMN in the *Osuegbu* matter.

3.     The foregoing does not apply to claims for penalties or damages under Labor Code §§ 203 & 226, for which there is a possible argument that there can only be one recovery even if there is a mutual carve out for the underlying claims based on differing factual predicates. Nonetheless, counsel in the *Clarke* matter and counsel in the *Osuegbu* matter reiterate their mutual commitment to consult with the other and use their best efforts to work out an equitable allocation pertaining to these particular claims before executing any settlement agreement that might result in the release of such claims that could apply to both matters.

4.     Hayes Pawlenko LLP herein consents that Plaintiffs in *Osuegbu* may determine or negotiate damages, premium wages and/or restitution for off-the-clock work and/or noncompliant meal and/or rest periods, based on a regular rate of pay that includes the value of

2

SHAW000597

1  Joshua Konecky, SBN 182897
   jkonecky@schneiderwallace.com
2  Nathan Piller, SBN 300569
   npiller@schneiderwallace.com
3  SCHNEIDER WALLACE
   COTTRELL KONECKY WOTKYNS LLP
4  2000 Powell Street, Suite 1400
   Emeryville, CA 94608
5  Telephone:  (415) 421-7100
   Facsimile:  (415) 421-7105
6
   Shanon Carson (admitted pro hac vice)
7  scarson@bm.net
   Sarah Schalman-Bergen (admitted pro hac vice)
8  Sschalman-bergen@bm.net
   BERGER & MONTAGUE, P.C.
9  1622 Locust Street
   Philadelphia, PA 19103
10 Telephone:  (215) 875-3000

11 Attorneys for Plaintiffs

12

13

14                **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| ROBERT SHAW, et al., individually and on behalf of all others similarly situated, and as a proxy of the State of California on behalf of aggrieved employees,<br><br>    Plaintiffs,<br><br>vs.<br><br>AMN SERVICES, LLC, KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., and THE PERMANENTE MEDICAL GROUP, INC.,<br><br>    Defendants. | Case No. 3:16-cv-02816-JCS<br><br>**PROOF OF SERVICE** |

## PROOF OF SERVICE

I, Sam Marks, am employed in the County of Alameda; I am over the age of eighteen years and not a party to the within entitled action; my business address is 2000 Powell Street, Suite 1400, Emeryville, California 94608.

On March 8, 2018, I served the following documents:

- **BATE STAMPED DOCUMENTS SHAW000596-SHAW000598**

on the persons set forth below:

Kenneth Sulzer
Sarah Kroll-Rosenbaum
Matthew Scholl
CONSTANGY, BROOK, SMITH &
PROPHETE, LLP
2029 Century Park East, Suite 1100
Los Angeles, California 90067
ksulzer@constangy.com
skrollrosenbaum@constangy.com
mscholl@constangy.com

*Attorneys for Defendant AMN Services, LLC*

Christian J. Rowley
Andrew M. McNaught
Eric G. Ruehe
SEYFARTH SHAW LLP
560 Mission Street, 31st Floor
San Francisco, CA 94105
crowley@seyfarth.com
amcnaught@seyfarth.com
eruehe@seyfarth.com

*Attorneys for Defendants Kaiser Foundation Hospitals, Southern California Permanente Medical Group, Inc., and The Permanente Medical Group, Inc.*

[✓]   **BY U.S. MAIL:** I placed a true copy(s) thereof enclosed in a sealed envelope(s) with the postage thereon fully prepaid at the address(s) set forth above and deposited such envelope(s) in the mail at Emeryville, California. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day at Emeryville, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[✓]   **BY ELECTRONIC SERVICE** by electronically mailing a true and correct copy in PDF format through Schneider Wallace Cottrell Konecky Wotkyns LLP's electronic mail system to the email address(s) set forth above.

C10

1    I declare under penalty of perjury under the laws of the United States and the State of

2  California that the foregoing is true and correct. Executed on March 8, 2018, at Emeryville,

3  California.

4

5

6                                                          Sam Marks

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE
Case No. 3:16-cv-02816-JCS

C11

## DECLARATION OF LISA LARSON

I Lisa Larson, declare as follows:

1. I am the Vice President of Customer Solutions for AMN Services, LLC. ("AMN"), a defendant in the above-captioned action. As the Vice President of Customer Solutions, I have overall responsibility for payroll and pay records matters for healthcare professionals employed by AMN, and oversight of AMN's Customer Support and Time Processing Departments. Except as may be noted below, I have knowledge of the facts set forth herein. If called as a witness to this matter, I could and would testify truthfully to the facts set forth herein.

## AMN's Business

2. AMN is one of the country's leading healthcare staffing companies. AMN contracts with healthcare facilities to deliver short-term staffing solutions by providing skilled healthcare professionals ("clinicians"), including registered nurses ("RNs") and licensed practical nurses ("LPNs").

3. Among AMN's clients are Defendants Kaiser Foundation Hospitals, Southern California Permanente Medical Group, Inc., and the Permanente Medical Group, Inc. ("Kaiser") which operate hospitals and medical offices throughout California.

4. I have reviewed business records that are generated and/or maintained by AMN in the ordinary course and scope of its business. These records include timesheets, wage statements and other employment documents of the named plaintiffs and certain members of the putative class that are referenced herein and attached as exhibits to this declaration.

5. Between September 11, 2013 and December 4, 2017, which I refer to as the "class period" in this declaration, AMN employed

approximately 11,612 RNs and LPNs at nearly four hundred healthcare facilities in California. Approximately 6,772 of those clinicians worked at least one assignment at one of the more than 70 Kaiser-operated facilities in California.

6. AMN's Clinical Department and Credentialing Department are involved in extensive coordination with Kaiser prior the assignment of clinicians to Kaiser facilities. Credentialing ensures that AMN clinicians have the skills and certifications required by the facility and unit to which clinicians are assigned. The Clinical Department is responsible for ensuring that clinical standards are met, and addressing any issues related to clinical practice that arise during clinicians' assignments.

7. Kaiser's compliance with California wage and hour laws, including by providing and making meal periods and rest breaks available to AMN clinicians assigned to its facilities, is an express term of Defendants' contractual agreement. A true and correct copy of the relevant provision is attached as Exhibit 1.

8. It is my understanding that the proposed class in this litigation is made up of RNs and LPNs who worked assignments at a Kaiser-operated facility at any time since September 11, 2013. Between September 11, 2013 and October 13, 2017, clinicians worked more than 11,000 assignments at Kaiser-operated facilities. The standard length of an AMN clinician assignment is 13 weeks. However, the length of the assignments to Kaiser facilities ranged from a few weeks to over one year.

**Plaintiffs' Employment with AMN**

9. The named plaintiffs in this lawsuit, Robert Shaw, Candy Kucharski, Jennifer Corona Teitelbaum, Sharon Davis and Lorenzo Holmes are all licensed RNs or LPNs, and are either current or former employees of AMN. Each of them worked at least one assignment at a California Kaiser

2

facility, with the exception of Davis.  Since September 11, 2013, Davis has worked a single assignment for AMN at Glendale Adventist Hospital, a non-Kaiser facility.

10.    It is my understanding that Shaw, Kucharski and Teitelbaum has asked to be named as representatives of the proposed class.  Shaw worked a single assignment in the Medical-Surgical ("Med-Surg") unit of Kaiser Permanente San Diego Medical Center from approximately December 2015 to March 2016.  A true and correct copy of Shaw's Professional Services Agreement ("PSA") for this assignment is attached as Exhibit 2.

11.    Teitelbaum worked assignments at Kaiser Permanente Los Angeles Medical Center from approximately June 2013 to March 2014, July 2014 to January 2015, and January 2015 to April 2015, and at Kaiser Permanente West Los Angeles Medical Center from approximately June 2014 to July 2014.  True and correct copies of Teitelbaum's PSAs for these assignments are attached as Exhibit 3.

12.    Kucharski was assigned to Kaiser Permanente San Diego Medical Center from approximately October 2013 to December 2013 and January 2015 to May 2015.  True and correct copies of Kucharski's PSAs for these assignments are attached as Exhibit 4.

### AMN Wage and Hour Policies

13.    AMN clinicians are provided with company policies including an employee handbook and a Meal Period Form for California Healthcare Employees ("Meal Period Waiver") upon hire, and often prior to starting a new assignment.  Clinicians acknowledge receipt of an AMN handbook electronically.  True and correct copies of handbook acknowledgements submitted by Shaw, Teitelbaum, and Kucharski during the class period are attached as Exhibits 5, 6, and 7 respectively.

DECLARATION OF LISA LARSON IN SUPPORT OF DEFENDANTS OPPOSITION TO MOTION FOR CLASS CERTIFICATION

14.    AMN's nurse staffing operation utilizes brand names including, American Mobile Health and NursesRX, which are the brands associated with Kucharski, Shaw and Teitelbaum's assignments. Despite the handbooks being labeled with different brand names, the same substantive policies are included in the handbooks provided to AMN clinicians. The overtime, off the clock work, meal and rest period policies included in the 2013, 2014, 2015, 2016 and 2017 versions of the American Mobile Health Handbook are attached as Exhibits 8, 9, 10, 11, and 12 respectively.

15.    The overtime policy contained in the AMN handbook advises clinicians that not all facilities permit travel nurses to work outside of scheduled shifts. This reflects the fact that some facilities prefer to utilize their permanent staff for such work if it is needed.

16.    The overtime policy requires clinicians to seek approval in advance of working overtime, if possible.

17.    The preapproval policy is in place to reduce instances of unauthorized or unnecessary overtime, and to give hospital personnel the opportunity to assess the need for overtime, and to redistribute work as needed.

18.    The approval described in the policy is preferred but, due to the nature of the work performed at hospitals, preapproval of overtime is not always practicable. Approval is commonly obtained after the time is worked.

19.    Meal period and rest break policies in the AMN handbook affirm AMN's compliance with legal requirements, while noting that individual facilities utilize different practices for scheduling, providing breaks, and documenting meal periods and rest breaks. Meal periods and rest breaks, and coverage for clinicians during their breaks, are provided according to the practices in place within individual units. The handbook advises clinicians

1  to "check with your manager at the facility to determine any policies relating

2  to scheduling, taking and reporting your meal and rest breaks."

3     20.   Clinicians are also instructed to report all instances in which they

4  are not "provided with the opportunity to take a meal break," or "not

5  authorized or permitted rest breaks."

6     21.   AMN pays meal period and rest break premiums, calculated as

7  one additional hour of pay, for reported non-compliant breaks in compliance

8  with California law.  Instances of non-compliant breaks are routinely

9  documented in the "Comments" section of clinician timesheets.  True and

10 correct copies of exemplar timesheets showing documentation of non-

11 compliant breaks are attached as Exhibit 13.

12    22.   Premiums paid to clinicians include a payment to Kucharski for a

13 noncompliant break during a shift she worked during a Kaiser assignment.

14 True and correct copies of a wage statement showing payment of a break

15 premium to Kucharski is attached as Exhibit 14.

16    23.   It is my understanding that Plaintiffs have submitted a letter

17 addressed to Shaw that states in part:

18        OT is not permitted at this facility.  If the clinician is required to work

19        OT or misses a meal period, then, OT/Missed Meal & Rest Period

20        Justification Form must be completed ON THE DAY that the missed

21        meal/rest period or OT occurred.  The form can be found in (sic) staff

22        office and is clinicians (sic) responsibility to complete & have signed

23        by the asst. clinical director, nurse manager or charge nurse.  Again,

24        this form is MANDATORY.

25    24.   While this provision states that overtime is generally not

26 permitted at the facility, it does not mean that clinicians assigned there do

27 not work or will not be paid for unscheduled overtime.  The second sentence

28

C16

confirms that the clinician may have to work unscheduled overtime during the assignment and sets out the procedure for obtaining approval.

## Clinician Assignments

25. The individual Kaiser facilities to which clinicians are assigned are responsible for scheduling clinicians' shifts.

26. The state of California prescribes nurse to patient ratios based on unit specialty that are applicable to Kaiser and other healthcare facilities.

27. During their assignment shifts, clinicians may be moved from their assigned unit to another unit with a temporary need for additional staff. Clinicians can only be floated to units for which they have the required skills, certifications and experience.

28. The extent to which any clinicians is asked to float during an assignment depends on facility and unit practice and need.

29. All clinicians are assigned a recruiter who is available by text, telephone and email. A recruiter may be a clinician's first point of contact for a range of issues such as, assignment dates and extensions, pay, housing arrangements and timesheet submission. Recruiters may refer clinicians to Customer Support as needed to address issues regarding timekeeping and pay.

30. The Clinical Department is responsible for interfacing with AMN's various clients including Kaiser, to ensure that clinicians have appropriate clinical support. The Department works with facilities at the pre-assignment stage to ensure AMN clinicians have appropriate training and experience to fill needed positions. The Clinical Department is also responsible for addressing any concerns clinicians may have about patient care, workload or other clinician issues at individual units and facilities.

31. AMN's Customer Support Department is responsible for assisting clinicians with a variety of issues that may arise during their

DECLARATION OF LISA LARSON IN SUPPORT OF DEFENDANTS OPPOSITION TO MOTION FOR CLASS CERTIFICATION

employment.  Customer Support representatives routinely respond to clinician questions about time recording, and various issues relating to pay.

32.  Depending on the issue, Customer Support will involve other AMN resources including, the Clinical, Credentialing and Time Processing Departments.

33.  Time Processing assists with issues such as verbal time submissions from clinicians who failed to submit a weekly timesheet, and time entry corrections.  The Clinical Department addresses any issues related to patient care including, any clinicians concerns about facility medical equipment or patient protocols.  The Credentialing Department helps clinicians with questions about credentials and skills training required for assignments.

34.  Customer Support personnel are available to answer calls from clinicians between the hours of 5:00 a.m. and 5:00 p.m. Pacific Time, Monday through Friday.  Clinicians are able to leave messages for Customer Support outside of business hours to which personnel can respond the following business day.

35.  AMN records show that Shaw contacted Customer Support regarding various issues.  True and correct copies of Shaw's Customer Support records are attached as Exhibit 15.

### Timekeeping During Kaiser Facility Assignments

36.  There is some limited use of electronic timekeeping by AMN time on paper timesheets during their assignments.   Kaiser staff nurses utilize Kaiser's electronic timekeeping system to clock in and out.  AMN clinicians are not in Kaiser's Time & Attendance systems as these systems are linked to Kaiser staff payroll.

DECLARATION OF LISA LARSON IN SUPPORT OF DEFENDANTS OPPOSITION TO MOTION FOR CLASS CERTIFICATION

C18

37. The timesheet includes space for clinicians to write the date, start and end time of their shift, the length of their meal period. Although rest breaks are not recorded on the timesheet, the timesheet includes space for clinicians to report missed or short meal periods and rest breaks to AMN.

38. AMN's paper timesheets contain an attestation in which the AMN nurse states, "I affirm that the time recorded above is accurate and all required approvals have been obtained."

39. Kaiser facilities generally permit overtime, and clinicians assigned to Kaiser-operated facilities regularly work hours outside of their scheduled shifts. Even at facilities or units that may have a general "no overtime policy, AMN clinician who work outside of their scheduled shifts are paid at the applicable overtime rate.

40. Between September 11, 2013 and December 4, 2017, 33.9% of workweeks completed by clinicians at Kaiser facilities included payment of unscheduled overtime (doubletime). 71.3% of clinicians assigned to work at California Kaiser facilities during that period received payment for unscheduled overtime during their assignments.

41. The timesheets and pay records of Teitelbaum and Kucharski show that they worked and received payment for unscheduled overtime. True and correct copies of timesheets and wage statements reflecting payment to Teitelbaum and Kucharski for unscheduled overtime are attached as Exhibits 16 and 17, respectively.

42. Other clinicians including those who, like Shaw, worked assignments at Kaiser San Diego, recorded and were paid for substantial amounts of unscheduled overtime. These include clinicians whose assignments to the Med-Surg unit overlapped with Shaw's. True and correct exemplars of timesheets and wage statements for clinicians assigned to

C19

Kaiser San Diego showing recordation and payment of unscheduled overtime, are attached as Exhibit 18.

43.   When they work unscheduled overtime, AMN clinicians generally are asked to obtain a signature from authorized facility personnel confirming that the time was worked.  Missed or interrupted meal periods and rest breaks should also be verified by the signature of authorized facility personnel.

44.   It is preferred that clinicians receive preapproval from Kaiser personnel before working unscheduled overtime, and the overtime policy included in AMN handbooks instructs clinicians to do so.  In practice, clinicians may obtain approval after the time is worked.

45.   Often approval signatures are provided by charge nurses, but depending on the facility and unit, signatures may be provided by nurse managers, staffing office personnel or other facility employees.

46.   AMN's Customer Support Department does not provide real time approval of unscheduled overtime for clinicians.  A facility signature is required when clinicians report unscheduled overtime because facility employees are in the best position to observe clinicians and verify that the time was worked.  In the event that a facility signature is refused or, for some other reason, a clinician is unable to obtain the required signature, he or she can contact Customer Support for assistance during business hours.  A representative can then contact the facility to address the issue and can also refer the matter to AMN's Time Processing Department as needed.

47.   Approval signatures may appear on the clinician's timesheet, or may be on a separate Overtime/Break Form.  Not all facilities and unit utilize the Overtime/Break Forms and in some facility units, no approval signature is needed for unscheduled overtime if it does not exceed a certain limit.

9

DECLARATION OF LISA LARSON IN SUPPORT OF DEFENDANTS OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**C20**

48. There is no requirement that clinicians obtain two separate approval signatures for unscheduled overtime or noncompliant meal periods or rest breaks. AMN's policy contemplates a single signature on the timesheet or the Overtime/Break Form verifying that the additional time was worked or that the meal or rest break was missed or interrupted.

49. AMN records show that approval of unscheduled overtime can be recorded directly on timesheets. It need not be documented on a separate form in order to be paid. True and correct copies of exemplars of timesheets showing facility approval of overtime are attached as Exhibit 19.

50. At the end of the weekly pay period, generally a Kaiser staffing office manager (or other designated Kaiser facility personnel) is responsible for signing and submitting the AMN clinicians' timesheets. The staffing office signature does not require a request or other affirmative steps by the clinician.

51. The need for a facility signature is not universal however, and in some units clinicians are authorized to sign one another's timesheets prior to submission. At some facilities, the staffing office does not submit clinician timesheets to AMN and the clinicians do so themselves.

52. AMN's Time Processing Department is responsible for reviewing the submitted timecards and entering clinicians' time into AMN's Kofax system for payment. Until late in 2017, clinician time was entered into a legacy system called Cardiff.

53. Time Processing Department personnel also work to confirm the accuracy of any unscheduled overtime and non-compliant breaks that appear on submitted timesheets without approval signatures. The clinician may be asked to obtain the missing signature, or Customer Support may contact facility personnel directly for needed confirmation.

C21

54.     AMN records show that regardless of approvals, reported unscheduled overtime is paid by AMN.  True and correct copies of timesheets showing unapproved overtime, and corresponding wage statements showing payment of unapproved hours are attached as Exhibit 20.

55.     During the proposed class period, AMN has paid approximately 11,308 meal period premiums totaling payments of $338,445.00 and 5,150 rest break premiums totaling payments of $164,399.00 to AMN clinicians in California.  Of those premiums, 4,710 payments totaling $160,958.00 in meal period premiums, and 2,639 payments totaling $88,954.00 in rest break premiums were paid to clinicians for non-compliant meal periods and rest breaks during Kaiser assignments.

56.     Some of the premiums paid to clinicians in California include payments to current and former clinicians who have submitted declarations in support of the Motion for Class Certification.  True and correct copies of wage statements reflecting premium payments to declarants are attached as Exhibit 21.

**AMN's Retention of Consultant Marliese Bartz**

57.     Marliese Bartz and her firm, Bartz Consulting LLC, were retained in 2016 to assist with planning for AMN and Kaiser's long-term goal of transitioning clinicians assigned to Kaiser facilities from paper timesheets to an electronic timekeeping system.  As part of this project, she was asked to make recommendations for streamlining current processes to reduce duplication in both timekeeping and billing, and for the eventual transition to electronic timekeeping.  As VP of Customer Support, I was involved in the planning associated with this project, and participated in several meetings involving stakeholders from AMN and Kaiser.

58.     Bartz was not asked to conduct a review of compliance with California wage and hour laws—such as meal period and rest break

11

C22

requirements—or off the clock or unscheduled overtime work by AMN clinicians. The limited scope of Bartz's engagement is described in the addendum to the consulting agreement between Bartz Consulting and AMN. A true and correct copy of the Addendum to the consulting agreement is attached as Exhibit 22.

59.   Bartz did not analyze timesheets, pay records or other employment documents of clinicians who worked assignments at Kaiser facilities.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed this 30th day of March, 2018 at Del Mar, California.

_____
Lisa Larson

C23

# EXHIBIT 1

## AMENDED AND RESTATED AGREEMENT FOR THE TEMPORARY STAFFING
## OF CLINICAL SERVICES

This Amended and Restated Agreement for the Temporary Staffing of Clinical Services ("Agreement") is entered into, and is effective as of, this 23rd day of September, 2012 ("Amended and Restated Effective Date") between Kaiser Foundation Hospitals, a California nonprofit public benefit corporation ("KFH"), and AMN Healthcare, Inc., a Nevada corporation having its principal place of business at 12400 High Bluff Drive, San Diego, CA 92130 ("Contractor").

## RECITALS

A. Contractor and KFH entered into an Agreement for the Temporary Staffing of Nursing Services, dated as of January 1, 2010 (the "Effective Date"), which was subsequently amended by the following amendments: First Amendment, on or about July 11, 2010, Second Amendment, on or about December 10, 2010, Third Amendment, on or about April 20, 2011, Fourth Amendment, on or about June 21, 2011, Fifth Amendment, on or about August 5, 2011, and Sixth Amendment, on or about January 1, 2012 (collectively, the "Original Agreement").

B. Pursuant to Section 9.5 of the Original Agreement, Contractor and KFH wish to amend and restate the Original Agreement in its entirety as forth in this Agreement. This Agreement shall be effective for all new Assignments and extensions to existing Assignments as of the Amended and Restated Effective Date. All existing Assignments as of the Amended and Restated Effective Date shall continue pursuant to the terms of the Original Agreement until completion of the Assignment or an extension thereto.

C. Kaiser Foundation Health Plan, Inc., a California nonprofit public benefit corporation ("Health Plan"), operates prepaid health care benefit plans and provides or arranges for the provision of medically necessary health care services to its Members entitled to receive such services under the terms of their Membership Agreements.

D. Health Plan has entered into an agreement with KFH, under which KFH agrees to provide or arrange for certain medically necessary hospital services for its Members. Health Plan has entered into agreements with The Permanente Medical Group, Inc. ("TPMG") and Southern California Permanente Medical Group ("SCPMG") (collectively, "Permanente Medical Group" or "PMG") under which PMG agrees to provide or arrange for certain medically necessary professional and other outpatient services for Members.

E. KFH and other KPMCP Entities (defined below) require, from time to time, temporary staff to provide nursing and other professional clinical services of the types described in this Agreement.

F. Contractor is in the business of providing such Services, and KFH desires to engage Contractor as the "Nursing MSP" for nursing staffing services ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

G. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

(h) <u>On-Duty Requirements</u>.  Contractor must notify each Resource that he or she is responsible at all times to satisfy every requirement set forth on and required by Exhibit 2.2(h).

(i) <u>Coordinating RN</u>.  Contractor shall employ and retain a registered nurse who will be responsible for coordinating and assuring the hiring and the retention of qualified Resources, providing for necessary and appropriate staff development and training, including, but not limited to, the orientation responsibilities of Contractor as set forth in Section 2.5 of this Agreement.  This individual, or another designee of Contractor, shall serve as liaison to KFH regarding the implementation of this Agreement.

(j) ████████████████████████████████████████████████████████

(k) ████████████████████████████████████████████████████████

(l) <u>Meal and Rest Breaks</u>.  Customers shall provide each Resource with meal and rest periods as required by applicable law.  Contractor and California Customers understand that under existing California law, a Resource is entitled to the following penalties if the Resource is not provided such meal or rest periods:

    (i)    One (1) hour of pay as required under California law for each Work Day (as defined in Exhibit 5.2)  that one or more meal periods are not provided as required by applicable California law, and

    (ii)    One (1) hour of pay as required under California law for each Work Day that one (1) or more rest periods are not provided as required by applicable California law.  A maximum penalty of one (1) hour's pay will be provided for a Work Day in which there are one or more meal period violations.  A maximum penalty of one (1) hour's pay will be provided for any Work Day in which there are one (1) or more rest period violations.  A Resource may not receive more than two (2) hours' pay as penalties for a single Work Day in which there have been one or more meal period and one or more rest period violations.

The applicable Customer will pay AMN the above-referenced penalties when it does not provide a Resource the required meal and/or rest periods.  To receive such penalties, Resource must record the qualifying times on its timesheets and obtain appropriate approval signatures on the timesheets.  Resource should make best efforts to obtain such signatures on the Work Day that the meal or rest periods are not provided.  Penalty pay hours should be noted in the remarks section of the timecard or within the ████████ System and clearly documented as either meal period or rest period violations. Contractor, subcontractors and California

8

# EXHIBIT 2

# PROFESSIONAL SERVICES AGREEMENT

**Assignment with AMN Services, LLC dba Nurses Rx (Company):**

**Professional:** Robert Shaw
**Dates:** 12/30/15 to 03/26/16
**Facility:** Kaiser - San Diego Medical Center - Critical Need, San Diego, CA
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36
**Minimum Required Shifts**: 3

**COMPENSATION AND BENEFITS:**
**Hourly Rate:** $25.00
**On Call Rate:** $4.00
**Call Back Rate:** $25.00
**Holiday Rate:** $37.50
**Meals & Incidentals Per Diem Rate:** $35.00/day
**Per Diem Adjustments:** Up to $806.75/week per diem may be adjusted based on number of shifts missed.
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Hourly Rate in the next available paycheck following receipt of required documentation.

**Insurance:** Company offers medical coverage that meets the affordable and minimum value ACA coverage requirements. Professional is eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely completion of enrollment no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on the Connect To Your Health benefits portal via TSC.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $500.00.
Ending amount: $ 0.40 per mile up to $500.00. In the event that Professional's Assignment is renewed or extended, ending travel reimbursement will be paid at the full completion of the Assignment.
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00, payroll deducted if applicable each pay period (prorated). Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided
**Companions:** The following person/people to reside with Professional in housing: Girlfriend.
**Reimbursements:** Professional will be reimbursed for License up to the amount of $150.00 on a one time only basis from 12/30/15 until 03/26/16 with acceptable proof of expense.

**401(k) Savings Plan:** Professional may be eligible to participate in the Company's 401(k) plan for the assignment. The 401(k) is a retirement savings plan that allows you to contribute pre-tax dollars to a retirement account. The Company's plan is administered by Prudential Retirement.

Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions.

**Termination:** Unauthorized absence, violation of Facility rules, insubordination, falsifying timecards or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional agrees the emergent needs of the Facility may require shift changes. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook
https://tsc.NursesRx.com/Forms/2011_NursesRx_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:     Robert Shaw                          AMN Services, Inc.
Professional signature: _____        By:
Date: _____                       <<IMG: KerrySirrkaSignature.jpg,60,60>>
PID:  4150463                                               Kerry Sirkka, Division Vice President, Travel Nurse Recruitment

# PROFESSIONAL SERVICES AGREEMENT

**Assignment with AMN Services, LLC dba Nurses Rx (Company):**

**Professional:** Robert Shaw
**Dates:** 12/30/15 to 03/26/16
**Facility:** Kaiser - San Diego Medical Center - Critical Need, San Diego, CA
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36
**Minimum Required Shifts**: 3

**COMPENSATION AND BENEFITS:**
**Hourly Rate:** $25.00
**On Call Rate:** $4.00
**Call Back Rate:** $25.00
**Holiday Rate:** $37.50
**Meals & Incidentals Per Diem Rate:** $35.00/day
**Per Diem Adjustments:** Up to $806.75/week per diem may be adjusted based on number of shifts missed.
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Hourly Rate in the next available paycheck following receipt of required documentation.

**Insurance:** Company offers medical coverage that meets the affordable and minimum value ACA coverage requirements. Professional is eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely completion of enrollment no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on the Connect To Your Health benefits portal via TSC.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $500.00.
Ending amount: $ 0.40 per mile up to $500.00. In the event that Professional's Assignment is renewed or extended, ending travel reimbursement will be paid at the full completion of the Assignment.
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00, payroll deducted if applicable each pay period (prorated). Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided
**Companions:** The following person/people to reside with Professional in housing: Girlfriend.
**Reimbursements:** Professional will be reimbursed for License up to the amount of $150.00 on a one time only basis from 12/30/15 until 03/26/16 with acceptable proof of expense.

**401(k) Savings Plan:** Professional may be eligible to participate in the Company's 401(k) plan for the assignment. The 401(k) is a retirement savings plan that allows you to contribute pre-tax dollars to a retirement account. The Company's plan is administered by Prudential Retirement.

Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions.

**Termination:** Unauthorized absence, violation of Facility rules, insubordination, falsifying timecards or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional agrees the emergent needs of the Facility may require shift changes. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook https://tsc.NursesRx.com/Forms/2011_NursesRx_Final_SA.pdf

## AGREED AND ACCEPTED

Professional name:     Robert Shaw
Professional signature: _____

AMN Services, Inc.
By:

Date: _____
PID: 4150463

Kerry Sirkka, Division Vice President, Travel Nurse Recruitment

# PROFESSIONAL SERVICES AGREEMENT

**Assignment with AMN Services, LLC dba Nurses Rx (Company):**

**Professional:** Robert Shaw
**Dates:** 12/24/15 to 12/24/15
**Facility:** Kaiser - Orientation ONLY - (Do not add orders), SAN DIEGO, CA
**Position:** Registered Nurse
**Shift:** 12 N
**Minimum Required Hours:** 1
**Minimum Required Shifts:** 0

**COMPENSATION AND BENEFITS:**
**Hourly Rate:** $15.00

**Meals & Incidentals Per Diem Rate:** $0.00/day
**Per Diem Adjustments:** Up to $0.00/week per diem may be adjusted based on number of shifts missed.

**Insurance:** Not accepted. Company offers medical coverage that meets the affordable and minimum value ACA coverage requirements. Professional has been offered the coverage and has chosen to waive coverage. Professional will contact the benefits team within 30 days of experiencing a qualifying event that may change the Professional's waiver of coverage.
**Travel Reimbursement:** Arriving travel: Declined
Ending travel: Declined

**Housing:** Not Provided.

**Furniture:** Not provided

**401(k) Savings Plan:** Professional may be eligible to participate in the Company's 401(k) plan for the assignment. The 401(k) is a retirement savings plan that allows you to contribute pre-tax dollars to a retirement account. The Company's plan is administered by Prudential Retirement.

Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions.

**Termination:** Unauthorized absence, violation of Facility rules, insubordination, falsifying timecards or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional agrees the emergent needs of the Facility may require shift changes. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook https://tsc.NursesRx.com/Forms/2011_NursesRx_Final_SA.pdf

## AGREED AND ACCEPTED

Professional name:　　Robert Shaw　　　　　　　　　AMN Services, Inc.
Professional signature: _____　　By:

Date: _____
PID: 4214859

Kerry Sirkka, Division Vice President, Travel Nurse Recruitment

# EXHIBIT 3

# PROFESSIONAL SERVICES AGREEMENT

11/18/14
PID: 3761121
CID: 626503

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Jennifer Corona
**Dates:** 01/25/15 to 04/25/15
**Location:** Kaiser - Los Angeles Medical Center - Incentive, Los Angeles, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36
**Minimum Required Shift:** 3

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are <u>not</u> included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $25.00
**On Call Rate:** $4.00
**Call Back Rate:** $25.00
**Holiday Rate:** $37.50
**Meals & Incidentals Per Diem Rate:** $35.00/day
**Per Diem Adjustments:** Up to $810.25/week per diem may be adjusted based on number of shifts missed.
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Regular Rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely submission of enrollment forms no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on TSC.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $300.00.
                          Ending amount: $ 0.40 per mile up to $300.00.
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00. Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Shifts.
Time off: 01/28/15 to 02/03/15 has been approved by Emily Sobrepena, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
Time off: 03/16/15 has been approved by Emily Sobrepena, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
Time off: 04/04/15 to 04/05/15 has been approved by Emily Sobrepena, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

### AGREED AND ACCEPTED

Professional name:      Jennifer Corona

Professional signature: _____

Date: _____

PID:  3761121

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

06/19/13
PID: 3285966
CID: 561169

## Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):

**Name (Professional):** Jennifer Corona
**Dates:** 06/26/13 to 09/21/13
**Location:** Kaiser - Los Angeles Medical Center, Los Angeles, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $21.93
**On Call Rate:** $4.00
**Call Back Rate:** $21.93
**Holiday Rate:** $32.90
**Per Diem Rate:** $35.00/day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 24 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the regular rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Eligible to participate in Company plan of group medical, life and dental insurance ("Plan"), conditioned upon specific plan design selected by Professional and Professionals timely submission of enrollment forms no later than 30 days from assignment start date and provided professional is on assignment on effective start day of coverage. If eligibility was established through previous assignment, then Professional must start the next assignment on or before the 31st day after the end date of the last assignment.
**Travel Reimbursement:** Arriving travel: Declined
      Ending amount: $ 0.40 per mile up to $300.00.
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00. Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.
Time off: 07/03/13 to 07/08/13 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, unearned Housing Benefit, as provided in the Work Schedule section of this Agreement.
Time off: 07/12/13 to 07/17/13 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, unearned Housing Benefit, as provided in the Work Schedule section of this Agreement.
Time off: 09/10/13 to 09/15/13 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, unearned Housing Benefit, as provided in the Work Schedule section of this Agreement.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire

AMN0004170

agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook.

AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3285966

# Addendum to Professional Services Agreement

Date: 08/29/13
PID: 3285966
CID: 570752

This addendum amends the Professional Services Agreement and any addendums between Jennifer Corona and AMN Services, Inc. dba American Mobile Healthcare for the Assignment from 6/26/2013 to 9/21/2013 at Kaiser - Los Angeles Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

The new end date is: 12/21/13.

**Effective: 09/22/13**
**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $21.93
**On Call Rate:** $4.00
**Call Back Rate:** $21.93
**Holiday Rate:** $32.90
**Per Diem Rate:** $35.00/day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the regular rate in the next available paycheck following receipt of required documentation.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.
**Work commitment (Minimum Hours):** 36
Time off: 10/02/13 to 10/09/13 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, unearned Housing Benefit, as provided in the Work Schedule section of this Agreement.
**Interim Travel Reimbursement:** $ 0.40 per mile up to $500.00 round trip, for travel that occurs during the following dates: 10/02/2013 to 10/09/2013.

## AGREED AND ACCEPTED

Professional name:  Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3285966

# Addendum to Professional Services Agreement

Date: 10/31/13
PID: 3285966
CID: 578633

This addendum amends the Professional Services Agreement and any addendums between Jennifer Corona and AMN Services, Inc. dba American Mobile Healthcare for the Assignment from 6/26/2013 to 12/21/2013 at Kaiser - Los Angeles Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

The new end date is: 03/22/14.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**Work commitment (Minimum Hours):** 36

Time off: 12/31/13 to 01/02/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

Time off: 01/24/14 to 01/30/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

Time off: 03/13/14 to 03/18/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

**Interim Travel Reimbursement:** $ 0.40 per mile up to $500.00 round trip, for travel that occurs during the following dates: 01/24/2014 to 01/30/2014.

## AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3285966

AMN0004175

# Addendum to Professional Services Agreement

Date: 02/07/14
PID: 3285966
CID: 590098

This addendum amends the Professional Services Agreement and any addendums between Jennifer Corona and AMN Services, Inc. dba American Mobile Healthcare for the Assignment from 6/26/2013 to 3/22/2014 at Kaiser - Los Angeles Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

The new end date is: 06/21/14.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.
**Work commitment (Minimum Hours):** 36
Time off: 04/17/14 to 04/19/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
Time off: 04/23/14 to 04/30/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
Time off: 05/21/14 to 05/27/14 has been approved by Debra Jones, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
**Interim Travel Reimbursement:** $ 0.40 per mile up to $500.00 round trip, for travel that occurs during the following dates:  04/23/2014 to 04/30/2014.

## AGREED AND ACCEPTED

Professional name:      Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date:  _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3285966

AMN0004176

# PROFESSIONAL SERVICES AGREEMENT

07/16/14
PID: 3622975
CID: 608759

## Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):

**Name (Professional):** Jennifer Corona
**Dates:** 07/30/14 to 10/25/14
**Location:** Kaiser - Los Angeles Medical Center, Los Angeles, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $21.93
**On Call Rate:** $4.00
**Call Back Rate:** $21.93
**Holiday Rate:** $32.90
**Per Diem Rate:** $35.00/day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Regular Rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely submission of enrollment forms no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on TSC.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $300.00.
Ending amount: $ 0.40 per mile up to $300.00.
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00. Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided
**Allowances:** Professional will be reimbursed for Car Allowance in the amount of $200.00 on a monthly basis from 07/30/14 until 10/25/14.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.
Time off: 08/12/14 to 08/20/14 has been approved by Cheryl Prince, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.
Time off: 10/22/14 to 10/25/14 has been approved by Cheryl Prince, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

AMN0004177

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

### AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID:  3622975

# First Addendum to Professional Services Agreement

Date: 08/25/14
PID: 3622975
CID: 614220

This addendum amends the Professional Services Agreement and any addendums between Jennifer Corona and AMN Services, Inc. dba American Mobile Healthcare for the Assignment from 7/30/2014 to 10/25/2014 at Kaiser - Los Angeles Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

The new end date is: 01/24/15.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**Work commitment (Minimum Hours):** 36

Time off: 10/26/14 to 10/28/14 has been approved by Agnes Jovellana, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

Time off: 10/31/14 to 10/31/14 has been approved by Agnes Jovellana, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

Time off: 12/13/14 to 12/14/14 has been approved by Agnes Jovellana, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

Time off: 12/29/14 to 01/02/15 has been approved by Agnes, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

## AGREED AND ACCEPTED

Professional name:     Jennifer Corona

AMN Services, Inc.

Professional signature: _____     By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3622975

AMN0004179

**C44**

# Addendum to Professional Services Agreement

Date: 11/25/14
PID: 3622975
CID: 628160

This addendum amends the Professional Services Agreement and any addendums between Jennifer Corona and AMN Services, Inc. dba American Mobile Healthcare for the Assignment from 7/30/2014 to 1/24/2015 at Kaiser - Los Angeles Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

**Allowances:** Professional will be reimbursed for Car Allowance in the amount of $200.00 on a monthly basis from 10/26/14 until 01/24/15.

### AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

Date: _____

PID: 3622975

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

06/19/14
PID: 3616573
CID: 606079

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Jennifer Corona
**Dates:** 06/11/14 to 06/13/14
**Location:** Kaiser - Orientation ONLY - (Do not add orders), SAN DIEGO, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 N
**Minimum Required Hours:** 1

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $15.00

**Per Diem Rate:** $ /day
/hr

**BENEFITS:**
**Insurance:** Not accepted.
**Travel Reimbursement:** Arriving travel: Declined
Ending travel: Declined

**Housing:** Not Provided.

**Furniture:** Not provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $0.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will

AMN0004182

**C46**

terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

Date: _____

PID:  3616573

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

06/25/13
PID: 3295897
CID: 562346

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Jennifer Corona
**Dates:** 06/20/13 to 06/22/13
**Location:** Kaiser - Orientation ONLY - (Do not add orders), SAN DIEGO, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 N
**Minimum Required Hours:** 1

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are <u>not</u> included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $15.00

**Per Diem Rate:** $ /day
/hr

**BENEFITS:**
**Insurance:** Not provided.
**Travel Reimbursement:** Arriving travel: Declined
                          Ending travel: Declined

**Housing:** Not Provided.

**Furniture:** Not provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $0.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve

months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook.

AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

Date: _____

PID: 3295897

AMN Services, Inc.
  By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

07/22/14
PID: 3647244
CID: 610306

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Jennifer Corona
**Dates:** 07/16/14 to 07/18/14
**Location:** Kaiser - Orientation ONLY - (Do not add orders), SAN DIEGO, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 N
**Minimum Required Hours:** 1

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are <u>not</u> included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $15.00

**Per Diem Rate:** $   /day
/hr

**BENEFITS:**
**Insurance:** Not accepted.
**Travel Reimbursement:** Arriving travel: Declined
                                              Ending travel: Declined

**Housing:** Not Provided.

**Furniture:** Not provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $0.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will

AMN0004186

**C50**

terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:　　Jennifer Corona

Professional signature: _____

AMN Services, Inc.
By:

Date: _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID:　3647244

# PROFESSIONAL SERVICES AGREEMENT

05/20/14
PID: 3583495
CID: 601860

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Jennifer Corona
**Dates:** 06/16/14 to 07/26/14
**Location:** Kaiser - West Los Angeles Medical Center- Critical need, Los Angeles, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $27.09
**On Call Rate:** $4.00
**Call Back Rate:** $27.09
**Holiday Rate:** $40.64
**Per Diem Rate:** $0.00 /day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Regular Rate in the next available paycheck following receipt of required documentation.
**Effective: 06/22/14**
**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $27.09
**On Call Rate:** $4.00
**Call Back Rate:** $27.09
**Holiday Rate:** $40.64
**Per Diem Rate:** $35.00 /day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Regular Rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely submission of enrollment forms no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on TSC.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $115.00.
Ending amount: $ 0.40 per mile up to $115.00.
**Housing:** Not Provided.
**Effective: 06/22/14**
**Housing:** Private One Bedroom/Studio at a monthly rate of $0.00. Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for such amounts from any amount due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

AMN0004188

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook
https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:     Jennifer Corona

Professional signature: _____

Date: _____

PID:  3583495

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# EXHIBIT 4

# PROFESSIONAL SERVICES AGREEMENT

01/15/15
PID: 3810993
CID: 635956

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Candy Frey
**Dates:** 01/01/15 to 01/02/15
**Location:** Kaiser - Orientation ONLY - (Do not add orders), SAN DIEGO, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 N
**Minimum Required Hours:** 1
**Minimum Required Shift:** 0

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are <u>not</u> included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $15.00

**Meals & Incidentals Per Diem Rate:** $0.00/day
**Per Diem Adjustments:** Up to $0.00/week per diem may be adjusted based on number of shifts missed.

**BENEFITS:**
**Insurance:** Not accepted. Company offers medical coverage that meets the affordable and minimum value ACA coverage requirements. Professional has been offered the coverage and has chosen to waive coverage. Professional will contact the benefits team within 30 days of experiencing a qualifying event that may change the Professional's waiver of coverage.
**Travel Reimbursement:** Arriving travel: Declined
          Ending travel: Declined

**Housing:** Not Provided.

**Furniture:** Not provided

**Companions:** The following person/people to reside with Professional in housing: Boyfriend.

**Pets:** Dog

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Shifts.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this

AMN0003415

Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:     Candy Frey

Professional signature: _____

Date: _____

PID:  3810993

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

12/16/14
PID: 3783426
CID: 631068

## Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):

**Name (Professional):** Candy Frey
**Dates:** 01/07/15 to 04/04/15
**Location:** Kaiser - San Diego Medical Center, San Diego, CA (Facility)
**Position:** Registered Nurse
**Shift:** 12 Hour Nights
**Minimum Required Hours:** 36
**Minimum Required Shift:** 3

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $21.09
**On Call Rate:** $4.00
**Call Back Rate:** $21.09
**Holiday Rate:** $31.64
**Meals & Incidentals Per Diem Rate:** $35.00/day
**Per Diem Adjustments:** Up to $751.31/week per diem may be adjusted based on number of shifts missed.
**Lodging Per Diem:** $72.33 per-day amount, paid in each pay check.
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the Regular Rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Company offers medical coverage that meets the affordable and minimum value ACA coverage requirements. Professional is eligible to participate in Company health plan ("Plan") conditioned upon Professional's timely completion of enrollment no later than 30 days from assignment start date and provided Professional is on assignment on effective start day of coverage. For further eligibility and enrollment requirements, Professional will review the Handbook and plan documents on the Connect To Your Health benefits portal via TSC.
**Travel Reimbursement:** Arriving travel: Declined
                           Ending travel: Declined

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Shifts.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

AMN0003417

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

https://tsc.AmericanMobile.com/Forms/2011_American Mobile_Final_SA.pdf

AGREED AND ACCEPTED

Professional name:     Candy Frey

Professional signature: _____

Date: _____

PID:  3783426

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# Addendum to Professional Services Agreement

Date: 03/12/15
PID: 3783426
CID: 645787

This addendum amends the Professional Services Agreement and any addendums between Candy Frey and AMN Services, LLC dba American Mobile Healthcare for the Assignment from 1/7/2015 to 4/4/2015 at Kaiser - San Diego Medical Center as set forth below.

## The following section of the above referenced agreement is hereby amended to:

The new end date is: 05/30/15.

**BENEFITS:**
**Bonus:** $400.00, paid after the completion of four weeks of work (hours as agreed above) on the Assignment ending 05/30/15. Bonuses for subsequent extensions only apply if specified in a written addendum.
**Reimbursements:** Professional will be reimbursed for ACLS/BLS Combination Course up to the amount of $200.00 on a one time only basis from 04/05/15 until 05/30/15 with acceptable proof of expense.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Shifts.
**Work commitment (Minimum Hours):** 36
**Time off:** 04/08/15 to 04/15/15 has been approved by Tiffany Grettler, a representative of the Facility. Professional agrees to make up this time off or reimburse Company for any advanced, missed shift adjustment, as provided in the Work Schedule section of this Agreement.

### AGREED AND ACCEPTED

Professional name:        Candy Frey

Professional signature: _____

Date: _____

PID: 3783426

AMN Services, Inc.
By:

Kerry Sirkka, Divisional Vice President of Recruitment

# PROFESSIONAL SERVICES AGREEMENT

09/18/13
PID: 3367034
CID: 572752

**Assignment with AMN Services, Inc. dba American Mobile Healthcare (Company):**

**Name (Professional):** Candy Frey
**Dates:** 10/02/13 to 12/28/13
**Location:** Kaiser - San Diego Medical Center, San Diego, CA (Facility)
**Position:** Registered Nurse
**Shift:** 8 Hour Evenings
**Minimum Required Hours:** 40

**COMPENSATION AND ALLOWANCES:** For all authorized and properly documented time, Professional will be paid at the Regular Rate below for the first eight (8) hours per workday and forty (40) per workweek, and overtime at the following rates: (1) 1.5X for hours worked in excess of eight (8) per workday and (2) 2X for hours worked in excess of twelve (12) per workday. Daily hours paid at an overtime rate are not included in determining when forty (40) hours have been worked. Professional authorizes Company to deduct from compensation any housing related co-pays/deposits identified below.
**Regular Rate:** $20.60
**On Call Rate:** $4.00
**Call Back Rate:** $20.60
**Holiday Rate:** $30.90
**Per Diem Rate:** $35.00/day
**Missed Shift Adjustment:** $18.00/hr
**GUARANTEED HOURS:** Professional is required to work all assigned and/or available hours up to the minimum required hours stated above. With appropriate documentation, Professional will be paid for cancelled shifts in excess of 36 hours per assignment, which are cancelled by the Facility and cannot be made up during the pay cycle. To receive payment, Professional must submit the appropriate documentation signed by the Facility. Guaranteed hours are paid at the regular rate in the next available paycheck following receipt of required documentation.

**BENEFITS:**
**Insurance:** Eligible to participate in Company plan of group medical, life and dental insurance ("Plan"), conditioned upon specific plan design selected by Professional and Professionals timely submission of enrollment forms no later than 30 days from assignment start date and provided professional is on assignment on effective start day of coverage. If eligibility was established through previous assignment, then Professional must start the next assignment on or before the 31st day after the end date of the last assignment.
**Travel Reimbursement:** Arrival amount: $ 0.40 per mile up to $250.00.
                                        Ending amount: $ 0.40 per mile up to $250.00.
**Housing:** Private One Bedroom/Studio at a monthly  rate of $0.00. Professional has reviewed the Housing Policy in the Handbook and agrees to pay utility overages, excessive cleaning and other expenses as required. Professional authorizes overages to be deducted from Professional's compensation where permitted by law.
**Furniture:** Provided
**Companions:** The following person/people to reside with Professional in housing: Boyfriend.
**Pets:** One cat
**Effective: 10/15/13**
**Subsidy:** $2000.00 monthly, calculated as a per-day amount, paid in each pay check.
**Furniture:** Not provided
**Reimbursements:** Professional will be reimbursed for Moving in the amount of $1000.00 on a one time only basis from 10/02/13 until 12/28/13 with acceptable proof of expense.

**WORK SCHEDULE:** Professional will receive various payments in addition to wages for actual hours worked as part of overall compensation. These payments are based on the expected Minimum Required Hours. If Professional works less than the Minimum Required Hours, Professional agrees to reimburse the Company a missed shift adjustment at the rate of $18.00 per hour and authorizes the Company to adjust for  such amounts from any amount  due (including bonuses). Professional may make up missed shifts and previous adjustments will be repaid.

**OTHER REQUIREMENTS:** Professional agrees to provide health documents and other assignment required documents described in the enclosed Quality Services letter to the Company prior to Assignment start date.

**PROFESSIONAL CONDUCT:** Professional will adhere to the rules, policies and procedures of the Facility. Allegations of unauthorized absence, violation of Facility rules or other unprofessional conduct or breach or neglect of duty will be grounds for immediate termination of the Assignment by Facility and of the Company's obligations under this Agreement. Professional is responsible for charges associated with a cancellation.

**OTHER TERMS:** Professional agrees that any additional time worked at Facility on a temporary or per diem basis commencing within twelve months of the end date set forth above, will be worked by Professional only through the Company, such obligation to survive the termination of this Agreement. Working any additional shifts during the travel assignment, other than that expressly permitted herein, is not permitted without prior approval of the Company. Professional's acceptance of this Assignment does not obligate the Company to offer or Professional to accept any future Assignments that may be available through the Company. This Agreement is governed by the laws of the State Of California and all claims arising

AMN0003420

under this Agreement shall only be brought in a court of competent jurisdiction in San Diego County, California. This Agreement contains the entire agreement between Professional and the Company and supersedes all prior oral and written agreements and discussions. This Agreement will terminate: (1) upon conclusion of the Assignment or (2) in the event Facility terminates Professional's services.

**ACCEPTANCE OF ASSIGNMENT:** Company and Professional agree and accept this Assignment under the terms and conditions set forth here. Professional acknowledges and understands that the Professional Handbook supplied to Professional includes the Company's policies, procedures, guidance and expectations, and is incorporated herein. Professional agrees to comply with the Handbook

AGREED AND ACCEPTED

Professional name:     Candy Frey

AMN Services, Inc.

Professional signature: _____   By:

Date:  _____

Kerry Sirkka, Divisional Vice President of Recruitment

PID: 3367034

AMN0003421

# EXHIBIT 5

# Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**

685576

**Signature:**

Robert Shaw

**Timestamp:**

11/26/2015 9:44:32 PM

**IP Address:**

10.241.3.5

AMN0001019

**C63**

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**

685576

**Signature:**

Robert Shaw

**Timestamp:**

11/26/2015 9:34:17 PM

**IP Address:**

10.241.3.5

AMN0001020

**C64**

# Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**

685576

**Signature:**

Robert Shaw

**Timestamp:**

11/26/2015 10:41:05 PM

**IP Address:**

10.241.3.5

AMN0001021

**C65**

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the NursesRx Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**
685576

**Signature:**
Robert Shaw

**Timestamp:**
11/26/2015 9:34:17 PM

**IP Address:**
10.241.3.5

AMN0001329

C66

# Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the NursesRx Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**

685576

**Signature:**

Robert Shaw

**Timestamp:**

11/26/2015 9:44:32 PM

**IP Address:**

10.241.3.5

AMN0001333

**C67**

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the NursesRx Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

**HP ID:**

685576

**Signature:**

Robert Shaw

**Timestamp:**

11/26/2015 10:41:05 PM

**IP Address:**

10.241.3.5

AMN0001336

**C68**

# EXHIBIT 6

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

HP ID:

414642

Signature:

Jennifer Corona

Timestamp:

9/29/2013 7:16:51 AM

IP Address:

198.228.213.178

AMN0003711

C70

# Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

HP ID:

414612

Signature:

Jennifer Corona

Timestamp:

2/26/2015 11:54:29 PM

IP Address:

10.241.3.5

AMN0003714

C71

# EXHIBIT 7

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

HP ID:

| 176867 |

Signature:

| Candy Frey |

Timestamp:

| 4/16/2014 1:49:13 PM |

IP Address:

| 173.196.206.85 |

AMN0002888

C73

## Handbook Acknowledgement

By typing my name and password below, I acknowledge that I have received a copy of the American Mobile Healthcare Handbook (hereinafter "Handbook"). I understand that I am to read the Handbook and if I have any questions about the Handbook, I am to discuss them with my appropriate company contact.

I recognize that the Handbook supersedes and replaces any previous handbooks or policies, and to the extent that the provisions of the Handbook conflict with previously issued policies or practices (whether or not such policies and practices were contained in a handbook), this Handbook shall prevail. I further understand that AMN Healthcare reserves the right to make changes to its policies, procedures, and benefits whenever it deems necessary. Although AMN Healthcare will normally distribute changes to this Handbook, there may be times when policies will change before this Handbook is revised.

I certify that I have been provided a copy of the Handbook, which includes the "Substance Abuse Prevention Policy"; and that I have read, understood and agree to abide with the Policy. I understand that it is my responsibility to understand and comply fully with the Handbook.

HP ID:

176867

Signature:

Candy Frey

Timestamp:

4/2/2015 4:58:30 AM

IP Address:

10.241.3.5

AMN0002891

**C74**

# EXHIBIT 8

# 2013
# HEALTHCARE
# PROFESSIONAL
# HANDBOOK

ESSENTIAL INFORMATION FOR
SUCCESSFULLY MANAGING THE
DETAILS OF YOUR
TRAVEL ASSIGNMENTS.



an AMN Healthcare company

# Table of Contents

**Important Contact Information** ....................................................................................................................6

**Welcome!** ..........................................................................................................................................................7

**Our Purpose and Values** ..............................................................................................................................8

**Customer Service Connection** ....................................................................................................................9

**Payroll and Timekeeping Information** .....................................................................................................9

  Wages ...............................................................................................................................................................9

      Overtime .......................................................................................................................................................9

      On-Call and Call-Back ..............................................................................................................................9

      Shift Differentials .....................................................................................................................................10

      Holiday Pay ...............................................................................................................................................10

      Bonuses ......................................................................................................................................................10

      When Payroll is Provided by the Facility ..........................................................................................10

  Allowances and Reimbursements ..............................................................................................................10

      Meals and Incidentals ............................................................................................................................10

      Housing ......................................................................................................................................................10

      Missed Shift Adjustment (MSA) ..........................................................................................................11

      Calculation and Timing of Housing Allowance Payments .............................................................11

      Travel Reimbursement ...........................................................................................................................11

  Timecards and Facility Timekeeping Systems ........................................................................................13

      Shifts Worked Outside of Contract Dates ..........................................................................................13

      Off The Clock Work ................................................................................................................................13

      Meal and Rest Periods ............................................................................................................................13

  Pay Schedule ................................................................................................................................................14

  Direct Deposit Service ................................................................................................................................15

**Tax Information** ............................................................................................................................................15

  W-4 ................................................................................................................................................................15

  W-2 ................................................................................................................................................................15

  Expense Reimbursements ...........................................................................................................................16

  Permanent Tax Residence Qualification .................................................................................................16

**Work Schedule/Time Off** ...........................................................................................................................17

**Housing** .........................................................................................................................................................17

  Property Selection .......................................................................................................................................17

American Mobile Handbook

Hotel Selection .............................................................................................................................................17

Housing Co-Payment ......................................................................................................................................18

Roommates .....................................................................................................................................................18

Children ..........................................................................................................................................................18

Pets .................................................................................................................................................................19

Move-In ..........................................................................................................................................................19

Furniture .........................................................................................................................................................19

Phone/Cable/Internet ......................................................................................................................................20

Utilities ...........................................................................................................................................................20

Maintenance ...................................................................................................................................................20

Move-Out ........................................................................................................................................................20

Post Assignment Cleaning, Ending Utility and Damage Fees ........................................................................20

Assignment Extensions ..................................................................................................................................21

Clinician Responsibilities ...............................................................................................................................21

**Health Benefits ..............................................................................................................................................21**

Group Medical, Dental and Life Insurance ....................................................................................................21

Eligibility ........................................................................................................................................................21

Enrollment ......................................................................................................................................................22

    Health Benefits Coverage Post Assignment ...........................................................................................22

    What is COBRA? ....................................................................................................................................22

**Additional Benefits .......................................................................................................................................22**

401(k) Savings Plan ........................................................................................................................................22

    Benefits ...................................................................................................................................................22

    Company Match ......................................................................................................................................23

    Electronic Enrollment .............................................................................................................................23

    Limits ......................................................................................................................................................23

    Saving for Retirement .............................................................................................................................23

Supplemental Life/Accidental Death & Dismemberment (AD&D) Insurance ...............................................23

Voluntary Vision Plan (VSP) ..........................................................................................................................23

Voluntary Dental Buy Up Plan ........................................................................................................................23

Voluntary Accident, Sickness/Hospitalization, Short Term Disability Plan and Critical Illness Insurance ............23

Referral Program ............................................................................................................................................24

Professional Liability Insurance Coverage .....................................................................................................24

Education Benefits – RN.com .........................................................................................................................24

American Mobile Handbook

Tuition Discounts ........................................................................................................................24

**Summary of Benefits** ..............................................................................................................**24**

**Clinician Work Exposures, Injuries, Illnesses, or Liability Related Incidents** ....................................**25**

Reporting a Work Exposure, Injury or Illness..............................................................................25

How the Workers' Compensation Process Works ........................................................................27

Texas Employees Only................................................................................................................27

California Employees Only .........................................................................................................27

Ohio, Washington State, North Dakota, Wyoming & U.S. Virgin Islands Employees Only................27

A Note About Workers' Compensation Fraud .............................................................................28

Occupational Exposure to Disease ..............................................................................................28

Workplace Accommodations ......................................................................................................28

Liability Related Incident Reporting ..........................................................................................28

**Credentialing Requirements** .................................................................................................**29**

State Licensure for Licensed Clinicians ......................................................................................30

ACLS/BLS ................................................................................................................................30

Physician's Health Statement .....................................................................................................31

Drug Screen ..............................................................................................................................31

Tuberculosis (TB) Screening ......................................................................................................31

MMR and Varicella Immunity ...................................................................................................31

Hepatitis B Immunity ...............................................................................................................31

Waiver of Hepatitis Vaccination ................................................................................................31

Identification/Work Eligibility Documents ................................................................................32

Testing ......................................................................................................................................32

**Standards of Professional Conduct** .......................................................................................**32**

**Employment Practices** ..........................................................................................................**33**

Equal Employment Opportunity................................................................................................33

Management of Personal Records ...............................................................................................33

Moonlighting ............................................................................................................................33

Employment References & Evaluations ......................................................................................33

Anti-Harassment Policy..............................................................................................................34

    All Unlawful Harassment Prohibited................................................................................34

    Sexual Harassment..........................................................................................................34

    Other Types of Harassment ............................................................................................34

    Complaint & Investigation Procedure ............................................................................34

American Mobile Handbook

No Retaliation ...........................................................................................................................35

Reporting ................................................................................................................................35

Disability Accomodations ...............................................................................................................35

Requesting a Reasonable Accommodation.........................................................................................35

Medical Information ...................................................................................................................36

Accommodation Determinations .....................................................................................................36

Leaves of Absence..........................................................................................................................36

Family and Medical Leave ...........................................................................................................36

Military Service Leave Policy .......................................................................................................39

Medical Leave of Absence for Work-Related Illness or Injury.................................................................39

Leave Under the Americans With Disabilities Act (ADA) .....................................................................39

California Employees Only ...............................................................................................................39

California Pregnancy Disability Leave (CPDL) and Accommodation.........................................................40

State Disability Insurance (SDI) and Paid Family Leave (PFL)................................................................41

Substance-Abuse Prevention Policy ....................................................................................................41

Prohibited Activity.....................................................................................................................41

Discipline ................................................................................................................................42

Drug & Alcohol Testing Requirements .............................................................................................42

Procedures for Drug & Alcohol Testing ...........................................................................................43

Refusing a Test .........................................................................................................................43

Confidentiality ..........................................................................................................................43

Compliance With All Applicable Laws .............................................................................................43

Dispute Resolution .........................................................................................................................44

Appendix ....................................................................................................................................45

What Do I Take On My Assignment? ...............................................................................................45

Excerpt From IRS Publication 463.....................................................................................................46

American Mobile Handbook

# Customer Service Connection

Welcome Welcome and congratulations on signing your Professional Services Agreement and beginning your new assignment. While on assignment, you may have questions or concerns pertaining to payroll, housing, reimbursements, benefits and other travel related issues. Our Customer Support team is available to offer general assistance Monday through Friday, 7:00 a.m. to 5:00 p.m. PST.

Our Service Connection web site at www.americanmobile.com is also available to you 24/7 and provides you access to a wide variety of information during your assignment. You'll have access to view your paycheck, verify hours worked, direct deposit information and earnings detail. We also provide access to review your contract and offer you the ability to submit online forms that are needed prior to the start of your assignment. Additionally, while on assignment you'll be able to verify that we've received your timecard, as well as enjoy connections to local services. We encourage you to explore the benefits of The Service Connection (TSC) by visiting the site tutorial link on the site's home page after logging in https://tsc.americanmobile.com/.

Most importantly, we want you to know that you truly matter to us and we are here to help. We know that you want your concerns taken care of quickly, accurately and courteously. That's our goal, too! We are always looking for ways to improve our service and value your opinion, so please give us a call or send us an e-mail with your suggestions.

The following sections describe in more detail the processes governing your travel experience. Please review the information and contact us with any questions you may have.

# Payroll and Timekeeping Information

Depending on your assignment location, you may be paid by the Company or directly by the assignment Facility. Timekeeping and other policies and procedures will also vary by assignment and facility. It will be important for you to understand the particular policies and procedures used for each assignment. The following are some general guidelines.

## Wages

Refer to your Professional Services Agreement for your specific hourly wage and information concerning other payments, such as, for example, assignment overtime, double-time, holiday pay, on call, charge, call-back, and shift differentials. The rates and information reflected on your Professional Services Agreement will govern the assignment, so please contact your recruiter immediately upon receipt of your Professional Services Agreement if you have any questions.

## Overtime

The Company follows federal and state wage and hour laws for payment of overtime worked. Some facilities do not authorize overtime work for contract staff. It is very important that you obtain approval from your manager at the Facility prior to working any overtime. In addition, your manager must also approve the overtime on your timecard. Federal law requires overtime to be paid after 40 hours in any given work week. State laws vary on overtime calculations.

## On-Call and Call-Back

Your on-call rate, if applicable, is specified in your Professional Services Agreement and will be paid for those hours you are designated as "on-call." The facility will provide direction regarding on-call time for your specific assignment. Generally, you will be required to carry a pager or otherwise be accessible by phone and respond to calls / return to the facility within thirty to forty-five minutes. This may be referred to as "uncontrolled" on-call or stand-by time. If you are required to remain on the premises or respond or return in a shorter amount of time, you may be entitled to a different hourly rate, so please contact Customer Service at (877)

CONFIDENTIAL

# Timecards and Facility Timekeeping Systems

To report your time each pay period, you will use either Company eTimecards, paper timecards, Facility provided timecards, or a Facility timekeeping system. If the Facility requires the use of eTimecards or paper timecards, you may obtain these on The Service Connection. Do not use any other timecards. Each timecard includes the date information and should be used for the appropriate timeframe. When filling out paper timecards, please use military time, write neatly, and stay within the boxes as these timecards are scanned directly into our payroll system. Please only use the special pay instructions box for information that is required to process your pay that is not already noted on the eTimecard.

Depending on your assignment Facility, your Manager may fax your timecard directly to our Payroll Department or may require you to accept this responsibility. Before the end of your first pay period, please determine who holds this responsibility at your Facility and submit your timecard accordingly. Should you have any questions or require any clarification about your Facility timecard, contact your Facility supervisor.

An authorized Facility employee must sign your timecards. You must account for the minimum required hours per pay period and include explanations for any time off. The timecard must be fully completed, including the column for meal period(s), before it can be processed. You must also note all schedule changes, such as sick time, requested time off, or exchanging hours on your timecard. If you do not work a scheduled shift, it is very important to indicate whether you or the Facility cancelled it. Additional information on timecard completion is provided with your timecards.

You may be required to report your time using a Facility timekeeping system. You will receive specific instructions from the Facility at the inception of the assignment regarding the use of their system. Please follow their directions to assure accurate and timely processing of your payroll data.

## Shifts Worked Outside of Contract Dates

Shifts worked must fall within the assignment dates of your Professional Services Agreement in order for the Company to process payment for the hours worked through the normal timecard and payroll process. If you work shifts either before or after your assignment start and end dates, or during scheduled and approved time off, you need to notify your Recruiter and provide the actual dates worked to ensure that you are paid accurately and timely for all hours worked.

## Off The Clock Work

The Company's policy is to pay for all hours worked. You are prohibited from performing any "off-the-clock" work. "Off-the-clock" work means work you perform but do not report on your time card. You must report all hours worked and do so accurately. You must notify Customer Support immediately if you are told not to report all hours worked on your timesheet or are otherwise prevented or discouraged from accurately reporting all time worked. The Company will investigate any concerns regarding off the clock work and will also investigate any discrepancies in time-reporting. Evidence of falsifying records or fraud may be reported to the appropriate licensing board or any certifying agency and/or responsible criminal authorities, and may be grounds for termination.

## Meal and Rest Periods

The Company provides Clinicians with meal and rest breaks as required under applicable federal and state laws. The policies related to the timing and reporting of meal and rest breaks vary by facility. Please be sure to check with your manager at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks. Regardless of the timecard or time-keeping system you are using on your assignment, you must accurately report all time worked. Breaks greater than twenty minutes should be reflected on your timecard. If you do not take a meal break, please make sure your time record accurately reflects that no break was taken and/or you follow the Facilities procedure for reporting missed meal periods.

CONFIDENTIAL                                                                        AMN0002212

### *California Meal Periods*

Clinicians who work in California are provided with meal breaks in accordance with California law. Meal periods as set forth below are are not considered hours worked and are not compensated. During your meal break, you should be relieved of all job duties and free to engage in personal activities.

- If you who work more than five hours in a day, you are provided the opportunity to take an uninterrupted 30 minute meal break no later than the end of your fifth hour of work. If you work more than five hours but no more than six hours in a workday, you may voluntarily waive the meal period.

- If you work more than ten hours in a day, you are provided the opportunity to take a second uninterrupted 30 minute meal period no later than the end of your tenth hour of work. You may voluntarily waive one of the two meal periods by completing the Meal Period Waiver form. If you decide to waive one of the two meal periods, then your meal period will be provided before the end of your tenth hour of work. Waiver forms are available on The Service Connection. You may change your waiver option at any time by completing and submitting a new form. Any change will become effective upon the next shift worked after submission to the Company.

If you were not provided the opportunity to take a meal break or breaks as explained above or are otherwise discouraged from taking your meal break(s), you must report this to the Company. Please notify the Company on your timecard or, if you are unable to report this information on your timecard, contact Customer Support at 877-777-8086. If you are provided the opportunity to take a meal break as explained above, but voluntarily choose 1) not to take it, 2) to take it later, or 3) to take a shorter meal period, you are not required to notify the Company but please make sure you accurately report your time to ensure you are paid for all hours worked.

### *California Rest Periods*

In accordance with California law, Clinicians who work in California and work more than 3.5 hours in a day are authorized and permitted to take a paid ten (10) minute rest period for every four (4) hours of work, or major fraction thereof. A major fraction is over two hours of work. If you were not authorized or permitted rest breaks, you must report this on your timecard. If you are unable to report this information on your timecard, you must contact Customer Support at 877-777-8086.

## Pay Schedule

Pay periods are weekly or biweekly, and the scheduled pay day is Friday. Timecards must be transmitted via fax to the Company by 5 p.m. Pacific Standard Time (8 p.m. Eastern Standard Time) on the Monday after the pay period ends. The Payroll fax lines are available 24 hours a day. The number can be found printed on the Company provided timecards. If you are using a facility provided timecard, please call Customer Support to get the corret fax number. 

Timecards received after this deadline, but before noon Pacific Standard Time on Wednesday will be processed in the second payroll cycle and will be paid on the following Monday. Timecards received after noon Pacific Standard Time Wednesday will be paid with the following week's payroll. You should carefully review your check stub on The Service Connection each pay period as it provides details regarding your pay, tax withholding and other deductions. If you have special requests about where your paycheck will be sent, notify your Customer Account Manager.

CONFIDENTIAL

AMN0002213

# EXHIBIT 9

# 2014

# HEALTHCARE

# PROFESSIONAL

# HANDBOOK

ESSENTIAL INFORMATION FOR
SUCCESSFULLY MANAGING THE
DETAILS OF YOUR
TRAVEL ASSIGNMENTS.



an AMN Healthcare company

# Table of Contents

Important Contact Information ................................................................................................................6

Welcome! .....................................................................................................................................................7

Our Purpose and Values ...........................................................................................................................8

Customer Service Connection...................................................................................................................9

Payroll and Timekeeping Information ....................................................................................................9

    Wages .......................................................................................................................................................9

        Overtime ............................................................................................................................................9

        On-Call and Call-Back......................................................................................................................9

        Shift Differentials ...........................................................................................................................10

        Holiday Pay .....................................................................................................................................10

        Bonuses ...........................................................................................................................................10

        When Payroll is Provided by the Facility .....................................................................................10

    Allowances and Reimbursements.........................................................................................................10

        Meals and Incidentals .....................................................................................................................10

        Housing............................................................................................................................................10

        Missed Shift Adjustment (MSA) ....................................................................................................11

        Calculation and Timing of Housing Allowance Payments.............................................................11

        Travel Reimbursement....................................................................................................................11

    Timecards and Facility Timekeeping Systems ...................................................................................13

        Shifts Worked Outside of Contract Dates .....................................................................................13

        Off The Clock Work ........................................................................................................................13

        Meal and Rest Periods ....................................................................................................................13

    Pay Schedule ........................................................................................................................................14

    Direct Deposit Service..........................................................................................................................15

Tax Information.........................................................................................................................................15

    W-4 .......................................................................................................................................................15

    W-2 .......................................................................................................................................................15

    Expense Reimbursements.....................................................................................................................16

    Permanent Tax Residence Qualification .............................................................................................16

Work Schedule/Time Off .........................................................................................................................17

Housing ......................................................................................................................................................17

    Property Selection ................................................................................................................................17

American Mobile Handbook

Hotel Selection ................................................................................................................................17

Housing Co-Payment .......................................................................................................................18

Roommates .......................................................................................................................................18

Children ...........................................................................................................................................18

Pets ..................................................................................................................................................19

Move-In ...........................................................................................................................................19

Furniture ..........................................................................................................................................19

Phone/Cable/Internet .......................................................................................................................20

Utilities ............................................................................................................................................20

Maintenance .....................................................................................................................................20

Move-Out .........................................................................................................................................20

Post Assignment Cleaning, Ending Utility and Damage Fees ..........................................................20

Assignment Extensions ....................................................................................................................21

Clinician Responsibilities ................................................................................................................21

**Health Benefits ..............................................................................................................................21**

Group Medical, Vision Discount and Life Insurance .......................................................................21

Eligibility .........................................................................................................................................21

Enrollment ........................................................................................................................................22

    Health Benefits Coverage Post Assignment ................................................................................22

    What is COBRA? ........................................................................................................................22

**Additional Benefits .......................................................................................................................22**

401(k) Savings Plan ..........................................................................................................................22

    Benefits .......................................................................................................................................22

    Company Match ..........................................................................................................................23

    Electronic Enrollment .................................................................................................................23

    Limits ..........................................................................................................................................23

    Saving for Retirement .................................................................................................................23

Supplemental Life/Accidental Death & Dismemberment (AD&D) Insurance ..................................23

Voluntary Vision Plan (VSP) ...........................................................................................................23

Voluntary Dental Plan ......................................................................................................................23

Voluntary Accident, Sickness/Hospitalization, Short Term Disability Plan and Critical Illness Insurance ...........23

Referral Program ..............................................................................................................................24

Professional Liability Insurance Coverage........................................................................................24

Education Benefits – RN.com ...........................................................................................................24

American Mobile Handbook

Tuition Discounts ........................................................................................................................24

**Summary of Benefits** ..............................................................................................................**24**

**Clinician Work Exposures, Injuries, Illnesses, or Liability Related Incidents** ...................**25**

Workers' Compensation Insurance .......................................................................................25

    Reporting a Work Exposure, Injury or Illness ...............................................................25

    You Have Reported a Work Injury .... Now What?........................................................25

    Texas Employees Only ...................................................................................................26

    California Employees Only .............................................................................................26

    Ohio, Washington State, North Dakota, Wyoming & U.S. Virgin Islands Employees Only .......................26

    Occupational Exposure to Disease ...............................................................................26

    A Note About Workers' Compensation Fraud ..............................................................26

Workplace Accommodations ..............................................................................................27

Liability Related Incident Reporting ..................................................................................27

**Credentialing Requirements**....................................................................................................**28**

State Licensure for Licensed Clinicians ..............................................................................29

ACLS/BLS ...........................................................................................................................29

Physician's Health Statement ..............................................................................................30

Drug Screen ..........................................................................................................................30

Tuberculosis (TB) Screening................................................................................................30

MMR and Varicella Immunity ............................................................................................30

Hepatitis B Immunity ..........................................................................................................30

Waiver of Hepatitis Vaccination .........................................................................................30

Identification/Work Eligibility Documents .........................................................................31

Testing ..................................................................................................................................31

**Standards of Professional Conduct**........................................................................................**31**

**Employment Practices**..............................................................................................................**32**

Equal Employment Opportunity..........................................................................................32

Management of Personal Records ........................................................................................32

Moonlighting ........................................................................................................................33

Employment References & Evaluations................................................................................33

Anti-Harassment Policy........................................................................................................34

    All Unlawful Harassment Prohibited............................................................................34

    Sexual Harassment.........................................................................................................34

    Other Types of Harassment ..........................................................................................34

American Mobile Handbook

Complaint & Investigation Procedure .................................................................................34

No Retaliation .......................................................................................................................35

Reporting ..............................................................................................................................35

Disability Accommodations ......................................................................................................35

Requesting a Reasonable Accommodation ...........................................................................35

Medical Information .............................................................................................................36

Accommodation Determinations ..........................................................................................36

Leaves of Absence ....................................................................................................................36

Family and Medical Leave ....................................................................................................36

Military Service Leave Policy ...............................................................................................39

Medical Leave of Absence for Work-Related Illness or Injury .............................................39

Leave Under the Americans With Disabilities Act (ADA) ....................................................39

California Employees Only ........................................................................................................39

California Pregnancy Disability Leave (CPDL) and Accommodation ...................................40

State Disability Insurance (SDI) and Paid Family Leave (PFL) ............................................40

Substance-Abuse Prevention Policy ..........................................................................................41

Prohibited Activity ...............................................................................................................41

Discipline ..............................................................................................................................41

Drug & Alcohol Testing Requirements .................................................................................42

Procedures for Drug & Alcohol Testing ...............................................................................43

Refusing a Test .....................................................................................................................43

Confidentiality ......................................................................................................................43

Compliance With All Applicable Laws .................................................................................43

Dispute Resolution ...................................................................................................................44

Appendix ..................................................................................................................................45

What Do I Take On My Assignment? ....................................................................................45

Excerpt From IRS Publication 463 ............................................................................................46

American Mobile Handbook

# Customer Service Connection

Welcome and congratulations on signing your Professional Services Agreement and beginning your new assignment. While on assignment, you may have questions or concerns pertaining to payroll, housing, reimbursements, benefits and other travel related issues. Our Customer Support team is available to offer general assistance Monday through Friday, 7:00 a.m. to 5:00 p.m. PST.

Our Service Connection web site at www.americanmobile.com is also available to you 24/7 and provides you access to a wide variety of information during your assignment. You'll have access to view your paycheck, verify hours worked, direct deposit information and earnings detail. We also provide access to review your contract and offer you the ability to submit online forms that are needed prior to the start of your assignment. Additionally, while on assignment you'll be able to verify that we've received your timecard, as well as enjoy connections to local services. We encourage you to explore The Service Connection (TSC) by visiting the site tutorial link on the site's home page after logging in https://tsc.americanmobile.com/.

Most importantly, we want you to know that you truly matter to us and we are here to help. We know that you want your concerns taken care of quickly, accurately and courteously. That's our goal, too! We are always looking for ways to improve our service and value your opinion, so please give us a call or send us an e-mail with your suggestions.

The following sections describe in more detail the processes governing your travel experience. Please review the information and contact us with any questions you may have.

# Payroll and Timekeeping Information

Depending on your assignment location, you may be paid by the Company or directly by the assignment Facility. Timekeeping and other policies and procedures will also vary by assignment and facility. It will be important for you to understand the particular policies and procedures used for each assignment. The following are some general guidelines.

## Wages

Refer to your Professional Services Agreement for your specific hourly wage and information concerning other payments, such as, for example, assignment overtime, double-time, holiday pay, on call, charge, call-back, and shift differentials. The rates and information reflected on your Professional Services Agreement will govern the assignment, so please contact your recruiter immediately upon receipt of your Professional Services Agreement if you have any questions.

### Overtime

The Company follows federal and state wage and hour laws for payment of overtime worked. Some facilities do not authorize overtime work for contract staff. It is very important that you obtain approval from your manager at the Facility prior to working any overtime. In addition, your manager must also approve the overtime on your timecard. Federal law requires overtime to be paid after 40 hours in any given work week. State laws vary on overtime calculations.

### On-Call and Call-Back

Your on-call rate, if applicable, is specified in your Professional Services Agreement and will be paid for those hours you are designated as "on-call." The facility will provide direction regarding on-call time for your specific assignment. Generally, you will be required to carry a pager or otherwise be accessible by phone and respond to calls / return to the facility within thirty to forty-five minutes. This may be referred to as "uncontrolled" on-call or stand-by time. If you are required to remain on the premises or respond or return in a shorter amount of time, you may be entitled to a different hourly rate, so please contact Customer Service at (877)

CONFIDENTIAL                                                                                       AMN0002302
**C90**

# Timecards and Facility Timekeeping Systems

To report your time each pay period, you will use either Company eTimecards, paper timecards, Facility provided timecards, or a Facility timekeeping system. If the Facility requires the use of eTimecards or paper timecards, you may obtain these on The Service Connection. Do not use any other timecards. Each timecard includes the date information and should be used for the appropriate timeframe. When filling out paper timecards, please use military time, write neatly, and stay within the boxes as these timecards are scanned directly into our payroll system. Please only use the special pay instructions box for information that is required to process your pay that is not already noted on the eTimecard.

Depending on your assignment Facility, your Manager may fax your timecard directly to our Payroll Department or may require you to accept this responsibility. Before the end of your first pay period, please determine who holds this responsibility at your Facility and submit your timecard accordingly. Should you have any questions or require any clarification about your Facility timecard, contact your Facility supervisor.

An authorized Facility employee must sign your timecards. You must account for the minimum required hours per pay period and include explanations for any time off. The timecard must be fully completed, including the column for meal period(s), before it can be processed. You must also note all schedule changes, such as sick time, requested time off, or exchanging hours on your timecard. If you do not work a scheduled shift, it is very important to indicate whether you or the Facility cancelled it. Additional information on timecard completion is provided with your timecards.

You may be required to report your time using a Facility timekeeping system. You will receive specific instructions from the Facility at the inception of the assignment regarding the use of their system. Please follow their directions to assure accurate and timely processing of your payroll data.

## Shifts Worked Outside of Contract Dates

Shifts worked must fall within the assignment dates of your Professional Services Agreement in order for the Company to process payment for the hours worked through the normal timecard and payroll process. If you work shifts either before or after your assignment start and end dates, or during scheduled and approved time off, you need to notify your Recruiter and provide the actual dates worked to ensure that you are paid accurately and timely for all hours worked.

## Off The Clock Work

The Company's policy is to pay for all hours worked. You are prohibited from performing any "off-the-clock" work. "Off-the-clock" work means work you perform but do not report on your time card. You must report all hours worked and do so accurately. You must notify Customer Support immediately if you are told not to report all hours worked on your timesheet or are otherwise prevented or discouraged from accurately reporting all time worked. The Company will investigate any concerns regarding off the clock work and will also investigate any discrepancies in time-reporting. Evidence of falsifying records or fraud may be reported to the appropriate licensing board or any certifying agency and/or responsible criminal authorities, and may be grounds for termination.

## Meal and Rest Periods

The Company provides Clinicians with meal and rest breaks as required under applicable federal and state laws. The policies related to the timing and reporting of meal and rest breaks vary by facility. Please be sure to check with your manager at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks. Regardless of the timecard or time-keeping system you are using on your assignment, you must accurately report all time worked. Breaks greater than twenty minutes should be reflected on your timecard. If you do not take a meal break, please make sure your time record accurately reflects that no break was taken and/or you follow the Facilities procedure for reporting missed meal periods.

CONFIDENTIAL

### *California Meal Periods*

Clinicians who work in California are provided with meal breaks in accordance with California law. Meal periods as set forth below are not considered hours worked and are not compensated. During your meal break, you should be relieved of all job duties and free to engage in personal activities.

- If you work more than five hours in a day, you are provided the opportunity to take an uninterrupted 30 minute meal break no later than the end of your fifth hour of work. If you work more than five hours but no more than six hours in a workday, you may voluntarily waive the meal period.

- If you work more than ten hours in a day, you are provided the opportunity to take a second uninterrupted 30 minute meal period no later than the end of your tenth hour of work. You may voluntarily waive one of the two meal periods by completing the Meal Period Waiver form. If you decide to waive one of the two meal periods, then your meal period will be provided before the end of your tenth hour of work. Waiver forms are available on The Service Connection. You may change your waiver option at any time by completing and submitting a new form. Any change will become effective upon the next shift worked after submission to the Company.

If you were not provided the opportunity to take a meal break or breaks as explained above or are otherwise discouraged from taking your meal break(s), you must report this to the Company. Please notify the Company on your timecard or, if you are unable to report this information on your timecard, contact Customer Support at 877-777-8086. If you are provided the opportunity to take a meal break as explained above, but voluntarily choose 1) not to take it, 2) to take it later, or 3) to take a shorter meal period, you are not required to notify the Company but please make sure you accurately report your time to ensure you are paid for all hours worked.

### *California Rest Periods*

In accordance with California law, Clinicians who work in California and work more than 3.5 hours in a day are authorized and permitted to take a paid ten (10) minute rest period for every four (4) hours of work, or major fraction thereof. A major fraction is over two hours of work. If you were not authorized or permitted rest breaks, you must report this on your timecard. If you are unable to report this information on your timecard, you must contact Customer Support at 877-777-8086.

## Pay Schedule

Pay periods are weekly or biweekly, and the scheduled pay day is Friday. Timecards must be transmitted via fax to the Company by 3:30 p.m. Pacific Standard Time (8 p.m. Eastern Standard Time) on the Monday after the pay period ends. The Payroll fax lines are available 24 hours a day. The number can be found printed on the Company provided timecards. If you are using a facility provided timecard, please call Customer Support to get the correct fax number. 

Timecards received after this deadline, but before noon Pacific Standard Time on Wednesday will be processed in the second payroll cycle and will be paid on the following Monday. Timecards received after noon Pacific Standard Time Wednesday will be paid with the following week's payroll. You should carefully review your check stub on The Service Connection each pay period as it provides details regarding your pay, tax withholding and other deductions. If you have special requests about where your paycheck will be sent, notify your Customer Account Manager.

---

American Mobile Handbook

CONFIDENTIAL

AMN0002307

**C92**

# EXHIBIT 10

# 2015

# HEALTHCARE PROFESSIONAL HANDBOOK

ESSENTIAL INFORMATION FOR
SUCCESSFULLY MANAGING THE
DETAILS OF YOUR
TRAVEL ASSIGNMENTS.



an AMN Healthcare company

# Table of Contents

Important Contact Information ........................................................................................................................6

Welcome! ....................................................................................................................................................7

Our Purpose and Values ............................................................................................................................8

Customer Service Connection....................................................................................................................10

Payroll and Timekeeping Information .......................................................................................................10

    Wages .....................................................................................................................................................10

        Overtime ...........................................................................................................................................10

        On-Call and Call-Back.......................................................................................................................10

        Shift Differentials .............................................................................................................................11

        Holiday Pay ......................................................................................................................................11

        Bonuses ...........................................................................................................................................11

        When Payroll is Provided by the Facility .........................................................................................11

    Allowances and Reimbursements............................................................................................................11

        Meals and Incidentals ......................................................................................................................11

        Lodging Per Diem .............................................................................................................................11

        Per Diem Adjustment .......................................................................................................................12

        Calculation and Timing of Lodging Per Diem Payments....................................................................12

        Travel Reimbursement......................................................................................................................12

    Timecards and Facility Timekeeping Systems .........................................................................................14

        Shifts Worked Outside of Contract Dates .........................................................................................14

        Off The Clock Work ..........................................................................................................................14

        Meal and Rest Periods ......................................................................................................................15

    Pay Schedule ..........................................................................................................................................16

    Direct Deposit Service .............................................................................................................................17

Tax Information........................................................................................................................................17

    W-4 ........................................................................................................................................................17

    W-2 ........................................................................................................................................................17

    Expense Reimbursements........................................................................................................................18

    Permanent Tax Residence Qualification .................................................................................................18

Work Schedule/Time Off ..........................................................................................................................19

Housing ....................................................................................................................................................19

    Property Selection ..................................................................................................................................19

American Mobile Handbook

Hotel Selection ....................................................................................................................19

Housing Co-Payment...........................................................................................................20

Roommates ..........................................................................................................................20

Children ...............................................................................................................................20

Pets ......................................................................................................................................21

Move-In ...............................................................................................................................21

Furniture ..............................................................................................................................21

Phone/Cable/Internet ..........................................................................................................22

Utilities ................................................................................................................................22

Maintenance ........................................................................................................................22

Move-Out ............................................................................................................................22

Post Assignment Cleaning, Ending Utility and Damage Fees ............................................23

Assignment Extensions .......................................................................................................23

Clinician Responsibilities ...................................................................................................23

**Health Benefits ..................................................................................................................23**

Health Insurance Marketplace

Group Medical, Vision Discount and Life Insurance .........................................................23

Eligibility ............................................................................................................................24

Enrollment ...........................................................................................................................24

Health Benefits Coverage Post Assignment ...............................................................24

What is COBRA? .........................................................................................................24

**Additional Benefits ...........................................................................................................25**

401(k) Savings Plan.............................................................................................................25

Benefits ........................................................................................................................25

Company Match............................................................................................................25

Electronic Enrollment ..................................................................................................25

Limits............................................................................................................................25

Saving for Retirement...................................................................................................25

Supplemental Life/Accidental Death & Dismemberment (AD&D) Insurance ..................25

Voluntary Vision Plan (VSP) .............................................................................................26

Voluntary Dental Plan ........................................................................................................26

Voluntary Accident, Sickness/Hospitalization, Short Term Disability Plan and Critical Illness Insurance ...........26

Referral Program .................................................................................................................26

Professional Liability Insurance Coverage.........................................................................26

American Mobile Handbook

    Education Benefits – RN.com ................................................................................................26

    Tuition Discounts ....................................................................................................................26

**Summary of Benefits** .....................................................................................................................**26**

**Clinician Work Exposures, Injuries, Illnesses, or Liability Related Incidents** ...................................**28**

    Workers' Compensation Insurance .........................................................................................28

        Reporting a Work Exposure, Injury or Illness ...........................................................28

        You Have Reported a Work Injury …. Now What? ....................................................28

        Texas Employees Only ...............................................................................................29

        California Employees Only ..........................................................................................29

        Ohio, Washington State, North Dakota, Wyoming & U.S. Virgin Islands Employees Only .........................29

        Occupational Exposure to Disease ..............................................................................29

        A Note About Workers' Compensation Fraud .............................................................29

    Workplace Accommodations ...................................................................................................30

    Liability Related Incident Reporting .......................................................................................30

**Credentialing Requirements** ...........................................................................................................**31**

    State Licensure for Licensed Clinicians ..................................................................................32

    ACLS/BLS ..............................................................................................................................32

    Physician's Health Statement ..................................................................................................33

    Drug Screen ............................................................................................................................33

    Tuberculosis (TB) Screening ...................................................................................................33

    MMR and Varicella Immunity ................................................................................................33

    Hepatitis B Immunity ..............................................................................................................33

    Waiver of Hepatitis Vaccination .............................................................................................33

    Identification/Work Eligibility Documents .............................................................................34

    Testing .....................................................................................................................................34

**Standards of Professional Conduct** .................................................................................................**34**

**Employment Practices** ....................................................................................................................**35**

    Equal Employment Opportunity .............................................................................................35

    Management of Personal Records ............................................................................................35

    Moonlighting ...........................................................................................................................35

    Employment References & Evaluations ..................................................................................36

    Anti-Harassment Policy ..........................................................................................................37

        All Unlawful Harassment Prohibited .........................................................................37

        Sexual Harassment ......................................................................................................37

American Mobile Handbook

Other Types of Harassment ........................................................................................................37

Complaint & Investigation Procedure ........................................................................................37

No Retaliation ............................................................................................................................38

Reporting ..................................................................................................................................38

Disability Accommodations ..........................................................................................................38

Requesting a Reasonable Accommodation..................................................................................38

Medical Information ..................................................................................................................39

Accommodation Determinations ................................................................................................39

Leaves of Absence........................................................................................................................39

Family and Medical Leave ........................................................................................................39

Military Service Leave Policy ....................................................................................................42

Medical Leave of Absence for Work-Related Illness or Injury....................................................42

Leave Under the Americans With Disabilities Act (ADA) ..........................................................42

California Employees Only ............................................................................................................42

California Pregnancy Disability Leave (CPDL) and Accommodation............................................43

State Disability Insurance (SDI) and Paid Family Leave (PFL)....................................................44

Substance-Abuse Prevention Policy ..............................................................................................44

Prohibited Activity....................................................................................................................44

Discipline ..................................................................................................................................45

Drug & Alcohol Testing Requirements ......................................................................................45

Procedures for Drug & Alcohol Testing ....................................................................................47

Refusing a Test ........................................................................................................................47

Confidentiality ..........................................................................................................................47

Compliance With All Applicable Laws........................................................................................47

Dispute Resolution ......................................................................................................................48

Appendix ....................................................................................................................................49

What Do I Take On My Assignment? ..........................................................................................49

Health Insurance Marketplace Coverage Options and Your Health Coverage

Excerpt From IRS Publication 463................................................................................................52

American Mobile Handbook

# Customer Service Connection

Welcome and congratulations on signing your Professional Services Agreement and beginning your new assignment. While on assignment, you may have questions or concerns pertaining to payroll, housing, reimbursements, benefits and other travel related issues. Our Customer Support team is available to offer general assistance Monday through Friday, 7:00 a.m. to 5:00 p.m. PST.

Our Service Connection web site at www.americanmobile.com is also available to you 24/7 and provides you access to a wide variety of information during your assignment. You'll have access to view your paycheck, verify hours worked, direct deposit information and earnings detail. We also provide access to review your contract and offer you the ability to submit online forms that are needed prior to the start of your assignment. Additionally, while on assignment you'll be able to verify that we've received your timecard, as well as enjoy connections to local services. We encourage you to explore The Service Connection (TSC) by visiting the site tutorial link on the site's home page after logging in https://tsc.americanmobile.com/.

Most importantly, we want you to know that you truly matter to us and we are here to help. We know that you want your concerns taken care of quickly, accurately and courteously. That's our goal, too! We are always looking for ways to improve our service and value your opinion, so please give us a call or send us an e-mail with your suggestions.

The following sections describe in more detail the processes governing your travel experience. Please review the information and contact us with any questions you may have.

# Payroll and Timekeeping Information

Depending on your assignment location, you may be paid by the Company or directly by the assignment Facility. Timekeeping and other policies and procedures will also vary by assignment and facility. It will be important for you to understand the particular policies and procedures used for each assignment. The following are some general guidelines.

## Wages

Refer to your Professional Services Agreement for your specific hourly wage and information concerning other payments, such as, for example, assignment overtime, double-time, holiday pay, on call, charge, call-back, and shift differentials. The rates and information reflected on your Professional Services Agreement will govern the assignment, so please contact your recruiter immediately upon receipt of your Professional Services Agreement if you have any questions.

### Overtime

The Company follows federal and state wage and hour laws for payment of overtime worked. Some facilities do not authorize overtime work for contract staff. It is very important that you obtain approval from your manager at the Facility prior to working any overtime. In addition, your manager must also approve the overtime on your timecard. Federal law requires overtime to be paid after 40 hours in any given work week. State laws vary on overtime calculations.

### On-Call and Call-Back

Your on-call rate, if applicable, is specified in your Professional Services Agreement and will be paid for those hours you are designated as "on-call." The facility will provide direction regarding on-call time for your specific assignment. Generally, you will be required to carry a pager or otherwise be accessible by phone and respond to calls / return to the facility within thirty to forty-five minutes. This may be referred to as "uncontrolled" on-call or stand-by time. If you are required to remain on the premises or respond or return in a shorter amount of time, you may be entitled to a different hourly rate. In these circumstances, please notify

---

CONFIDENTIAL

# Timecards and Facility Timekeeping Systems

To report your time each pay period, you will use either Company eTimecards, Company paper timecards, Facility provided timecards, or a Facility timekeeping system. If the Facility requires the use of Company eTimecards or Company paper timecards, you may obtain these on The Service Connection. Do not use any other timecards. Each timecard includes the date information and should be used for the appropriate timeframe. When filling out paper timecards, please use military time, write neatly, and stay within the boxes as these timecards are scanned directly into our payroll system. Please only use the special pay instructions box for information that is required to process your pay that is not already noted on the eTimecard.

Depending on your assignment Facility, your Manager may fax your timecard directly to our Payroll Department or may require you to accept this responsibility. Before the end of your first pay period, please determine who holds this responsibility at your Facility and submit your timecard accordingly. Should you have any questions or require any clarification about your Facility timecard, contact your Facility supervisor.

An authorized Facility employee must sign your timecards. You must account for the minimum required hours per pay period and include explanations for any time off. The timecard must be fully completed, including the column for meal period(s), before it can be processed. You must also note all schedule changes, such as sick time, requested time off, or exchanging hours on your timecard. If you do not work a scheduled shift, it is very important to indicate whether you or the Facility cancelled it. Additional information on timecard completion is provided with your timecards.

You may be required to report your time using a Facility timekeeping system. You will receive specific instructions from the Facility at the inception of the assignment regarding the use of their system. Please follow their directions to assure accurate and timely processing of your payroll data.

## Shifts Worked Outside of Contract Dates

Shifts worked must fall within the assignment dates of your Professional Services Agreement in order for the Company to process payment for the hours worked through the normal timecard and payroll process. If you work shifts either before or after your assignment start and end dates, or during scheduled and approved time off, you need to notify your Recruiter and provide the actual dates worked to ensure that you are paid accurately and timely for all hours worked.

## Off The Clock Work

The Company's policy is to pay for all hours worked. You are prohibited from performing any "off-the-clock" work. "Off-the-clock" work means work you perform but do not report on your time card. You must report all hours worked and do so accurately. You must notify Customer Support immediately if you are told not to report all hours worked on your timesheet or are otherwise prevented or discouraged from accurately reporting all time worked. The Company will investigate any concerns regarding off the clock work and will also investigate any discrepancies in time-reporting. Evidence of falsifying records or fraud may be reported to the appropriate licensing board or any certifying agency and/or responsible criminal authorities, and may be grounds for termination.

## A Note on Working at Federal Government Facilities

The Company complies with the Service Contract Act and pays Clinicians working at federal government facilities in accordance with the law. While working at a federal government facility you are entitled to a minimum health and welfare benefit, as determined by the Department of Labor. The Company meets this requirement by offering all eligible Clinicians working at federal government facilities the opportunity to enroll in its insurance program and paying a cash equivalent to make up the remainder of the required benefit amount. You are also entitled to certain paid holidays while working at a federal government facility, as determined by the Department of Labor. On your one year anniversary, you become eligible for vacation pay based on the number of hours you have worked at a federal government facility. If you have questions about benefits, paid holidays or vacation pay for Clinicians working at federal government facilities, contact the Government Contracts Compliance Manager at (858) 792-0711.

---

CONFIDENTIAL

## *Meal and Rest Periods*

The Company provides Clinicians with meal and rest breaks as required under applicable federal and state laws. The policies related to the timing and reporting of meal and rest breaks vary by facility. Please be sure to check with your manager at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks. Regardless of the timecard or time-keeping system you are using on your assignment, you must accurately report all time worked. Breaks greater than twenty minutes should be reflected on your timecard. If you do not take a meal break, please make sure your time record accurately reflects that no break was taken and/or you follow the Facilities procedure for reporting missed meal periods.

CONFIDENTIAL

AMN0002569

**C101**

### *California Meal Periods*

Clinicians who work in California are provided with meal breaks in accordance with California law. Meal periods as set forth below are not considered hours worked and are not compensated. During your meal break, you should be relieved of all job duties and free to engage in personal activities.

- If you work more than five hours in a day, you are provided the opportunity to take an uninterrupted 30 minute meal break no later than the end of your fifth hour of work. If you work more than five hours but no more than six hours in a workday, you may voluntarily waive the meal period.

- If you work more than ten hours in a day, you are provided the opportunity to take a second uninterrupted 30 minute meal period no later than the end of your tenth hour of work. You may voluntarily waive one of the two meal periods by completing the Meal Period Waiver form. If you decide to waive one of the two meal periods, then your meal period will be provided before the end of your tenth hour of work. Waiver forms are available on The Service Connection. You may change your waiver option at any time by completing and submitting a new form. Any change will become effective upon the next shift worked after submission to the Company.

If you were not provided the opportunity to take a meal break or breaks as explained above or are otherwise discouraged from taking your meal break(s), you must report this to the Company. Please notify the Company on your timecard or, if you are unable to report this information on your timecard, contact Customer Support at 877-777-8086. If you are provided the opportunity to take a meal break as explained above, but voluntarily choose 1) not to take it, 2) to take it later, or 3) to take a shorter meal period, you are not required to notify the Company but please make sure you accurately report your time to ensure you are paid for all hours worked.

### *California Rest Periods*

In accordance with California law, Clinicians who work in California and work more than 3.5 hours in a day are authorized and permitted to take a paid ten (10) minute rest period for every four (4) hours of work, or major fraction thereof. A major fraction is over two hours of work. If you were not authorized or permitted rest breaks, you must report this on your timecard. If you are unable to report this information on your timecard, you must contact Customer Support at 877-777-8086.

## Pay Schedule

Pay periods are weekly or biweekly, and the scheduled pay day is Friday. Timecards must be transmitted via fax to the Company by 3:30 p.m. Pacific Standard Time (8 p.m. Eastern Standard Time) on the Monday after the pay period ends. The Payroll fax lines are available 24 hours a day. The number can be found printed on the Company provided timecards. If you are using a facility provided timecard, please call Customer Support to get the correct fax number.

Timecards received after this deadline, but before noon Pacific Standard Time on Wednesday will be processed in the second payroll cycle and will be paid on the following Monday. Timecards received after noon Pacific Standard Time Wednesday will be paid with the following week's payroll. You should carefully review your check stub on The Service Connection each pay period as it provides details regarding your pay, tax withholding and other deductions. If you have special requests about where your paycheck will be sent, notify your Customer Account Manager.

CONFIDENTIAL

AMN0002570

**C102**

# EXHIBIT 11

# 2016

# HEALTHCARE

# PROFESSIONAL

# HANDBOOK

ESSENTIAL INFORMATION FOR
SUCCESSFULLY MANAGING THE
DETAILS OF YOUR
TRAVEL ASSIGNMENTS.



an AMN Healthcare company

# Table of Contents

**Important Contact Information** .................................................................................6

**Welcome!** .............................................................................................................7

**Our Purpose and Values** ......................................................................................8

**Customer Service Connection** .............................................................................9

**Payroll and Timekeeping Information** ..................................................................9

Wages ..................................................................................................................9

    Overtime ..........................................................................................................9

    On-Call and Call-Back ........................................................................................9

    Shift Differentials ...........................................................................................10

    Holiday Pay ....................................................................................................10

    Bonuses .........................................................................................................10

    When Payroll is Provided by the Facility ..........................................................10

Allowances and Reimbursements .........................................................................10

    Meals and Incidentals .....................................................................................10

    Housing Allowance .........................................................................................10

    Per Diem Adjustment .....................................................................................11

    Calculation and Timing of Housing Allowance Payments ...................................11

    Travel Reimbursement ....................................................................................11

Timecards and Facility Timekeeping Systems ........................................................13

    Shifts Worked Outside of Contract Dates .........................................................13

    Off The Clock Work ........................................................................................13

    A Note on Working at Federal Government Facilities ..........................................13

    Meal and Rest Periods ....................................................................................14

Pay Schedule ......................................................................................................15

Direct Deposit Service .........................................................................................16

**Tax Information** .................................................................................................16

W-4 ....................................................................................................................16

W-2 ....................................................................................................................16

Expense Reimbursements ....................................................................................17

Tax Residence Qualification .................................................................................17

**Work Schedule/Time Off** ....................................................................................18

**Housing** ..........................................................................................................18

**Health Benefits** .................................................................................................................................**26**

   Health Insurance Marketplace ........................................................................................................26

   Group Medical, Dental, Vision, Life Insurance and other Voluntary Benefits ..............................27

   Eligibility .........................................................................................................................................27

   Enrollment ......................................................................................................................................27

      Health Benefits Coverage Post Assignment ..............................................................................27

      What is COBRA? .......................................................................................................................27

**Additional Benefits** ...........................................................................................................................**28**

   401(k) Savings Plan ........................................................................................................................28

      Benefits .....................................................................................................................................28

      Company Match .........................................................................................................................28

      Electronic Enrollment ...............................................................................................................28

      Limits ........................................................................................................................................28

      Saving for Retirement ...............................................................................................................28

   Supplemental Life/Accidental Death & Dismemberment (AD&D) Insurance ................................29

   Voluntary Vision Plan (VSP) ..........................................................................................................29

   Voluntary Dental Plan ....................................................................................................................29

   Voluntary Accident, Critical Illness, Hospital Indemnity and Short Term Disability Plan ...........29

   Referral Program ............................................................................................................................29

   Professional Liability Insurance Coverage .....................................................................................29

   Education Benefits – RN.com ........................................................................................................29

   Tuition Discounts ...........................................................................................................................30

**Summary of Benefits** .........................................................................................................................**30**

**Healthcare Professional Work Exposures, Injuries, Illnesses, or  Liability Related Incidents** .........**31**

   Workers' Compensation Insurance .................................................................................................31

      Reporting a Work Exposure, Injury or Illness .........................................................................31

      You Have Reported a Work Injury …. Now What? ....................................................................31

      Texas Employees Only ...............................................................................................................32

      California Employees Only .........................................................................................................32

      Ohio, Washington State, North Dakota, Wyoming & U.S. Virgin Islands Employees Only ..........32

      Occupational Exposure to Disease ...........................................................................................32

      A Note About Workers' Compensation Fraud ...........................................................................32

   Workplace Accommodations ..........................................................................................................33

   Professional Liability Related Incident Reporting .........................................................................33

**Credentialing Requirements** ............................................................................................................**33**

State Licensure for Licensed Healthcare Professionals.............................................................35

ACLS/BLS/NRP/PALS..............................................................................................................35

Physician's Health Statement .....................................................................................................35

Drug Screen ................................................................................................................................36

Tuberculosis (TB) Screening ......................................................................................................36

MMR and Varicella Immunity ....................................................................................................36

Hepatitis B Immunity .................................................................................................................36

Waiver of Hepatitis Vaccination ................................................................................................36

Identification/Work Eligibility Documents .................................................................................37

Testing ........................................................................................................................................37

**Standards of Professional Conduct** ............................................................................................**37**

**Employment Practices** ...............................................................................................................**38**

Equal Employment Opportunity .................................................................................................38

Management of Personal Records ...............................................................................................38

Moonlighting ..............................................................................................................................39

Employment References & Evaluations ......................................................................................39

Anti-Harassment Policy ..............................................................................................................40

　　　All Unlawful Harassment Prohibited ....................................................................................40

　　　Sexual Harassment..............................................................................................................40

　　　Other Types of Harassment .................................................................................................40

　　　Complaint & Investigation Procedure ..................................................................................40

　　　No Retaliation .....................................................................................................................41

　　　Reporting .............................................................................................................................41

Disability Accommodations ........................................................................................................41

　　　Requesting a Reasonable Accommodation...........................................................................41

　　　Medical Information .............................................................................................................42

　　　Accommodation Determinations ..........................................................................................42

Leaves of Absence......................................................................................................................42

　　　Family and Medical Leave ..................................................................................................42

　　　Military Service Leave Policy .............................................................................................45

　　　Medical Leave of Absence for Work-Related Illness or Injury.............................................45

　　　Leave Under the Americans With Disabilities Act (ADA) ...................................................45

California Employees Only ..........................................................................................................45

　　　California Pregnancy Disability Leave (CPDL) and Accommodation...................................47

　　　State Disability Insurance (SDI) and Paid Family Leave (PFL)...........................................47

Substance-Abuse Prevention Policy ...................................................................................................48

    Prohibited Activity ...........................................................................................................................48

    Discipline ..........................................................................................................................................49

    Drug & Alcohol Testing Requirements ...........................................................................................49

    Procedures for Drug & Alcohol Testing .........................................................................................51

    Refusing a Test .................................................................................................................................51

    Confidentiality ..................................................................................................................................51

    Compliance With All Applicable Laws ...........................................................................................51

Dispute Resolution ...................................................................................................................................52

Appendix ...................................................................................................................................................53

    What Do I Take On My Assignment? ..............................................................................................53

Appendix ...................................................................................................................................................54

PART B: Information About Health Coverage Offered by the Company Healthcare ...........................55

Excerpt From IRS Publication 463 .........................................................................................................57

# Customer Service Connection

Welcome and congratulations on signing your Professional Services Agreement and beginning your new assignment. While on assignment, you may have questions or concerns pertaining to payroll, housing, reimbursements, benefits and other travel related issues. Our Customer Support team is available to offer general assistance Monday through Friday, 7:00 a.m. to 5:00 p.m. PST.

Our Service Connection web site at www.americanmobile.com is also available to you 24/7 and provides you access to a wide variety of information during your assignment.  You'll have access to view your paycheck, verify hours worked, direct deposit information and earnings detail.  We also provide access to review your contract and offer you the ability to submit online forms that are needed prior to the start of your assignment.  Additionally, while on assignment you'll be able to verify that we've received your timecard, as well as enjoy connections to local services.  We encourage you to explore The Service Connection (TSC) by visiting the site tutorial link on the site's home page after logging in https://tsc.americanmobile.com/.

Most importantly, we want you to know that you truly matter to us and we are here to help.  We know that you want your concerns taken care of quickly, accurately and courteously.  That's our goal, too!  We are always looking for ways to improve our service and value your opinion, so please give us a call or send us an e-mail with your suggestions.

The following sections describe in more detail the processes governing your travel experience. Please review the information and contact us with any questions you may have.

# Payroll and Timekeeping Information

Depending on your assignment location, you may be paid by the Company or directly by the assignment facility.  Timekeeping and other policies and procedures will also vary by assignment and facility.  It will be important for you to understand the particular policies and procedures used for each assignment.  The following are some general guidelines.

## Wages

Refer to your Professional Services Agreement for your specific hourly wage and information concerning other payments, such as, for example, assignment overtime, double-time, holiday pay, on call, charge, call-back, and shift differentials.  The rates and information reflected on your Professional Services Agreement will govern the assignment, so please contact your recruiter immediately upon receipt of your Professional Services Agreement if you have any questions.

## *Overtime*

The Company follows federal and state wage and hour laws for payment of overtime worked. Some facilities do not authorize overtime work for contract staff.  It is very important that you obtain approval from your manager at the facility prior to working any overtime. In addition, your manager must also approve the overtime on your timecard. Federal law requires overtime to be paid after 40 hours in any given work week. State laws vary on overtime calculations.

## *On-Call and Call-Back*

Your on-call rate, if applicable, is specified in your Professional Services Agreement and will be paid for those hours you are designated as "on-call."  The facility will provide direction regarding on-call time for your specific assignment.  Generally, you will be required to carry a pager or otherwise be accessible by phone and respond to calls / return to the facility within thirty to forty-five minutes.  This may be referred to as

## Timecards and Facility Timekeeping Systems

To report your time each pay period, you will use either Company eTimecards, Company paper timecards, facility provided timecards, or a facility timekeeping system. If the facility requires the use of Company eTimecards or Company paper timecards, you may obtain these on The Service Connection. Do not use any other timecards. Each timecard includes the date information and should be used for the appropriate timeframe. When filling out paper timecards, please use military time, write neatly, and stay within the boxes as these timecards are scanned directly into our payroll system. Please only use the special pay instructions box for information that is required to process your pay that is not already noted on the eTimecard.

Depending on your assignment facility, your Manager may fax your timecard directly to our Payroll Department or may require you to accept this responsibility. Before the end of your first pay period, please determine who holds this responsibility at your facility and submit your timecard accordingly. Should you have any questions or require any clarification about your facility timecard, contact your facility supervisor.

An authorized Facility employee must sign your timecards. You must account for the minimum required shifts per pay period and include explanations for any time off. The timecard must be fully completed, including the column for meal period(s), before it can be processed. You must also note all schedule changes, such as sick time, requested time off, or exchanging hours on your timecard. If you do not work a scheduled shift, it is very important to indicate whether you or the facility cancelled it. Additional information on timecard completion is provided with your timecards.

You may be required to report your time using a facility timekeeping system. You will receive specific instructions from the facility at the inception of the assignment regarding the use of their system. Please follow their directions to assure accurate and timely processing of your payroll data.

## Shifts Worked Outside of Contract Dates

Shifts worked must fall within the assignment dates of your Professional Services Agreement in order for the Company to process payment for the hours worked through the normal timecard and payroll process. If you work shifts either before or after your assignment start and end dates, or during scheduled and approved time off, you need to notify your Recruiter and provide the actual dates worked to ensure that you are paid accurately and timely for all hours worked.

## Off The Clock Work

The Company's policy is to pay for all hours worked. You are prohibited from performing any "off-the-clock" work. "Off-the-clock" work means work you perform but do not report on your time card. You must report all hours worked and do so accurately. You must notify Customer Support immediately if you are told not to report all hours worked on your timesheet or are otherwise prevented or discouraged from accurately reporting all time worked. The Company will investigate any concerns regarding off the clock work and will also investigate any discrepancies in time-reporting. Evidence of falsifying records or fraud may be reported to the appropriate licensing board or any certifying agency and/or responsible criminal authorities, and may be grounds for termination.

## A Note on Working at Federal Government Facilities

The Company complies with the Service Contract Act and pays Healthcare Professionals working at federal government facilities in accordance with the law. While working at a federal government facility you are entitled to a minimum health and welfare benefit, as determined by the Department of Labor. The Company meets this requirement by offering all eligible Healthcare Professionals working at federal government facilities the opportunity to enroll in its insurance program and paying a cash equivalent to make up the remainder of the required benefit amount. You are also entitled to certain paid holidays while working at a federal government facility, as determined by the Department of Labor. On your one year anniversary, you become eligible for vacation pay based on the number of hours you have worked at a federal government facility. If you have questions about benefits, paid holidays or vacation pay for Healthcare Professionals working at federal government facilities, contact the Government Contracts Compliance Manager at ((800) 282-0300.

**C110**

## *Meal and Rest Periods*

The Company provides Healthcare Professionals with meal and rest breaks as required under applicable federal and state laws. The policies related to the timing and reporting of meal and rest breaks vary by facility. Please be sure to check with your manager at the facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks.  Regardless of the timecard or time-keeping system you are using on your assignment, you must accurately report all time worked.  Breaks greater than twenty minutes should be reflected on your timecard.  If you do not take a meal break, please make sure your time record accurately reflects that no break was taken and/or you follow the Facilities procedure for reporting missed meal periods.

**C111**

### *California Meal Periods*

Healthcare Professionals who work in California are provided with meal breaks in accordance with California law. Meal periods as set forth below are not considered hours worked and are not compensated. During your meal break, you should be relieved of all job duties and free to engage in personal activities.

- If you work more than five hours in a day, you are provided the opportunity to take an uninterrupted 30 minute meal break no later than the end of your fifth hour of work. If you work more than five hours but no more than six hours in a workday, you may voluntarily waive the meal period.

- If you work more than ten hours in a day, you are provided the opportunity to take a second uninterrupted 30 minute meal period no later than the end of your tenth hour of work. You may voluntarily waive one of the two meal periods by completing the Meal Period Waiver form. If you decide to waive one of the two meal periods, then your meal period will be provided before the end of your tenth hour of work. Waiver forms are available on The Service Connection. You may change your waiver option at any time by completing and submitting a new form. Any change will become effective upon the next shift worked after submission to the Company.

If you were not provided the opportunity to take a meal break or breaks as explained above or are otherwise discouraged from taking your meal break(s), you must report this to the Company. Please notify the Company on your timecard or contact Customer Support at 877-777-8086. If you are provided the opportunity to take a meal break as explained above, but voluntarily choose 1) not to take it, 2) to take it later, or 3) to take a shorter meal period, you are not required to notify the Company but please make sure you accurately report your time to ensure you are paid for all hours worked.

### *California Rest Periods*

In accordance with California law, Healthcare Professionals who work in California and work more than 3.5 hours in a day are authorized and permitted to take a paid ten (10) minute rest period for every four (4) hours of work, or major fraction thereof. A major fraction is over two hours of work. If you were not authorized or permitted rest breaks, you must report this on your timecard. If you are unable to report this information on your timecard, you must contact Customer Support at 877-777-8086.

## Pay Schedule

Pay periods are weekly or biweekly and the scheduled pay day is Friday. Timecards must be transmitted via fax to the Company by 5:00 p.m. Pacific Standard Time (8 p.m. Eastern Standard Time) on the Monday after the pay period ends. The Payroll fax lines are available 24 hours a day. The number can be found printed on the Company provided timecards. If you are using a facility provided timecard, please call Customer Support to get the correct fax number. 

Timecards received after this deadline, but before noon Pacific Standard Time on Wednesday will be processed in the second payroll cycle and will be paid on the following Monday. Timecards received after noon Pacific Standard Time Wednesday will be paid with the following week's payroll. You should carefully review your check stub on The Service Connection each pay period as it provides details regarding your pay, tax withholding, and other deductions. If you have special requests about where your paycheck will be sent, notify your Customer Account Manager.

# EXHIBIT 12

# 2017

# HEALTHCARE

# P<span>ROFESSIONA</span>L

# HANDBOOK

ESSENTIAL INFORMATION

FOR SUCCESSFULLY MANAGING

THE DETAILS OF YOUR

TRAVEL ASSIGNMENT



# Table of Contents

Welcome! ........................................................................................................................................ 2

Critical Content – Quick Reference Guide ................................................................................... 3

Important Contact Information .................................................................................................... 8

Our Purpose and Values ............................................................................................................... 9

Customer Service Connection ................................................................................................... 10

Payroll and Timekeeping Information ....................................................................................... 10

   Wages ....................................................................................................................................... 10

      Overtime .............................................................................................................................. 10

      On-Call and Call-Back ...................................................................................................... 10

      Shift Differentials .............................................................................................................. 11

      Holiday Pay ........................................................................................................................ 11

      Bonuses .............................................................................................................................. 11

      When Payroll is Provided by the Facility ....................................................................... 11

   Allowances and Reimbursements ......................................................................................... 11

      Meals and Incidentals ...................................................................................................... 11

      Housing Allowance ........................................................................................................... 11

      Per Diem Adjustment ....................................................................................................... 12

      Calculation and Timing of Housing Allowance Payments ........................................... 12

      Travel Reimbursement .................................................................................................... 12

   Timecards and Facility Timekeeping Systems .................................................................... 13

      Shifts Worked Outside of Contract Dates ...................................................................... 13

      Off The Clock Work .......................................................................................................... 13

      A Note on Working at Federal Government Facilities .................................................... 14

      Meal and Rest Periods ..................................................................................................... 14

   Pay Schedule .......................................................................................................................... 15

   Direct Deposit Service ........................................................................................................... 15

Tax Information ........................................................................................................................... 15

   W-4 .......................................................................................................................................... 15

   W-2 .......................................................................................................................................... 16

   Expense Reimbursements ..................................................................................................... 16

   Tax Residence Qualification .................................................................................................. 16

Work Schedule/Time Off ............................................................................................................ 17

Housing ....................................................................................................................................... 17

   Introduction ............................................................................................................................ 17

   Critical Information ................................................................................................................. 17

**Property Selection** ........................................................................................................ 19

**Hotels** ............................................................................................................................ 19

**Housing Special Requests and Co-Payment** .......................................................... 19

**Other Occupants** ......................................................................................................... 20

**Pets** ................................................................................................................................ 21

**Furniture** ....................................................................................................................... 21

**Utility Offerings and Overage Charges** ..................................................................... 22

**Move-In** .......................................................................................................................... 23

**Maintenance** .................................................................................................................. 24

**Move-Out** ....................................................................................................................... 24

**Post Assignment Cleaning, Ending Utility and Damage Fees** ............................... 25

**Assignment Extensions** ............................................................................................... 25

**Healthcare Professional Housing Responsibilities** ................................................ 25

**Health Benefits** ............................................................................................................. 26

**Health Insurance Marketplace** ................................................................................... 26

**Group Medical, Dental, Vision, Life Insurance and other Voluntary Benefits** ...... 26

    Eligibility ..................................................................................................................... 26

    Enrollment .................................................................................................................. 26

    Health Benefits Coverage Post Assignment ............................................................. 26

    What is COBRA? ....................................................................................................... 27

**Additional Benefits** ...................................................................................................... 27

**401(k) Savings Plan** ..................................................................................................... 28

    Benefits ...................................................................................................................... 28

    Company Match ......................................................................................................... 28

    Electronic Enrollment ................................................................................................ 28

    Limits ......................................................................................................................... 28

    Saving for Retirement ............................................................................................... 28

**Commuter Benefits** ...................................................................................................... 28

**Referral Program** .......................................................................................................... 29

**Professional Liability Insurance Coverage** .............................................................. 29

**Education and Professional Development Benefits** .................................................. 29

**Tuition Discounts** ......................................................................................................... 29

**Summary of Benefits** ................................................................................................... 29

**Healthcare Professional Work Exposures, Injuries, Illnesses, or Liability Related Incidents** ............... 30

**Workers' Compensation Insurance** ............................................................................ 30

**Reporting a Work Exposure, Injury or Illness** .......................................................... 30

    You Have Reported a Work Injury … Now What? ..................................................... 30

Texas Employees Only ..................................................................................................31

California Employees Only ............................................................................................31

Ohio, Washington State, North Dakota, Wyoming & U.S. Virgin Islands Employees Only ..................31

Occupational Exposure to Disease ..............................................................................31

A Note About Workers' Compensation Fraud ..............................................................32

**Workplace Accommodations** ............................................................................................32

**Professional Liability Related Incident Reporting** ..........................................................32

**Credentialing Requirements** ..............................................................................................**33**

**Introduction** ......................................................................................................................33

**State Licensure for Licensed Healthcare Professionals** ................................................34

**ACLS/BLS/NRP/PALS** ......................................................................................................34

**Physician's Health Statement** ..........................................................................................35

**Drug Screen** ......................................................................................................................35

**Tuberculosis (TB) Screening** ............................................................................................35

**MMR and Varicella Immunity** ..........................................................................................35

**Hepatitis B Immunity** ........................................................................................................35

**Waiver of Hepatitis Vaccination** ......................................................................................35

**Identification/Work Eligibility Documents** ......................................................................36

**Testing** ..............................................................................................................................36

**Standards of Professional Conduct** ..................................................................................**36**

**Introduction** ......................................................................................................................36

**Performance Evaluations** ..................................................................................................37

**Cell Phone Use & Texting While Driving** ..........................................................................**38**

**Employment Practices** ......................................................................................................**39**

**Equal Employment Opportunity** ........................................................................................39

**Management of Personal Records** ....................................................................................39

**Moonlighting** ....................................................................................................................39

**Employment References & Evaluations** ............................................................................39

**Pay Transparency** ..............................................................................................................39

**Anti-Harassment Policy** ....................................................................................................39

All Unlawful Harassment Prohibited ............................................................................39

Sexual Harassment ......................................................................................................39

Other Types of Harassment ........................................................................................40

Complaint & Investigation Procedure ..........................................................................40

No Retaliation ..............................................................................................................41

Reporting ......................................................................................................................41

**Disability Accommodations** ..............................................................................................41

C117

Requesting a Reasonable Accommodation ................................................................41

Medical Information ............................................................................................41

Accommodation Determinations ............................................................................42

**Leaves of Absence** ..............................................................................................42

Family and Medical Leave ....................................................................................42

Military Service Leave Policy ................................................................................44

Medical Leave of Absence for Work-Related Illness or Injury ....................................44

Leave Under the Americans With Disabilities Act (ADA) ............................................44

**California Employees Only** ....................................................................................44

California Family Rights Act (CFRA) Leave ..............................................................45

California Pregnancy Disability Leave (CPDL) and Accommodation..............................45

State Disability Insurance (SDI) and Paid Family Leave (PFL) ....................................46

Paid Sick Leave ..................................................................................................46

**Substance-Abuse Prevention Policy** ......................................................................46

Prohibited Activity ..............................................................................................47

Discipline ..........................................................................................................47

Drug & Alcohol Testing Requirements ....................................................................47

Procedures for Drug & Alcohol Testing ..................................................................48

Refusing a Test ..................................................................................................49

Confidentiality ....................................................................................................49

Compliance With All Applicable Laws ....................................................................49

**Dispute Resolution** ..............................................................................................49

**Appendix** ..........................................................................................................**51**

**Health Insurance Marketplace Coverage Options and Your Health Coverage** ....................51

PART A: General Information ................................................................................51

PART B: Information About Health Coverage Offered by the Company Healthcare..............52

**Excerpt From IRS Publication 463** ........................................................................53

**C118**

# Customer Service Connection

Welcome and congratulations on signing your Professional Services Agreement and beginning your new assignment. While on assignment, you may have questions or concerns pertaining to payroll, housing, reimbursements, benefits and other travel related issues. Our Customer Support team is available to offer general assistance Monday through Friday, 5:00 a.m. to 5:00 p.m. PST.

Our Service Connection web site at www.americanmobile.com is also available to you 24/7 and provides you access to a wide variety of information during your assignment. You'll have access to view your paycheck, verify hours worked, direct deposit information and earnings detail. We also provide access to review your contract and offer you the ability to submit online forms that are needed prior to the start of your assignment. Additionally, while on assignment you'll be able to verify that we've received your timecard, as well as view additional assignment opportunities and enjoy connections to local services. We encourage you to explore *The Service Connection* (TSC) by visiting the site tutorial link on the site's home page after logging in https://tsc.americanmobile.com/.

Most importantly, we want you to know that you truly matter to us and we are here to help. We know that you want your concerns taken care of quickly, accurately and courteously. That's our goal, too! We are always looking for ways to improve our service and value your opinion, so please give us a call or send us an e-mail with your suggestions.

The following sections describe in more detail the processes governing your travel experience. Please review the information and contact us with any questions you may have.

# Payroll and Timekeeping Information

Depending on your assignment location, you may be paid by the Company or directly by the assignment Facility. Timekeeping and other policies and procedures will also vary by assignment and Facility. It will be important for you to understand the particular policies and procedures used for each assignment. The following are some general guidelines.

## Wages

Refer to your Professional Services Agreement for your specific hourly wage and information concerning other payments, such as assignment holiday pay, on call, charge, call-back, and shift differentials. The rates and information reflected on your Professional Services Agreement will govern the assignment, so please contact your Recruiter immediately upon receipt of your Professional Services Agreement if you have any questions.

### Overtime

The Company follows federal and state wage and hour laws for payment of overtime worked. Some Facilities do not authorize overtime work for contract staff. It is very important that you obtain approval from your Manager at the Facility prior to working any overtime. In addition, your Manager must also approve the overtime on your timecard. Federal law requires overtime to be paid after 40 hours in any given workweek. State laws vary on overtime calculations.

### On-Call and Call-Back

Your on-call rate, if applicable, is specified in your Professional Services Agreement and will be paid for those hours you are designated as "on-call". The Facility will provide direction regarding on-call time for your specific assignment. Generally, you will be required to carry a pager or otherwise be accessible by phone and respond to calls / return to the Facility within thirty to forty-five minutes. This may be referred to as "uncontrolled" on-call or stand-by time. If you are required to remain on the premises or respond or

### Calculation of Reimbursement

For 13-week assignments in the 48 contiguous states, reimbursement is based on actual miles traveled to and from the assignment. Mileage is determined by using the difference between the odometer readings at the beginning and at the end of the trip. Mileage will be verified using mapping software. For most assignments, there is a per-mile reimbursement with a one-way amount cap.

Healthcare Professionals on assignment in Hawaii or Alaska will be paid either a flat amount of travel reimbursement each way if you do not drive to the assignment, or actual miles if you drive to the assignment locations. Please refer to your Professional Services Agreement for specific details.

### When Travel is Reimbursed by the Facility

At some assignments, the Facility pays the travel reimbursement directly to you. Each Facility has its own policies for payment of travel reimbursement and may require receipts or other verification of your travel. It is important that you understand the Facility's travel reimbursement policy before you leave for your assignment. Be sure to discuss this with the Facility's Recruiter or the department Manager to whom you are assigned.

## Timecards and Facility Timekeeping Systems

To report your time each pay period, you will use either Company eTimecards, Company paper timecards, Facility provided timecards, or a Facility timekeeping system. If the Facility requires the use of Company eTimecards or paper timecards, you may obtain these on *The Service Connection.* Do not use any other timecards. Each timecard includes the date information and should be used for the appropriate timeframe. When filling out paper timecards, please use military time, write neatly, and stay within the boxes as these timecards are scanned directly into our payroll system. Please only use the special pay instructions box for information that is required to process your pay that is not already noted on the eTimecard.

Depending on your assignment Facility, your Manager may fax your timecard directly to our Payroll Department or may require you to accept this responsibility. Before the end of your first pay period, please determine who holds this responsibility at your Facility and submit your timecard accordingly. Should you have any questions or require any clarification about your Facility timecard, contact your Facility Supervisor.

An authorized Facility employee must sign your timecards. You must account for the minimum required shifts per pay period and include explanations for any time off. The timecard must be fully completed, including the column for meal period(s), before it can be processed. You must also note all schedule changes, such as sick time, requested time off, or exchanging hours on your timecard. If you do not work a scheduled shift, it is very important to indicate whether you or the Facility cancelled it. Additional information on timecard completion is provided with your timecards.

You may be required to report your time using a Facility timekeeping system. You will receive specific instructions from the Facility at the inception of the assignment regarding the use of their system. Please follow their instructions to assure accurate and timely processing of your payroll data.

### Shifts Worked Outside of Contract Dates

Shifts worked must fall within the assignment dates of your Professional Services Agreement in order for the Company to process payment for the hours worked through the normal timecard and payroll process. If you work shifts either before or after your assignment start and end dates, or during scheduled and approved time off, you need to notify your Recruiter and provide the actual dates worked to ensure that you are paid accurately and timely for all hours worked.

### Off The Clock Work

The Company's policy is to pay for all hours worked. You are prohibited from performing any "off-the-clock" work. "Off-the-clock" work means work you perform but do not report on your time card. You must report all hours worked and do so accurately. You must notify Customer Support immediately if you are

**C120**

told not to report all hours worked on your timesheet or are otherwise prevented or discouraged from accurately reporting all time worked. The Company will investigate any concerns regarding off-the-clock work, and will also investigate any discrepancies in time-reporting. Evidence of falsifying records or fraud may be reported to the appropriate licensing board or any certifying agency and/or responsible criminal authorities, and may be grounds for termination.

## A Note on Working at Federal Government Facilities

The Company complies with the Service Contract Act and pays Healthcare Professionals working at federal government Facilities in accordance with the law. While working at a federal government Facility you are entitled to a minimum health and welfare benefit, as determined by the Department of Labor. The Company meets this requirement by offering all eligible Healthcare Professionals working at federal government Facilities the opportunity to enroll in its insurance program and paying a cash equivalent to make up the remainder of the required benefit amount. You are also entitled to certain paid holidays while working at a federal government Facility, as determined by the Department of Labor. On your one year anniversary, you become eligible for vacation pay based on the number of hours you have worked at a federal government Facility. If you have questions about benefits, paid holidays or vacation pay for Healthcare Professionals working at federal government Facilities, contact the Government Contracts Compliance Manager at ((800) 282-0300.

## Meal and Rest Periods

The Company provides Healthcare Professionals with meal and rest breaks as required under applicable federal and state laws. The policies related to the timing and reporting of meal and rest breaks vary by Facility. Please be sure to check with your Manager at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks. Regardless of the timecard or time-keeping system you are using on your assignment, you must accurately report all time worked. Breaks greater than 20 minutes should be reflected on your timecard. If you do not take a meal break, please make sure your time record accurately reflects that no break was taken and/or you follow the Facilities procedure for reporting missed meal periods.

### California Meal Periods

Healthcare Professionals who work in California are provided with meal breaks in accordance with California law. Meal periods as set forth below are not considered hours worked and are not compensated. During your meal break, you should be relieved of all job duties and free to engage in personal activities.

➢ If you work more than five hours in a day, you are provided the opportunity to take an uninterrupted 30-minute meal break no later than the end of your fifth hour of work. If you work more than five hours but no more than six hours in a workday, you may voluntarily waive the meal period.

➢ If you work more than ten hours in a day, you are provided the opportunity to take a second uninterrupted 30-minute meal period no later than the end of your tenth hour of work. You may voluntarily waive one of the two meal periods by completing the Meal Period Waiver form. If you decide to waive one of the two meal periods, then your meal period will be provided before the end of your tenth hour of work. Waiver forms are available on *The Service Connection*. You may change your waiver option at any time by completing and submitting a new form. Any change will become effective upon the next shift worked after submission to the Company.

If you were not provided the opportunity to take a meal break or breaks as explained above or are otherwise discouraged from taking your meal break(s), you must report this to the Company. Please notify the Company on your timecard or contact Customer Support at (877) 777-8086. If you are provided the opportunity to take a meal break as explained above, but voluntarily choose 1) not to take it, 2) to take it later, or 3) to take a shorter meal period, you are not required to notify the Company, but please make sure you accurately report your time to ensure you are paid for all hours worked.

### *California Rest Periods*

In accordance with California law, Healthcare Professionals who work in California and work more than 3.5 hours in a day are authorized and permitted to take a paid ten (10) minute rest period for every four (4) hours of work, or major fraction thereof. A major fraction is over two hours of work. If you were not authorized or permitted rest breaks, you must report this on your timecard. If you are unable to report this information on your timecard, you must contact Customer Support at (877) 777-8086.

## Pay Schedule

Pay periods are weekly or biweekly and the scheduled pay day is Friday. Timecards must be transmitted via fax to the Company by 5:00 p.m. Pacific Standard Time (8:00 p.m. Eastern Standard Time) on the Monday after the pay period ends. The Payroll fax lines are available 24 hours a day. The phone number can be found printed on the Company provided timecards. If you are using a Facility provided timecards, please call Customer Support to get the correct fax number at (877) 777-8086.

Timecards received after this deadline, but before noon Pacific Standard Time on Wednesday will be processed in the second payroll cycle and will be paid on the following Monday. Timecards received after noon Pacific Standard Time Wednesday will be paid with the following week's payroll. You should carefully review your check stub on *The Service Connection* each pay period as it provides details regarding your pay, tax withholding, and other deductions. If you have special requests about where your paycheck will be sent, notify your Customer Account Manager.

## Direct Deposit Service

We offer you the opportunity to have your paycheck deposited directly into the bank accounts of your choice free of charge. You have multiple direct deposit options:

➢ You may have your entire check deposited into one checking or savings account.

➢ You may designate a specific dollar amount of your check for deposit into up to two separate checking or savings accounts.

➢ You may designate a specific dollar amount of your check for deposit into one or two accounts, and the remainder issued to you as a partial paycheck.

We strongly encourage Healthcare Professionals to use the direct deposit option, as it is the most efficient route of distributing payroll across the United States. As an added benefit that provides increased security of private information, Healthcare Professionals who participate in the direct deposit program will receive their pay stubs electronically via a secure link on *The Service Connection.* You may also obtain paper copies of your pay stubs instead of electronic copies. Simply contact Customer Support at (877) 777-8086 to request paper pay stubs. To initiate direct deposit, please complete the electronic form available on *The Service Connection.* Because clearing time varies from bank to bank, and from paycheck to paycheck, you should verify that your pay is credited to your account before writing checks. If you have a question about direct deposit, please contact one of our Customer Account Managers.

# Tax Information

## W-4

In order to establish your tax withholding status, please complete the electronic W-4 Form available on *The Service Connection* before the end of the first week of your assignment. *If your completed Form W-4 is not received by the end of your first pay period, the default tax set up is "single" as marital status with zero exemptions until we receive a completed Form W-4.*

If your deduction status changes at any time during your employment, you may complete and submit a new W-4 Form and we will change your deductions accordingly. Changes are made only on a go-forward basis from our date of receipt. We are not able to make retroactive changes. Your tax withholdings will be

**EXHIBIT 13**



AMN Healthcare Timecard - KFH/Hospital

Thank you for printing neatly and within the boxes.

Please do not sign in and out at the same time.

AMN0019865

C124

AMN Healthcare Timecard

**751898**

Fax #:

Pay Cycle: WEEKLY

Facility: KAISER SAN JOSE ED

Please do not sign in and out at the same time.

| Date | Time in (24h) | Meal Period (mins) | Time Out (24h) |
|---|---|---|---|
| 3/14/17 | 19:00 | 30 | 03:30 |
| 3/17/17 | 11:00 | 30 | 03:30 |

*see attached, approved O.T.

Cost Center

Kaiser Use Only — Regular | OT1H/OL | OT2

WEEKLY TOTAL

Missed Meal Period Authorization (Initial) | Shift not worked at request of: F=Facility HR=Healthcare Prof.

I affirm that the time recorded above is accurate and all required approvals have been attached.

Dated: 3/18/17   Healthcare Professional's Signature:

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll approval entries forwards without an authorized signature.

Print Name: Kac Karis
Facility Authorization: Kac Dela

Dated: 3/20/2017   Title: ER Manager   Contact:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Agency: AMN
*Required Field
**Required Field

Primary GL Code:

Comments:
Approved OT 3/17/17 (1100-0330)
Missed breaks 3/17/17
Please fax to AMN (not MCl)

Draft

Emergency Department

2017-03-20 09:45

AMN0017074

C125



# AMN Healthcare Timecard

**Name:** 369428

**Facility:** KAISER - SAN DIEGO MEDICAL CENTER

**Fax #:** ___  **Pay Cycle:** WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular | OT/HOL | OT2 |
|------|---------------|--------------------|-----------------|-------------|---------|--------|-----|
| 03/13/16 | 19:00 | 30 | 07:30 | 0226 | 12:00 | | |
| 3/14/16 | 19:00 | ╫ | 07:14 | 0226 | 12:15 | 1:15 | |
| 3/15/16 | 19:00 | ╫ | 07:20 | 0226 | 12: | | |
| 3/16/16 | 19:30 | 30 | 07:30 | 0226 | 12:00 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**WEEKLY TOTAL:** 48 | | .25 | |

**Agency:** Nurse Choice

**Primary GL Code:** ___

**\*\*Required Field**

**Comments:**
3/14 No lunch - out @ 0716
3/15 No lunch - out @ 0746

I affirm that the time reported above is accurate and all recorded...
the undersigned certifies that he or she is an authorized... Healthcare Professional's Signature
named employee is correct. Payroll cannot process timecards without an authorized signature.

**Dated:** 3/14/16

**Print Name:** CARLOS SALAS

**Facility Authorization:** CARLOS SALAS  **Title:** COORDINATOR

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

RECEIVED BY
MAR 21 2016
Contact #: ___ CARLOS SALAS
Dated: ___

Draft

2016-03-21 02:08    Staffing&Scheduling    >>    P 94/101

AMN0012293

C126

AMN0016757

# AMN Healthcare Timecard - KFH/Hospital

**534208**

Thank you for printing neatly and within the boxes.

Name: _____

Per Diem?: ☐ Yes  ☒ No   Facility: VACAVILLE   Code: _____   Pay Cycle: _____   Fax #: _____

WEEKLY

| Date | Time In (24hr) | Meal Period (mins) | Time Out (24hr) | Cost Center Department | Shift not recol'd at request of F-Facility RQ=Healthcare Prof'l | Regular | OT1/HOL | OT2 | Missed Meal/Break Authorization (initials) |
|------|------|------|------|------|------|------|------|------|------|
| 5/23/16 | 19:00 | 30 | 07:15 | -0131 | | 12:00 | | 2S | |
| 5/24/16 | 19:00 | 30 | 07:00 | 0131 | | 4.00 | | | |
| | | | | 0104 | | 8:00 | | | |
| 5/27/16 | 19:00 | 30 | 07:15 /pm | 0131 | | 12:00 | | 2S | |
| | | | | | | | | | |
| | | | | | | WEEKLY TOTAL | | | |
| | | | | | | 30 | | .50 | |

**Kaiser Use Only**

NUID: _____

Agency: AMN HEALTHCARE

Primary GL Code: _____

Comments:
5/24 1900 - 2300 NO 15 MIN BREAKS
2:00 - 0700 NO 15 MIN BREAKS
K.E.

Please do not sign in and out at the same time.

I affirm that the time recorded above is accurate and all required approvals have been obtained.

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee was reviewed for payroll and, process hereunder without an authorized signature.

Healthcare Professional's Signature _____ Date: 5/28/16

Facility Authorization _____ Print Name: _____ Fax: _____

Dated: 5/28/14

Documentation of all hours worked (timecard) must be received by 3:00 pm PT Monday after the end of the pay period.

**534208**



Healthcare Timecard - KFH/Hospital

390048

Thank you for printing neatly and within the boxes.

Name: ___  Facility: ___  Code: ___  Fax #: ___  Pay Cycle: WEEKLY

Per Diem?: ☐ Yes ☐ No

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Regular | OT1/HOL | OT2 | Missed Meal/Break Authorization (initial) |
|------|---------------|--------------------|----------------|---------|---------|-----|-------|
| 2/6/17 | 15:00 | 30 No | 03:30 | 12.T | | | |
| 2/8/17 | 15:00 | No | 07:00 | 12.T | D0 | | |
| 2/9/17 | 15:00 | 45 No | 03:40 | 12.0 | 4.b7 | | |

WEEKLY TOTAL: 36.- | 4.b7

Please do not sign in and out at the same time.

Kaiser Use Only

I affirm that the hours worked above is accurate and all cap...

Healthcare Professional's Signature: Nurse Choice
Date: 2/5/17

The undersigned certifies that he or she is an authorized representative...
Highrisq employers is correct. Payroll cannot process timecards without an authorized signature.

Print Name: ___
Facility Authorization: ___
Title: ___
Contact #: ___  Date: 2/13/17

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Agency: Nurse Choice

Primary GL Code: ___

Comments: ___

Staffing Office

117-02-13 13:40   Draft

P 48/57

AMN0017200

C128

# EXHIBIT 14

C129

Thank you for printing neatly and within the boxes.

# AMN Healthcare TimeCard - KFH/Hospital

Fax: 888-667-7101

Name: Candy Frey

Per Diem? ☐ Yes ☐ No    Facility: SAN DIEGO MEDICAL CENTER    Code:    Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift not worked at: F-Facility H-Healthcare Prof'l | Regular | Kaiser Use Only OT#/HOL | | OT2 | Missed Break/Meal Period Compliance X=Application |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/4 | 15:00 | 30 | 23:30 | 0175 | | 8 | | | | ✗ |
| 11/5 | 15:00 | ✗ | 23:30 Edith aware | 0175 | | 9 | 1 | | | |
| 11/6 | 15:00 | 30 | 23:30 | 0203/0175 | | 8 | 1 | | | |
| 11/7 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 | | | |
| 11/8 | 15:00 | 30 | 23:30 | 0175/020 | | 8 | 1 | | | |
| 11/9 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 | | | |
| | | | | | WEEKLY TOTAL | 40 | | | | |

Agency: American Mobile

Please do not sign in and out at the same time.

Primary GL Code: _____

Comments: _____

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 11/4/13    Healthcare Professional's Signature: Candy Frey

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS    Title: SCHEDULING/PAYROLL    Contact #: 619-528-6279

Facility Authorization: KAISER SAN DIEGO

Dated: NOV 11 2013    Received by: Carlos

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft

AMN0003353
C130

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

| Pay Group: | WSU-Weekly Sunday Start | | Business Unit: AMNHC |
| Pay Begin Date: | 11/03/2013 | | Advice #: | **000000002201063** |
| Pay End Date: | 11/09/2013 | | Advice Date: | 11/15/2013 |

**Candy Frey**

Aliso Viejo, CA 92656

| Employee ID: | 175887 |
| Department: | AMH01-American Mobile Healthcare |
| Location: | American Mobile Healthcare |
| Job Title: | Registered Nurse |

| TAX DATA: | Federal | CA State |
| Marital Status: | Single | Single, or Married with 1 |
| Allowances: | 2 | 2 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

| HOURS AND EARNINGS | | | | | | TAXES | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Current | | ---------- YTD ---------- | | | |
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| NT Subsidy | | | 461.54 | | 4,457.14 | Fed Withholding | 88.68 | 1,052.41 |
| CA Lunch Penalty | 20.600000 | 1.00 | 20.60 | 1.00 | 20.60 | Fed MED/EE | 12.19 | 163.48 |
| M&I PerDiemN | | | 245.00 | | 3,185.00 | Fed OASDI/EE | 52.12 | 699.02 |
| OT Premium | 10.300000 | 0.50 | 5.15 | 5.30 | 54.81 | CA Withholdng | 25.84 | 220.18 |
| Regular Hrs | 20.600000 | 40.50 | 834.30 | 490.60 | 10,508.68 | CA OASDI/EE | 8.41 | 55.09 |
| AAA Reim NT TAP | | | 0.00 | | 25.00 | WI Withholding | 0.00 | 302.12 |
| NT Travel | | | 0.00 | | 500.00 | | | |
| Transportation Reim TAP | | | 0.00 | | 1,000.00 | | | |
| Total: | | 42.00 | 1,566.59 | 496.90 | 19,750.63 | Total: | 187.24 | 2,492.30 |

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| Medical/Dental | 17.68 | 282.88 | Electronic Fund Transfer | 0.00 | 562.12 | Medical/Dental | 50.98 | 815.63 |
| VISION - Pre-Tax | 1.63 | 26.03 | Stop Pay Reissue | 0.00 | 0.00 | | | |
| Total: | 19.31 | 308.91 | Total: | 0.00 | 562.12 | * Taxable | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
| --- | --- | --- | --- | --- | --- |
| Current: | 1,566.59 | 840.74 | 187.24 | 19.31 | 1,360.04 |
| YTD: | 19,750.63 | 11,274.58 | 2,492.30 | 871.03 | 16,387.30 |

| NET PAY DISTRIBUTION | |
| --- | --- |
| Advice #000000002201063 | 1,360.04 |
| Total: | 1,360.04 |

MESSAGE:

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

Date
**11/15/2013**

Advice No.
**2201063**

Deposit Amount: **$1,360.04**

To The
Account(s) Of  **CANDY FREY**

Aliso Viejo, CA 92656

Location: American Mobile Healthcare

| DIRECT DEPOSIT DISTRIBUTION | | |
| --- | --- | --- |
| Account Type | Account Number | Deposit Amount |
| Checking | | 1,360.04 |
| Total: | | 1,360.04 |

# NON-NEGOTIABLE

AMN0002703

**C131**

# EXHIBIT 15

## General

### Case Details

| | | | |
|---|---|---|---|
| **Department** | Customer Service | **HP** | Robert Shaw |
| **Issue** | Touchpoint | **HPID** | 685576 |
| **Subcategory** | Notification | **Recruiter** | Michelle Goeldenitz |
| **Initiator** | Customer Support | **Case Contact Telephone** | (608) 412-0101 |
| **Case Type** | Proactive Call | **Assigned To** | Ashley Bray |
| **Method** | Automated Case Creation | **Follow Up** | 1/4/2016 |
| **PI Status** | | **Vendor** | |
| **Other Issue** | | **Fax Sent** | No |
| **Fax Received** | No | **Web Case Created By** | |

| | |
|---|---|
| **Touchpoint** | Robert Shaw PID: 4150463 (12/30/15 – 03/26/16) at Kaiser - San Diego Medical Center - Critical Need |
| **Intro Call Checklist** | |
| **Placement** | Robert Shaw PID: 4150463 (12/30/15 – 03/26/16) at Kaiser - San Diego Medical Center - Critical Need |
| **Facility** | **Pay Period** |
| **Details** | 12/31/2015 - Hi, Blair. PLEASE NOTIFY RECRUITER ABOUT PTH. This TP case was not sent back to me and CLN needs a new PTH (and maybe other docs). Could you please contact CLN to submit one by 11 am TUESDAY? Will default to taxable/S-0 if docs are not received after 1st paycheck. Thanks! -Aimee, PR |

### Case Status

| | | | |
|---|---|---|---|
| **Status** | Resolved | **Status Reason** | Problem Solved |
| **Urgency** | High | **Date Created** | 12/24/2015 |
| **Manual Process** | | **Concession Dollar Amount** | |
| **Logged Date/Time** | 12/24/2015 11:50 PM | | |

### Case Resolution

| | | | |
|---|---|---|---|
| **Case Resolved** | Yes | **Resolution Date** | 3/31/2016 5:43 PM |
| **Resolution Description** | left detailed msg for cln. -Blair | | |

## Notes and Article

### Notes

### Knowledge Base Article

### Article

| | | | |
|---|---|---|---|
| **Contract** | | **Subject** | |

CONFIDENTIAL                                                                      AMN0002174

**C133**

**Contract Line**

Title       Customer Service - Touchpoint - Customer Support

CONFIDENTIAL

AMN0002175

**C134**

## General

### Case Details

| | | | |
|---|---|---|---|
| Department | Time Processing | HP | Robert Shaw |
| Issue | Hours Discrepancy - Facility Responsible | HPID | 685576 |
| Subcategory | Facility Error | Recruiter | Michelle Goeldenitz |
| Initiator | HP | Case Contact Telephone | (608) 412-0101 |
| Case Type | Question | Assigned To | Spencer O'Kieffe |
| Method | Phone | Follow Up | |
| PI Status | | Vendor | |
| Other Issue | | Fax Sent | No |
| Fax Received | No | Web Case Created By | |
| Touchpoint | | | |
| Intro Call Checklist | | | |
| Placement | Robert Shaw PID: 4150463 (12/30/15 - 03/26/16) at Kaiser - San Diego Medical Center - Critical Need | | |
| Facility | Kaiser - San Diego Medical Center - Critical Need | Pay Period | |
| Details | I got a PDA notification, can you go over this w/ me? Reviewed PDA and accumulated shifts, realized short shift from PPE 1/9 is Fcxl CLN sending FCOF for ppe 1/9 directly to me and accumulated shift will then negate HP sick shift. | | |

### Case Status

| | | | |
|---|---|---|---|
| Status | Resolved | Status Reason | Problem Solved |
| Urgency | | Date Created | 2/4/2016 |
| Manual Process | | Concession Dollar Amount | |
| Logged Date/Time | 2/4/2016 11:08 AM | | |

### Case Resolution

| | | | |
|---|---|---|---|
| Case Resolved | Yes | Resolution Date | 2/4/2016 12:24 PM |
| Resolution Description | advised CLN FCOF due 2/9 to negate PDA. direct CLN if he rcvd pushback from F | | |

## Notes and Article

### Notes

### Knowledge Base Article

### Article

CONFIDENTIAL

AMN0002176

**C135**

**Contract**                                        **Subject**
**Contract Line**
**Title**              Time Processing - Hours Discrepancy - Facility Responsible - HP

CONFIDENTIAL                                                          AMN0002177

**C136**

# EXHIBIT 16



# AMN Healthcare Timecard - KFH/Hospital

Thank you for printing neatly and within the boxes.

**Name:** CORONA, JENNIFER

**Facility:** KAISER PERMANENTE - LAMC  **Code:** 80002

**Fax #:** 888-667-7101  **Pay Cycle:** WEEKLY

Per Diem?: ☐ Yes ☒ No

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift not worked at request of: F-Facility HP-Healthcare Prof |
|------|---------------|--------------------|----------------|-------------------------|---|
| 9/26 | 19:30 | 30 | 08:00 | 0170 | |
| 9/27 | 19:30 | 30 | 08:10 | 0170 | |
| 9/29 | 19:30 | 30 | 08:00 | 0170 | |
| 9/3 | 19:30 | 30 | 0800 | 0170 | |

WEEKLY TOTAL

**Agency:** AMN

**Primary GL Code:** 0801 - 80002 - 59015

**Comments:** *Kohn proper procedure not followed*

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: _____  Healthcare Professional's Signature: _____

The undersigned certifies that he or she is the authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process it necessary to avoid an authorized signature.

Print Name: _____
Facility Authorization: _____

**Title:** PROCESSOR  **Contact #:** (323) 783-5985

Date: 7/1/13

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

Draft

AMN0004057

C138

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

| Pay Group: | WSU-Weekly Sunday Start | Business Unit: AMNHC |
| Pay Begin Date: | 06/30/2013 | Advice #: | 000000002131464 |
| Pay End Date: | 07/06/2013 | Advice Date: | 07/12/2013 |

**Jennifer Corona**
Stratford, CT 06615

| Employee ID: | 414612 |
| Department: | AMH01-American Mobile Healthcare |
| Location: | American Mobile Healthcare |
| Job Title: | Registered Nurse |

| TAX DATA: | Federal | CA State |
| Marital Status: | Single | Single, or Married with t |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | 50.00 | |

## HOURS AND EARNINGS

| Description | Begin Date | End Date | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|---|---|
| Reg Hrs | | | 21.930000 | 36.42 | 798.69 | 891.75 | 20,194.89 |
| Reg Hrs | 06/26/2013 | 06/29/2013 | 21.930000 | 0.17 | 3.73 | | 0.00 |
| OT Prem | | | 10.965000 | 12.00 | 131.58 | 275.25 | 3,172.23 |
| DT Prem | | | 21.930000 | 0.42 | 9.21 | 1.50 | 31.71 |
| DT Prem | 06/26/2013 | 06/29/2013 | 21.930000 | 0.17 | 3.73 | | 0.00 |
| M&I PDN | | | | 245.00 | | 6,790.00 |
| Compl Bns | | | | 0.00 | | 500.00 |
| ComplBnsOT | | | | 0.00 | | 82.66 |
| Nn Tx Trav | | | | 0.00 | | 1,100.00 |
| QS Req | | | | 0.00 | | 170.00 |
| **Total:** | | | | **49.18** | **1,191.94** | **1,168.50** | **32,041.49** |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 191.75 | 4,833.46 |
| Fed MED/EE | 13.38 | 337.45 |
| Fed OASDI/EE | 57.19 | 1,442.89 |
| CA Withholdng | 37.44 | 951.75 |
| CA OASDI/EE | 9.22 | 232.72 |
| **Total:** | **308.98** | **7,798.27** |

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Medical/Dental | 17.68 | 512.72 |
| VISION - Pre-Tax | 1.63 | 47.23 |
| Dental Buy-Up Plan | 5.14 | 149.10 |
| **Total:** | **24.45** | **709.05** |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Supplemental Life Traveler | 2.08 | 60.28 |
| Pet Deposit | 60.00 | 300.00 |
| Non-Ref Pet Fee | 60.00 | 300.00 |
| Missed Shift Adj | 0.00 | 1,346.94 |
| **Total:** | **122.08** | **2,007.22** |

### EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| Medical/Dental | 50.98 | 1,478.38 |

* Taxable

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,191.94 | 922.49 | 308.98 | 146.53 | 736.43 |
| YTD: | 32,041.49 | 23,272.44 | 7,798.27 | 2,716.27 | 21,526.95 |

### NET PAY DISTRIBUTION

| | |
|---|---|
| Advice #000000002131464 | 736.43 |
| **Total:** | **736.43** |

MESSAGE:

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

Date
**07/12/2013**

Advice No.
**2131464**

Deposit Amount: **$736.43**

To The
Account(s) Of

**JENNIFER CORONA**
Stratford, CT 06615

Location: American Mobile Healthcare

### DIRECT DEPOSIT DISTRIBUTION

| Account Type | Account Number | Deposit Amount |
|---|---|---|
| Checking | | 736.43 |
| **Total:** | | **736.43** |

# NON-NEGOTIABLE

AMN0003526

**C139**



# AMN Healthcare Timecard - KFH/Hospital

Name: Jennifer Corso CORONA

Fax #: 888-667-7101

Facility: KAISER PERMANENTE

Per Diem? □ Yes ☒ No

Pay Cycle: WKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24hr) | Meal Period (mins) | Time Out (24hr) | Cost Center Department | Regular | OT1/RCL | JT2 | |
|------|---------------|--------------------|-----------------|------------------------|---------|---------|-----|---|
| 6/30 | 19:30 | 30 | 06:12 | ① 0176 | 12 | | | |
| 7/1 | 19:30 | 30 | 06:06 | ② 0176 | 12 | | | |
| 7/2 | 19:30 | 30 | 06:35 | ⑦ 0176 | 12 | | | 42 |
| | | | | | | | | |

Comments: XJ72 no OT form submitted

Codes: Pra Friske Shimendu chatt
Jawad 0176, Elisse 0104 Revised
Drink here or Didn't

WEEKLY TOTAL: 36 / 42

Agency: AMN

Primary GL Code: 0801 - 80902 - 59015

Please do not sign in and out at the same time.

I affirm that the time recorded above is accurate and all required approvals have been obtained.
Dated: 7/2/13

The undersigned certifies that he or she has authorized, reviewed client company and client company staff certification above, ecusta or time entries of line
finance employee payroll period services timesheets with as authorized signature.
Print Name:
Facility Authorization:

PROCESSOR

Documentation of all hours worked (timekeeping) must be received by 5:00 pm PT Monday after the end of the pay period.
Contact #: (323) 771-5965
Dated: 7/8/13

AMN0004058

C140

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

| Pay Group: | WSU-Weekly Sunday Start | Business Unit: AMNHC |
| Pay Begin Date: | 06/30/2013 | Advice #: | 000000002131464 |
| Pay End Date: | 07/06/2013 | Advice Date: | 07/12/2013 |

**Jennifer Corona**

Stratford, CT 06615

| Employee ID: | 414612 |
| Department: | AMH01-American Mobile Healthcare |
| Location: | American Mobile Healthcare |
| Job Title: | Registered Nurse |

| TAX DATA: | Federal | CA State |
| Marital Status: | Single | Single, or Married with t |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | 50.00 | |

## HOURS AND EARNINGS

| | ------- Prior Period ------ | | --------------- Current --------------- | | ----------- YTD ---------- | | |
| Description | Begin Date | End Date | Rate | Hours | Earnings | Hours | Earnings |
|---|---|---|---|---|---|---|---|
| Reg Hrs | | | 21.930000 | 36.42 | 798.69 | 891.75 | 20,194.89 |
| Reg Hrs | 06/26/2013 | 06/29/2013 | 21.930000 | 0.17 | 3.73 | | 0.00 |
| OT Prem | | | 10.965000 | 12.00 | 131.58 | 275.25 | 3,172.23 |
| DT Prem | | | 21.930000 | 0.42 | 9.21 | 1.50 | 31.71 |
| DT Prem | 06/26/2013 | 06/29/2013 | 21.930000 | 0.17 | 3.73 | | 0.00 |
| M&I PDN | | | | | 245.00 | | 6,790.00 |
| Compl Bns | | | | | 0.00 | | 500.00 |
| ComplBnsOT | | | | | 0.00 | | 82.66 |
| Nn Tx Trav | | | | | 0.00 | | 1,100.00 |
| QS Req | | | | | 0.00 | | 170.00 |
| **Total:** | | | | 49.18 | 1,191.94 | 1,168.50 | 32,041.49 |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 191.75 | 4,833.46 |
| Fed MED/EE | 13.38 | 337.45 |
| Fed OASDI/EE | 57.19 | 1,442.89 |
| CA Withholdng | 37.44 | 951.75 |
| CA OASDI/EE | 9.22 | 232.72 |
| **Total:** | 308.98 | 7,798.27 |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Medical/Dental | 17.68 | 512.72 |
| VISION - Pre-Tax | 1.63 | 47.23 |
| Dental Buy-Up Plan | 5.14 | 149.10 |
| **Total:** | 24.45 | 709.05 |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Supplemental Life Traveler | 2.08 | 60.28 |
| Pet Deposit | 60.00 | 300.00 |
| Non-Ref Pet Fee | 60.00 | 300.00 |
| Missed Shift Adj | 0.00 | 1,346.94 |
| **Total:** | 122.08 | 2,007.22 |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| Medical/Dental | 50.98 | 1,478.38 |

* Taxable

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,191.94 | 922.49 | 308.98 | 146.53 | 736.43 |
| YTD: | 32,041.49 | 23,272.44 | 7,798.27 | 2,716.27 | 21,526.95 |

### NET PAY DISTRIBUTION

| Advice #000000002131464 | 736.43 |
|---|---|
| **Total:** | 736.43 |

MESSAGE:

American Mobile Healthcare
12400 High Bluff Drive
San Diego, CA 92130

Date
**07/12/2013**

Advice No.
**2131464**

Deposit Amount: **$736.43**

To The
Account(s) Of

**JENNIFER CORONA**

Stratford, CT 06615

Location: American Mobile Healthcare

### DIRECT DEPOSIT DISTRIBUTION

| Account Type | Account Number | Deposit Amount |
|---|---|---|
| Checking | | 736.43 |
| **Total:** | | 736.43 |

# NON-NEGOTIABLE

AMN0003526

**C141**



# AMN Healthcare Timecard - KFH/Hospital

Thank you for printing neatly and within the boxes.

Name: **CORONA, JENNIFER**

Facility: **KAISER PERMANENTE - LAMC**   Code: **80002**

Fax #: 888-667-7101   Pay Cycle: WEEKLY

Per Diem?: ☐ Yes ☒ No

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift not worked at request of: F-Facility HP-Healthcare Prof. | Kaiser Use Only Regular | O/T-Hol | O/T-Hol | WEEKLY TOTAL |
|------|------|------|------|------|------|------|------|------|------|
| 6/27 | 19:30 | 30 | 08:00 | 0176 | | 12 | | | |
| 6/28 | 19:30 | 30 | 08:30 | 0176 | | 12 | | 1.00 | |
| 6/29 | 19:30 | 30 | 08:30 | 0176 | | 12 | 1 | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | 36 | 1.00 | 1.00 | |

Agency: AMN

Primary GL Code: **0801 - 80002 - 59015**

Comments: 1 hr for bag light saving time

Please do not sign in and out at the same time.

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 16/30   Healthcare Professional's Signature

The undersigned certifies that he or she is an authorized person(s) of the client company and that the above record of time worked by the named employee is correct. Facility cannot process timecard without an authorized signature.

Print Name:

Facility Authorization

**PROCESSOR**   Contact #: (323) 783-5985

Title:   Dated:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft

**American Mobile Healthcare**
12400 High Bluff Drive
San Diego, CA 92130

| Pay Group: | WSU-Weekly Sunday Start | Business Unit: AMNHC |
|---|---|---|
| Pay Begin Date: | 10/27/2013 | Advice #: **00000002197251** |
| Pay End Date: | 11/02/2013 | Advice Date: 11/08/2013 |

**Jennifer Corona**
Stratford, CT 06615

| Employee ID: | 414612 |
|---|---|
| Department: | AMH01-American Mobile Healthcare |
| Location: | American Mobile Healthcare |
| Job Title: | Registered Nurse |

| TAX DATA: | Federal | CA State |
|---|---|---|
| Marital Status: | Single | Single, or Married with t |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | 50.00 | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| DT Premium | 21.930000 | 1.00 | 21.93 | 2.50 | 53.64 | Fed Withholdng | 196.25 | 7,870.65 |
| M&I PerDiemN | | | 245.00 | | 10,955.00 | Fed MED/EE | 13.64 | 550.20 |
| OT Premium | 10.965000 | 12.00 | 131.58 | 471.25 | 5,321.37 | Fed OASDI/EE | 58.31 | 2,352.57 |
| Regular Hrs | 21.930000 | 37.00 | 811.41 | 1,480.75 | 33,111.66 | CA Withholdng | 39.02 | 1,510.29 |
| Comp Bonus | | | 0.00 | | 500.00 | CA OASDI/EE | 9.41 | 379.45 |
| Comp Bonus OT | | | 0.00 | | 82.66 | | | |
| NT Travel | | | 0.00 | | 1,600.00 | | | |
| QS Reim NT TAP | | | 0.00 | | 170.00 | | | |
| **Total:** | | 50.00 | 1,209.92 | 1,954.50 | 51,794.33 | **Total:** | 316.63 | 12,663.16 |

## TAXES (header above)

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| Medical/Dental | 17.68 | 813.28 | Supplemental Life Traveler | 2.08 | 95.64 | Medical/Dental | 50.98 | 2,345.04 |
| VISION - Pre-Tax | 1.63 | 74.94 | Missed Shift Adj | 18.00- | 1,318.50 | | | |
| Dental Buy-Up Plan | 5.14 | 236.48 | Non-Ref Pet Fee | 0.00 | 300.00 | | | |
| | | | Pet Deposit | 0.00 | 300.00 | | | |
| **Total:** | 24.45 | 1,124.70 | **Total:** | 15.92- | 2,014.14 | * Taxable | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,209.92 | 940.47 | 316.63 | 8.53 | 884.76 |
| YTD: | 51,794.33 | 37,944.63 | 12,663.16 | 3,138.84 | 35,992.33 |

| NET PAY DISTRIBUTION | |
|---|---|
| Advice #00000002197251 | 884.76 |
| Total: | 884.76 |

MESSAGE:

**American Mobile Healthcare**
12400 High Bluff Drive
San Diego, CA 92130

**Date**
**11/08/2013**

**Advice No.**
**2197251**

Deposit Amount: $884.76

To The
Account(s) Of

**JENNIFER CORONA**
Stratford, CT 06615

Location: American Mobile Healthcare

| DIRECT DEPOSIT DISTRIBUTION | | |
|---|---|---|
| Account Type | Account Number | Deposit Amount |
| Checking | | 884.76 |
| Total: | | 884.76 |

# NON-NEGOTIABLE

AMN0003543

**C143**

Thank you for printing neatly and within the boxes.

## AMN Healthcare Timecard - KFH/Hospital

**Name:** CORONA, JENNIFER  **Facility:** KAISER PERMANENTE - LAMC  **Code:** 80002

Fax #: 888-667-7101  **Pay Cycle:** WEEKLY

Per Diem? ☐ Yes ☒ No



| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center / Department |
|---|---|---|---|---|
| 10/29 | 19:30 | 30 | 08:00 | 6002 |
| 10/30 | 19:30 | 30 | 08:00 | 6170 |
| 11/1 | 19:30 | 30 | 08:00 | 0176 |
| | | +1hr Daylight Saving | | 6705 |
| | | | | 37hrs |

**Agency:** A.Mn

**Primary GL Code:** 0801 - 80002 - 59015

**Comments:** Will Dist. @

Please do not sign in and out at the same time.

Kaiser Use Only

Regular | O1t/HOL | O1/HOL | OT?

WEEKLY TOTAL

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 10/3/3   Healthcare Professional's Signature

The undersigned verifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: _____   Title: _____

Facility Authorization

**PROCESSOR**   Contact #: (323) 783-5985

Dated: 11/3/14

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft


AMERICAN MOBILE
HEALTHCARE
an AMN Healthcare company

```
CO     FILE #    PID    000000-000000
PCSXG9 000414612 3622975
```

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

| | |
|---|---|
| Period Beginning: | 10/26/2014 |
| Period Ending: | 11/01/2014 |
| Advice Date: | 11/07/2014 |
| Advice Number: | 0002405098 |
| Batch Number: | 000000003302 |

Taxable Marital Status: Single

Exemptions/Allowances   Add'l
Fed: 00                 $60.00
CA:  00

**JENNIFER CORONA**
Stratford, CT  06615

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 21.9300 | 37.00 | 811.41 | 34772.82 |
| OT Premium | 10.9650 | 12.00 | 131.58 | 5712.70 |
| DT Premium | 21.9300 | 1.00 | 21.93 | 21.93 |
| M&I PerDiemN | | | 245.00 | 10920.00 |
| NT Travel | | | 0.00 | 1600.00 |
| Housing Frin | | | 0.00 | 0.00 |
| M&I PerDiemT | | | 0.00 | 0.00 |
| Transportati | | | 0.00 | 507.00 |
| Car Allowanc | | | 0.00 | 580.17 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Medical | 40.00 | 1760.00 |
| *VISION - Pre-Tax | 1.66 | 73.04 |
| *Dental Buy-Up Pl | 7.49 | 329.56 |
| Supplemental Life | 2.77 | 92.90 |
| Missed Shift Adj | 18.00- | 1062.18 |
| Other Deductions | 0.00 | 0.00 |
| Total Additional | 33.92 | 3317.68 |
| *Excluded from Taxable Wages | | |
| Net Pay | 1036.79 | 41040.52 |

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXXXXX7091 | 1,036.79 |
| Net Check | | | 0.00 |

### Customer Name          Facility
Kaiser - Los Angeles Medical Center  2897

### Other Balances

| Gross Pay | 1209.92 | 54114.62 |
|---|---|---|

### Tax Deductions

| | | |
|---|---|---|
| Fed Withholdng | 60.00 | 5559.76 |
| Fed MED/EE | 13.27 | 571.76 |
| Fed OASDI/EE | 56.78 | 2444.79 |
| CA Withholdng | 0.00 | 785.79 |
| CA OASDI/EE | 9.16 | 394.32 |
| Total Tax Deductions: | 139.21 | 9756.42 |

Federal Taxable Wages are      $915.77

**Message**
Our offices will be closed 11/27-11/28 in
observance of the Thanksgiving holiday.
Regular office hours will resume on 12/1

2002 Automatic Data Processing (PCSUVO)


AMERICAN MOBILE
HEALTHCARE
an AMN Healthcare company

**AMN Services, LLC**
**(800) 282-0300**
**12400 High Bluff Drive**
**San Diego, CA  92130**

Advice Number:  0002405098

Advice Date:    11/07/2014

| Deposited to the account of | Account Number | Transit ABA | Amount |
|---|---|---|---|
| JENNIFER CORONA | Checking | | 1036.79 |

**THIS IS NOT A CHECK**

# NON-NEGOTIABLE

AMN0003595

**C145**

**EXHIBIT 17**



# AMN Healthcare Timecard

Thank you for printing neatly and within the boxes.

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: Candy Frey

Facility: KAISER - SAN DIEGO MEDICAL CENTER

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3/9/15 | 19:00 | 30 | 07:30 | | 0175 | 12 | | 25 |
| 3/12/15 | 19:00 | 30 | 07:50 | | 0175 | 10 | | |
| 3/14/15 | 19:00 | 30 | 07:30 | | 0175 | 12 | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | 3.9 | 25 |

Please do not sign in and out at the same time.

Agency: American Mobile

**Required field

Primary GL Code:

I affirm that the time recorded above is accurate and all required approvals have been obtained:

Dated: 3/9/15    Healthcare Professional's Signature:

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: TIFFANY GRETLER    Title: TRAVEL COORDINATO   Contact #: 619.528.6279

Facility Authorization: Candy Frey    Dated: 3/16/15

Comments:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft



# Earnings Statement

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

| | |
|---|---|
| Period Beginning: | 03/08/2015 |
| Period Ending: | 03/14/2015 |
| Advice Date: | 03/20/2015 |
| Advice Number: | 0002491971 |
| Batch Number: | 000000003404 |

Taxable Marital Status: Single

Exemptions/Allowances   Add'l
Fed: 01
CA:  01

**CANDY FREY**

San Diego, CA  92108

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 21.0900 | 36.25 | 764.51 | 7807.67 |
| OT Premium | 10.5450 | 12.00 | 126.54 | 1272.90 |
| DT Premium | 21.0900 | 0.25 | 5.27 | 5.27 |
| Lodg PDN | | | 506.31 | 4846.11 |
| M&I PerDiemN | | | 245.00 | 2345.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Dental PPO H | 6.77 | 54.16 |
| *Medical PPO | 70.00 | 420.00 |
| *Vision | 1.90 | 15.20 |
| Accident Insuranc | 4.24 | 33.92 |
| Vol Short Disb | 4.20 | 33.60 |
| Total Additional | 87.11 | 556.88 |
| *Excluded from Taxable Wages | | |
| Net Pay | 1368.65 | 13626.30 |

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXX3581 | 1,368.65 |
| Net Check | | | 0.00 |

## Customer Name          Facility

Kaiser - San Diego Medical Center    3028

## Other Balances

| Gross Pay | 1647.63 | 16276.95 |
|---|---|---|

## Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 95.60 | 1056.81 |
| Fed MED/EE | 11.86 | 124.65 |
| Fed OASDI/EE | 50.69 | 532.98 |
| CA Withholdng | 25.55 | 293.37 |
| CA OASDI/EE | 8.17 | 85.96 |
| Total Tax Deductions: | 191.87 | 2093.77 |

Federal Taxable Wages are      $817.65

**Message**

2012 Automatic Data Processing (PCSUVO)

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002491971

Advice Date:    03/20/2015

| Deposited to the account of | Account Number | Transit ABA | Amount |
|---|---|---|---|
| CANDY FREY | Checking | | 1368.65 |

**THIS IS NOT A CHECK**

**NON-NEGOTIABLE**

# AMN Healthcare Timecard

Thank you for printing neatly and within the boxes.

**Name:** Candy Frey

**Facility:** KAISER - SAN DIEGO MEDICAL CENTER

**Fax #:** 888-667-7101

**Pay Cycle:** WEEKLY

**Kaiser Use Only**



| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular | OT1(HOL) | OT2 |
|---|---|---|---|---|---|---|---|
| 4 5 15 | 19:00 | 30 | 07:30 | 0201 | 12 | | |
| 4 6 15 | 19:00 | 30 | 07:30 | 0201 | 12 | | |
| 4 10 15 | 19:00 | 30 | 08:00 | 0203 | 12 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| WEEKLY TOTAL | | | | | 36 | | 30 |

**Agency:** American Mobile

**\*Required Field**

**Primary GL Code:**

**Comments:**

Please do not sign in and out at the same time.

Dated: 4/11/15   Healthcare Professional's Signature: Candy Frey

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: TIFFANY GRETLER   Title: TRAVEL COORDINATO   Contact #: 619-528-6279

Facility Authorization: _____   Dated: 4/13/15

Documentation of all hours worked (timecard) must be received by 5:00pm PT Monday after the end of the pay period.

AMN0003379
C149



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Taxable Marital Status: Single

Exemptions/Allowances    Add'l
Fed: 01
CA:  01

# Earnings Statement

Period Beginning:    04/05/2015
Period Ending:       04/11/2015
Advice Date:         04/17/2015
Advice Number:       0002511597
Batch Number:        000000003428

**CANDY FREY**

San Diego, CA  92108

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 21.0900 | 36.50 | 769.79 | 10855.18 |
| OT Premium | 10.5450 | 12.00 | 126.54 | 1779.06 |
| DT Premium | 21.0900 | 0.50 | 10.55 | 15.82 |
| Lodg PDN | | | 506.31 | 6871.35 |
| M&I PerDiemN | | | 245.00 | 3325.00 |
| QS Reim NT T | | | 0.00 | 200.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Dental PPO H | 6.77 | 81.24 |
| *Medical PPO | 70.00 | 700.00 |
| *Vision | 1.90 | 22.80 |
| Accident Insuranc | 4.24 | 50.88 |
| Vol Short Disb | 4.20 | 50.40 |
| Total Additional | 87.11 | 905.32 |

*Excluded from Taxable Wages

| Net Pay | 1377.45 | 19300.48 |
|---|---|---|

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXX3581 | 1,377.45 |
| Net Check | | | 0.00 |

## Customer Name          Facility

Kaiser - San Diego Medical Center     3028

## Other Balances

| Gross Pay | 1658.19 | 23046.41 |
|---|---|---|

## Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 97.19 | 1436.06 |
| Fed MED/EE | 12.01 | 171.77 |
| Fed OASDI/EE | 51.35 | 734.45 |
| CA Withholdng | 25.63 | 391.72 |
| CA OASDI/EE | 7.45 | 106.61 |
| Total Tax Deductions | 193.63 | 2840.61 |

Federal Taxable Wages are       $828.21
**Message**

2012 Automatic Data Processing (PCSUVO)



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002511597

Advice Date:    04/17/2015

| Deposited to the account of | | Account Number | Transit ABA | Amount |
|---|---|---|---|---|
| CANDY FREY | Checking | | | 1377.45 |

THIS IS NOT A CHECK

# NON-NEGOTIABLE



Thank you for printing neatly and within the boxes.

# AMN Healthcare Timecard

Name: Candy Fry

Facility: KAISER - SAN DIEGO (MEDICAL CENTER)

Fax #: 888-667-7101

Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only REG hrs | OT1/OT2 | OT2 |
|---|---|---|---|---|---|---|---|
| 4/26/15 | 19:00 | 30 | 07:30 | 0203 | 10:10 | 10:00 | |
| 4/29/15 | 19:00 | 30 | 07:45 | 0201 | 4:00 | 00:25 | |
| 4/30/15 | 19:00 | 30 | * form filled out 5 w monday | 0203 | 12:00 | 00:00 | |
| | | | | called | 12:00 | 0:00 | |
| 4/30/15 | 19:00 | 30 | 07:55 | 0201 | | | |
| | | | | | WEEK TOTAL 36:10 | 0:43 | |

* form filled out 5 w monday

Please do not sign in and out at the same time.

Agency: American Mobile

**Required field

Primary GL Code:

I affirm that the time/I recorded above is accurate and all required approvals have been obtained. Healthcare Professional's Signature: Candy Fry RN

Dated: 4/30/15

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: TIFFANY GRETLER   Title: TRAVEL COORDINATOR   Contact #: 619-528-6279

Facility Authorization: [signature]   Dated:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Comments:

Draft



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

# Earnings Statement

Page 001 of 002

| | |
|---|---|
| Period Beginning: | 04/26/2015 |
| Period Ending: | 05/02/2015 |
| Advice Date: | 05/08/2015 |
| Advice Number: | 0002526194 |
| Batch Number: | 000000003446 |

Taxable Marital Status: Single

Exemptions/Allowances    Add'l
Fed: 01
CA: 01

**CANDY FREY**

San Diego, CA  92108

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 21.0900 | 36.33 | 766.20 | 13139.86 |
| OT Premium | 10.5450 | 12.00 | 126.54 | 2158.68 |
| DT Premium | 21.0900 | 0.33 | 6.96 | 22.78 |
| **Sign-on Bonu** | | | **400.00** | **400.00** |
| Lodg PDN | | | 506.31 | 8390.28 |
| M&I PerDiemN | | | 245.00 | 4060.00 |
| QS Reim NT T | | | 0.00 | 200.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Dental PPO H | 6.77 | 101.55 |
| *Medical PPO | 70.00 | 910.00 |
| *Vision | 1.90 | 28.50 |
| Accident Insuranc | 4.24 | 63.60 |
| Vol Short Disb | 4.20 | 63.00 |
| Total Additional | 87.11 | 1166.65 |

*Excluded from Taxable Wages

| Net Pay | 1603.33 | 23629.24 |
|---|---|---|

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXX3581 | 1,603.33 |
| Net Check | | | 0.00 |

## Customer Name          Facility

Kaiser - San Diego Medical Center    3028

## Other Balances

| Gross Pay | 2051.01 | 24371.60 |
|---|---|---|

Bolded lines include prior per. earnings on following pgs

## Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 194.08 | 1818.18 |
| Fed MED/EE | 17.71 | 212.88 |
| Fed OASDI/EE | 75.71 | 910.24 |
| CA Withholdng | 62.08 | 502.28 |
| CA OASDI/EE | 10.99 | 132.13 |
| Total Tax Deductions | 360.57 | 3575.71 |

Federal Taxable Wages are     $1,221.03

## Message

2012 Automatic Data Processing (PCSUVO)



**AMN Services, LLC**
**(800) 282-0300**
**12400 High Bluff Drive**
**San Diego, CA  92130**

Advice Number:  0002526194

Advice Date:     05/08/2015

| Deposited to the account of | | Account Number | Transit ABA | Amount |
|---|---|---|---|---|
| CANDY FREY | Checking | | | 1603.33 |

THIS IS NOT A CHECK

# NON-NEGOTIABLE

AMN0002749

**C152**



# AMN HealthCare Timecard

Name: Candy Frey

Per Diem?: ☐ Yes ☐ No

Facility: SAN DIEGO MEDICAL CENTER (KAISER HOSPITAL)

Fax #: 888-667-7101

Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) |
|---|---|---|---|
| 5/19/15 | 19:00 | 30 | 07:30 |
| 5/20/15 | 19:00 | 30 | 07:15 |
| 5/21/15 | 19:00 | 30 | 07:30 |

note sent to Catharine - Nm

Please do not sign in and out at the same time.

Agency: American Mobile

**Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 5/19/15    Healthcare Professional's Signature: Candy Frey RN

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: T. GRETLER

Facility Authorization:

Title: TRAVEL COORDINATOR    Contact #: 619-528-0279    Dated: 5/26/15

Documentation of all hours worked (timecard) must be received by 6:00 pm PT Monday after the end of the pay period.

Draft

AMN0003385

C153



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Taxable Marital Status: Single

Exemptions/Allowances   Add'l
Fed: 01
CA: 01

# Earnings Statement

Page 001 of 001

| | |
|---|---|
| Period Beginning: | 05/17/2015 |
| Period Ending: | 05/23/2015 |
| Advice Date: | 05/29/2015 |
| Advice Number: | 0002540372 |
| Batch Number: | 000000003464 |

**CANDY FREY**

San Diego, CA  92108

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 21.0900 | 36.25 | 764.51 | 14916.69 |
| OT Premium | 10.5450 | 12.00 | 126.54 | 2453.94 |
| DT Premium | 21.0900 | 0.25 | 5.27 | 28.05 |
| Lodg PDN | | | 506.31 | 9909.21 |
| M&I PerDiemN | | | 245.00 | 4795.00 |
| QS Reim NT T | | | 0.00 | 200.00 |
| Sign-on Bonu | | | 0.00 | 400.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Dental PPO H | 6.77 | 121.86 |
| *Medical PPO | 70.00 | 1120.00 |
| *Vision | 1.90 | 34.20 |
| M&I ADJ NT | 81.67 | 81.67 |
| Lodging Adj NT | 168.77 | 168.77 |
| Other Deductions | 8.44 | 151.92 |
| Total Additional | 337.55 | 1678.42 |
| *Excluded from Taxable Wages | | |
| Net Pay | 1119.64 | 27056.44 |

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXX3581 | 1,119.64 |
| Net Check | | | 0.00 |

## Customer Name          Facility

Kaiser - San Diego Medical Center    3028

## Other Balances

| Gross Pay | | 1647.63 | 32702.89 |
|---|---|---|---|

## Tax Deductions

| Fed Withholdng | 95.60 | 2013.24 |
|---|---|---|
| Fed MED/EE | 11.86 | 239.58 |
| Fed OASDI/EE | 50.69 | 1024.40 |
| CA Withholdng | 24.93 | 542.11 |
| CA OASDI/EE | 7.36 | 148.70 |
| Total Tax Deductions: | 190.44 | 3968.03 |

Federal Taxable Wages are        $817.65

**Message**
Our offices will be closed 05/25 in
observance of the Memorial Day holiday.
Regular office hours will resume on 05/26

2012 Automatic Data Processing (PCSUVO)

AMERICAN MOBILE
HEALTHCARE
an AMN Healthcare company

**AMN Services, LLC**
**(800) 282-0300**
**12400 High Bluff Drive**
**San Diego, CA  92130**

Advice Number:  0002540372

Advice Date:     05/29/2015

| Deposited to the account of | Account Number | Transit ABA | Amount |
|---|---|---|---|
| CANDY FREY | Checking | | 1119.64 |

THIS IS NOT A CHECK

# NON-NEGOTIABLE

# EXHIBIT 18



# AMN Healthcare Timecard

**369428**

Name: _____
Facility: _____ CENTER

Fax #: _____
Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular | O.T./HOL |
|------|---------------|--------------------|----------------|-------------|---------|----------|
| 2/9/16 | 15:00 | 30 | 03:30 | VD 0226 | 12 | |
| 2/10/16 | 19:00 | 30 | 08:00 | VD 0226 | 12 | |
| 2/11/16 | 19:00 | 30 | 07:30 | VD 0226 | 12 | |
| 2/12/16 | 19:00 | 30 | 07:30 | VD 0226 | 12 | |

WEEKLY TOTAL: 48.0

Nurse Signature: Nurz Choie, AMN

Please do not sign in and out at the same time.

RECEIVED
FEB 15 2016
FRED THOMPSON
TRAVEL COORD

I affirm that the hours recorded above is accurate and all...
The undersigned certifies that he or she is an authorized...named employee is correct. Payroll cannot process...

Dated: 2/9/16
Print Name: VANGIE MARQUEZ
Facility (Authorization)

Title: TRAVEL COORD

Contact: _____
Dated: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Agency: _____
**Required Field
Primary GL Code: _____

Comments: _____

Draft

C156

| ACTIVITY ID | EMPLID | NAME | PAY START DT | PAY END DT | | PAYCHECK DT | PAY START DT | PAY END DT | PAYCHECK DT | PAYCHECK R NBR | | HOURS | AMOUNT | RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4163792 | 369428 | [redacted] | 2016-01-13 00:00:00 | 2016-02-13 00:00:00 | | 2016-04-23 00:00:00 | 2016-02-07 00:00:00 | 2016-02-13 00:00:00 | 2016-02-19 00:00:00 | 2763247 | ST | 48.50 | 2122.36 | 43.760000 |

**Rate Code: Over Time Payment**

| EMPLID | PAY START DT | PAY END DT | RATE USED | EARN HRS | COMP RATE | HOURLY RT | COMP RATE USED | RATE USED | | HOURS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 369428 | 2016-02-07 00:00:00 | 2016-02-13 00:00:00 | OTP | 15.00 | 350.08 | 43.760000 | 43.760000 | IH | OTP | 0.5 | 21.83 | 43.760000 | 43.760000 |

# AMN Healthcare Timecard

**505567**

Name: _____
Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax: _____
Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.



| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | | | |
|------|--------------|--------------------|----------------|--|--|--|
| 3/15 | 19:00 | 30 | 07:30 | 0250 | 12-1 | |
| 3/17 | 19:00 | 30 | 07:30 | 0250 | 12-1 | |
| 3/19 | 19:00 | 100 BREAK | 07:30 | 0250 | 10-11 | SD 11 |
| 3/20 | 19:00 | 30 | 07:30 | 0250 | 10-1 | |
| | ** | ** | ** | | -08- | |
| | ** | ** | ** | | | |

Please do not sign in and out at the same time.

Agency: AMN
**Required Field
Primary GL Code: _____

Comments: _____

Draft

I affirm that the time recorded above is accurate and all reported above.

Dated: 3/21/15   Healthcare Professional's Signature: _____

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: TIFFANY GRETLER   Title: TRAVEL COORDINATO   Contac...
Facility Authorization: _____   Dated: 3/23/15

Documentation of all hours worked (timecard) must be received by 3:00 pm PT Monday after the end of the pay period.

AMN0011664

C158

| ACTIVITY_# | EMPLID | NAME | START_DT | END_DT | EARNS_BEGIN_DT | EARNS_END_DT | CHECK_DT | PAYCHECK_NBR | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3731010 | 505567 | [redacted] | 2015-01-07 00:00:00 | 2015-07-19 00:00:00 | 2015-03-15 00:00:00 | 2015-03-21 00:00:00 | 2015-03-27 00:00:00 | 2497512 | 57 | 48.50 | 1438.51 | 29.660000 |

**Earn Code - Over Time Premium**

| EMPLID | EARNS_BEGIN_DT | EARNS_END_DT | ERNCD | OTH_HRS | OTH_EARNS | HOURLY_RT | FLSA_RT | COMPRATE_USED | RATE_USED | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 505567 | 2015-03-15 00:00:00 | 2015-03-21 00:00:00 | OTP | 16.00 | 237.28 | 29.660000 | 29.660000 | 29.660000 | H | DTP | 0.5 | 14.83 | 29.660000 | 29.660000 |

**Earn Code - Double Time Premium**

C159



AMN Healthc. re Timecard

**757862**

Name: _____
Facility: KAISER - ZION

Fax #: _____
Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/8/17 | 19:00 | 30 | 07:30 | 0203 | 1/2 - | 5/5 - | | |
| 10/11/17 | 19:00 | 30 | 07:30 | 02:03 | 1/2 - | | | |
| 10/12/17 | 19:00 | 30 | 08:15 | 02:03 | 1/2 - | | 36 - | .72 |

Please do not sign in and out at the same time.

Agency: AMN
**Required Field
Primary GL Code: _____

Comments: 10/12 q meding the day sing

Draft

I affirm that the time recorded above is accurate and all required app...

Dated: 10/12/17  Healthcare Professional's Signature: _____

The undersigned certifies that he or she is an authorized representative of the ...
named employee to ... Payroll cannot p process timecards without an authorized signature.

Print Name: CARLOS SALAS
Facility Authorization: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

RECEIVED BY
OCT 16 2017
CARLOS SAL...
Contact #: _____
Title: COORDINATOR
Dated: _____

AMN0011643
AMN0011643

Nurse admin >>

2017-10-16 10:05

C160

| ACTIVITY_ID | EMPLID | NAME | START_DT | END_DT | EARNS_BEGIN_DT | EARNS_END_DT | CHECK_DT | PAYCHECK_NBR | Earn Code_4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ERNCD | EARNS | PREMIUM |
| 4701202 | 57862 | [redacted] | 2017-05-17 00:00:00 | 2018-05-05 00:00:00 | 2017-10-08 00:00:00 | 2017-10-14 00:00:00 | 2017-10-20 00:00:00 | 3360390 | ST | 37.00 | 925.00 | 25.000000 |

| EMPLID | EARNS_BEGIN_DT | EARNS_END_DT | ERNCD | OTH_HRS | OTH_EARNS | HOURLY_RT | FLSA_RT | COMPRATE_USED | RATE_USED | Earn Code: Over Time Premium | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ERNCD | HRS | EARNS | PREMIUM |
| 757862 | 2017-10-08 00:00:00 | 2017-10-14 00:00:00 | OTP | 12.00 | 150.00 | 25.000000 | 25.000000 | 25.000000 | H | OTP | 1 | 25.000000 | 25.000000 |

C161

**EXHIBIT 19**



AMN Healthcare Timecard - KFH/Hospital

393041

Thank you for printing neatly and within the boxes.

Name: _____

Facility: Kaiser - Vacaville

Code: _____

Fax #: _____

Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center / Department | Regular | OT1/HOL | OT2 |
|---|---|---|---|---|---|---|---|
| 8/10/14 | 07:00 | 30 | 19:30 | 0121 | 12:00 | | |
| 8/13/14 | 11:00 | 30 | 00:00 | 96 | 12:00 | | 0.50 |
| 8/14/14 | 11:00 | 30 | 23:30 | 0103 | 12:00 | | |
| | | | | 3A | | | |
| | | | | 010A | | | |
| | | | | 8A | | | |

WEEKLY TOTAL: 36:00 / 0.50

Per Diem?: ☐ Yes ☐ No

Kaiser Use Only

Please do not sign in and out at the same time.

I affirm that the time reported above is accurate and 2nd required approvals have been obtained.

Dated: 8/14/14  Healthcare Professional's Signature: _____

Print Name: Kaiser - Vacaville Diana Nardi

Facility Authorization: _____ Title: _____ Contact #: _____ Dated: 8/14/14

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Agency: _____

Primary GL Code: _____

Comments: _____

2014-08-15 01:30



## AMN Healthcare Timecard - KFH/Hospital

Name: 520386

Per Diem?: ☐ Yes ☐ No   Facility: San Jose Kaiser   Code:

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/Department | Skilled worked at regular/PT only Reg Holiday Eval | WEEKLY TOTAL |
|---|---|---|---|---|---|---|
| 01/16/17 | 19:00 | 30 | 07:30 | 012 | | 12 CH |
| 01/18/17 | 19:00 | 30 | 07:30 | 0101 | | 12 CH |
| 01/19/17 | 19:00 | 30 | 07:42 | 0124 | | 12 CH |
| 01/20/17 | 19:00 | 30 | 08:46 | 0124 | | 14 CH |

Working on next timecard

Agency: AMN nurse choice

WEEKLY TOTAL   4:00   9:08

Flex #: 520386   Pay Cycle: WEEKLY

Please do not sign in and out at the same time.

I claim that the above reported hours, accurate and all required meal/rest breaks have been claimed.

_____   Date _____
Healthcare Professional's Signature

This undersigned certifies that he or she is an authorized representative of this client company and that this above record of time worked by the named employee is correct. Signed record acknowledges immediate services without an authorized signature.

Paid Name _____   Title _____   Date _____
Facility Authorization

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Primary GL Code: _____

Comments: _____

Draft

AMN0016759

# AMN Healthcare Timecard - KFH/Hospital

**534208**

Thank you for printing neatly and within the boxes.

Name: _____  Per Diem?: ☐ Yes ☒ No  Facility: _____  Code: _____  Fax #: _____  Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Regular | OT/HOL | OT2 |
|---|---|---|---|---|---|---|---|
| 6/6/16 | 19:00 | 30 | 07:45 | 0104 | 14:00 | | |
| 6/7/16 | 19:00 | 30 | 07:45 | 0103 | 9:00 | | 15 |
| 6/10/16 | 19:00 | 30 | 07:30 | 0105 | 12:00 | | 5 |
| | | | | 5:024 pm | 4:00 | | |
| | | | | 0170 | 9:00 | | |
| | | | | | | | |
| | | | | | | | |
| | | | WEEKLY TOTAL | 34.01 | | 20. |

Kaiser Use Only

Star can worked at request of: F=Facility HP=Healthcare Prof

NUID: _____

Agency: AMN Healthcare

Primary GL Code: _____

Comments: GETTING OUT LATER DUE TO HAVING TO REPORT OFF TO J OR BLADE NURS.

I affirm that the time recorded above is accurate and all required appendixes have been obtained.

Dated: 6/11/16   Healthcare Professional's Signature

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: SHIRLEEN LACCURDA   Title: RN/MM   Contact #: _____

Facility Authorization: _____  Dated: 6/11/16

Documentation of all hours worked (timecard) must be received by 5:00 PM Pacific Friday after the end of the pay period.

Please do not sign in and out at the same time.

C165



Thank you for printing neatly and within the boxes.

# Timecard

**347669**

Name: [REDACTED]
Facility: SAN LEANDRO, CA　KAISER PERMANENTE
Fax #: [REDACTED]
Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Kaiser Use Only Cost Center | Regular | OT1HOL | OT2 |
|------|---------------|--------------------|-----------------|----------|---------|--------|-----|
| 12-17-16 | 18:30 | 30 | 07:50 | 0122 | 12.00 | 30 | |
| 2-14-16 | 18:53 | 30 | 07:50 | 0122 | 12.00 | 30 | |
| 12-22-16 | 18:50 | 30 | 07:50 | 0122 | 12.00 | 30 | |
| | | | | WEEKLY TOTAL | 36.00 | .27 | |

I affirm that the time checked above is accurate and all required...

The undersigned certifies that he or she is an authorized representative of the Client Company and is authorized to sign for proper time worked and that all breaks and meal periods were taken and that the above timecard is accurate. Payroll cannot process timecards without an authorized signature.

Dated: 12/21/16
Print Name: BILLSMAYNE
Title: ASR Nurse Mgr
Contact: 12/21/16

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Agency: AMN HEALTHCARE
**Required Field
Primary GL Code:

Comments:

Please do not sign in and out at the same time.

fillin dust
this part

AMN0017226

C166

# EXHIBIT 20

# 505567

## N Health_are Timecard

Name: _____
Facility: KAISER-SDMC

Fax #: _____

Pay Cycle: WEEKLY



| Date | Time In (24hr) | Meal Period (mins) | Time Out (24hr) | Professional ID: |
|------|---------------|--------------------|-----------------|--------------|
| 1/21 | 19:00 | 30 | 07:30 | 0250 1/21 |
| 1/22 | 19:00 | 30 | 07:45 | 0250 1/22 |
| 1/23 | 19:00 | 30 | 07:30 | 0250 1/23 |
| | | | | |
| | | | | |
| | | | | 80 |

Please do not sign in and out at the same time.

Agency: _____
**Required Field

Primary GL Code: _____

Comments: _____

I affirm that the time recorded above is accurate and all require

Dated: 1/24/15    Healthcare Professional's Signat_

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the
named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: TIFFANY GRETLER    Title: TRAVEL COORDINATO  Contact #

Facility
Authorization: _____    Dated: 1/26/15

**Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.**

Draft

AMN0011656

| AC GROUP ID | EMPLID | NAME | PERIOD END | END DT | EARNS BEGIN DT | EARNS END DT | CHECK DT | PAYCHECK NBR | | | | rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3731010 | 505567 | [redacted] | 2015-01-07 00:00:00 | 2015-07-19 00:00:00 | 2015-01-18 00:00:00 | 2015-01-24 00:00:00 | 2015-03-30 00:00:00 | 2450054 | 5T | 36.25 | 1075.18 | 29.660000 |

**Earn Code: Overtime Premium**

| EMPLID | EARNS BEGIN DT | EARNS END DT | ERNCD | OTH HRS | OTH EARNS | HOURLY RT | ESLR RT | COMPRATE USED | RATE_USED | | | rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 505567 | 2015-01-18 00:00:00 | 2015-01-24 00:00:00 | OTP | 12.00 | 177.96 | 29.660000 | 29.660000 | 29.660000 | H | 0.25 | 7.42 | 29.660000 |



AMN Health[ ] [ ]e Timecard

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

Name: Debra M Park RN
Facility: Kaweah - Medical cntr

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | | WEEKLY TOTAL |
|------|------|------|------|------|------|
| 3/23 | 19:00 | 30 | 08:00 | Cnv 3S | |
| 3/24 | 19:00 | 30 | 07:30 | 3S | |
| 3/28 | | | | | |

Please do not sign in and out at the same time.

Agency: Medical Explo

*Required Field
**Primary GL Code:

Comments:
3/24 - late teaving due to late report - 5 chipped away
- missed 15 min break
3/25 - missed 15 min break

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Health care Professional's Signature: Debra M Park RN    Dated: 3/30

The undersigned certifies that he or she is the authorized representative of the client company and that the above record of time worked by the named employee is correct. The employee's timecard is verified and authorized for payment.

Facility Authorization: [signature]    Title: RN

Print name: [ ]    Contact #: _____    Dated: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

DRAFT

AMN0020138

P 1/2    << 925295485Σ    ICUB    2015-03-30 05:31 ICUB

EXHIBIT 8
Park 8
3/9/15

C170



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

CO      FILE #    PID    000002-000000
PCSXG9 000550162 3837623

## Earnings Statement

Period Beginning: 03/22/2015
Period Ending: 03/28/2015
Advice Date: 04/03/2015
Advice Number: 0002502910
Batch Number: 000000003416

CELENA PARKS

Taxable Marital Status: Single

Exemptions/Allowances   Add'l
  Fed: 00
  CA: 00

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 45.5000 | 24.50 | 1114.75 | 5628.63 |
| OT Premium | 22.7500 | 8.00 | 182.00 | 705.25 |
| DT Premium | 45.5000 | 0.50 | 22.75 | 34.13 |
| Lodg PDN | | | 506.31 | 1952.91 |
| M&I PerDiemN | | | 245.00 | 945.00 |
| CA Rest Peri | 45.5000 | 2.00 | 91.00 | 91.00 |
| NT Travel | | | 0.00 | 300.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Vision | 1.90 | 1.90 |

| | | |
|---|---|---|
| Total Additional | 1.90 | 1.90 |

*Excluded from Taxable Wages

| Net Pay | 1695.73 | 7429.63 |
|---|---|---|

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | | 1,695.73 |
| Net Check | | | 0.00 |

### Customer Name                  Facility
Kaiser - Walnut Creek Medical Cente  405118

### Other Balances

| Gross Pay | | 2161.81 | 9656.92 |
|---|---|---|---|

### Tax Deductions

| Fed Withholdng | 260.20 | 1252.35 |
|---|---|---|
| Fed MED/EE | 20.43 | 93.63 |
| Fed OASDI/EE | 87.33 | 400.34 |
| CA Withholdng | 83.55 | 420.96 |
| CA OASDI/EE | 12.67 | 58.11 |
| Total Tax Deductions: | 464.18 | 2225.39 |

Federal Taxable Wages are    $1,408.60

### Message

2002 Automatic Data Processing (PCSUMS)



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Advice Number: 0002502910

Advice Date:    04/03/2015

Deposited to the account of
CELENA PARKS                Checking

Account Number   Transit/ABA

Amount
1695.73

THIS IS NOT A CHECK

NON-NEGOTIABLE

EXHIBIT 9
Parks
3/9/18

AMN0020145

C171

# EXHIBIT 21

AMN0019865



AMN Healthcare Timecard - KFH/Hospital

Fax#: 888-667-7101

Thank you for printing neatly and within the boxes.

Please do not sign in and out at the same time.

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

C173



CO    FILE #   PID   000000-000000
PCSXG3 000728026 4340076

**NursesRx**
an AMN Healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Taxable Marital Status: Single

Exemptions/Allowances    Add'l
Fed: 03
CA: 03

# Earnings Statement

| | |
|---|---|
| Period Beginning: | 07/10/2016 |
| Period Ending: | 07/16/2016 |
| Advice Date: | 07/22/2016 |
| Advice Number: | 0002907312 |
| Batch Number: | 000000003821 |

**SARAH REYNOSA-JUAREZ**

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 31.3700 | 36.75 | 1152.85 | 3419.33 |
| OT Premium | 15.6850 | 12.00 | 188.22 | 439.18 |
| DT Premium | 31.3700 | 0.75 | 23.53 | 31.37 |
| Lodg PDN | | | 644.35 | 1841.00 |
| M&I PerDiemN | | | 245.00 | 700.00 |
| CA Rest Peri | 31.3700 | 1.00 | 31.37 | 31.37 |
| Hol .5 Prem | | | 0.00 | 192.20 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| Total Additional | 0.00 | 0.00 |

*Excluded from Taxable Wages

| Net Pay | 1892.97 | 5510.01 |
|---|---|---|

**Direct Deposit Summary**

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | | 1,892.97 |
| Net Check | | | 0.00 |

**Customer Name          Facility**

Kaiser - Sacramento Medical Center   405451

**Other Balances**

| Gross Pay | 2285.32 | 6654.45 |
|---|---|---|

## Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 198.44 | 576.70 |
| Fed MED/EE | 20.25 | 59.65 |
| Fed OASDI/EE | 86.55 | 255.03 |
| CA Withholdng | 74.55 | 216.04 |
| CA OASDI/EE | 12.56 | 37.02 |
| Total Tax Deductions: | 392.35 | 1144.44 |

Federal Taxable Wages are    $1,395.97
**Message**

2002 Automatic Data Processing (PCSUVO)

---

**NursesRx**
an AMN Healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002907312

Advice Date:    07/22/2016

Deposited to the account of          Account Number   Transit ABA          Amount
SARAH REYNOSA-JUAREZ        Checking                                     1892.97

THIS IS NOT A CHECK

# NON-NEGOTIABLE

AMN0020140

# AMN Healthcare Timecard

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: Celena M Parks

Facility: Kaiser - Walnut Creek

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) |
|------|---------------|--------------------|----------------|
| 4/15 | 19:00 | 0 | 07:45 |
| 4/8 | 1 | 30 | 1 |
| 4/11 | 16:00 | 30 | 07:30 |
| | | | |
| | | | |
| | | | |

Please do not sign in and out at the same time.

**Raise/Fee Only**
Cost Center Premium | Agency/Fill
30.35
ICU

H+P

WEEKLY TOTAL

Agency: Medical Express

*Required Field

Primary GL Code:

Comments: 4ft. did not receive any breaks (¢ lunch breaks)

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 4/14/15   Healthcare Professional's Signature: Celena m Parks LN

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: _____  Title: _____

Facility Authorization: _____

Contact #: _____

Dated: _____

Draft

**Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.**

9252954831 >>

2015-04-11 18:05 ICUA

C175



**medical express**
an AMN Healthcare company

CO      FILE #     PID     000000-000000
PCSXG9 000550152 3837623

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Period Beginning: 04/05/2015
Period Ending: 04/11/2015
Advice Date: 04/17/2015
Advice Number: 0002512732
Batch Number: 000000003428

Taxable Marital Status: Single

**CELENA PARKS**

Exemptions/Allowances    Add'l
  Fed: 00
  CA: 00

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 45.5000 | 24.25 | 1103.38 | 7824.01 |
| OT Premium | 22.7500 | 8.00 | 182.00 | 1069.25 |
| DT Premium | 45.5000 | 0.25 | 11.38 | 45.51 |
| Lodg PDN | | | 506.31 | 2965.53 |
| CA Lunch Pen | 45.5000 | 1.00 | 45.50 | 45.50 |
| M&I PerDiemN | | | 245.00 | 1435.00 |
| NT Travel | | | 0.00 | 300.00 |
| Ins Reimb | | | 0.00 | 147.60 |
| CA Rest Peri | | | 0.00 | 91.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Vision | 1.90 | 5.70 |
| M&I ADJ NT | 81.67 | 163.34 |
| Lodging Adj NT | 168.77 | 337.54 |
| Total Additional | 252.34 | 506.58 |

*Excluded from Taxable Wages

| Net Pay | 1406.92 | 10288.07 |
|---|---|---|

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | | 1,406.92 |
| Net Check | | | 0.00 |

## Customer Name          Facility

Kaiser - Walnut Creek Medical Cente   405118

## Other Balances

| Gross Pay | 2093.57 | 13923.40 |
|---|---|---|

## Tax Deductions

| Fed Withholdng | 243.14 | 1758.47 |
|---|---|---|
| Fed MED/EE | 19.44 | 133.65 |
| Fed OASDI/EE | 83.10 | 571.46 |
| CA Withholdng | 76.57 | 582.22 |
| CA OASDI/EE | 12.06 | 82.95 |
| Total Tax Deductions: | 434.31 | 3128.75 |

Federal Taxable Wages are   $1,340.36

**Message**

2002 Automatic Data Processing (PCSUVO)



**medical express**
an AMN Healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Advice Number: 0002512732

Advice Date: 04/17/2015

| Deposited to the account of | | Account Number | Transit-ABA | Amount |
|---|---|---|---|---|
| CELENA PARKS | Checking | | | 1406.92 |

**THIS IS NOT A CHECK**

**NON-NEGOTIABLE**

AMN0020317



## AMN Healthcare Timecard

Thank you for printing neatly and within the boxes.

Name: Sandra Boyd
Facility: Kaiser Permanente — Roseville, CA
Fax #: 888-667-7101
Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Regular | OT/Hol | OT |
|------|---------|------|---------|------|------|------|
| 1/29/15 2N | 06:45 | 30 | 19:15 | 08.00 | 04.00 | 01.00 |
| 1/29/15 2N-6hrs, 2S-5 hrs | 06:45 | 30 | 20:15 | 08.00 | 04.00 | 01.00 |
| 1/31/15 1OA-6hr;3S-4 hrs | 06:45 | 30 | 20:15 | 08.00 | 04.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

WEEKLY TOTAL: 24.00 | 12.00 | 02.00

Agency: AMN Healthcare
**Required Field
Primary GL Code: 01-02-21801

Comments:

Please do not sign in and out at the same time.

Contact #: 916-784-4768

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: Jasmine Hasselrazoleh
Title: Senior Staff Assistant
Dated: 2/2/15
Facility Authorization:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Dated: 2/2/15



CO    FILE #    PID    000000-000000
PCSXG9 000543161 3786920

# Earnings Statement

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

| | |
|---|---|
| Period Beginning: | 01/25/2015 |
| Period Ending: | 01/31/2015 |
| Advice Date: | 02/06/2015 |
| Advice Number: | 0002462906 |
| Batch Number: | 000000003368 |

Taxable Marital Status: Single

**SANDRA BOYD**

Exemptions/Allowances   Add'l
  Fed: 02
  CA:  02

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 27.9400 | 38.00 | 1061.72 | 4607.28 |
| OT Premium | 13.9700 | 12.00 | 167.64 | 597.98 |
| DT Premium | 27.9400 | 2.00 | 55.88 | 55.88 |
| Lodg PDN | | | 437.29 | 1124.46 |
| M&I PerDiemN | | | 245.00 | 630.00 |
| Transportati | | | 0.00 | 500.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| Total Additional | 0.00 | 0.00 |

*Excluded from Taxable Wages

| Net Pay | 1597.71 | 5617.42 |
|---|---|---|

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | | 1,597.71 |
| Net Check | | | 0.00 |

### Customer Name          Facility
Kaiser - Roseville Medical Center -   405582

### Other Balances

| Gross Pay | 1967.53 | 7515.60 |
|---|---|---|

## Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 190.90 | 1020.08 |
| Fed MED/EE | 18.64 | 83.54 |
| Fed OASDI/EE | 79.68 | 357.19 |
| CA Withholdng | 67.75 | 379.76 |
| CA OASDI/EE | 12.85 | 57.61 |
| Total Tax Deductions: | 369.82 | 1898.18 |

Federal Taxable Wages are        $1,285.24
**Message**

2002 Automatic Data Processing (PCSUVD)

---



AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002462906

Advice Date:   02/06/2015

**Deposited to the account of          Account Number   Transit   ABA          Amount**
SANDRA BOYD          Checking          1597.71

THIS IS NOT A CHECK

## NON-NEGOTIABLE

AMN0020371

# AMN Healthcare Timecard

Name: _Sandra Boyd_    Fax #: 888-667-7101

Facility: _Kaiser Permanente - Morse_    Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT/AROL | OT2 | | |
|---|---|---|---|---|---|---|---|---|---|
| 7/13/16 | 06:45 | 30 | 19:15 | 0106 | 8:00 | | | 1 | |
| | | | | 0163 | | 4:00 | | | |
| 3/17/16 | 06:45 | 30 | 19:15 | 0121 | 8:00 | 4:30 | | | |
| 7/8/16 | 06:45 | 30 | 19:15 | 0104 | 8:00 | 4:00 | | | |
| | : | | : | | | | | | |
| | : | | : | | | | | | |
| | : | | : | | | | | | |

Please do not sign in and out at the same time.

Thank you for printing neatly and within the boxes.

Agency: _American Mobile_

**Required Field

Primary GL Code: _____

| WEEKLY TOTAL | 24.0 | 12.0 | | | |
|---|---|---|---|---|---|

Comments: _____

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Date: 3/21/16    Healthcare Professional's Signature: _Sandra J Boyd_

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: _____    Title: _____    Contact #: _____

Facility Authorization: _DEE SINGH_    Dated: 3-21-16

Documentation of all hours worked (timecard) must be received by 6:00 pm PT Monday after the end of the pay period.

AMN0020360

# SACRAMENTO MEDICAL CENTER
## Missed Break/Missed Meal
### Authorization for Payment

**OUR MISSION**
KP exists to provide affordable, high-quality health care service to improve the health of our members and the communities we serve.



Specific reason for missing Meal/Break:

No break relief RN

○ Missed Meal

○ Missed Break        X ↑

Date: 3/13/16   Shift: DAY   X

Staff Name: Sandra Boyd, RN   X

Staff Signature: _____   Title: _____

Manager or Assistant Manager or Supervisor Signature:

○ Approved/Reason: M Muñoz RN ANM

○ Denied/Reason: _____

(Copy to Staffing Office)

AMN0020359



| CO | FILE # | PID | 000009-000009 |
| PCSXG9 000543161 4088657 |

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

| Period Beginning: | 03/13/2016 |
| Period Ending: | 03/19/2016 |
| Advice Date: | 03/25/2016 |
| Advice Number: | 0002793975 |
| Batch Number: | 000000003719 |

Taxable Marital Status: Single

**SANDRA BOYD**

Exemptions/Allowances  Add'l
  Fed: 02
  CA: 02

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 45.5000 | 36.00 | 1638.00 | 18928.00 |
| OT Premium | 22.7500 | 12.00 | 273.00 | 2912.00 |
| Lodg PDN | | | 623.00 | 8285.97 |
| CA Lunch Pen | 45.5000 | 1.00 | 45.50 | 136.50 |
| M&I PerDiemN | | | 245.00 | 2940.00 |
| CA Rest Peri | 45.5000 | 1.00 | 45.50 | 182.00 |
| DT Premium | | | 0.00 | 182.00 |
| Hol .5 Prem | | | 0.00 | 273.00 |
| QS Reim NT T | | | 0.00 | 85.00 |
| Transportati | | | 0.00 | 500.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *MedConChoice | 21.00 | 252.00 |
| *Dental PPO H | 7.33 | 87.56 |
| Lodging Adj NT | 0.00 | 453.91 |
| M&I ADJ NT | 0.00 | 163.34 |
| Total Additional | 28.33 | 956.81 |

*Excluded from Taxable Wages

Net Pay  2173.97  25819.26

**Direct Deposit Summary**

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | | 2,173.97 |
| Net Check | | | 0.00 |

**Customer Name          Facility**

Kaiser - Sacramento Medical Center   405451

**Other Balances**

| Gross Pay | 2870.00 | 34424.47 |

**Tax Deductions**

| Fed Withholdng | 362.99 | 4154.54 |
| Fed MED/EE | 28.62 | 330.22 |
| Fed OASDI/EE | 122.36 | 1411.98 |
| CA Withholdng | 135.96 | 1546.69 |
| CA OASDI/EE | 17.77 | 204.97 |
| Total Tax Deductions: | 667.70 | 7648.40 |

Federal Taxable Wages are    $1,973.67

**Message**

2002 Automatic Data Processing (PCSUVO)

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002793975

Advice Date:    03/25/2016

| Deposited to the account of | Account Number | Transit ABA | Amount |
|---|---|---|---|
| SANDRA BOYD | Checking | | 2173.97 |

**THIS IS NOT A CHECK**

**NON-NEGOTIABLE**

AMN0020403

AMN0020214

# AMN Health..re Timecard

Thank you for printing neatly and within the boxes.

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: _Clinik NNVA_

Facility: _Kaiser - RWC (Redwood City)_

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT@HOL | OT2 |
|---|---|---|---|---|---|---|---|
| 3/30/15 Mon | 11:00 | 30 | 20:45 | 0300 | 8:00 | 1:25 | |
| 3/31/15 Tues | 11:00 | 30 | 19:30 | 0300 | 8:00 | | |
| 4/1/15 Wed | 11:00 | 30 | 20:00 19:30 | 0300 | 8:00 | 0:50 | |
| 4/2/15 Thurs | 11:00 | 30 | 20:00 | 0300 | 8:00 | | |
| 4/3/15 Fri | 11:00 | 30 | 19:30 | 0300 | 8:00 | | |
| | | | | | | | |
| | | | | WEEKLY TOTAL | 40:00 | 1:75 | |

Agency: AMN

**Required Field

Primary GL Code: _____

Please do not sign in and out at the same time.

Comments: _____

I affirm that the time recorded above is accurate and all required meal periods have been taken.

Dated: _4/3/15_    Healthcare Professional's Signature: _____

The undersigned certifies that he or she is an authorized representative of the client company and that this above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: _Erna A. Rivera_   Title: _Sr. Staff RN_   Contact: _(650) 299-4247_

Facility Authorization: _Erna A. Rivera_   Dated: _4/6/15_

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

C182



medical express
an AMN Healthcare company

CO     FILE #    PID    000000-000000
PCSXG9 000010198 3770091

# Earnings Statement

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Period Beginning: 03/29/2015
Period Ending: 04/04/2015
Advice Date: 04/10/2015
Advice Number: 0002508041
Batch Number: 000000003422

Taxable Marital Status: Single

**OLIVIA NAVA**

Exemptions/Allowances   Add'l
    Fed: 18
    CA:  18

| Earnings | Rate | Hours | This Period | Year-to-Date |
|----------|------|-------|-------------|--------------|
| Regular Hrs | 31.6000 | 41.75 | 1319.30 | 14817.70 |
| OT Premium | 15.8000 | 1.75 | 27.65 | 130.35 |
| Lodg PDN | | | 529.34 | 6276.46 |
| M&I PerDiemN | | | 245.00 | 2905.00 |
| NT Travel | | | 0.00 | 182.40 |

| Additional Deductions | This Period | Year-to-Date |
|-----------------------|-------------|--------------|
| Lodging Adj NT | 0.00 | 105.87 |
| M&I ADJ NT | 0.00 | 49.00 |

| Total Additional | 0.00 | 154.87 |
*Excluded from Taxable Wages

| Net Pay | 1970.01 | 22522.05 |

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|--------|------|---------|--------|
| Deposit | Che | | 1,970.01 |
| Net Check | | | 0.00 |

### Customer Name          Facility
Kaiser - Redwood City Medical Cente  434317

### Other Balances

| Gross Pay | 2121.29 | 24311.91 |

## Tax Deductions

| Fed Withholdng | 0.00 | 28.80 |
|----------------|------|-------|
| Fed MED/EE | 19.53 | 216.75 |
| Fed OASDI/EE | 83.51 | 926.78 |
| CA Withholdng | 36.12 | 328.13 |
| CA OASDI/EE | 12.12 | 134.53 |

| Total Tax Deductions: | 151.28 | 1634.99 |

Federal Taxable Wages are   $1,346.95
**Message**

2002 Automatic Data Processing (PCSUVO)



medical express
an AMN Healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Advice Number: 0002508041

Advice Date: 04/10/2015

**Deposited to the account of**   Account Number   Transit-ABA   **Amount**
OLIVIA NAVA                       Checking                        1970.01

*THIS IS NOT A CHECK*

## NON-NEGOTIABLE

AMN0020263

# EXHIBIT 22



BARTZ CONSULTING
LEAN + SIX SIGMA

Sept. 8, 2016

**AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT**

Bartz Consulting, LLC



The Professional Services Agreement dated 4/10/15 and the Professional Services Agreement dated 7/12/15 between Bartz Consulting and AMN Healthcare (AMN) are hereby amended. All other terms shall remain in full effect.

**Entire Document**
Replace "Bartz Consulting" with "Bartz Consulting LLC"

**Add new Section "Reimbursement"**
AMN agrees to reimburse Bartz Consulting LLC for all actual reasonable and necessary expenditures directly related to the Services. These expenditures include, but are not limited to, expenses related to travel (i.e., coach airfare, hotel, meals, parking, taxis, etc.), postal costs, and printing fees. Expenses incurred by Bartz Consulting LLC shall be billed at actual costs, with no profit or fee permitted. Expenses shall be reimbursed by AMN after Bartz Consulting LLC submits written documentation and receipts per AMN submission guidelines.

**Proposal**
Attached Proposals shall be replaced by updated Proposal dated 9/8/16.

I have read, understand and agree to all terms of this Amendment.

_____

AMN Healthcare                                    Date

_____

Bartz Consulting LLC                              Date

# PROFESSIONAL SERVICES AGREEMENT

**SCOPE OF PROFESSIONAL SERVICES**
This Agreement is made on 4/10/15 ("Effective Date") by and between Bartz Consulting and AMN Healthcare (AMN). AMN engages Bartz Consulting to provide, and Bartz Consulting agrees to provide, services and deliverables as described in the attached Proposal (collectively, the "Services").

**PAYMENT**
Payment for services rendered will be payable as described below. If payment of any invoice is not received within 30 days of receipt, the Services will be suspended until payment is received.

- AMN will receive a detailed invoice every 2 weeks with hours worked, activities completed, and total hourly fees due

**STANDARD OF CARE.** Bartz Consulting will perform the Services in a manner reasonably consistent with that level of care and skill ordinarily exercised by other members of its profession practicing in the same locality, under similar conditions and at the date the Services are provided. Bartz Consulting makes no representation, guarantee or warranty, express or implied, regarding the Services, or any communication (oral or written), certification, report, opinion, or instrument of the Services provided under or pursuant to this Agreement.

**CONFIDENTIALITY; OWNERSHIP.** Bartz Consulting acknowledges that, during the course of performing the Services, AMN will be disclosing information related to its business, projects, products, personnel, business plans, and finances, as well as other commercially valuable information not otherwise known to third parties (collectively, "Confidential Information"). Bartz Consulting agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, except as required by law or until such information becomes publicly known and thereby is no longer Confidential Information. Data, Standard Operating Procedures, templates, and other items generated for AMN as part of the Services shall be the sole and exclusive property of AMN.

**ENTIRE AGREEMENT; NO CONFLICT.** This Agreement represents the parties' entire agreement of and supersedes all agreements on the same subjects between the parties, either oral or in writing. AMN represents that this Agreement has been duly authorized and executed, and is a valid and legally binding obligation of AMN, subject to no conflicting agreements.

**TERMINATION.** Either party may terminate this Agreement upon 30 days written notice, for any reason whatsoever. In such event AMN shall pay Bartz Consulting for such portion of the Services performed and materials provided up to the date of termination. Bartz Consulting will provide AMN with an invoice of final amount due and AMN shall pay this invoice within 14 days of receipt.

**NATURE OF RELATIONSHIP. PERFORMANCE.** Bartz Consulting will perform the Services as an independent contractor and will not act as AMN's agent or employee. Bartz Consulting will be subject to and operate in compliance with all federal, state and local laws and regulations. Bartz Consulting will not be liable for delay or failure to perform the Services caused directly or indirectly by circumstances beyond its control, including but not limited to, acts of God, fire, flood, accident, or delays due to actions or inactions of AMN or others.

**AMN RESPONSIBILITIES.** AMN agrees to provide all available material, data, and information pertaining to the Services, including, without limitation, relevant analyses and business roadmaps. AMN will ensure the cooperation of its employees with Bartz Consulting, and she is entitled to rely upon the accuracy and completeness of all information given by AMN and its employees.

**USE OF CLIENT NAME.** Notwithstanding anything herein (or in any other agreement) to the contrary, Bartz Consulting shall have the right to reference AMN and the general nature of the Services on its web site and in presentations to prospects, clients or investors. In no event will Bartz Consulting utilize these rights in any way which: misrepresents its contribution; damages or disadvantages AMN's competitive position; or violates its obligations of confidentiality to AMN hereunder or in any other document.

**SEVERABILITY.** If any part of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or otherwise unenforceable, that provision will be amended as nearly possible to achieve the original intent, and the remainder will remain in full force and effect.

**APPLICABLE LAW.** This Agreement will be governed by and construed in accordance with the laws of the state of California.

**INDEMNITY; LIMITATION OF LIABILITY.** AMN will defend, indemnify and hold harmless Bartz Consulting from and against all claims, demands, causes of action, damages or other liabilities, including but not limited to attorney's fees and other legal expenses reasonably incurred by Bartz Consulting (collectively, "Claims"), that arise from performance of the Services or from Bartz Consulting's acts, errors or omissions in connection with this Agreement, excepting Claims arising from the sole negligence or willful misconduct of Bartz Consulting. The maximum aggregate liability of Bartz Consulting in connection with this Agreement and all amendments thereto, whether based in contract or tort or otherwise in law or equity, will be limited to the greater of the compensation actually paid to Bartz Consulting for the Services hereunder or $25,000, and AMN hereby releases Bartz Consulting from any liability above such amount. Neither party will be liable to the other for any special, incidental, indirect, exemplary, punitive or consequential damages, however arising, incurred by either Bartz Consulting or AMN, or for which either may be liable to a third party.

I have read, understand and agree to all terms of this Agreement.

AMN HEALTHCARE:

_____
SIGNATURE

_____
4/10/15
DATE

BARTZ CONSULTING:

_____
SIGNATURE

_____
4/10/15
DATE



**PROBLEM**

AMN Healthcare is implementing SalesForce and PeopleSoft, with an August 2015 launch date. The Sales Operations department requires interim assistance with process analysis, project management, and implementation support.

**RECOMMENDED SERVICES**

- Process analysis and project management to support SalesForce and PeopleSoft implementation
- Gap and requirements analysis
- Process improvement road-mapping

**FEE**                                     **per hour, for Lean Six Sigma Black Belt services**

# PROFESSIONAL SERVICES AGREEMENT

**SCOPE OF PROFESSIONAL SERVICES**
This Agreement is made on 7/12/15 ("Effective Date") by and between Bartz Consulting and AMN Healthcare (AMN). AMN engages Bartz Consulting to provide, and Bartz Consulting agrees to provide, services and deliverables as described in the attached Proposal (collectively, the "Services").

**PAYMENT**
Payment for services rendered will be payable as described below. If payment of any invoice is not received within 30 days of receipt, the Services will be suspended until payment is received.

* AMN will receive a detailed invoice every 2 weeks with hours worked, activities completed, and total hourly fees due

**STANDARD OF CARE.** Bartz Consulting will perform the Services in a manner reasonably consistent with that level of care and skill ordinarily exercised by other members of its profession practicing in the same locality, under similar conditions and at the date the Services are provided. Bartz Consulting makes no representation, guarantee or warranty, express or implied, regarding the Services, or any communication (oral or written), certification, report, opinion, or instrument of the Services provided under or pursuant to this Agreement.

**CONFIDENTIALITY; OWNERSHIP.** Bartz Consulting acknowledges that, during the course of performing the Services, AMN will be disclosing information related to its business, projects, products, personnel, business plans, and finances, as well as other commercially valuable information not otherwise known to third parties (collectively, "Confidential Information"). Bartz Consulting agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, except as required by law or until such information becomes publicly known and thereby is no longer Confidential Information. Data, Standard Operating Procedures, templates, and other items generated for AMN as part of the Services shall be the sole and exclusive property of AMN.

**ENTIRE AGREEMENT; NO CONFLICT.** This Agreement represents the parties' entire agreement of and supersedes all agreements on the same subjects between the parties, either oral or in writing. AMN represents that this Agreement has been duly authorized and executed, and is a valid and legally binding obligation of AMN, subject to no conflicting agreements.

**TERMINATION.** Either party may terminate this Agreement upon 30 days written notice, for any reason whatsoever. In such event AMN shall pay Bartz Consulting for such portion of the Services performed and materials provided up to the date of termination. Bartz Consulting will provide AMN with an invoice of final amount due and AMN shall pay this invoice within 14 days of receipt.

**NATURE OF RELATIONSHIP. PERFORMANCE.** Bartz Consulting will perform the Services as an independent contractor and will not act as AMN's agent or employee. Bartz Consulting will be subject to and operate in compliance with all federal, state and local laws and regulations. Bartz Consulting will not be liable for delay or failure to perform the Services caused directly or indirectly by circumstances beyond its control, including but not limited to, acts of God, fire, flood, accident, or delays due to actions or inactions of AMN or others.

**AMN RESPONSIBILITIES.** AMN agrees to provide all available material, data, and information pertaining to the Services, including, without limitation, relevant analyses and business roadmaps. AMN will ensure the cooperation of its employees with Bartz Consulting, and she is entitled to rely upon the accuracy and completeness of all information given by AMN and its employees.

**USE OF CLIENT NAME.** Notwithstanding anything herein (or in any other agreement) to the contrary, Bartz Consulting shall have the right to reference AMN and the general nature of the Services on its web site and in presentations to prospects, clients or investors. In no event will Bartz Consulting utilize these rights in any way which: misrepresents its contribution; damages or disadvantages AMN's competitive position; or violates its obligations of confidentiality to AMN hereunder or in any other document.

**SEVERABILITY.** If any part of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or otherwise unenforceable, that provision will be amended as nearly possible to achieve the original intent, and the remainder will remain in full force and effect.

**APPLICABLE LAW.** This Agreement will be governed by and construed in accordance with the laws of the state of California.

**INDEMNITY; LIMITATION OF LIABILITY.** AMN will defend, indemnify and hold harmless Bartz Consulting from and against all claims, demands, causes of action, damages or other liabilities, including but not limited to attorney's fees and other legal expenses reasonably incurred by Bartz Consulting (collectively, "Claims"), that arise from performance of the Services or from Bartz Consulting's acts, errors or omissions in connection with this Agreement, excepting Claims arising from the sole negligence or willful misconduct of Bartz Consulting. The maximum aggregate liability of Bartz Consulting in connection with this Agreement and all amendments thereto, whether based in contract or tort or otherwise in law or equity, will be limited to the greater of the compensation actually paid to Bartz Consulting for the Services hereunder or $25,000, and AMN hereby releases Bartz Consulting from any liability above such amount. Neither party will be liable to the other for any special, incidental, indirect, exemplary, punitive or consequential damages, however arising, incurred by either Bartz Consulting or AMN, or for which either may be liable to a third party.

I have read, understand and agree to all terms of this Agreement.

AMN HEALTHCARE:

_____
SIGNATURE

_____
7/13/15
DATE

BARTZ CONSULTING:

_____
SIGNATURE

_____
7/13/15
DATE



## PROBLEM

AMN Healthcare is implementing SalesForce and PeopleSoft ("Destinations Project"), and requires additional help with business readiness activities. Specifically, the Destinations Project requires interim assistance with process documentation and business analysis.

## RECOMMENDED SERVICES

- Process map consolidation and documentation to support SalesForce and PeopleSoft implementation

## FEE

██ per hour for up to 2 Business Analysts



**PROBLEM**

AMN Healthcare is implementing SalesForce and PeopleSoft ("Destinations Project"), and requires additional help with Standard Operating Procedures. Specifically, the Destinations Project requires interim assistance with documentation and inputs for user training.

**RECOMMENDED SERVICES**

- Project Management of SOP inventory to support Destinations go-live and training activities
- Training and Mentoring of SMEs to construct and edit SOPs
- Quality Control of SOP documents created by SMEs
- Technical writing of SOP documents (if needed)
- Creation of Job Aids and training inputs (if needed)

**FEES**

- ███ **per hour for Project Management/Mentoring**
- ███ **per hour for Technical Writing (if needed)**



BARTZ CONSULTING
LEAN + SIX SIGMA


Bartz Consulting, LLC



# PROPOSAL — 9/8/16

### Background

AMN Healthcare (AMN) is integrating its Locum Tenens business onto its enterprise technology platforms — SalesForce and PeopleSoft. They need to leverage existing technology and documentation from the Local Staffing business, while mapping a future state for Locum Tenens business processes that achieves additional ROI.

### Estimated Services

* Services are based on AMN's proposed Future State Process Mapping Workshops schedule and format from 8/22/16 through 12/16/16 (estimated) and include:

• Facilitation of Workshops
• Business Analysis, planning, and project management as required
• Assistance with future process definition in workshop and lab settings
• Training and mentoring of Business Process Owners (BPO's), including a BPO Forum
• Production of Level 3 process maps in Visio
• Assisting assigned Scribe(s) with a Preliminary Gap Analysis Matrix
• Reporting, planning, and communications as required
• Preparatory and follow up activities as required

Estimates are based on the agreement that process map validations will occur separate from the workshops and that daily outputs from the Workshops/ Facilitator will require additional process definition by the BPO's and Bartz Consulting LLC in order to produce Level 3 process maps.

| Services * | Estimate for BPO Lead and Facilitator at ▮▮ / hour (60 hours per week) | Estimate for Secondary Facilitator at ▮▮ / hour (60 hours per week) | Estimate for up to 2 Process Analysts at ▮▮ / hour (60 hours per week) | Estimate for Junior Analyst at ▮▮ / hour (60 hours per week) |
|---|---|---|---|---|
| Pre-workshop prep and planning | ▮▮▮ | ▮▮▮ | ▮▮▮ | N/A |

| Services * | Estimate for BPO Lead and Facilitator at █/ hour (60 hours per week) | Estimate for Secondary Facilitator at █/ hour (60 hours per week) | Estimate for up to 2 Process Analysts at █/ hour (60 hours per week) | Estimate for Junior Analyst at █/hour (60 hours per week) |
|---|---|---|---|---|
| Workshop Support and Production Support for: Marketing, Sales, Recruiting, Credentialing, License, Account Mgt, Clinical, Rev Cycle Mgt | █ | N/A | █ | █ |
| Workshop Support and Production Support for: CAM, Time Processing, Client Contracts, AP, Payroll, Billing, CAR, General Ledger, Reporting, Commissions, Housing, Travel, MSP Account Mgt | █ | █ | █ | █ |
| Gap Analysis | Out of Office | █ | █ | N/A |
| End to End Review | █ | █ | █ | █ |
| Additional Analysis/ Review (if needed) | █ | █ | █ | █ |
| Process Map validations (separate from workshops) | █ | N/A | █ | █ |
| EXPENSE: Travel for up to 8, week-long trips to Dallas | █ | N/A | █ | N/A |

| Services * | Estimate for BPO Lead and Facilitator at ███/ hour (60 hours per week) | Estimate for Secondary Facilitator at ███/ hour (60 hours per week) | Estimate for up to 2 Process Analysts at ███/ hour (60 hours per week) | Estimate for Junior Analyst at ███/hour (60 hours per week) |
|---|---|---|---|---|
| EXPENSE: Travel for up to 6, week-long trips to San Diego or Dallas | N/A | ███ | N/A | N/A |
| EXPENSE: Large format printing | N/A | N/A | ███ | N/A |
| **Totals** | ███ | ███ | ███ | ███ |
| **Grand Total** | | | | ███ |

Respectfully submitted on 9/816.   Thank you for the opportunity to serve AMN!

_____

AMN Healthcare                                        Date


_____

AMN Healthcare                                        Date


_____

AMN Healthcare                                        Date


_____

Bartz Consulting LLC                                  Date

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    ROBERT SHAW, et al.,          )
     individually and on behalf of)
5    all others similarly         )
     situated, and as a proxy of  )
6    the State of California on    )
     behalf of aggrieved          )
7    employees,                    )
                                   )
8                    Plaintiffs,   )
                                   )
9         vs.                      ) Case No.
                                   ) 3:16-cv-028116-JCS
10                                 )
     AMN HEALTHCARE, INC. and      )
11   KAISER PERMANENTE             )
     INTERNATIONAL,                )
12                                 )
                     Defendants.   )
13   _____)

14

15

16              DEPOSITION OF ROBERT SHAW

17      _____

18            MONDAY, SEPTEMBER 11, 2017

19

20                    VOLUME I

21              (Pages 1 - 233)

22

23

24   REPORTED BY:  JANE GROSSMAN, CSR 5225  (LA-141749)

25

C196

```
 1                   I N D E X

 2              INDEX OF EXAMINATIONS

 3

 4                                              PAGE

 5   EXAMINATION BY MS. IMARA                      5

 6

 7                   ---oOo---

 8       EXHIBITS MARKED FOR IDENTIFICATION

 9   NUMBER            DESCRIPTION              PAGE

10   Exhibit 1    Two-page document on the letter-    9
                  head of AMN Healthcare, entitled
11                "Traveler Application," dated
                  07/03/2015 (AMN0001356 -
12                AMN0001357)

13   Exhibit 2    One-page document entitled "PRO-   13
                  FESSIONAL SERVICES AGREEMENT,"
14                dated as "Dates" 12/28/15 to
                  03/26/16 (AMN0001367)
15
     Exhibit 3    Two-page document entitled "PRO-   16
16                FESSIONAL SERVICES AGREEMENT,"
                  dated as "Dates" 12/09/15 to
17                03/05/16 (AMN0001365 - AMN0001366)

18   Exhibit 4    One-page document entitled "PRO-   19
                  FESSIONAL SERVICES AGREEMENT,"
19                dated as "Dates" 12/30/15 to
                  03/26/16 (AMN0001361)
20
     Exhibit 5    Two-page document entitled "PRO-   29
21                FESSIONAL SERVICES AGREEMENT,"
                  dated as "Dates" 12/24/15 to
22                12/24/15 (AMN0001363 - AMN0001364)

23   Exhibit 6    Two-page document entitled "AMN    31
                  Healthcare Timecard," dated
24                11-27-15, with handwritten
                  entries (AMN0001317 - AMN0001318)
25
```

C197

```
 1                  E X H I B I T S

 2                     (Continued)

 3   NUMBER               DESCRIPTION              PAGE

 4   Exhibit 7    One-page document entitled "Meal     39
                  Period Form for California Health-
 5                care Employees," dated 11/26/2015
                  (AMN0001332)
 6
     Exhibit 8    Multipage document entitled "2014    43
 7                HEALTHCARE PROFESSIONAL HANDBOOK,"
                  designated "CONFIDENTIAL"
 8                (AMN0002341 - AMN0002387)

 9   Exhibit 9    One-page document entitled "Hand-    47
                  book Acknowledgement," dated
10                11/26/2015 (AMN0001329)

11   Exhibit 10   One-page document entitled "Hand-    47
                  book Acknowledgement," dated
12                11/26/2015 (AMN0001333)

13   Exhibit 11   One-page document entitled "Hand-    47
                  book Acknowledgement," dated
14                11/26/2015 (AMN0001336)

15   Exhibit 12   Two-page document entitled "Job      51
                  Specification for Registered
16                Nurse (RN)," dated 11/26/2015
                  (AMN0001257 - AMN0001258)
17
     Exhibit 13   Multipage packet of documents, the  115
18                first page of which is entitled
                  "AMN Healthcare Timecard," dated
19                3-26-16, with handwritten entries
                  (AMN0001376 - AMN0001391)
20
     Exhibit 14   Multipage packet of documents, the  129
21                first page of which is an Earnings
                  Statement on the letterhead of
22                NurseRx, dated 01/08/2016
                  (AMN0000968 - AMN0000982)
23
                       ---oOo---
24

25
```

C198

```
 1              The deposition of ROBERT SHAW was taken by

 2   Defendant AMN Healthcare, Inc., at the Law Offices of

 3   Constangy Brooks Smith & Prophete LLP, 50 California

 4   Street, Suite 1625, San Francisco, California 94111,

 5   commencing at 10:02 a.m., on Monday, September 11,

 6   2017, before JANE GROSSMAN, CSR, pursuant to Notice of

 7   Taking Deposition.

 8                      ---oOo---

 9              A P P E A R A N C E S

10   FOR PLAINTIFFS ROBERT SHAW, et al.:

11              SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS
                LLP
12              2000 Powell Street, Suite 1400
                Emeryville, California 94608
13              415.421.7100
                By:  JOSHUA G. KONECKY, Attorney at Law
14                   jkonecky@schneiderwallace.com

15

16   FOR DEFENDANT AMN HEALTHCARE:

17              CONSTANGY BROOKS SMITH & PROPHETE LLP
                2029 Century Park East, Suite 1100
18              Los Angeles, California 90067
                310.912.3414
19              By:  TAZAMISHA H. IMARA, Attorney at Law
                     timara@constangy.com
20

21   FOR DEFENDANT KAISER FOUNDATION HOSPITALS:

22              SEYFARTH SHAW LLP
                560 Mission Street, 31st Floor
23              San Francisco, California 94105-2930
                415.397.2823
24              By:  CHRISTIAN J. ROWLEY, Attorney at Law
                     crowley@seyfarth.com
25
```

C199

1        A.   I believe April was the month.          10:19:50

2        Q.   Of what year?                           10:19:55

3        A.   Of 2016.                                10:19:56

4        Q.   At the end of your assignment at Kaiser   10:20:01

5   San Diego, were you offered the opportunity to renew   10:20:03

6   that assignment?                                  10:20:05

7        A.   I couldn't tell you.                    10:20:10

8        Q.   You don't remember?                     10:20:11

9        A.   I do not remember.                      10:20:12

10                (Deposition Exhibit 4 was marked for   10:20:13

11                 identification.)                   10:20:13

12             MS. IMARA:   Q.   Have you seen this   10:21:08

13   document before?                                 10:21:08

14        A.   I have not.                            10:21:09

15        Q.   Okay.  In the upper-left corner it says   10:21:10

16   (as read):                                       10:21:14

17             "Professional: Robert Shaw.            10:21:14

18             "Dates:  December 30th, 2015 to        10:21:17

19             March 26th, 2016.                      10:21:20

20             "Facility:  Kaiser - San Diego Medical   10:21:22

21             Center..."                             10:21:25

22             Do you see that?                       10:21:26

23        A.   I do.                                  10:21:27

24        Q.   Do you believe that your assignment at   10:21:29

25   Kaiser San Diego Medical Center was between       10:21:32

```
 1    December 30th, 2015 and March 26th, 2016?        10:21:35

 2         A.    I believe so.                          10:21:40

 3         Q.    Did you attend any training for the Kaiser  10:22:02

 4    San Jose assignment?                             10:22:07

 5         A.    Yes.                                   10:22:09

 6         Q.    Before you started your assignment at  10:22:18

 7    Kaiser San Diego, were you told what hospital unit  10:22:19

 8    you would be working in?                         10:22:22

 9         A.    Yes.                                   10:22:24

10         Q.    What unit were you -- were you told you  10:22:25

11    would be working in?                             10:22:27

12         A.    Med/surg/telemetry.                    10:22:29

13         Q.    Is med/surg/telemetry a single hospital  10:22:31

14    unit?                                            10:22:35

15         A.    That's correct.                        10:22:36

16         Q.    Do you remember how you were assigned to  10:22:39

17    the med/surg/telemetry unit?                     10:22:45

18         A.    Through my recruiter.                  10:22:49

19         Q.    You had an AMN recruiter?              10:22:50

20         A.    That's correct.                        10:22:52

21         Q.    What was the AMN recruiter's name?     10:22:53

22         A.    Michelle Goeldenitz, G-o-e-l-d-e-n-i-t-z.  10:22:55

23               Hopefully, that's right.               10:23:11

24         Q.    Did you work in any other units at Kaiser  10:23:17

25    San Diego during your assignments other than the  10:23:20
```

C201

```
 1   med/surg/telemetry unit?                      10:23:23

 2        A.   Yes.                                 10:23:25

 3        Q.   What other units did you work in?    10:23:25

 4        A.   I cannot recall.                     10:23:27

 5        Q.   Do you know how many other units you 10:23:29

 6   worked in?                                     10:23:31

 7        A.   I believe two.                       10:23:32

 8        Q.   Do you recall how often you worked -- 10:23:51

 9   strike that.                                   10:23:53

10        Do you recall how often you worked in     10:23:53

11   units other than med/surg/telemetry?          10:23:56

12        A.   For this assignment?                 10:24:00

13        Q.   Yes.                                 10:24:02

14        A.   I believe it was only twice.         10:24:02

15        And I think the correct terminology is    10:24:10

16   "floating."                                    10:24:12

17        Q.   When you say that you worked in other 10:24:13

18   units besides med/surg/telemetry twice, do you mean 10:24:16

19   you worked two shifts during your assignment that 10:24:21

20   were not in the med/surg/telemetry unit?       10:24:23

21        A.   That's correct.                      10:24:27

22        Q.   When you started the assignment, were you 10:24:33

23   aware that you would be asked to float to units 10:24:35

24   other than med/surg/telemetry?                 10:24:38

25        A.   Yes.                                 10:24:41
```

C202

1    Q.   So you simply don't know whether you          11:33:00

2  signed it or whether you didn't?                     11:33:03

3    A.   I do not know.                                 11:33:05

4    Q.   But you could have signed it?                  11:33:06

5         MR. KONECKY:  Objection.  Calls for            11:33:07

6  speculation; vague and ambiguous.                    11:33:08

7         THE WITNESS:  I could or could not.  I         11:33:11

8  wouldn't be able to recall that.                     11:33:13

9         MS. IMARA:  Q.  Okay.  Let me know when        11:33:15

10 you've reviewed Exhibit 12.                           11:33:18

11   A.   I have.                                        11:33:20

12   Q.   Okay.  Have you seen this document before?     11:33:20

13   A.   I have not.                                    11:33:22

14   Q.   And would it be fair to say that you don't     11:33:27

15 know if you electronically signed this document?      11:33:29

16   A.   That is fair to say.                           11:33:32

17   Q.   You said you remember being provided with      11:33:46

18 a -- I believe you described it as a "packet of       11:33:50

19 documents" by AMN before you started the assignment   11:33:53

20 at Kaiser San Diego; is that correct?                 11:33:58

21   A.   That is correct.                               11:33:59

22   Q.   Did you read the documents you received?       11:34:00

23        MR. KONECKY:  Overbroad; vague and             11:34:03

24 ambiguous.                                            11:34:04

25        THE WITNESS:  I couldn't tell you if I         11:34:07

C203

1    read it (sic) or not.                                    11:34:09

2              MS. IMARA:  Q.  You don't know if you read     11:34:11

3    them?                                                    11:34:12

4         A.   I do not know.                                 11:34:13

5         Q.   Do you specifically remember reading any       11:34:14

6    of the documents that you received from AMN before       11:34:16

7    you started the assignment?                              11:34:19

8         A.   Yes, I can tell you with certainty that        11:34:29

9    I've read some of the material.                          11:34:32

10        Q.   What documents do you remember reading         11:34:33

11   before you started the assignment that you received      11:34:35

12   from AMN?                                                11:34:37

13        A.   That, I cannot recall.                         11:34:39

14        Q.   I'm not sure I understand your answer to       11:34:41

15   my previous question then.                               11:34:43

16             So you specifically recall reading some        11:34:45

17   documents, but you don't recall what they were; is       11:34:48

18   that correct?                                            11:34:50

19        A.   Let me rephrase how I answered that.           11:34:51

20             I would speculate that I -- if the             11:34:54

21   material was given to me as a nurse, I would have        11:34:56

22   read the things that were important pertaining to my     11:34:58

23   job.                                                     11:35:01

24             As far as what I read, I could not tell        11:35:03

25   you two years ago.                                       11:35:05

```
 1      Q.   Okay.  You believe, however, that you read    11:35:13

 2   some documents that were provided to you by AMN        11:35:16

 3   before you started the assignment; correct?            11:35:19

 4      A.   I think that would be accurate to say.         11:35:21

 5      Q.   But you're not able to tell me which           11:35:24

 6   documents you read?                                    11:35:26

 7      A.   That is correct.                               11:35:28

 8      Q.   Okay.  I'm going to ask you to turn back       11:35:29

 9   to what's been numbered as Exhibit 8.                  11:36:01

10      A.   Okay.                                          11:36:09

11      Q.   Read the policy on page 9 that's labeled       11:36:12

12   "Overtime."  It's a short paragraph about three        11:36:16

13   quarters of the way down the page.                     11:36:20

14      A.   Okay.                                          11:37:14

15      Q.   The second sentence of this "Overtime"         11:37:14

16   provision says:                                        11:37:18

17           "Some facilities do not authorize              11:37:19

18           overtime work for contract staff."             11:37:21

19           Do you see that?                               11:37:24

20      A.   I do.                                          11:37:25

21      Q.   Before I ask you about that, let me ask        11:37:25

22   you this:  Do you recall ever reading this provision   11:37:26

23   of the AMN handbook?                                   11:37:28

24      A.   I couldn't tell you that.                      11:37:30

25      Q.   Okay.  So you may have read it, or you may     11:37:31
```

C205

1          But to my recollection, he covered the          11:42:03

2     entire training.          11:42:07

3          Q.   You don't recall there being other          11:42:10

4     orientation presenters besides Pete; is that right?          11:42:13

5          A.   That's correct.          11:42:17

6          Q.   And what do you recall Pete saying on the          11:42:22

7     subject of contract travelers working more than          11:42:25

8     12 hours in a shift?          11:42:28

9          A.   That it would need prior approval from          11:42:30

10    your supervisor and then from him.          11:42:35

11         Q.   Do you remember him saying anything else          11:42:49

12    about contract travelers working more than 12 hours          11:42:50

13    in a shift?          11:42:53

14         A.   I do not.          11:43:02

15         Q.   Before you attended the orientation,          11:43:10

16    had anyone spoken to you about any procedure for          11:43:12

17    working -- that you would have to follow to work          11:43:17

18    more than 12 hours in a shift during your          11:43:19

19    assignment?          11:43:23

20         A.   Would you repeat that?          11:43:25

21         Q.   Sure.          11:43:27

22              Before you attended the orientation, had          11:43:27

23    anyone else, for instance, your recruiter, told you          11:43:30

24    what the procedure would be for you to work more          11:43:35

25    than 12 hours in a shift at Kaiser San Diego?          11:43:38

| | | |
|---|---|---|
| 1 | A. I don't believe so. | 11:43:41 |
| 2 | Q. So when Pete said that you would need two | 11:43:42 |
| 3 | approvals, this was the first time you had been told | 11:43:45 |
| 4 | what the procedure would be in order for you to work | 11:43:50 |
| 5 | more than 12 hours in a shift at Kaiser San Diego; | 11:43:52 |
| 6 | is that right? | 11:43:55 |
| 7 | A. I believe that's correct. | 11:43:56 |
| 8 | Q. And did Pete explicitly say that contract | 11:43:58 |
| 9 | travelers would not be allowed to work more than | 11:44:03 |
| 10 | 12 hours in a shift? | 11:44:05 |
| 11 | MR. KONECKY: Vague and ambiguous. | 11:44:09 |
| 12 | THE WITNESS: I don't recall the exact | 11:44:19 |
| 13 | conversation we had about that. | 11:44:20 |
| 14 | MS. IMARA: Q. Do you remember him saying | 11:44:29 |
| 15 | anything about travelers working more than 12 hours | 11:44:30 |
| 16 | in a shift other than you would need to receive | 11:44:33 |
| 17 | prior approval from a supervisor and also from him? | 11:44:36 |
| 18 | A. Would you repeat that again? | 11:44:43 |
| 19 | MS. IMARA: (Addressing the reporter) Can | 11:44:44 |
| 20 | you read the question back? | 11:44:45 |
| 21 | (Whereupon, the record was read as follows: | 11:44:46 |
| 22 | "Question: Do you remember him saying | 11:44:46 |
| 23 | anything about travelers working more than | 11:44:46 |
| 24 | 12 hours in a shift other than you would | 11:44:46 |
| 25 | need to receive prior approval from a | 11:44:46 |

1          supervisor and also from him?")          11:44:46

2          THE WITNESS:  I don't recall any other          11:45:07

3     conversations.          11:45:08

4          MS. IMARA:  Q.  And did you -- well,          11:45:09

5     strike that.          11:45:12

6          And you concluded from what Pete said that          11:45:12

7     contract travelers would not be permitted to work          11:45:16

8     more than 12 hours in a shift at Kaiser San Diego?          11:45:19

9          A.   No.          11:45:28

10          It was my understanding that I would need          11:45:28

11     pre-approval from both him and my supervisor.          11:45:30

12          Q.   So based on what Pete said, your          11:45:37

13     understanding was that in order to work more than          11:45:39

14     12 hours in a shift, you would need the approval of          11:45:41

15     a supervisor as well as Pete; is that right?          11:45:45

16          A.   Pre-approval.          11:45:47

17          Q.   Pre-approval -- strike that.  Let me          11:45:48

18     repeat the question.          11:45:50

19          So your understanding was, based on what          11:45:51

20     Pete said, that in order to work more than 12 hours          11:45:54

21     in a shift, you would need pre-approval from a          11:45:57

22     supervisor and, also, from Pete; is that right?          11:46:00

23          A.   That's what I recall.          11:46:04

24          Q.   Was there anything else said at the          11:46:07

25     orientation concerning the ability of -- well,          11:46:09

1   strike that.                                          11:46:13

2           Was there anything else you learned during   11:46:14

3   that orientation about whether contract travelers    11:46:18

4   could work more than 12 hours in a shift?            11:46:23

5       A.   I don't recall anything besides that        11:46:27

6   information.                                          11:46:30

7       Q.   When you attended the -- strike that.       11:46:34

8           Did Pete tell you what supervisor would      11:46:36

9   need to provide the pre-approval of any hours you    11:46:39

10  worked over 12?                                       11:46:43

11      A.   I do not recall.                             11:46:44

12      Q.   You don't know if he did?                    11:46:46

13      A.   I do not know if he did or did not.          11:46:47

14      Q.   Did you ask any questions about what Pete    11:46:52

15  had said?                                             11:46:55

16      A.   I don't believe I did.                       11:46:56

17      Q.   So you don't recall anyone in the           11:47:20

18  orientation saying that travelers would not be       11:47:25

19  allowed to work more than 12 hours in a shift?       11:47:27

20          MR. KONECKY:  Objection to form.             11:47:33

21          THE WITNESS:  Will you repeat that           11:47:37

22  question, again?                                      11:47:38

23          MS. IMARA:  Q.  Sure.                         11:47:39

24          (Addressing the reporter) Can you read it    11:47:39

25  back?                                                 11:47:40

1    from Kaiser, telling you what rest breaks you would          12:20:42

2    be entitled to receive during your shifts at Kaiser         12:20:45

3    San Diego?                                                   12:20:49

4          A.   Yes.                                              12:20:49

5          Q.   And who do you recall speaking to on that         12:20:50

6    subject?                                                     12:20:53

7          A.   I don't recall the person that I spoke            12:20:59

8    with.                                                        12:21:00

9               But I recall seeing the paper that had            12:21:01

10   your name by it, along with rest periods and a lunch        12:21:08

11   period.  And I also recall supervisors periodically         12:21:13

12   checking that you have got those all checked off.           12:21:19

13         Q.   Do you remember anyone explaining to you          12:21:28

14   how many rest breaks you would receive during               12:21:31

15   your -- during your shifts?                                 12:21:34

16         A.   I don't know if it was told to me or it          12:21:41

17   was an observation that I made.                             12:21:43

18         Q.   Okay.                                             12:21:47

19         A.   I do remember that there was a person that       12:21:48

20   they called a "breaker," who would take over the            12:21:50

21   care of your patients while you got either your meal        12:21:56

22   break or you got your rest period.                          12:22:00

23              And that was very random.  It wasn't a           12:22:08

24   choice that I made for timing.  I don't know who            12:22:12

25   made that decision.                                         12:22:19

| | | |
|---|---|---|
| 1 | Q.   Is there some documentation that you have | 12:37:05 |
| 2 | that would refresh your recollection as to when you | 12:37:06 |
| 3 | went and spoke with him? | 12:37:09 |
| 4 | A.   There is. | 12:37:11 |
| 5 | Q.   What is that? | 12:37:12 |
| 6 | A.   It's a timecard. | 12:37:13 |
| 7 | If you will notice, all of my timecards | 12:37:14 |
| 8 | are 7:00 to 7:30, 7:00 to 7:30, 7:00 to 7:30. | 12:37:17 |
| 9 | And then on one occasion there is a seven | 12:37:22 |
| 10 | to eight o'clock.  And that was the one time I had | 12:37:24 |
| 11 | had it, and I didn't care whether I would lose my | 12:37:29 |
| 12 | job or had repercussions.  I felt it was important | 12:37:32 |
| 13 | to stand up. | 12:37:35 |
| 14 | So if we could find that timecard, we | 12:37:36 |
| 15 | would have an accurate picture of when it was that I | 12:37:38 |
| 16 | had the realization that this should be made right. | 12:37:43 |
| 17 | Q.   So there is a timecard where you recorded | 12:37:51 |
| 18 | working from seven o'clock until eight o'clock? | 12:37:55 |
| 19 | A.   Uh-huh -- | 12:37:59 |
| 20 | Q.   Okay. | 12:38:00 |
| 21 | A.   -- that's correct. | 12:38:00 |
| 22 | Q.   And does the date on that timecard match | 12:38:01 |
| 23 | the date that you went and spoke to Pete about | 12:38:03 |
| 24 | obtaining pre-approval, but you worked overtime? | 12:38:07 |
| 25 | A.   There's many dates on a timecard. | 12:38:13 |

C211

1    Q.   I'm trying to pinpoint the date when you          12:38:17

2    went and spoke to Pete about your frustration about    12:38:19

3    getting pre-approval before you worked overtime.       12:38:28

4    A.   Yes, that would reflect the time I talked         12:38:34

5    with him.                                              12:38:36

6    Q.   Would that reflect the exact date that you        12:38:36

7    spoke with Pete about this issue?                      12:38:38

8         MR. KONECKY:  Objection.  Calls for              12:38:41

9    speculation.                                           12:38:41

10        THE WITNESS:  I wouldn't know if it               12:38:42

11   reflected the exact day, but it would reflect the      12:38:43

12   week of the paycheck.                                  12:38:47

13        MS. IMARA:  Q.  Would the week on the             12:38:50

14   timecard where you worked between seven and            12:38:51

15   eight o'clock -- did you speak with Pete that same     12:38:54

16   week?                                                  12:38:59

17   A.   To my recollection, it was the exact --          12:38:59

18   take that back.                                        12:39:06

19        It is my recollection that it was within         12:39:17

20   that week.                                             12:39:18

21   Q.   So if we found the timecard where you            12:39:19

22   worked between seven and eight o'clock -- so a         12:39:21

23   13-hour shift -- that week is the week you spoke       12:39:25

24   with Pete?                                             12:39:29

25   A.   That is correct.                                 12:39:30

C212

1           MR. KONECKY:  Hang on.                        12:39:31

2           THE WITNESS:  Oops.                           12:39:34

3           MR. KONECKY:  Objection as to form in         12:39:35

4    terms of the description of the timecard; incomplete  12:39:36

5    hypothetical.                                         12:39:40

6           MS. IMARA:  Q.  What do you recall saying     12:39:49

7    to Pete when you spoke with him?                      12:39:50

8        A.   I can tell you the mood.  I was very        12:39:55

9    frustrated.                                           12:39:59

10       Q.   Let me stop you and just ask you what you   12:40:00

11   remember telling him.                                 12:40:03

12       A.   Okay.  Honestly, I don't think I can give   12:40:04

13   you accurate details of the verbiage I used with     12:40:16

14   him.                                                  12:40:19

15       Q.   Can you tell me generally what it is you    12:40:19

16   remember saying to him?                               12:40:22

17          MR. KONECKY:  Well, he was trying to do       12:40:23

18   that, Counsel, and then you interrupted him.          12:40:24

19          THE WITNESS:  I can tell you the nature of    12:40:29

20   the conversation.                                     12:40:31

21          MS. IMARA:  Q.  Are you able to describe      12:40:34

22   to me at all what you said to him?                    12:40:37

23       A.   I am not.                                   12:40:41

24       Q.   Do you remember at all what he said to      12:40:44

25   you?                                                  12:40:45

C213

```
 1       A.    Specifically, no, I cannot.              12:40:53

 2       Q.    Do you remember generally what he said to  12:40:55

 3   you?                                                12:40:57

 4       A.    Yes.                                      12:40:57

 5       Q.    What did he say?                          12:40:57

 6       A.    Generally, he said, "I will approve this  12:41:00

 7   for you."                                           12:41:02

 8       Q.    What did he say he would approve?         12:41:06

 9       A.    My timecard for the extra hour.           12:41:08

10       Q.    For the day you spoke to him?             12:41:11

11       A.    For the day that I had frustration that I 12:41:14

12   had worked past eight o'clock and waited for four   12:41:19

13   different nurses to do their activities so that I   12:41:24

14   could then give report and leave.  And I expressed  12:41:31

15   to him that I was very frustrated that I am not     12:41:37

16   getting paid for this.                              12:41:41

17            And I believe his answer was that, "I will 12:41:44

18   approve this."                                      12:41:52

19       Q.    When you say that he said he would        12:41:54

20   "approve this," did he say he would approve the day 12:41:55

21   on your timecard when you wrote down that you worked 12:42:01

22   between seven o'clock and eight o'clock?            12:42:05

23       A.    That's correct.                           12:42:09

24       Q.    Did you tell him --                       12:42:11

25            MR. KONECKY:  Objection.  Assumes facts in 12:42:12
```

1    anyone at AMN that you didn't know how to go about          12:45:55

2    getting pre-approval --          12:46:01

3         A.    Sure.          12:46:03

4         Q.    -- to work more than 12 hours in a shift?          12:46:03

5         A.    Yes.          12:46:06

6         Q.    Why didn't you?          12:46:06

7         A.    So there was a general understanding that          12:46:08

8    this is how you comply to the rules.          12:46:10

9              And I believed I understood those rules,          12:46:14

10   and I believed that I could comply to those rules.          12:46:16

11             I don't believe those rules, in hindsight,          12:46:20

12   were fair.  I believe they were illegal.          12:46:22

13             But I didn't want to buck the system.  I          12:46:27

14   wanted to keep my job, and I wanted to keep my          12:46:31

15   supervisors happy.          12:46:34

16        Q.    Okay.  So you said you had a general          12:46:38

17   understanding that this is how you could comply with          12:46:42

18   the rules.          12:46:49

19             Can you explain to me what rules you were          12:46:50

20   trying to comply to?  What specific rules?          12:46:52

21        A.    That there is no need to work over a 12-          12:46:55

22   hour shift.  That was the general understanding.          12:46:58

23             Pete's statement was, "You would need          12:47:02

24   pre-approval for anything worked over a 12-hour          12:47:05

25   shift from two managers."          12:47:08

C215

1          So with body language, with tone of voice,          12:47:13

2     with other employees, it was the general consensus          12:47:16

3     that there's no reason to need this approval.          12:47:22

4          So it may not have been stated, but it was          12:47:31

5     implied.          12:47:34

6          Q.    You don't recall anyone ever specifically          12:47:39

7     stating that there was no reason to work more than          12:47:42

8     12 hours in a shift; correct?          12:47:44

9          A.    No, I don't believe any- --          12:47:46

10          MR. KONECKY:  I was just going to object.          12:47:48

11     It misstates the testimony; argumentative.          12:47:50

12          You can answer.          12:47:52

13          THE WITNESS:  No, I don't believe anybody          12:47:53

14     used that verbiage.          12:47:55

15          MS. IMARA:  Q.  And you said there was a          12:48:08

16     general understanding that there was no need to work          12:48:09

17     more than 12 hours in a shift.          12:48:13

18          A.    That's correct.          12:48:16

19          Q.    Whose understanding was that?          12:48:19

20          A.    Myself and all of the traveling nurses          12:48:21

21     that I had been in contact with.          12:48:25

22          Q.    Are these traveling nurses who were also          12:48:30

23     working at Kaiser San Diego?          12:48:34

24          A.    Yes.          12:48:36

25          Q.    Who were they?          12:48:36

1    for me.                                                      12:52:03

2         Q.   Is that why, when you worked until eight           12:52:07

3    o'clock, you wrote it down on your time sheet?              12:52:10

4         A.   No.                                                12:52:13

5              I wrote that on my time sheet because Pete         12:52:16

6    told me that he would approve it.  So then I wrote          12:52:18

7    it down.                                                    12:52:22

8         Q.   When you talked to Pete, and he told you          12:52:24

9    that he would approve the time that you worked until        12:52:26

10   eight o'clock, had you already worked that time?           12:52:30

11        A.   Yes.                                               12:52:35

12        Q.   And so Pete approved the hours you worked         12:52:36

13   past 7:30 on that occasion, even though you did not        12:52:39

14   obtain pre-approval; is that right?                        12:52:44

15        A.   That is correct.                                  12:52:46

16        Q.   Okay.  You mentioned that you had an             12:52:55

17   understanding that five, 10, or 15 minutes past 7:30      12:52:57

18   was something that you had to live with.                  12:53:03

19             Do you recall that testimony?                    12:53:05

20        A.   I do.                                            12:53:06

21        Q.   Okay.  Where did you come to some               12:53:07

22   understanding that if you worked five, 10, or 15          12:53:12

23   minutes past the scheduled end of your shift, that        12:53:15

24   was something you'd have to live with?                    12:53:18

25        A.   It was tolerable for me.  It was something      12:53:21

C217

1    that I would be able to tolerate.                    12:53:23

2          The understanding came from the              12:53:27

3    orientation with Pete.                               12:53:33

4    Q.   Did you feel you had a choice in the           12:53:40

5    matter?  That is to say, did you feel that if you   12:53:41

6    wanted to be paid for that, you could write it down 12:53:45

7    and be paid?                                         12:53:48

8          MR. KONECKY:  Objection.  Vague and           12:53:49

9    ambiguous.                                           12:53:52

10          THE WITNESS:  It was my understanding that   12:53:55

11   anything worked past a 12-hour shift would need     12:53:56

12   pre-approval.                                        12:54:01

13          MS. IMARA:  Q.  Was it your understanding    12:54:02

14   that anything that you worked past a 12-hour shift  12:54:03

15   would not be paid?                                   12:54:05

16   A.   Whether it would be -- whether it would be     12:54:17

17   paid or not paid wasn't really the question for me. 12:54:19

18          It was whether I could get approval for      12:54:26

19   it.  And if I could get approval for it, then I     12:54:29

20   could document it.                                   12:54:32

21          If I didn't get approval for it, then I      12:54:38

22   would need to answer to someone.  That was my       12:54:40

23   understanding.  And I did not want to be in a       12:54:42

24   position of having to answer to somebody.           12:54:46

25   Q.   Did anyone ever tell you that if you           12:55:00

1          So I never documented anything unless I      12:56:31

2     had approval.                                    12:56:34

3          MS. IMARA:  Q.  And there were occasions    12:56:47

4     when you worked beyond the scheduled end of your 12:56:48

5     shift and you did not document that overtime on your 12:56:54

6     time sheet; is that right?                       12:57:00

7          A.   That is correct.                       12:57:01

8          Q.   When you -- when you worked past the   12:57:03

9     scheduled end of your shift, did you ever try to 12:57:06

10    obtain pre-approval of the overtime?             12:57:10

11         A.   I did not.                             12:57:13

12         Q.   Why didn't you try to obtain pre-approval 12:57:14

13    of the overtime?                                 12:57:17

14         A.   There was a general consensus that     12:57:19

15    anything that was worked over a 12-hour shift would 12:57:21

16    need pre-approval.  And without that pre-approval, I 12:57:25

17    could not document.  So I didn't.                12:57:29

18         MS. IMARA:  (Addressing the reporter) Can   12:57:33

19    you read back my question?                       12:57:33

20         (Whereupon, the record was read as follows: 12:57:35

21         "Question:  Why didn't you try to obtain    12:57:35

22         pre-approval of the overtime?")             12:57:35

23         MS. IMARA:  Q.  So my question is, when     12:57:48

24    you did need to work more than 12 hours in a shift, 12:57:49

25    why didn't you try to get pre-approval?          12:57:53

C219

1              Would you say that more than 75 percent of          14:21:00

2     the times entered as your "time out" are inaccurate?          14:21:02

3         A.   I cannot tell you with certainty.          14:21:06

4         Q.   Some percentage more than 50 percent of          14:21:11

5     the "time outs" are inaccurate?          14:21:13

6         A.   Correct.          14:21:16

7         Q.   Have you maintained any records that          14:21:17

8     accurately reflect the hours that you worked during          14:21:21

9     your assignment at Kaiser San Diego?          14:21:25

10        A.   No.  Actually, I could look into that.          14:21:31

11        Q.   Do you remember making any notations          14:21:37

12    during your assignment that recorded the actual          14:21:40

13    times you started work and ended work during your          14:21:46

14    assignment?          14:21:49

15        A.   Would you repeat that for me?          14:21:51

16        Q.   Sure.          14:21:53

17             (Addressing the reporter) Can you read it          14:21:54

18    back?          14:21:56

19             (Whereupon, the record was read as follows:          14:21:56

20             "Question:  Do you remember making any          14:21:56

21             notations during your assignment that          14:21:56

22             recorded the actual times you started work          14:21:56

23             and ended work during your assignment?")          14:21:56

24             THE WITNESS:  No.          14:22:21

25             MS. IMARA:  Q.  So you didn't keep a          14:22:22

C220

1    notebook or any kind of other document where you          14:22:24

2    wrote down when you actually started work and when          14:22:27

3    you actually stopped working?          14:22:30

4          A.    I don't believe I did.          14:22:32

5          Q.    Okay.  So when you say that you could look          14:22:33

6    into what your actual hours worked were, what would          14:22:36

7    you do to reconstruct that information?          14:22:39

8          A.    I was thinking text-messaging.          14:22:44

9          Q.    -- what?          14:22:46

10         A.    There's a possibility that I may have          14:22:46

11   sent a text saying, "I'm going to be late," or          14:22:51

12   hypothetically, "I'm frustrated.  Still stuck here.          14:22:57

13   Waiting on nurses," et cetera.          14:23:03

14         Q.    Are you referring to text messages that          14:23:06

15   you would have sent from your personal cell phone?          14:23:07

16         A.    Yes.          14:23:10

17         Q.    And who would the text messages you're          14:23:10

18   referring to be sent to?          14:23:13

19         A.    That would be to my fiancée.          14:23:15

20         Q.    Okay.  Do you have the telephone number          14:23:17

21   that those text messages would have been sent to?          14:23:19

22         A.    Yes.          14:23:26

23         Q.    What is that?          14:23:27

24         A.    (563) 880-5186.          14:23:29

25         MR. KONECKY:  Let's designate the number          14:23:37

1     Q.   Okay.  So each week that you worked at          14:28:01

2  Kaiser San Diego, did you receive one of these          14:28:04

3  documents from ADP showing what pay you had             14:28:07

4  received?                                                14:28:11

5     A.   That's correct.                                 14:28:11

6     Q.   And you received your actual pay through        14:28:12

7  direct deposit; is that correct?                        14:28:15

8     A.   Yes, that is correct.                           14:28:20

9     Q.   Let me refer you back to Exhibit 13 just        14:28:27

10  for a moment.                                           14:28:31

11          If you look, for instance, at AMN-1379 --      14:28:42

12     A.   All right.                                      14:28:50

13     Q.   -- each of the three shifts that are           14:28:50

14  entered on the time sheet that is numbered AMN-1379     14:28:53

15  has written under "Meal Period," "30."                  14:29:00

16          Do you see that?                               14:29:08

17     A.   I do.                                           14:29:08

18     Q.   And does this -- is this your writing, the     14:29:09

19  three 30s that are marked on this time sheet?           14:29:14

20     A.   I believe they are.                             14:29:18

21     Q.   And the 30 is the -- is that the number of     14:29:19

22  minutes that you entered for the meal period?           14:29:22

23     A.   Yes.                                            14:29:25

24     Q.   And would it be fair to say where 30           14:29:26

25  minutes is entered for the meal period on the time      14:29:30

 1    sheets that are marked as Exhibit 13, those numbers          14:29:34

 2    are not always accurate?          14:29:39

 3         A.    That is correct.          14:29:41

 4         Q.    Okay.          14:29:42

 5         A.    And when you say "accurate," do you mean          14:29:44

 6    uninterrupted meal periods?          14:29:49

 7         Q.    I mean, is the entry in any way incorrect?          14:29:52

 8               It could be --          14:30:00

 9         A.    The entry itself is not incorrect.          14:30:03

10         Q.    I see.          14:30:06

11         A.    But my understanding from the handbook is          14:30:07

12    that it's a 30-minute uninterrupted (sic).  So          14:30:13

13    there's a little inaccuracy here.          14:30:19

14               There were many times, because we had a          14:30:23

15    break room -- there was no lunchroom that we were to          14:30:26

16    go to.  We were instructed to go to the break room.          14:30:30

17    And there were many occasions other nurses or the,          14:30:34

18    quote/unquote, "breaker" would have to drop in and          14:30:39

19    ask a question --          14:30:43

20         Q.    I see.          14:30:44

21         A.    -- or make a statement.          14:30:45

22         Q.    So to the extent the 30 minutes entered on          14:30:49

23    the time sheets marked as Exhibit 13 are inaccurate,          14:30:53

24    the inaccuracy is that you were interrupted?          14:30:58

25         A.    That's correct.          14:31:02

1      Q.   Were there ever times when you did not          14:31:05

2    receive a meal period at all, and you wrote down       14:31:07

3    that you took a 30-minute meal period on your time     14:31:09

4    sheet?                                                 14:31:13

5            MR. KONECKY:  Vague and ambiguous.             14:31:15

6            You can answer.                                14:31:16

7            THE WITNESS:  I don't believe so.              14:31:26

8            MS. IMARA:  Q.  Okay.                          14:31:27

9      A.   I believe I was able to get every lunch         14:31:27

10   period.                                                14:31:29

11     Q.   Okay.  Did you ever compare the hours you       14:31:36

12   entered on your time sheets to the hours that          14:31:48

13   appeared on your paystubs?                             14:31:51

14     A.   You know, I think in the very beginning I       14:31:59

15   did that.                                              14:32:02

16     Q.   Did you ever -- strike that.                    14:32:07

17          In doing so, did you ever find that you         14:32:08

18   had not been paid for all the hours that were          14:32:10

19   entered on your time sheet?                            14:32:13

20     A.   I don't remember ever finding that to be        14:32:18

21   true.                                                  14:32:21

22     Q.   Okay.  Your scheduled shift at Kaiser           14:32:22

23   San Diego was scheduled to begin at 7:00 p.m.; is      14:32:54

24   that right?                                            14:32:58

25     A.   Yes.                                            14:33:00

1   is that how you say it? -- the respective nurses.          14:35:00

2          And it was very frequent that for four          14:35:05

3   patients, I would have a different nurse to give          14:35:13

4   report to.          14:35:17

5          So with 15 minutes with four different          14:35:21

6   nurses, that nurse would generally be over 7:30 p.m.          14:35:24

7   before they would be able to leave.          14:35:33

8          It's a general practice at the end of your          14:35:38

9   shift to finish up any charting that's left over.          14:35:40

10      Q.   Okay.  So you would -- is it fair to say          14:36:16

11   you generally would arrive at work at 6:45 and not          14:36:24

12   at your scheduled start time of 7:00 p.m.?          14:36:29

13      A.   That is correct.          14:36:36

14      Q.   And you said that the first thing that you          14:36:38

15   would do was to figure out where your assignment          14:36:40

16   was.          14:36:43

17      A.   Correction.  I would actually go down into          14:36:46

18   the basement to log my hours coming in at 1900.          14:36:49

19   Then I'd start the day that I described.          14:36:53

20      Q.   So when you arrived at Kaiser San Diego,          14:37:04

21   you would first go to the basement and fill out your          14:37:07

22   start time on your time sheet for the day?          14:37:12

23      A.   That is correct.          14:37:16

24      Q.   And you would write down that your start          14:37:17

25   time was 1900 hours; is that correct?          14:37:19

1      Q.   And the huddle happened at the beginning      14:49:23

2   of every shift that you worked at Kaiser San Diego?      14:49:25

3      A.   That's correct.      14:49:30

4      Q.   And did that include shifts that you      14:49:32

5   worked in departments other than med/surg/telemetry      14:49:35

6   or the -- I suppose the stand-alone telemetry unit?      14:49:40

7      A.   No, I don't recall huddling with the other      14:49:45

8   floors.      14:50:03

9      Q.   Okay.  Let me make sure that I understand      14:50:03

10   what your testimony on this is.      14:50:06

11          So there definitely were huddles at the      14:50:08

12   start of each shift that you worked in the med/surg/      14:50:11

13   telemetry unit?      14:50:14

14      A.   Correct.      14:50:17

15      Q.   And there were also huddles at the start      14:50:17

16   of each shift you worked in the telemetry unit?      14:50:21

17      A.   Correct.      14:50:26

18      Q.   But you don't believe that there were      14:50:27

19   huddles at the start of shifts that you worked in      14:50:28

20   other units?      14:50:31

21          MR. KONECKY:  Objection.  Misstates the      14:50:32

22   testimony and --      14:50:33

23          THE WITNESS:  I just --      14:50:33

24          MR. KONECKY:  -- calls for speculation.      14:50:33

25          THE WITNESS:  I don't know if there were      14:50:34

C226

1    huddles or not, but I was not part of those huddles.  14:50:35

2              MS. IMARA:  Q.  Okay.  Fair enough.  14:50:37

3              You don't recall attending huddles when  14:50:38

4    you worked in units other than the telemetry unit or  14:50:40

5    the med/surg/telemetry unit?  14:50:44

6         A.  Correct.  14:50:47

7         Q.  Okay.  And I believe you testified that  14:50:47

8    the huddle would last between 10 and 15 minutes.  14:50:48

9         A.  Correct.  14:50:52

10        Q.  Did it ever last more than 15 minutes?  14:50:54

11        A.  Possibly.  14:51:01

12        Q.  Do you remember it ever lasting more than  14:51:05

13   15 minutes?  14:51:08

14        A.  I don't recall.  14:51:09

15        Q.  You don't know if it did or didn't?  14:51:09

16        A.  Correct.  14:51:11

17        Q.  Do you remember the huddle ever lasting  14:51:12

18   less than 10 minutes?  14:51:14

19        A.  No.  14:51:15

20        Q.  About what time would the huddle start?  14:51:16

21        A.  7:05, approximately, by the time everybody  14:51:20

22   got filtered in.  14:51:27

23        Q.  When you arrived at the huddle, you had  14:51:29

24   completed the task of looking up the information you  14:51:33

25   needed about your patients in the charting system;  14:51:37

C227

1        Q.   Did you ever use those credentials to          15:42:07

2    access the records of patients other than the ones      15:42:09

3    that you were assigned?                                 15:42:13

4        A.   Never.                                         15:42:14

5        Q.   And was it your understanding that if you      15:42:17

6    used those credentials to access the records of         15:42:18

7    patients other than those you were assigned, that       15:42:21

8    would be a violation of policy?                         15:42:23

9        A.   Better said, a violation of HIPAA.             15:42:27

10       Q.   Did anyone ever tell you that you should       15:42:44

11   log onto that system before the start of the shift      15:42:48

12   in order to gather the information that you needed?      15:42:51

13       A.   I believe that's how I would have acquired     15:42:55

14   that information, yes.                                  15:42:57

15       Q.   Let me restate the question.                   15:42:59

16            Did anyone ever tell you that you should       15:43:00

17   access that information before seven o'clock?           15:43:05

18       A.   Yes.                                           15:43:09

19       Q.   Okay.  Who told you that you should look       15:43:10

20   up the histories and the doctors' notes before the      15:43:13

21   start of your shift?                                    15:43:16

22       A.   My guess is that that would have been my       15:43:23

23   preceptor, and that would have been the one day that    15:43:25

24   I had training on the floor.                            15:43:28

25       Q.   You said you'd "guess" that it would have      15:43:35

```
 1    been your preceptor.                              15:43:37

 2              Do you have a specific recollection of  15:43:39

 3    someone telling you that you should log into the  15:43:41

 4    system to get this information before the scheduled 15:43:43

 5    start of your shift?                              15:43:45

 6        A.   No.                                      15:43:46

 7              But I can tell you that for every       15:43:53

 8    assignment I've done, I gather information from the 15:43:54

 9    nurses that get the opportunity to orientate me to 15:43:57

10    the floor and to the system.                      15:44:01

11              And from my recollection, I've gathered 15:44:05

12    what their day looks like.  And that's where I would 15:44:09

13    have gotten that information.                      15:44:14

14        Q.   So you believe someone specifically told 15:44:16

15    you to log into the system before the start of the 15:44:18

16    shift?                                            15:44:21

17        A.   I believe that someone specifically told 15:44:22

18    me that their day starts at a certain period of   15:44:24

19    time, and this is what they do, start to finish,  15:44:29

20    through a complete shift.                          15:44:35

21              So to answer your question, yes, I believe 15:44:37

22    somebody specifically told me.                    15:44:40

23        Q.   But you don't --                         15:44:48

24        A.   And --                                   15:44:49

25        Q.   Oh, go ahead.                            15:44:50
```

C229

1        A.    Sorry.                                    15:44:51

2              And I would add that that is common --    15:44:52

3    that that's a common culture, nursing culture, to be  15:44:56

4    prepared before you get your assignment.            15:45:02

5        Q.    You are unsure who specifically told you  15:45:13

6    to log into the system before the start of your     15:45:15

7    shift; is that right?                               15:45:18

8        A.    That's correct.  I cannot remember the    15:45:27

9    name of the person that orientated me there.        15:45:29

10       Q.    You said you can't remember the name of   15:45:44

11   the person.                                         15:45:46

12             Is it the case that you are certain it was  15:45:47

13   the preceptor who gave you this information, and you  15:45:49

14   simply can't remember that person's name?           15:45:52

15       A.    That's right.                             15:45:55

16       Q.    Okay.  Do you remember whether your       15:45:56

17   preceptor was a male or female?                     15:46:01

18       A.    Female.                                   15:46:04

19       Q.    And the preceptor was the person who gave  15:46:05

20   you an orientation; is that correct?                15:46:09

21       A.    It would be considered a floor            15:46:13

22   orientation, if my verbiage is correct.             15:46:16

23             So just to clarify, there would be a day  15:46:21

24   of orientation; getting you on the computer system;  15:46:23

25   where is the Pyxis, which is a machine that has all  15:46:27

C230

1    of the drugs in it.  You know, it's all of these          15:46:31

2    types of details.                                          15:46:35

3              And then there's the actual day on the           15:46:36

4    floor, where I follow a nurse, from start to finish,       15:46:38

5    in what their day is like.                                 15:46:43

6              So the best way that I found out is to           15:46:44

7    watch each nurse, starting with my preceptor, and          15:46:47

8    get as much information about how they succeed in          15:46:50

9    their day; and then ask another nurse how do they          15:46:53

10   succeed in their day; and another.                         15:46:57

11             So it really doesn't matter who first said       15:46:59

12   it.                                                        15:47:01

13             The general consensus is that every nurse        15:47:03

14   I've spoken to -- I don't think I've ever come             15:47:05

15   across a nurse that shows up at seven o'clock and          15:47:08

16   just starts receiving a report.  There's also a           15:47:12

17   preparation.                                               15:47:14

18             And I would suspect that managers, nurses,       15:47:16

19   supervisors, AMN, Kaiser, they all are aware of            15:47:22

20   these -- this culture.                                     15:47:27

21        Q.   The preceptor gave you this orientation.         15:47:41

22             Can you tell me when it was?                     15:47:45

23        A.   The first week of my assignment.  It could       15:48:35

24   either have been 12/30 or 1/1/16.                          15:48:38

25        Q.   Okay.  And the preceptor told you to log         15:48:45

 1  their meal period --                                15:59:12

 2      A.   No.                                         15:59:13

 3      Q.   -- on the shift that you worked?            15:59:13

 4      A.   Sorry.                                      15:59:15

 5           No, I couldn't tell you that for a          15:59:16

 6  certainty.                                           15:59:17

 7      Q.   Do you know of any nurses ever being        15:59:18

 8  disciplined because they left the hospital during    15:59:22

 9  the meal period?                                     15:59:25

10      A.   No, I don't believe I witnessed anything    15:59:30

11  like that.                                           15:59:33

12      Q.   Are you --                                  15:59:36

13      A.   I can tell you -- sorry.                    15:59:37

14           I can tell you what I did witness.          15:59:38

15      Q.   Go ahead.                                   15:59:41

16      A.   It was that many times during the break     15:59:42

17  there would be information that someone would need.  15:59:43

18           So I may have gathered that information     15:59:47

19  from the simple fact that I was interrupted and the, 15:59:50

20  quote/unquote, "breaker" would need to communicate   15:59:57

21  with a physician or with a tech of some sort for a   16:00:00

22  test and would need more information than what that  16:00:06

23  breaker had.                                         16:00:09

24      Q.   Are you aware of any nurse ever being       16:00:13

25  disciplined because they were on a break and the     16:00:15

1    breaker was unable to locate them to ask a question?    16:00:19

2         A.    I've never witnessed that circumstance.    16:00:24

3         Q.    Have you ever heard about that happening?    16:00:26

4         A.    During that assignment?    16:00:30

5         Q.    Correct.    16:00:31

6         A.    No.    16:00:32

7         Q.    Did you ever ask anyone if you were    16:00:43

8    permitted to leave the unit during your meal period?    16:00:45

9         A.    No.    16:00:50

10        Q.    Okay.  What about when you floated to    16:00:58

11   other units?  Do you recall -- did you ever leave    16:01:00

12   those units during your meal period?    16:01:07

13        A.    Yes.    16:01:09

14        Q.    And where would you go on those occasions    16:01:10

15   when you left the unit you floated to during your    16:01:12

16   meal period?    16:01:16

17        A.    Back to my unit.    16:01:16

18        Q.    When you say "my unit," are you referring    16:01:18

19   to the med/surg/telemetry unit?    16:01:21

20        A.    Correct.    16:01:24

21        Q.    So was it the case that regardless of what    16:01:25

22   unit you were assigned to for your shift, when you    16:01:30

23   took your meal period, you went to the med/surg/    16:01:33

24   telemetry break room?    16:01:36

25        A.    Well, just to pick up my lunch.    16:01:39

C233

```
 1   if I cannot get that information from who knows       16:09:06
 2   which manager that that would put me in jeopardy      16:09:10
 3   with the company.                                     16:09:16
 4           And, frankly, I didn't want to make waves.    16:09:20
 5       Q.   Did anyone ever tell you that at Kaiser      16:09:44
 6   San Diego they had been disciplined in any way        16:09:47
 7   because they recorded time on their time sheet        16:09:49
 8   outside of their scheduled hours?                     16:09:54
 9       A.   I don't believe I've heard that.             16:10:03
10       Q.   Have you ever heard about anybody at         16:10:05
11   Kaiser San Diego being disciplined because they       16:10:08
12   recorded time on their time sheet outside of their    16:10:11
13   scheduled hours?                                      16:10:14
14       A.   I don't believe I've heard that either.      16:10:19
15       Q.   Have you ever heard of anyone at any         16:10:24
16   Kaiser facility being disciplined or terminated       16:10:26
17   because they recorded time beyond the hours they      16:10:30
18   were scheduled to work?                               16:10:35
19       A.   I don't believe I've heard that either.      16:10:41
20       Q.   Do you believe it would be lawful to         16:10:56
21   terminate someone because they recorded time on       16:10:58
22   their time sheet beyond the hours they were           16:11:01
23   scheduled to work?                                    16:11:03
24           MR. KONECKY:  Objection.  Calls for a         16:11:05
25   legal conclusion.                                     16:11:06
```

C234

| | |
|---|---|
| 1 | THE WITNESS:  How would I know that?  I'm | 16:11:11 |
| 2 | not a lawyer. | 16:11:13 |
| 3 | MS. IMARA:  Q.  Do you have an opinion one | 16:11:14 |
| 4 | way or another? | 16:11:15 |
| 5 | MR. KONECKY:  Same objection. | 16:11:16 |
| 6 | THE WITNESS:  I do not. | 16:11:21 |
| 7 | MS. IMARA:  Let's take a five-minute | 16:11:38 |
| 8 | break; okay? | 16:11:38 |
| 9 | THE WITNESS:  Okay. | 16:11:42 |
| 10 | (Recess taken:  4:11 p.m. until 4:24 p.m.) | 16:11:45 |
| 11 | MS. IMARA:  Okay.  We can go back on the | 16:24:24 |
| 12 | record. | 16:24:25 |
| 13 | Q.  You've testified about a handoff that took | 16:24:30 |
| 14 | place at the -- during the first part of your shift. | 16:24:33 |
| 15 | Was there also a handoff that took place | 16:24:39 |
| 16 | at the end of your shift? | 16:24:42 |
| 17 | MR. KONECKY:  I mean, that's another | 16:24:48 |
| 18 | example.  You've already asked that question and | 16:24:49 |
| 19 | know the answer to that question. | 16:24:52 |
| 20 | It seems like you're stalling, continuing | 16:24:55 |
| 21 | to ask the same questions over and over again so | 16:24:59 |
| 22 | that you can say that you need more time. | 16:25:01 |
| 23 | MS. IMARA:  Q.  You can answer the | 16:25:07 |
| 24 | question. | 16:25:08 |
| 25 | A.  You want me to answer that? | 16:25:09 |

C235

1        Q.    Sure.                                    16:25:10

2        A.    Yes.                                     16:25:12

3        Q.    And what time did the handoff at the end 16:25:13

4    of the shift begin?                                16:25:17

5        A.    I would say about 7:15 in the morning.   16:25:38

6    And that could go on as long as eight o'clock in   16:25:41

7    the morning.  So figure 15 to 30 minutes very      16:25:51

8    conservatively, but it could go as long as it needed 16:25:59

9    to until all the patients were taken care of and we 16:26:05

10   could focus on giving report.                      16:26:08

11       Q.    Is the longest that the handoff at the end 16:26:12

12   of your shift lasted 45 minutes?                   16:26:15

13       A.    I don't know if I would limit it to that. 16:26:20

14       Q.    What do you think is the longest it ever 16:26:22

15   took to complete the handoff during the second part 16:26:24

16   of your shift?                                     16:26:27

17       A.    Realistically and without shorting all of 16:26:33

18   the nurses that I'm representing, I would say easily 16:26:37

19   it could go until 8:30.                            16:26:43

20       Q.    During the time that you were working an 16:26:46

21   assignment at Kaiser San Diego, did you ever have an 16:26:50

22   end-of-shift handoff that lasted as late as 8:30?  16:26:56

23       A.    I personally did not.                    16:27:07

24       Q.    What is the latest you ever completed an 16:27:08

25   end-of-shift handoff?                              16:27:11

1        A.    I would say around 8:15.                    16:27:18

2        Q.    And how many times do you recall the        16:27:24

3    second handoff ending as late as 8:15?                16:27:29

4        A.    I would say rarely, less than 25 percent    16:27:38

5    of the time.                                          16:27:40

6        Q.    Do you think that the end-of-shift handoff  16:27:47

7    ended as late as 8:15 more than 10 times during your  16:27:50

8    shift -- during your assignment at Kaiser San Diego?  16:27:55

9        A.    I would have to do the math of how many     16:28:00

10   shifts I had in 13 weeks, times three shifts a week,  16:28:02

11   and then I would probably times that by 25 percent.   16:28:12

12   That's how I would get my number.  But that's just a  16:28:16

13   guess.                                                16:28:20

14       Q.    What's the longest you recall the second    16:28:27

15   handoff taking?                                       16:28:29

16       A.    Again, I believe 8:15.                      16:28:36

17       Q.    I'm asking you now not what time it ended,  16:28:41

18   but the duration of the handoff.  How long did it     16:28:44

19   take?                                                 16:28:48

20       A.    I see.                                      16:28:48

21             7:15 was the usual time to be finished      16:28:52

22   with -- with the huddle.  And so, then, that would    16:28:55

23   be a half an hour plus 15.  So that would be 45       16:29:01

24   minutes and then 15 -- an hour.                       16:29:07

25       Q.    And how often did the second handoff take   16:29:11

C237

1         Q.   Did the breaker usually break you to take

2    your lunch break before the fifth hour of your

3    shift?                                                    17:00:11

4         A.   I believe that is correct.                      17:00:14

5         Q.   Other than the one time that you recall         17:00:26

6    being frustrated that it was beyond the fifth hour        17:00:28

7    and you were hungry, do you have any specific             17:00:31

8    recollection of not getting your meal period before       17:00:33

9    the conclusion of the fifth hour of your shift?           17:00:37

10             MR. KONECKY:  Vague and ambiguous.              17:00:41

11             THE WITNESS:  Can you repeat that one?          17:00:45

12             THE REPORTER:  Do you want me to read it        17:00:50

13    back?                                                     17:00:51

14             MS. IMARA:  Yes, please.                        17:00:52

15             (Whereupon, the record was read as follows:     17:00:52

16             "Question:  Other than the one time that        17:00:52

17             you recall being frustrated that it was         17:00:52

18             beyond the fifth hour and you were hungry,      17:00:52

19             do you have any specific recollection of        17:00:52

20             not getting your meal period before the         17:00:52

21             conclusion of the fifth hour of your            17:00:52

22             shift?")                                         17:00:52

23             THE WITNESS:  I do not.                          17:01:14

24             MS. IMARA:  Q.  Did you maintain any            17:01:20

25    records that would indicate when you took your lunch      17:01:21

C238

1   breaks during your shifts at Kaiser San Diego?                17:01:25

2        A.   Can you repeat that?                                17:01:33

3             MS. IMARA:  (Addressing the reporter) Can            17:01:34

4   you read it back, please?                                     17:01:34

5             (Whereupon, the record was read as follows:          17:01:35

6             "Question:  Did you maintain any records             17:01:36

7             that would indicate when you took your               17:01:36

8             lunch breaks during your shifts at Kaiser            17:01:36

9             San Diego?")                                          17:01:36

10            THE WITNESS:  No.                                    17:01:45

11            MS. IMARA:  Q.  Were you also -- strike              17:01:58

12  that.                                                          17:01:59

13            Did a breaker also tell you when to take a           17:02:00

14  rest break during your shift?                                  17:02:04

15       A.   Yes.                                                 17:02:09

16       Q.   And how many times during a shift would a           17:02:10

17  breaker provide you coverage for a rest break?                 17:02:12

18       A.   I believe it was three times throughout a           17:02:20

19  shift, but that wasn't always the case.                        17:02:25

20       Q.   And how long were the rest breaks supposed          17:02:35

21  to be?                                                         17:02:37

22       A.   Fifteen minutes.                                    17:02:38

23       Q.   Did you work any shifts at Kaiser                    17:02:47

24  San Diego in which you did not receive three rest             17:02:49

25  breaks?                                                        17:02:53

1        MR. KONECKY:  Vague and ambiguous.                    17:04:33

2        THE WITNESS:  I -- I don't know that I                17:04:45

3    ever declined a break, but I can't tell you for a         17:04:46

4    certainty.                                                17:04:54

5        MS. IMARA:  Q.  As far as you're aware, if            17:04:59

6    a breaker came to tell you, "I'm relieving you for a      17:05:01

7    break," you took that break; correct?                     17:05:06

8        A.   Correct.                                         17:05:11

9        Q.   You talked about -- strike that.                 17:05:11

10            You previously testified about being             17:05:16

11   interrupted during your meal breaks.                      17:05:19

12            Were there occasions where you were              17:05:23

13   relieved for a rest break, and your rest break was        17:05:29

14   interrupted?                                              17:05:32

15       A.   Can you ask that again?                          17:05:36

16       Q.   Sure.                                            17:05:38

17            (Addressing the reporter) Can you read the       17:05:38

18   question back, please?                                    17:05:39

19            (Whereupon, the record was read as follows:      17:05:40

20            "Question:  You previously testified about       17:05:40

21            being interrupted during your meal breaks.       17:05:40

22            "Were there occasions where you were             17:05:40

23            relieved for a rest break, and your rest         17:05:40

24            break was interrupted?")                         17:05:40

25            THE WITNESS:  You know, rest breaks are so       17:06:15

C240

 1   short.  I couldn't recall if I've ever been          17:06:17

 2   interrupted or not.                                   17:06:22

 3          MS. IMARA:  Q.  So you don't have a            17:06:25

 4   specific recollection of anyone coming to interrupt   17:06:26

 5   you while you were taking a rest break; is that fair  17:06:28

 6   to say?                                               17:06:31

 7      A.   That's fair to say.                           17:06:32

 8      Q.   And where would you go when you were          17:06:34

 9   relieved to take a rest break?                        17:06:37

10      A.   The break room.                               17:06:40

11      Q.   Were you required to take your rest breaks    17:06:46

12   in the break room?                                    17:06:48

13      A.   I don't know.                                 17:06:52

14      Q.   Do you know if any nurses ever left the       17:06:53

15   hospital during their rest breaks?                    17:06:56

16      A.   I have never seen anyone leave the floor.     17:07:00

17      Q.   Do you know if any nurses ever left --        17:07:04

18   strike that.                                          17:07:10

19          Even if they stayed in the hospital, do        17:07:11

20   you know if any nurses left the unit during their     17:07:13

21   rest break?                                           17:07:17

22      A.   I don't believe I've ever seen anyone         17:07:19

23   leave the unit for a break or a meal period.          17:07:21

24      Q.   Did you ever ask anyone if you were           17:07:25

25   permitted to leave the unit for your rest break?      17:07:27

1    else why you -- you hadn't received your third rest     17:09:23

2    break?                                                  17:09:27

3         A.   No, I don't believe I did.                    17:09:28

4              And I should also say that I didn't know      17:09:32

5    that there were -- strike that (sic).                   17:09:35

6         Q.   Okay.  When you did not -- on those           17:09:45

7    occasions when you didn't get a third rest break,       17:09:52

8    did you mark on your timecard that you hadn't           17:09:55

9    received one of your rest breaks?                       17:09:59

10        A.   Our timecards do not have spots for rest      17:10:02

11   breaks.                                                 17:10:04

12        Q.   Did anyone ever tell you that if you          17:10:06

13   didn't receive a break that you were entitled to        17:10:08

14   that you should indicate that on the timecard?          17:10:11

15        A.   It may or may not have been said.  My         17:10:20

16   guess would have been during orientation, if it was     17:10:23

17   said.                                                   17:10:25

18        Q.   But you don't have a specific recollection    17:10:26

19   of ever being told that you should record any missed    17:10:28

20   breaks on your timecard; is that right?                 17:10:31

21        A.   That is correct.                              17:10:34

22        Q.   During the time that you were on              17:10:37

23   assignment at Kaiser San Diego, did you call AMN        17:10:39

24   Customer Support?                                       17:10:46

25        A.   I did not.                                    17:10:48

C242

| | | |
|---|---|---|
| 1 | A.   No, I don't believe I have. | 17:32:10 |
| 2 | Q.   When you were at Kaiser San Diego working | 17:32:18 |
| 3 | as a travel nurse, was it your understanding that | 17:32:20 |
| 4 | you were due any additional pay if you did not | 17:32:23 |
| 5 | receive an uninterrupted meal period or rest break? | 17:32:27 |
| 6 | A.   I was not aware of that. | 17:32:36 |
| 7 | Q.   Do you know if other AMN travel nurses | 17:32:40 |
| 8 | received additional pay if they reported that they | 17:32:44 |
| 9 | had not received an uninterrupted meal period or | 17:32:47 |
| 10 | rest break? | 17:32:52 |
| 11 | A.   I'm not aware of that. | 17:32:53 |
| 12 | Q.   During your assignment at Kaiser | 17:33:47 |
| 13 | San Diego, were you required to carry a pager, | 17:33:49 |
| 14 | cell phone, or other device during your shift? | 17:33:53 |
| 15 | A.   I don't believe we did carry anything. | 17:33:59 |
| 16 | Q.   What about, when you went on a meal break | 17:34:13 |
| 17 | or rest period, were you required to have a phone or | 17:34:16 |
| 18 | another device so that you could be reached? | 17:34:19 |
| 19 | A.   I don't believe so. | 17:34:22 |
| 20 | Q.   Did anyone ever interrupt your meal period | 17:34:22 |
| 21 | by -- strike that. | 17:34:26 |
| 22 | Did anyone from Kaiser ever interrupt your | 17:34:29 |
| 23 | meal period by contacting you on a phone or other | 17:34:32 |
| 24 | device? | 17:34:35 |
| 25 | A.   I don't believe so. | 17:34:36 |

C243

```
 1                CERTIFICATE OF REPORTER

 2            I, JANE GROSSMAN, a Certified Shorthand

 3   Reporter, hereby certify that the witness in the

 4   foregoing deposition was by me duly sworn to tell

 5   the truth, the whole truth, and nothing but the

 6   truth in the within-entitled cause;

 7            That said deposition was taken in

 8   shorthand by me, a disinterested person, at the time

 9   and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13            That before completion of the deposition,

14   review of the transcript [X] was [ ] was not

15   requested.

16            I further certify that I am not of counsel

17   or attorney for either or any of the parties to the

18   said deposition, nor in any way interested in the

19   event of this cause, and that I am not related to

20   any of the parties thereto.

21

22       DATED:  September 14, 2017

23

24       _____

25       JANE GROSSMAN, CSR No. 5225
```

Deposition Exhibit 13
Deponent: R. Shaw
Date: September 11, 2017
Reporter: Jane Grossman, CSR No. 5225

Thank you for printing neatly and within the boxes.

# AMN Healthcare Timecard

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: Rob Shaw

Facility: KAISER: SAN DIEGO MEDICAL CENTER

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) |
|------|---------------|--------------------|----------------| 
| 3-20-16 | 19:00 | 30 | 23:30 |
| 3-21-16 | 23:30 | 30 | 07:30 |
| 3-22-16 | 19:00 | 30 | 07:30 |
| 3-23-16 | 19:00 | 30 | 07:30 |

Cost Center: 0203 / 0201 / 0203 / 0203

Regular Hours: 4 / 8 / 12 / 12

Total Hours: 36

Agency: AMN Healthcare

Primary GL Code:

**Required Field

Comments:

Please do not sign in and out at the same time.

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature:

Dated: 3-24-16

The undersigned certifies that his or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process this timecard without an authorized signature.

Print Name: CARLOS SALAS    Title: COORDINATOR

Facility:

Authorized:

RECEIVED BY
CARLOS SALAS
Cellular #:
Dated: MAR 27

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

# AMN Healthcare Timecard

Name: Onset Smu

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT(1)/HOL | OT2 |
|------|---------------|--------------------|----------------|-------------|-------------------------|-----------|-----|
| 3-1b-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 3-18-16 | 19:02 | 30 | 07:30 | 0203 | 12 | | |
| 3-19-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | WEEKLY TOTAL | 36- | |

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Date: 3-20-16    Healthcare Professional's Signature: [signature]

The undersigned certifies that he or she is an authorized representative of the client/facility and that the above named employee is correct. PayrAll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS

Title: COORDINATOR

Facility Agreement:

Agency: AMN Healthcare

**Required Field

Primary GL Code:

Comments:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

RECEIVED MAR 21 2016

AMN0001377

C246

# AMN Healthcare Timecard

Name: Rob Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Dates | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT/HOL | OT2 | | | | |
|-------|---------------|--------------------|----------------|-------------|---------|--------|-----|---|---|---|---|
| 3-9-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | | | | |
| 3-11-16 | 19:00 | 30 | 07:30 | 0203 | 18 | | | | | | |
| 3-13-16 | 19:00 | 30 | 07:30 | 0203 | 18 | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | WEEKLY TOTAL | 36 | | | | | |

Please do not sign in and out at the same time.

Agency: AMN Healthcare

**Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required information has been provided.

Dated: 3-13-16   Healthcare Professional Signature:

The undersigned certifies that the s/he or the is an authorized representative of the client company and that the above record of time recorded by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS

Title: COORDINATOR

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

RECEIVED BY
MAR 14 2016
CARLOS SALAS

Draft

AMN Healthcare Timecard

Name: Robert Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY



| Date | Time In (24h) | Meal Period (min/s) | Time Out (24h) | Cost Center | Regular | OT/HOL | Weekly Total |
|------|-----|-----|-----|-----|-----|-----|-----|
| 7/29 | 17:00 | 30 | 07:30 | 0203 | 12 | | |
| 3/31/16 | 18:00 | 30 | 07:30 | 0203 | 12 | | |
| 3/5/16 | 18:00 | 30 | 07:30 | 0203 | 12 | | |
| | | | | | | | 36-16 |

Please do not sign in and out at the same time.

Agency: AMN Healthcare

**Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been completed.

Dated: 3-6-16    Healthcare Professional's Signature: _____

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process time cards without an authorized signature.

Print Name: VANGIE MARQUEZ

Family Authorization: _____

Thank you for printing neatly and within the boxes.

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay week.

Title: TRAVEL COORD

RECEIVED FEB 07 2016

AMN0001379

C248

# AMN Healthcare Timecard

Fax #: 888-667-7101

Name: Rob Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Pay Cycle: WEEKLY

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular | OTt:HOL | OT2 |
|------|------|------|------|------|------|------|------|
| 2.24 | 19:00 | 30 | 07:30 | 0103 | 12 | | |
| 2.25 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 2.26 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| | | | | WEEKLY TOTAL | 36 | | |

Kaiser Use Only

Agency: AMN Healthcare

*Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 2.27.16    Healthcare Professional's signature:

The undersigned certifies that his or she is an authorized representative of the Client company and that the above record of hours worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS    Title: COORDINATOR    Contact #

Facility Authorization:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

C249

# AMN Healthcare Timecard

Name: Rob Shaw
Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT/HOL | OT2 |
|------|---------------|--------------------|----------------|-------------|------------------------|--------|-----|
| 2-14-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 2-9-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 2-20-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |

WEEKLY TOTAL: 36 —

Agency: AMN Healthcare

*Required Field

Primary GL Code:

Comments:

Please do not sign in and out at the same time.

Date: 2-21-16

I affirm I, the time recorded above is a true and correct representation of my time.

This acknowledgment card certifies that he or she is an authorized representative of the client company and that he or she approved and accepted above listed hours.

Print Name: CARLOS SALAS

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

staffing&scheduling 619 528 5990 >>

2016-02-22 12:33

AMN0001381

P 75/93

C250

# AMN Healthcare Timecard

Thank you for printing neatly and within the boxes.

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: Robert Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

| Date | Time In (24h) | Meal Period (min) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT1/HOL | OT2 |
|------|---------------|-------------------|----------------|-------------|------|---------|-----|
| 2-13-16 | 07:00 | | 15:00 | 50 Kaiser Training | | | |

Please do not sign in and out at the same time.

Agency: AMN Healthcare

**Required Field

Primary GL Code:

WEEKLY TOTAL

I affirm that the time recorded above is accurate and that all required approvals have been obtained.

Date: 2-13-16    PlaceHealthcare Professional's Signature

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the Named temporary is correct. Payroll cannot process timecards without an authorized signature.

Print Name: VANGIE MARQUEZ    Facility Representative's Signature    Date

Print Name: TRAVEL COORD    Title    Contact: 619-528-5842    Date

Title: TRAVEL COORD

Comments:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft

AMN0001382

C251



# AMN Healthcare Timecard

Name: Robert Shaw
Facility: KAISER SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | | | | | | | | | | | | |
|------|---------------|--------------------|-----------------|-------------|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-8-16 | 19:00 | 30 | 07:30 | D203 | 12 | | | | | | | | | | | |
| 2-9-16 | 19:00 | | 23:00 | 0203 | 4 | | | | | | | | | | | |
| 2-12-16 | 19:00 | 30 | 08:00 | 0203 | 12 | | 00:70 | | | | | | | | | |
| 2-13-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| WEEKLY TOTAL | | | | | | | 40.0 | 0.70 | | | | | | | | |

RECEIVED BY
FEB 13 2016
FRED THOMPSON

Agency: AMN Healthcare
*Required field

Please do not sign in and out at the same time.

The undersigned contract staffer and his or her agency, that each represent "the" of the client company posted that the above referenced time worked or time worked by the named employee is accurate. The undersigned verify the accuracy and/or value of and/or verification of report.

Print Name: VANGIE MARQUEZ      Title: TRAVEL COORD      Date: 
Sign: 
AMN rep on 

Comments:

Primary GL Code: 

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

2016-02-15 15:19      Staffing&Scheduling >> 619 528 5990      P 33/49
AMN0001383
C252

## Facility Call-Off Verification Form

### Fax To: 800-705-1466

To be completed by Employee:

Employee Name: _____ Employee ID: _____

Facility Name: _____

| Date(s) of Call Off(s) | Total Hours you are short | Reason |
|---|---|---|
| | | Called off due to no show |
| _____ | | Call off due to no computer access |
| | | attendance |
| | | sick not feeling |
| | | |
| | | |

Employee Signature _____ Date _____

To be completed by Facility:

Authorized Facility Signature _____ Date 2-9-2016

Facility Printed Name _____

Pursuant to the Healthcare Staffing Agreement, Facility shall provide healthcare professional a minimum work week.

AMN0001384

C253

## FAX COVER SHEET

**To:**

**Company:**

**Fax Number:** 8772820350

**Re:**

**From:** Spencer OKieffe

**Date:** 02/11/16 12:15:02 PM

**Pages (Including cover):** 2

**Notes:**

Please key PCOF for 1/4
Robert shaw 685576



AMN0001385

C254

# AMN Healthcare Timecard

Name: Robert Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Please do not sign in and out at the same time.

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular | | | | | | | | WEEKLY TOTAL |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2-1-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | | | | | | |
| 2-4-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | | | | | | |
| 2-5-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | | | | | | |
| | | | | | | | | | | | | | 30 |

*Kaiser Use Only*

Agency: AMN

*Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals were obtained.

Dated: 2-6-16   Healthcare Professional's Signature: _____

This undersigned certifies that he or she is an authorized representative of the client company and that the above facts are true to the named employer is correct. Payroll cannot process timecards without an authorized signature.

Print Name: VANGIE MARQUEZ

Facility Authorization: _____

Title: TRAVELS OXFORD

COPY   CARLOS SALAS
Dated: _____

619 528-5812
FEB 08 2016

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.



AMN Healthcare Timecard - KFH/Hospital

Name: Robert Shaw    Fax #: 888-667-7101

Per Diem? ☐ Yes ☒ No    Facility: SAN DIEGO MEDICAL CENTER

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes

Kaiser Use Only

| Date | Time In (24hr) | Meal Period (mins) | Time Out (24hr) | Cost Center/ Department | Regular | OT1/HOL | OT2 |
|---|---|---|---|---|---|---|---|
| 1-27-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 1-28-16 | 19:00 | 30 | 07:30 | 0201 | 12 | | |
| 1/26/16 | | | | sick call | | | |

WEEKLY TOTAL: 24.0

Agency: AMN    Healthcare

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals obtained.

Dated: 1-30-16    Healthcare Professional's Signature: Robert Shaw

To the undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by this named employee is correct. Payroll cannot process time and attendance without an authorized signature.

Print Name: Robert Shaw    Title: SCHEDULING/PAYROLL    Contact #: 619-528-8279

Facility: KAISER SAN DIEGO    Dated:
Authorization:

RECEIVED BY
JAN 31 2016
FRED THOMPSON

Please do not sign in and out at the same time.

Draft

# AMN Healthcare Timecard

Name: Rob Shaw

Per Diem?: ☐Yes ☐No   Facility: SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Position Identifier | Kaiser Use Only Regular | OTH/HOL | OT2 | WEEKLY TOTALS |
|------|---------------|--------------------|----------------|---------------------|--------------------------|---------|-----|---------------|
| 1-17-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | |
| 1-20-16 | 19:00 | 30 | 23:30 | 0100 | 4 | | | |
| 1-20-16 | 23:30 | 30 | 07:30 | 0201 | 8 | | | |
| 1-21-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | | |
| | | | | | | | | 30 |

Please do not sign in and out at the same time.

Agency: AMN Healthcare

*Required Field

Primary GL Code:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature:

Dated: _____

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time submitted by the current employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: VANGIE MARQUEZ

Title: STAFFING COORDINATOR   Contact #: 619-528-5842

Facility Authorization: _____   Date: _____

RECEIVED
SPECIALTY
JAN 25 2016
CARLOS SALAS

Comments:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period CARLOS SALAS

Draft

AMN0001388

C257



# AMN Healthre Timecard

Fax #: 888-667-7101

...ame: _Shad Rob_

Facility: KAISER - SANDIEGO MEDICAL CENTER

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

RECEIVED BY

JAN 17 2016

FRED THOMPSON

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | OT1 | OT2 |
|------|---------------|--------------------|----------------|-------------|--------------------------|-----|-----|
| 1/12 | 19:00 | 30 | 07:30 | 0203 | 1/2 | | |
| 1-13 | 19:00 | 30 | 07:30 | 0203 | 1/2 | | |
| 1-16 | 19:00 | 30 | 07:30 | 0203 | 1/2 | | |
| | | | | | 36-0 | | |

Agency: AMN Healthcare

**Required Field

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature _____

The undersigned certifies that his or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot be processed without an authorized signature.

Print Name: VANGIE MARQUEZ   Title: TRAVEL COORD   Contact #: 619-528-5042

Facility Authorization: _____ Dated: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

Draft

AMN0001389

C258



# AMN Healthcare Timecard

Name: Robert Shaw

Facility: KAISER - SAN DIEGO MEDICAL CENTER

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (min:s) | Time Out (24h) | Cost Center | Kaiser Use Only Regular | TOT/HOL | OT12 |
|------|------|------|------|------|------|------|------|
| 1-6-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| 1-7-16 | 19:00 | 30 | 07:30 | 0203 | 12 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | 24.0 |

Please do not sign in and out at the same time.

RECEIVED
JAN 11 2016
FRED THOMPSON

I affirm that the time recorded above is accurate and all required approvals have been obtained.

_____ Healthcare Professional's Signature.

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Dated: 1-8-16

Print Name: VANSHE MARQUEZ     Title: TRAVEL COORD     Contact #: 619-528-5842

Facility
Authorization: _____     Dated: _____

Agency: AMN HealthCare

*Required Field

**Primary GL Code:

Comments:

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

P 26/40

<< Staffing&Scheduling 619 528 5990 >>

2016-01-11 06:47

AMN0001390

C259



# AMN Healthcare Timecard

Thank you for printing neatly and within the boxes.

Fax #: 888-667-7101
Pay Cycle: WEEKLY

Name: Rob Shaw
Facility: KAISER - SAN DIEGO MEDICAL CENTER

Kaiser Use Only

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center | Regular |
|------|---------------|--------------------|----------------|-------------|---------|
| 12-30-15 | 07:30 | 30 | 20:00 | 0203 | 12 |
| 1-1-16 | 19:00 | 30 | 07:30 | 0203 | 12 |
| 1-2-16 | 19:00 | 30 | 07:30 | 0105 | 12 |
| | | | | | 36.0 |

Please do not sign in and out at the same time.

Agency: AMN Healthcare
**Required Field
Primary GL Code:
Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot be correctly without an authorized signature. _____ Healthcare Professional's Signature

Date: 1-2-16
Print Name: Rob Shaw
Title: RN
Facility Authorization:

RECEIVED BY
VANGIE MARQUEZ
JAN 08 2016

Documentation of all hours worked (timecard) must be Received by 5:00 pm PT Monday after the end of the pay period.

Draft

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4  ROBERT SHAW, et al.,              )

5  individually and on behalf of    ) Case No.

6  all others similarly situated,   ) 3:16-cv-028116-JCS

7  and as a proxy of the State of   )

8  California on behalf of          )

9  aggrieved employees,             )

10                 Plaintiffs,      )

11          vs.                     )

12  AMN HEALTHCARE, INC., and KAISER )

13  PERMANENTE INTERNATIONAL,        )

14                 Defendants.      ) (Pages 1-172)

15  --------------------------------)

16                 THIS TRANSCRIPT

17         CONTAINS NONCONFIDENTIAL INFORMATION

18  DEPOSITION OF:

19                 JENNIFER CORONA TEITELBAUM

20                 FRIDAY, SEPTEMBER 22, 2017

21                 10:08 A.M.

22

23  Nonconfidential:  Pages 1-155, 158-172

24  REPORTED BY:

25                 SUSAN NELSON, C.S.R. No. 3202

```
 1   Deposition of JENNIFER CORONA TEITELBAUM, the witness,

 2   taken on behalf of Defendants, commencing at

 3   10:08 A.M., on FRIDAY, SEPTEMBER 22, 2017, at 2029

 4   Century Park East, Los Angeles, California, before

 5   SUSAN NELSON, C.S.R. No. 3202.

 6

 7   APPEARANCES OF COUNSEL

 8   FOR PLAINTIFFS:

 9           SCHNEIDER WALLACE COTTRELL KONECKY

10           WOTKYNS LLP

11           BY:  JOSHUA KONECKY, ESQ.

12           2000 Powell Street

13           Suite 1400

14           Emeryville, California 94608

15           (800) 689-0024

16           jkonecky@schneiderwallace.com

17

18   FOR DEFENDANT AMN HEALTHCARE, INC.:

19           CONSTANGY BROOKS, SMITH & PROPHETE LLP

20           BY:  SARAH KROLL-ROSENBAUM, ESQ.

21           2029 Century Park East

22           Suite 1100

23           Los Angeles, California 90067

24           (310) 912-3411

25           skroll-rosenbaum@constangy.com
```

1   APPEARANCE OF COUNSEL (CONTINUED):

2

3   FOR DEFENDANT KAISER FOUNDATION HOSPITALS:

4           SEYFARTH SHAW LLP

5           BY:  ERIC G. RUEHE, ESQ.

6           560 Mission Street

7           Suite 3100

8           San Francisco, California 94105-2930

9           (415) 397-2823

10          ERuehe@seyfarth.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  before, I worked at UCLA at the same time, but not as

2  a -- I mean, those are the only two things I did,

3  was --

4      Q.  Okay.

5      A.  -- a single travel assignment and then I would

6  pick up a shift here or there at UCLA.

7      Q.  Okay.  But through your employment at AMN, you

8  were only assigned to LAMC and West Los Angeles Medical

9  Center.

10      Is that correct?

11      A.  Yes.  I was very loyal for three years with

12  them.

13      Q.  Okay.  Have you had any assignments for AMN

14  outside of California?

15      A.  No.

16      Q.  Okay.

17      A.  No.

18      Q.  You mentioned that you worked with at least

19  one recruiter at AMN.  Is that correct?

20      A.  Several, but yes.

21      Q.  Do you recall the names of the recruiters you

22  worked with?

23      A.  I remember the last recruiter that I worked

24  with 'cause I had more of a rapport with her than most

25  of the other ones.

C264

1      A.  Hm-hm.

2          Q.  Can you explain what you mean by "floated"?

3          A.  Yes.  So basically on -- when I was hired by

4      AMN/Kaiser, I was hired to the CCU unit.  Okay?

5      Cardiac care unit, CCU unit.  And that was my -- nurses

6      like to say that's your home base.  That's where I

7      would report to every day unless, you know, when I

8      would get there, they would send me elsewhere.

9              So I would attend a huddle.  That was where we

10     always met.  And while I attended the huddle, at that

11     point in time is where our charge nurse would say,

12     "Jennifer, you're going to go float," meaning that my

13     assignment is going to be on a different unit.  So then

14     I would go and work that unit.

15         Q.  And how long would you work the other unit?

16         A.  It depends.  Sometimes they would float me

17     multiple times in one night.  Other times, it would be

18     once.

19         Q.  Would it be for the entire duration of a shift

20     that you would float?

21         A.  No.

22         MR. KONECKY:  Vague and ambiguous.

23         THE WITNESS:  It depends.  Like I said,

24     sometimes I would come in -- well, actually, routinely

25     I would come in and I would regularly get floated mid

1      A.  No.

2      Q.  I believe you mentioned that at LAMC you were

3  initially assigned to the cardiac care unit.

4          Is that correct?

5      A.  Yes.

6      Q.  And was that the unit that you were assigned

7  to for all of your time at LAMC?

8      A.  Yes.

9      Q.  Okay.  And did you work in other units while

10  you were at LAMC?

11      A.  Routinely.

12      Q.  Routinely.  Okay.  And do you recall which

13  units those were?

14      A.  Yes.  The ICU.  The telemetry units.  CDU,

15  which is a step-down unit.  And occasionally they would

16  float me to a med/surg unit as well, medical-surgical

17  unit.  And also an intermediate care unit, so ICSU.

18  Intermediate care unit.

19      Q.  And were each of these units within the

20  Los Angeles Medical Center facility?

21      A.  They were, but I did not receive orientation

22  on all of those units.

23      Q.  Were the units different from each other such

24  that you believe orientation would have been

25  appropriate?

C266

1    had questions, then we would resource each other.

2        Q.  Okay.  I want to ask you about a previous

3    question about West Los Angeles Medical Center.

4            Was it again a charge nurse who would assign

5    patients to you that you were responsible for?

6        A.  Yes.

7        Q.  And what unit were you assigned to at West Los

8    Angeles Medical Center?

9        A.  The intensive care unit.

10       Q.  The intensive care unit?

11       A.  Hm-hm, yes.

12       Q.  And did you float when you were at West

13   Los Angeles Medical Center?

14       A.  Yes.

15       Q.  Do you recall which other units you floated

16   to?

17       A.  Telemetry unit and the step-down unit, from

18   what I remember.

19       Q.  Okay.  Do you recall, again, estimating, how

20   many charge nurses you worked with while you were at

21   West Los Angeles Medical Center?

22       A.  Eight to ten, roughly.

23       Q.  Okay.  You just told me that at LAMC, if you

24   had questions about your job duties, you would talk to

25   the charge nurse.

1    process when we're going through, you know, what to

2    expect, the nature of what we're walking into, they

3    would -- "they" meaning people who are representing AMN

4    at the onboarding, they're the ones I mean by "they,"

5    and they would tell us, okay, well, you report to the

6    staffing office and sign in and sign out there.

7         Q.  Okay.  Do you recall who from AMN did your

8    onboarding?

9         A.  I don't know.

10        Q.  Okay.

11        A.  Don't know.

12        Q.  But whoever that was on behalf of AMN

13   explained that you should submit your time through the

14   staffing office?

15        A.  Yes.

16        Q.  Okay.  Were you told -- excuse me.

17             And was that your understanding for both your

18   LAMC assignment and your West Los Angeles Medical

19   Center assignment?

20        A.  Yes, both we reported to staffing.

21        Q.  Okay.  Were you told you that would be

22   required to complete a paper, a time card, and give it

23   to the staffing office?

24        A.  Well, the paper where we signed in and out was

25   our time card.

C268

1    paper signed in order for us to issue you an overtime

2    payment.

3         Q.  Did you fill out your time sheet daily?

4         A.  Yes.

5         Q.  Did you write the start time for your shift on

6    the time sheet?

7         A.  Check-in time yes.

8         Q.  And the check-out time as well?

9         A.  It wasn't always accurate.

10        Q.  Okay.  But you wrote -- you did come back to

11   the staffing office and put in the time that you --

12   whatever you put in at the end of your shift.

13            Is that correct?

14        A.  Yes.

15        Q.  Okay.  And did you write the length of your

16   meal period on your time sheet?

17            MR. KONECKY:  Objection.  Assumes facts not in

18   the record.  Vague and ambiguous.

19            THE WITNESS:  Not that I remember.  I honestly

20   don't.  You know, when you're that exhausted after

21   working twelve hours on an overnight shift, you know,

22   you -- you're signing -- I don't recall writing a meal

23   because most of the time I didn't take one, so I don't

24   remember writing it.

25   BY MS. KROLL-ROSENBAUM:

C269

1   patients, then, while I was at lunch, if a doctor came

2   by, I would have to -- I would get OptiVox'd and I

3   would have leave my food and I would have to go and I

4   would have to attend to the questions, or it would

5   be -- it was never not interrupted, is what I'm getting

6   down to, is that I always had gotten interrupted during

7   any kind of meal breaks.

8   BY MS. KROLL-ROSENBAUM:

9        Q.  Were you required to carry the OptiVox?

10       A.  It was always insinuated by the staff to take

11   the OptiVox with you.

12          When I had removed -- when I have had a

13   battery die before, I have gotten spoken to regarding,

14   why I haven't changed the battery out before when the

15   situation happened.

16          Even without the OptiVox, they will come into

17   the kitchen into the staffing lounge and they will get

18   you.  'Cause there's been times, yes, I will -- my

19   battery may have died and I would have to get up and --

20       Q.  When you say --

21          MR. KONECKY:  Hang on.  You just interrupted

22   her.

23          THE WITNESS:  I would have to get up and I

24   would have to be physically brought to the unit because

25   a nurse was covering for me.  It would be like, Jen, I

C270

 1   was there?  Because some patients are not just there a

 2   day, some are there for a long span of time.

 3          So we are going through day of admission to

 4   present day, so they're quite lengthy, especially when

 5   you get to a partial who is critically ill.

 6      Q.  How often do you do a hand-off?

 7      A.  Once a shift, like when you -- well, twice

 8   'cause I'm going to get report as I'm coming in and

 9   then I have to give report as I'm leaving, so twice

10   technically.

11      Q.  Okay.  And when you were at LAMC, you did

12   these hand-offs.  Correct?

13      A.  Yes.

14      Q.  Okay.  And how long would a hand-off generally

15   take?

16      A.  Depending on the acuity of the patient and

17   what's involved, a hand-off for one patient who is

18   critically ill can take twenty minutes for one patient.

19      Q.  Is that -- and is that a representative

20   number?  I mean, is that a typical -- typically they

21   take about twenty minutes?

22      A.  I would say typically about twenty minutes.

23   You want to give a thorough report.  You want to make

24   sure you touch base on everything.

25          Also, it depends on who does the assignment.

1    So whenever they get released from huddle, then they

2    would come into their respective areas of work and then

3    we would start giving report.

4        Q.  So you've said that you were required to stay

5    past the end of your shift fairly regularly to complete

6    a hand-off --

7        A.  Yes.

8        Q.  -- correct?

9            Okay.  Did you ever keep track of that time

10   you worked past the end of your shift on your time

11   card?

12           A.  I've done it on certain occasions where I

13   would be, like kind of fed up 'cause at one point, I

14   would put on my time card that, you know, like you have

15   seen in the examples that we had talked about earlier,

16   about being over and I wouldn't get paid for it.

17           So it would be -- it become very frustrating

18   to have to fight.  So a lot of times, it would -- a lot

19   of nurses -- 'cause travelers, we all talk, and we've

20   talked about the aggravation and the -- the -- the

21   fight to have to get the overtime papers signed that we

22   would -- normally it wouldn't happen -- it would be

23   impossible to happen.

24       Q.  Okay.  But you did not regularly keep track of

25   the time you spent working beyond the scheduled shift.

C272

1          Is that correct?

2          A.  No, I'd mentally note the clock and be like,

3   wow, I'm leaving again thirty minutes later, but not

4   like a physical piece of paper if --

5          Q.  Okay.  So you --

6          A.  -- that's what you're asking.

7          Q.  -- did not write it down on a physical piece

8   of paper?

9          A.  No, just a mental --

10         Q.  Okay.

11         A.  -- here-we-go-again thing.

12         Q.  Okay.  Did you hand off patients to different

13  nurses, or was it the same nurse every time?

14         A.  No.  Sometimes it was two different nurses,

15  and sometimes it was even three different nurses.

16  Depending on the unit, of course.

17         Q.  How far in advance would you know that you

18  would need to stay beyond the end of your shift in

19  order to complete the hand-off?

20         A.  We don't know that we need to stay.  Because

21  it depends on when they're released from the huddle for

22  that.  And then sometimes you have situations where

23  patients acutely decompensate or we have emergencies

24  that happen, which can happen at any given time when

25  you work in a critical care unit, and when those

C273

```
 1   situations arise, then, yes, that will create

 2   incidental overtime.

 3        Q.  Were there ever times when you went to the

 4   charge nurse to say, you know, "The huddle went longer

 5   and I had to stay later.  Can you approve my overtime"?

 6        A.  Yes, I have.  And a lot of times, they won't

 7   do it.  They won't sign the paper.

 8             I'll explain to them whoever -- whoever was on

 9   that day, and they would say, "Well, I have to go give

10   report right now to the oncoming.  Come find me after."

11   Or, you know, they would make some sort of roadblock

12   where they wouldn't sign the paper.

13        Q.  How often did you try to get approval from the

14   charge --

15        A.  Often.

16        Q.  -- nurse in those circumstances?

17        A.  Often.

18        Q.  Can you give me an estimate of what that

19   means?

20        A.  I would say that once or twice, maybe, in a

21   month I would, you know, say something because,

22   otherwise, there's only so many times and there's only

23   so -- there's only so many times that you can ask, hey,

24   you know, I've worked over.  I want to be compensated

25   for my time here.  And when, you know, it becomes the
```

1    nature and the standard of the hospital that you work

2    at -- I mean, other travelers talk.  I mean I -- being

3    at LAMC, I've ran into other people who've had the same

4    problems that I have and it becomes a fight to have to

5    get your money.

6              So a lot of times, we -- we, speaking on

7    behalf of the other travelers, that we're -- it's like,

8    well, we're not even -- it's not worth the fight.

9              I worked twelve-plus hours.  I don't want to

10   have to be here any longer than I have to be.  You

11   know, I'm mentally tired.  I work a night shift.  My

12   circadian rhythm is already off, you know.  I just want

13   to get home.  And it's unfair that we as nurses even

14   have to take it to that level.

15             It should be a punch-in, punch-out

16   circumstance.  It shouldn't have to be, I have to spend

17   an additional seven, eight, nine minutes finding a

18   charge nurse to sign my paper.

19        Q.  Were there things that caused you to work

20   beyond your scheduled shift other than the hand-off

21   when you were at LAMC?

22        A.  Say that -- I'm sorry.  Rephrase that.

23        Q.  Well, we just talked about you working beyond

24   your shift to complete the hand-off.  Correct?

25        A.  Yes.

C275

```
 1        MR. KONECKY:  Objection.  Asked and answered.
 2   She already answered that question to you.
 3   BY MS. KROLL-ROSENBAUM:
 4        Q.  Did you ever contact anyone at customer
 5   support at AMN?
 6        A.  I called the AMN number to discuss about not
 7   being paid for overtime.
 8             And this -- after you have read this
 9   "Off The Clock Work," and it says that "the company's
10   policy is to pay for all hours worked," now, I had put
11   here on my time card that I've worked past the hours
12   that -- you know, overtime and I still didn't get paid
13   for it.
14             So this is kind of like a silly -- it's silly
15   to me reading -- like reading this with you because
16   this says everything like, yes, we will pay you for all
17   hours worked, but really they do not pay you for all
18   hours worked.
19        Q.  You told me that you contacted your recruiter?
20        A.  Yes.
21        Q.  And I'm asking if you recall ever contacting
22   anyone else, and I think you said you called AMN's
23   number?
24        A.  Yeah, like the -- the -- whatever customer
25   number that I have.
```

C276

1        Q.  Okay.  So you may have contacted customer

2    support?

3        A.  I may have, yeah, because they would transfer

4    you through different -- different lines.

5        Q.  Okay.

6        A.  I don't remember exactly if it's actually a

7    customer support line.  But I was directed through AMN

8    to take the process of filling out an overtime sheet,

9    again, as we discussed.

10        Q.  That's what AMN told you --

11        A.  Yeah.

12        Q.  -- to do in that instance?

13        A.  Follow the, you know, poli- -- not policy, but

14    following the process of getting the overtime paper

15    filled out.

16        Q.  Okay.  And did you then go back and try to get

17    the overtime paper filled out?

18        A.  I -- I have -- I have tried actually many

19    times to backtrack and present to different managers

20    that, hey, I worked on this day and I was here X amount

21    of minutes over, and this is what happened.

22            "Oh, I can't sign that for you because I

23    wasn't here that day."

24            So I was faced again with another roadblock

25    where the charge nurse and the managers didn't want to

C277

 1   sign the papers for us.  For whatever reason that is, I

 2   don't know.  Maybe it was -- now, this is assumption --

 3   make it would get traced back to them, I don't know.

 4        But I have hit that roadblock as well where my

 5   overtime, even though I may have had a paper ready to

 6   be signed and I took the time to explain it, I have

 7   been told "no" before because it was a previous shift

 8   or it wasn't the same day or they didn't witness it, so

 9   they wouldn't sign my paper.

10        Q.  Did you go back and tell anyone at AMN that

11   you hit the roadblocks that you've referred to from

12   getting approval at Kaiser?

13        A.  I don't remember.

14        Q.  And I just want to be clear.

15        Did you ever work off the clock at the

16   beginning of your shift?  Or is your testimony that the

17   work you did that -- was off the clock at the end of

18   the shift?

19        A.  Occasionally I would look up -- if I knew who

20   my assignment was, I would look up and -- start looking

21   up patient information because -- to help speed up the

22   hand-off process.  So it does happen.

23        Q.  You would do that before the beginning of your

24   shift?

25        A.  Occasionally.

 1    happened.  Nothing changes.

 2        Q.  Did you ever note on your time card that you

 3    did not receive a rest break?

 4        A.  Not that I recall.  I don't remember if I did

 5    or not.

 6        Q.  I think you testified that one -- and you can

 7    correct me, but one of the units you worked in did not

 8    have break nurses.

 9            Is that correct?

 10       A.  The entire hospital doesn't have break nurses.

 11       Q.  What is a break nurse?

 12       A.  Basically, to define that, would be a nurse,

 13   same credentials as myself, who comes in strictly only

 14   to break you.

 15           So if -- for example, if I was on duty to be

 16   the break nurse, I would come in, no assignment

 17   attached to me.  I would have my three nurses or four

 18   nurses, whoever I'm going to break, and they would give

 19   me a full report on what's going on with the patient.

 20   I would assume all care, including charting,

 21   medications, any kind of testing that needs to go on, I

 22   would take over solely as that primary RN for that time

 23   being as the break nurse until that nurse came back

 24   from break.  That's basically what a break nurse is.

 25       Q.  And so how are you familiar with the notion of

1   STATE OF CALIFORNIA    )

2   COUNTY OF LOS ANGELES )  ss.

3            I, SUSAN NELSON, C.S.R. 3202, in and for the

4   State of California, do hereby certify:

5            That, prior to being examined, the witness

6   named in the foregoing deposition was by me duly sworn

7   to testify the truth, the whole truth and nothing but

8   the truth;

9            That said deposition was taken down by me

10  stenographically at the time and place therein named,

11  and thereafter transcribed via computer-aided

12  transcription under my direction, and the same is a

13  true, correct and complete transcript of said

14  proceedings;

15           Before completion of the deposition, review of

16  the transcript [x] was [ ] was not requested.  If

17  requested, any changes made by the deponent (and

18  provided to the reporter) during the period allowed are

19  appended hereto.

20           I further certify that I am not interested in

21  the event of the action.

22           Witness my hand this 27th day of September,

23  2017.

                            _____

24                          Susan Nelson, C.S.R. No. 3202
                            Certified Shorthand Reporter
25                          State of California

1         SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF LOS ANGELES

3

4  ROBERT SHAW, SHARON DAVIS, JENNIFER)
    CORONA TEITELBAUM, LORENZO HOLMES, )
5  and CANDY KUCHARSKI, individually, )
    and on behalf of all others      )
6  similarly situated, and as a proxy )
    of the State of California on     )
7  behalf of aggrieved employees,    )
                             )
8                 Plaintiffs, )Case No.
                             )3:16-cv-02816 JCS
9         vs.              )
                             )VOLUME I
10  AMN SERVICES, LLC, KAISER       )
    FOUNDATION HOSPITALS, SOUTHERN    )
11  CALIFORNIA PERMANENTE MEDICAL     )
    GROUP, INC., and THE PERMANENTE   )
12  MEDICAL GROUP, INC.,          )
                             )
13                 Defendants. )
    _____)
14

15

16  DEPOSITION OF:

17              CANDY KUCHARSKI

18              THURSDAY, OCTOBER 5, 2017

19              9:58 A.M.

20

21

22

23

24  Reported by:  SUSAN LYNN POBOR

25              CSR No. 5132

1          Deposition of CANDY KUCHARSKI, the witness,

2     taken on behalf of the Defendant, AMN HEALTHCARE,

3     INC., on Thursday, October 5, 2017, 9:58 a.m., at

4     2029 Century Park East, Suite 3100, Los Angeles,

5     California, before SUSAN LYNN POBOR, CSR No. 5132,

6     pursuant to Notice.

7

8     APPEARANCES OF COUNSEL:

9     FOR THE PLAINTIFFS:

10            SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS
              BY:  JOSHUA G. KONECKY, ESQ.
11            2000 Powell Street
              Suite 1400
12            Emeryville, California  94608
              (415) 421-7100
13

14    FOR THE DEFENDANT, AMN HEALTHCARE, INC.:

15            CONSTANGY, BROOKS, SMITH & PROPHETE LLP
              BY:  SARAH KROLL-ROSENBAUM, ESQ.
16            2029 Century Park East
              Suite 1100
17            Los Angeles, California  90067
              (310) 909-7775
18

19    FOR THE DEFENDANT, KAISER FOUNDATION HOSPITALS:

20            SEYFARTH SHAW  LLP
              BY:  ERIC G. RUEHE, ESQ.
21            560 Mission Street
              Suite 3100
22            San Francisco, California  94105-2930
              (415) 397-2823
23

24

25

C282

1          Q.   Were you ever provided any information

2     at Kaiser San Diego Medical Center in 2013 about the

3     hospital's expectations for traveling nurses?

4          A.   Repeat that again, just because I don't

5     want to answer the wrong way.

6          Q.   Of course.

7               Were you given any information at

8     Kaiser San Diego Medical Center in 2013 about the

9     hospital's expectations for traveling nurses?

10          A.   We were first to float.  We were told

11     that.

12          Q.   And what do you mean by "float"?

13          A.   Well, when I worked a 12-hour shift, I

14     could guarantee that I likely floated at least twice,

15     sometimes three times in a 12-hour period.

16          Q.   And when you say "float", though, can

17     you describe what that means?

18          A.   That means I started out with an

19     assignment on one unit, and then usually maybe five

20     minutes between -- five minutes to 11:00, I would

21     float to another unit.

22               Could be a Med/Surg tele, could be the

23     step-down unit, could be the ICU.  Depends on where I

24     started.

25          Q.   So is it fair to say that to float, as

C283

 1    Palomar Medical Center when you were employed by AMN,

 2    did anyone employed by Palomar Medical Center tell you

 3    there were any specific expectations for traveling

 4    nurses distinct from nurses on the permanent staff?

 5         A.   Distinct?

 6              No.

 7         Q.   Okay.  How about when you worked at the

 8    assignment at Pomerado Hospital?

 9         A.   No.

10         Q.   What about when you went back to

11    Kaiser San Diego Medical Center in 2015?

12         A.   They already knew I worked there, so --

13         Q.   But no one had a conversation with you

14    about the expectations of the hospital upon your

15    return?

16         A.   No.

17         Q.   How about at Scripps?

18         A.   No.

19         Q.   When you were at Kaiser San Diego

20    Medical Center, what unit were you assigned to?

21              And I mean the 2013 assignment.

22              What unit were you assigned to?

23         MR. KONECKY:  Vague and ambiguous.

24         THE WITNESS:  I'll answer.

25              I was hired for ICU, was told I could

1    float to the step-down unit, and there's the potential

2    to go to the Med/Surg tele floor.

3    BY MS. KROLL-ROSENBAUM:

4          Q.   Who told you that?

5          A.   My recruiter.

6          Q.   And did you, in fact, float to those

7    other units when you were at Kaiser San Diego Medical

8    Center?

9          A.   Way too often.

10         Q.   Did you float to any other units besides

11   those two?

12         A.   No, there's three.

13         Q.   I'm sorry.

14              I had step-down and -- you were assigned

15   to the ICU, and you were told you would float to the

16   step-down unit and potentially to the Med/Surg unit.

17              Is there a third?

18         A.   I was floated to Med/Surg tele floors,

19   yes.

20         Q.   Is Med/Surg tele more than one unit?

21         A.   There's many of them.

22         Q.   Okay.  Those are the types of units,

23   though?

24         A.   Yes.

25         Q.   So other than those categories of units,

1          Q.   Okay.

2          A.   Unpaid time.

3               Because we had to go down to the

4     staffing office, which is in the basement.  And so

5     travelers would sign in, and we would get our

6     assignment by a young secretary that did staffing

7     there.  She would tell us where to go.

8          Q.   Did someone tell you to come ten minutes

9     early?

10          A.   No, but the expectation was that I

11     needed to be up on the floor by 7:00 p.m.

12          Q.   And you would -- There was a secretary

13     in the staffing office.

14               Is that correct?

15          A.   She was the one who took sick calls, and

16     she also gave us our assignment.

17          Q.   Do you recall her name?

18          A.   No, but she bleached her hair a lot,

19     young girl.

20          Q.   Was it one individual person --

21          A.   Yes.

22          Q.   -- who worked as a secretary at Kaiser

23     San Diego Medical Center?

24               Is that correct?

25          A.   Yes.

1  needed to float to the telemetry unit when you were at

2  Pomerado Hospital?

3          A.   I don't remember how they did their

4  staffing.  I don't remember if they called me ahead of

5  time.  I don't remember that.

6          Q.   Okay.  Do you recall whether there was

7  any specific individual who you would go to if you had

8  a question about your job duties when you were at

9  Pomerado Hospital?

10         A.   No, just it was, again, staff.

11         Q.   And is it correct, if I heard you

12 correctly before, that you worked three 12s when you

13 were at Pomerado Hospital?

14         A.   Yes.

15         Q.   Did Pomerado ever ask you to work extra

16 shifts while you were on assignment there?

17         A.   They may have.  I don't recall.

18         Q.   Okay.  Do you recall if you asked to

19 work extra shifts during that assignment?

20         A.   I may have.

21         Q.   And do you recall whether you were

22 required to work on-call hours when you were at

23 Pomerado?

24         A.   No.

25         Q.   Okay.  Let me ask you now about when you

C287

1    went back to Kaiser San Diego Medical Center in 2015.

2                  What unit were you assigned to then?

3          A.    Exactly the same ICU, with the potential

4    to float to the step-down unit, and the Med/Surg tele

5    units.

6          Q.    Did the AMN recruiter talk to you about

7    the potential for the floating to the other units?

8          A.    Yes.

9          Q.    Why did you take the assignment at

10   Kaiser San Diego Medical Center in January 2015?

11         A.    Because Sharp would not take me because

12   I was living -- I kind of thought that I was thinking

13   I was going to stay living in San Diego, and they did

14   not want to take on someone who was a resident of

15   San Diego.  And so I was considered moving there.

16                And the other thing is that when it

17   comes to San Diego, it's a high demand area for

18   travelers.  And I have bills and so I kind of --

19                Did I want to?  No.

20                But did I need a job?  Yeah.

21         Q.    Okay.  Where were you living at the time

22   when you took the San Diego assignment, Kaiser

23   San Diego assignment?

24         A.    What's the dates again?

25         Q.    January 2015 to April/May 2015.

1    were having problems with things, but their huddles

2    seemed to have become lengthier and larger and more

3    detailed.

4              Maybe they were going through a lot of

5    changes at Kaiser then.

6         Q.   So is it fair to say your experience

7    with the huddles at Kaiser San Diego Medical Center

8    were different for your 2015 assignments than they

9    were for your 2013 assignment?

10        MR. KONECKY:  Vague and ambiguous.

11        THE WITNESS:  They still had lengthy ones.  I

12   think that they had more lengthy ones in 2015.

13   BY MS. KROLL-ROSENBAUM:

14        Q.   I believe you testified earlier that

15   when you came in for your shift, you first went to a

16   staffing office to sign in.

17              Is that correct?

18        A.   Yes.

19        Q.   Did you do that before the huddles

20   began?

21        A.   Yes, because I had to know where I was

22   going.

23        Q.   Okay.

24        A.   And that's where we signed our

25   timecards.

1    hands off the patient to the next oncoming nurse?

2          A.    Yes.

3          Q.    Okay.  So, generally speaking, there are

4    two handoffs in a shift.

5          A.    Yes.

6          Q.    Is that correct?

7          A.    Yes.

8          Q.    Okay.  Did you -- Were you required to

9    do handoffs of your patients when you were on

10   assignment at Kaiser San Diego Medical Center in 2013?

11         A.    Yes.

12         Q.    How long, in your experience, did those

13   handoffs typically take?

14         A.    Depends on how many patients you have.

15   Depends on the unit I worked.  Depends on --

16               That's an individual thing.  If a

17   patient has a whole lot of wounds, you go through the

18   wounds.  So that's time consuming.

19               Average?

20               Okay.  I go per patient, because it's

21   only fair for me to say.  Per patient, I would say

22   maybe 10, 15 minutes per patient.

23               Mind you, Med/Surg, you have five.

24         Q.    So it's 10 to 15 minutes per patient,

25   regardless of what unit that patient is in?

C290

1    supervisor wasn't there when I was there.

2          Q.   Did you ever try to obtain approval for

3    overtime from anyone at Kaiser?

4          A.   Charge nurses, they were gone.

5               So the night shift charge nurse would

6    say:  That's not my -- You needed it from the other

7    one who is already gone.

8               And so I remember a couple times

9    throwing a little note on the supervisor's desk, times

10   that I got pretty mad because of always being overtime

11   and being fed up with it.

12         Q.   Did you ever call AMN to tell them that

13   you worked beyond the shift?

14         A.   I told you before, I tried to call my

15   recruiter many times, especially with the Kaiser, and

16   I think only with the Kaiser assignments.

17         Q.   Okay.  Ms. Kucharski, I want to refer

18   you back to Exhibit 7, which is the handbook.

19              And, again, I'll ask you:  Is it still

20   your testimony that you haven't seen this handbook

21   before?

22         A.   Yes.

23         Q.   Okay.  I'm going to refer you to Page 13

24   of this handbook.  It's Bates AMN 2212.

25              There's a policy just below the bottom

C291

1    to get approval before you worked the overtime?

2              A.    How are you supposed to know that?

3                    That's a very --

4                    Get approval before you worked the

5    overtime?

6              Q.    What was your understanding of when you

7    were supposed to get approval for overtime?

8              A.    When you work overtime, you have to have

9    the charge nurse approve it, and then I was told it

10   goes to a supervisor.

11                   But you're already overtime, and the

12   charge nurse is gone.  I've never had a charge nurse

13   stick around.

14             Q.    Were you required to get approval for

15   overtime at Palomar?

16             A.    No, because -- I mean, I might have said

17   something to -- you know, "I'm leaving now", or they

18   saw I was leaving now, but it was never an issue

19   because we clocked out with the swipe badge.

20             Q.    What about at Pomerado Hospital?

21             A.    Same thing.

22             Q.    What about at Scripps?

23             A.    Same thing.

24             Q.    So at Palomar, did anyone either at

25   Palomar or at AMN ever come to you and say:  Hey, it

1    looks like you're working a lot of overtime.  Can we

2    talk about your schedule?

3            A.   No.

4            Q.   Did that happen when you were working at

5    Pomerado Hospital?

6            A.   No.

7            Q.   What about at Scripps?

8            A.   No.

9            Q.   Before you started your assignment at

10   Kaiser San Diego Medical Center in 2013, did anyone at

11   AMN explain to you how you should record your time?

12           A.   I remember, I think, the recruiter

13   saying they used the timesheet method, and the

14   timesheets are left in the nursing staffing office,

15   and they have a stack of them.

16                And it was in a book that was

17   alphabetized, and I just -- I'm not sure if anyone

18   ever taught me versus it's pretty self-explanatory:

19   Time in, meal break, time out.

20           Q.   So did anyone other than the recruiter

21   talk to you about how you should record your time?

22           A.   No.

23           Q.   Okay.  Did anyone at Kaiser talk to you

24   about how you should record your time?

25           A.   No.

1          Q.    So did you go to the staffing office
2    before you started each shift to record --
3          A.    Yes, I said -- You asked that before.
4                You had to, because that's where you got
5    your assignment.
6          Q.    And did you return to the staffing
7    office at the end of your shift to record the time you
8    were leaving?
9          A.    Honestly, because I'm under oath,
10   majority of the time, I did.
11               There were some days when you're over an
12   hour that I just said I'll do it tomorrow.
13         Q.    And then you would fill it in when you
14   came in for the next shift?
15         A.    Yeah.
16         Q.    Okay.  And did you record your meal at
17   the end of the shift when you returned to the staffing
18   office?
19         A.    Yes.
20               That did not mean I got a meal, but --
21         Q.    Well, were there occasions when you
22   wrote that you did get a meal but, in fact, you did
23   not get a meal?
24         A.    Majority of the time, yeah, or on
25   breaks.

1          A.    -- yeah.

2               MR. KONECKY:  Vague and ambiguous.  Compound.

3     BY MS. KROLL-ROSENBAUM:

4          Q.    At Kaiser San Diego Medical Center, in

5     2013, what were the circumstances that caused you to

6     be unable to take a meal period?

7          A.    They don't have break nurses or they

8     either had their break nurses were caught up doing

9     other assignments or helping out other people and not

10    doing what --

11               A break nurse, from what I've learned

12    from other facilities, is comes in just to do breaks,

13    alone.

14         Q.    So I just want to be clear.

15               Are you saying that there were occasions

16    where there were break nurses at Kaiser San Diego

17    Medical Center?

18         A.    I don't remember that, but if someone

19    had said to me, you know, if you want to take a break,

20    but I don't remember.

21               But the thing is, I usually was the one

22    that said, "I did not get a break yet".

23         Q.    Who did you say that to?

24         A.    Usually, the charge nurse.

25         Q.    Were you ever interrupted during a meal

C295

1    break while you were on assignment at Kaiser San Diego

2    Medical Center?

3              A.    Frequently, yes.

4              Q.    How frequently, if you could estimate?

5              A.    Three-quarters of the time.

6              Q.    How were you interrupted?

7              A.    Either someone would --

8                    Because I would be in the break room,

9    they'd come into the break room and say:  So and so

10   needs this.

11                   And that would be -- especially when no

12   one was covering and no one is watching my patients

13   and they realize that it's my patient.

14                   So it was a dog-eat-dog assignment

15   there.

16                   So either I come back to a very upset

17   patient, I come back to a very upset family member, or

18   I come back to a patient who is a mess or a patient

19   who pulled his art line out, which has happened.

20                   That's an example of a great one that I

21   had.

22             Q.    Did you ever take a meal period that was

23   longer than 30 minutes when you were at Kaiser

24   San Diego Medical Center?

25             A.    Never.

C296

 1          Q.   Was it the same situation as before?

 2          A.   I don't remember if they were pagers or

 3   phones.

 4          Q.   But were you required to carry an

 5   electronic device?

 6          A.   Yes.

 7          Q.   Do you believe the device was different

 8   in 2015 than it was in 2013?

 9          MR. KONECKY:  Vague and ambiguous.

10          THE WITNESS:  I can't recall, but -- I kind of

11   think it was, but I can't recall for sure.

12   BY MS. KROLL-ROSENBAUM:

13          Q.   And did you take that device home with

14   you?

15          A.   No.

16          Q.   And who issued the --

17          A.   Charge nurse.

18          Q.   And were you required to carry the

19   device with you during your entire shift?

20          A.   Yes.

21          Q.   Who told you you were required to carry

22   your device?

23          A.   Nobody told me.  This is my patients in

24   here.  It's programmed for my patients.  And so they

25   were my patients that I needed to take care of.

C297

1          And since -- If no one is taking care of

2     them while I'm on my break, I went and took care of

3     them.

4          Q.   So did the charge nurse tell you you

5     needed to carry the pager during your breaks?

6          A.   No one ever took it from me.

7          Q.   Or did anyone ever ask you for it?

8          A.   No.

9          Q.   Did anyone at AMN tell you to carry a

10    pager during your breaks?

11         A.   I don't know that AMN knows what each

12    facility uses for their call system.

13         Q.   That was my next question.

14              Did AMN have any knowledge about your

15    pager according -- as far as you know?

16         A.   Yeah, I don't know.

17         Q.   How about at Scripps in 2015?

18              Were you required to carry a pager or

19    other device while you were on assignment there?

20         A.   We have -- I don't want to say --

21    something Kyocera phones or something like that.

22         Q.   I'm sorry?

23         A.   It's a brand.  Kyocera phones, or

24    something like that.

25         Q.   And is that what you have now, or is

1  that what you had when you were on assignment for AMN?

2          A.   No, I think that's the same ones.

3          Q.   Were you required to carry those during

4  your entire shift?

5          A.   Other than, again, they had meal nurses,

6  so -- break nurses.

7          Q.   So you would hand the phone to the break

8  nurse?

9          A.   Right.  They would ask for it.

10         MS. KROLL-ROSENBAUM:  Okay.  Ms. Kucharski,

11  I'm going to refer you back to Exhibits 10 and 11.

12              And, again, I want to just --

13              I'll state these are your

14  Wage Statements and timecards for your Kaiser

15  San Diego assignment in 2015.

16              Let me ask you first, actually, did you

17  keep any records of your time other than on your

18  timecards when you were on assignment for Kaiser

19  San Diego in 2013?

20         A.   I made photocopies of my timecards.  I

21  made photocopies of it.

22         Q.   You made photocopies of your timecards?

23         A.   Yeah, but I don't think I did right

24  away.  I don't know if I -- I did it --

25              Like, when I started realizing that I

C299

 1    wasn't getting breaks and stuff like that, I wanted to

 2    kind of just keep my own records.

 3             Q.   Okay.  But so if they're photocopies of

 4    the same timecards, they would be just copies for

 5    yourself of the same document.

 6                  Is that correct?

 7             A.   Correct.

 8             Q.   Did you keep any other records about the

 9    time you worked at Kaiser San Diego Medical Center in

10    2013?

11             A.   No.

12             Q.   How about at Palomar Medical Center in

13    2014?

14             A.   No.

15             Q.   How about at Pomerado Hospital?

16             A.   No.

17             Q.   And then what about Kaiser San Diego for

18    2015?

19             A.   No, just -- The only reason I did was

20    because they did paper ones.  So, yes.

21             Q.   Okay.  And what about at Scripps?

22                  Did you keep other records?

23             A.   It's all through Kronos, so I don't get

24    access to that.

25             Q.   And with respect to your

C300

1          Q.   Why.

2               Why does it matter that you were pissed

3     off?

4          A.   Because they -- Kaiser -- Kaiser was

5     responsible for paying overtime.  American Mobile

6     threatened that if we did overtime.

7               So, you know, out of these few that you

8     showed me, I could have probably had every one of them

9     if I would have done it legally.

10              So every one of them probably should

11    have at least anywhere from 15 to an hour overtime,

12    not including the meal breaks.

13         Q.   So why did you not put in that time?

14         A.   Because your organization told me:  You

15    are not supposed to do overtime because Kaiser doesn't

16    want to pay for it.

17         Q.   And, again --

18         A.   And I have never gone -- steered from

19    that comment.

20         Q.   Okay.  And, again, that was a single

21    recruiter who you spoke to before your assignment in

22    2013.

23              Is that correct?

24              MR. KONECKY:  Misstates and understates the

25    testimony from earlier today.

C301

 1    BY MS. KROLL-ROSENBAUM:

 2         Q.   Was there any individual other than the

 3    recruiter you identified before you began your

 4    assignment at Kaiser San Diego Medical Center in 2013

 5    who told you not to work overtime at Kaiser?

 6         A.   Not that I'm aware of, but --

 7         Q.   Okay.

 8         MR. KONECKY:  I think you just interrupted

 9    her.

10         THE WITNESS:  -- but while I was there, it was

11    told by other travelers.  Were they American Mobile?

12              I don't know, but they had been told the

13    same thing.

14    BY MS. KROLL-ROSENBAUM:

15         Q.   So we talked a bit about this before,

16    about whether you ever contacted Customer Support.

17              And I believe other than saying that you

18    may have called to talk to payroll --

19         A.   Is that Customer Support?

20         Q.   I'm asking you.

21              Did you ever separately reach out to

22    Customer Support at AMN?

23         A.   I never heard of Customer Support.

24         Q.   Can you ever recall instances of

25    calling AMN to complain during your assignment at

C302

1          Q.   Not that you recall --

2          A.   No.

3          Q.   -- in 2013?

4          A.   Yeah.

5          Q.   In 2015, were there break nurses in the

6     ICU unit?

7          A.   Not that I recall.

8          Q.   Were there break nurses --

9               You said you were in a step-down ICU

10    unit, as well?

11         A.   I work three units.  Well --

12         Q.   You floated --

13         A.   I --

14         Q.   This is all my fault.  Let me start

15    over.

16               So at the step-down unit, you floated

17    there.

18               So in 2013, assignment at Kaiser

19    San Diego Medical Center, we're just going to talk

20    about that three-month assignment.

21         A.   Okay.

22         Q.   You floated into the step-down ICU unit.

23               Is that correct?

24         A.   I did, yes.

25    BY MR. RUEHE:

C303

1          Q.    Frequently?

2          A.    Yes.

3          Q.    And at that unit, the step-down ICU

4    unit, were there break nurses?

5          A.    I don't recall.

6          Q.    Okay.

7          A.    No.

8          Q.    And now the third unit or department you

9    were assigned to was the Med/Surg Telemetry unit?

10         A.    Yes.

11         Q.    And were there break nurses in that

12   unit?

13         A.    I recall never getting a break.  I never

14   got a break when I worked on the Med/Surg floors.

15               Because, often, I was floated, and there

16   is that assumption -- I guess I was going to get my

17   break from the next assignment.

18               There was lack of communication.

19         Q.    So my question was:  Were there break

20   nurses or reliever nurses?

21         A.    I couldn't -- Not that I'm aware of, no.

22         Q.    Okay.  And let's go to 2015, your second

23   assignment at Kaiser Medical Center.

24               Let me restate.

25               It was January 7, 2015 to May 31st or

C304

1    May 30, 2015?

2              A.   Hold on.  Let me see.

3                   Yes.

4              Q.   And let's -- I'm going to go through the

5    same questions again.

6                   At the ICU unit, you were assigned at

7    the ICU -- you were assigned there again in 2015?

8              A.   Yes.

9              Q.   And, again, it's your testimony that

10   there were not break nurses?

11             A.   That I recall.

12             Q.   Not that you recall?

13             A.   Right.

14             Q.   Okay.  And at the step-down ICU, were

15   there break nurses?

16             A.   I don't ever remember step-down nurses.

17             Q.   And at the Med/Surg telemetry unit, were

18   there break nurses?

19             A.   I don't think so, no.

20             Q.   Now, let's go back to 2013.

21                  If there were not break nurses, who

22   covered the breaks?

23             MR. KONECKY:  Assumes facts not on the record,

24   and incomplete hypothetical.

25   BY MR. RUEHE:

C305

 1          Q.   Let me restate the question.

 2               Who covered breaks in 2013 at

 3    Kaiser Medical Center?

 4          MR. KONECKY:  Assumes facts not in the record.

 5          THE WITNESS:  Are we saying that I got a

 6    break?

 7               Because lets make the assumption that I

 8    did get a break.

 9               Okay?

10               I am covering my own patients.  I had a

11    pager.  So I'm responsible for those, you know.  So

12    very often, I didn't get a break.

13    BY MR. RUEHE:

14          Q.   Did you get a break in 2013?

15          MR. KONECKY:  Vague and ambiguous.

16          THE WITNESS:  Very seldom.

17    BY MR. RUEHE:

18          Q.   So let me focus on when you got a break.

19               So you got no breaks?

20               I'm just trying to clarify what your

21    testimony is.

22               Did you get an uninterrupted meal break

23    at Kaiser Medical Center in 2013?

24          A.   I think the question I answered before

25    was probably 90 percent of the time, I did not.

C306

1   STATE OF CALIFORNIA    )
                           )
2                          )   ss.
    COUNTY OF LOS ANGELES  )
3

4           I, SUSAN LYNN POBOR, Certified Shorthand

5   Reporter No. 5132 for the State of California, do

6   hereby certify:

7           That prior to being examined, the witness

8   named in the foregoing deposition, was duly sworn to

9   testify the truth, the whole truth, and nothing but

10  the truth;

11          That said deposition was taken down by me in

12  shorthand at the time and place therein named and

13  thereafter reduced by me to typewritten form and that

14  the same is a true, correct, and complete transcript

15  of said proceedings.

16          Before completion of the deposition, review of

17  the transcript [ ] was [ ] was not requested.  If

18  requested, any changes made by the deponent (and

19  provided to the reporter) during the period allowed

20  are appended hereto.

21          I further certify that I am not interested in

22  the outcome of the action.

23          Witness my hand this 23rd day of October, 2017.

24          _____

25          Susan Lynn Pobor, CSR No. 5132

C307

```
  1                UNITED STATES DISTRICT COURT
  2               NORTHERN DISTRICT OF CALIFORNIA
  3
  4
  5   ROBERT SHAW, et al.,          )
      individually and on behalf    )
  6   of all others similarly       )
      situated, and as a proxy of   )
  7   the State of California on     )
      behalf of aggrieved employees, )
  8                                  )
             Plaintiffs,             )
  9                                  )  No. 3:16-cv-028116-JCS
          vs.                        )
 10                                  )
      AMN HEALTHCARE, INC., and      )
 11   KAISER PERMANENTE              )
      INTERNATIONAL,                 )
 12                                  )
             Defendants.             )
 13   _____)
 14
 15            DEPOSITION OF SHARON A. DAVIS
 16              San Diego, California
 17             Thursday, April 20, 2017
 18                   Volume I
 19
 20
 21   Reported By:
 22   CATHERINE A-M GAUTEREAUX
 23   CSR No. 3122
 24   Job No. 2595546
 25   PAGES 1 - 218
```

C308

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   ROBERT SHAW, et al.,           )
     individually and on behalf     )
 6   of all others similarly        )
     situated, and as a proxy of    )
 7   the State of California on      )
     behalf of aggrieved employees, )
 8                                   )
              Plaintiffs,            )
 9                                   )  No. 3:16-cv-028116-JCS
          vs.                        )
10                                   )
     AMN HEALTHCARE, INC., and       )
11   KAISER PERMANENTE               )
     INTERNATIONAL,                  )
12                                   )
              Defendants.            )
13   _____)

14

15

16          Deposition of SHARON A. DAVIS, Volume I, taken

17   on behalf of Defendants, at the Sunroad Corporate

18   Center, 4445 Eastgate Mall, Suite 200, San Diego,

19   California, beginning at 9:57 a.m., on Thursday,

20   April 20, 2017, before CATHERINE A-M GAUTEREAUX,

21   Certified Shorthand Reporter No. 3122.

22

23

24

25

                                              Page  2
```

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS

 5        BY:  JOSHUA G. KONECKY, ESQ.

 6             NATHAN PILLER, ESQ.

 7        2000 Powell Street, Suite 1400

 8        Emeryville, California 94608

 9        415.421.7100

10        jkonecky@schneiderwallace.com

11

12

13   For Defendants AMN Healthcare, Inc., and Kaiser

14   Foundation Hospitals:

15        CONSTANGY, BROOKS SMITH & PROPHETE, LLP

16        BY:  TAZAMISHA H. IMARA, ESQ.

17        2029 Century Park East, Suite 1100

18        Los Angeles, California 90067

19        310.912.3414

20        timara@constangy.com

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

C310

1      A      I'm sorry.

2      Q      That's okay.  It was my fault.  So NursesRx is

3  the only brand within AMN that you worked for as a

4  traveling nurse; is that right?

5      A      Yes.

6      Q      And so do you remember when you became

7  employed by AMN?

8      A      Meaning NursesRx?  'Cause that's how --

9      Q      That's how you think --

10     A      Yes.

11     Q      -- of your employment relationship?

12     A      Yes.

13     Q      So when did you first begin working at

14  NursesRx?

15     A      My first assignment was 2013.  February 2013.

16     Q      And when did that assignment end?

17     A      First assignment was eight weeks, and then I

18  extended for another -- for 13 more weeks.

19     Q      Okay.  Where were you working on that

20  assignment?

21     A      At UCLA Santa Monica.

22     Q      And what was the next position that you --

23  strike that.  When was the next assignment that you

24  worked for NursesRx?

25     A      It was January, at Glendale Adventist.  I

Page 21

C311

1    think it was January 9, 2016, yeah.  At Glendale

2    Adventist in Glendale.

3         Q    And I think you previously testified that that

4    assignment ended around April 23rd, 2016?

5         A    Yes, around, 'cause it was a 13-week contract,

6    as well.

7         Q    Did you -- there were no renewals in your

8    contract at Glendale Adventist; is that right?

9         A    Yes.

10        Q    So you worked one assignment that was

11   scheduled to last 13 weeks; is that right?

12        A    Yes.

13        Q    And at Glendale Adventist, you worked as a

14   traveling nurse; is that correct?

15        A    Yes.

16        Q    Was your employment at NursesRx the first time

17   that you had worked as a traveling nurse?

18        A    Yes.

19        Q    So you had not, prior to that time, worked for

20   any other staffing company as a nurse; is that right?

21        A    Yes.

22        Q    So NursesRx is the only staffing company that

23   you worked with as of today?

24        A    No.

25        Q    Okay.  So since you left your employment with

C312

```
 1        Q    Did you work for any of those companies in

 2   California?

 3        A    All of them was in California.

 4        Q    All of your assignments were in California?

 5        A    California, yes.

 6        Q    Did you work for either Med Staffing, Emerald

 7   HS or Aya Healthcare at Glendale Adventist?

 8        A    No.

 9        Q    During your assignment in -- for NursesRx in

10   2016, you worked at Glendale Adventist; is that correct?

11        A    January -- yes.

12        Q    Okay.  Were you assigned to a particular

13   department within Glendale Adventist?

14        A    Postpartum mother and baby.

15        Q    Who did you report to during that assignment

16   at Glendale Adventist?

17        A    Once you get to the facility, you went to the

18   staffing office and you signed in.  After that, you

19   report to the unit where you will get a report, you get

20   an assignment.

21        Q    Was there a particular person in the unit that

22   you -- who provided you with instruction during your

23   shifts?

24             MR. KONECKY:  Vague and ambiguous.

25             THE WITNESS:  When you get to the floor --
```

C313

1      Q    Okay.  Do you know -- strike that.  Other than

2   UCLA Santa Monica and Glendale Adventist, did you work

3   at any other facilities as a traveler for AMN?

4      A    No.

5      Q    Does the class that you want to represent in

6   this lawsuit include people who worked at locations

7   where you have never worked as a traveler for AMN?

8           MR. KONECKY:  Objection.  Vague and ambiguous.

9           THE WITNESS:  But they are part of the

10   settlement, the suit?

11           MS. IMARA:  No.  Let me --

12           (To the Reporter)  Can you read back the

13   question.  We'll see.

14           (Record Read.)

15           MR. KONECKY:  Objection.  Vague and ambiguous,

16   calls for a legal conclusion.

17           THE WITNESS:  Yes.

18   BY MS. IMARA:

19      Q    It does?

20      A    Yes.

21      Q    What other facilities besides Glendale

22   Adventist do the people who are included in the class

23   that you want to represent -- strike that.

24           What other -- do you know any of the other

25   facilities where people who are included in the class

Veritext Legal Solutions
866 299-5127

```
 1    have worked as travelers for AMN?

 2            MR. KONECKY:  By names, are you asking?

 3            MS. IMARA:  Yes.

 4    BY MS. IMARA:

 5        Q    Do you know any of them?

 6        A    Sorry.  Repeat the question.

 7            MS. IMARA:  (To the Reporter)  Can you read

 8    back that question.

 9            (Record Read.)

10            THE WITNESS:  No.

11    BY MS. IMARA:

12        Q    No?  Do you know if AMN travelers at

13    facilities other than Glendale Adventist recorded their

14    time using a paper time sheet?

15        A    No, because I didn't know what -- the

16    companies that the travelers have worked for.

17        Q    Okay.  Understood.  I'm asking you

18    specifically about AMN travelers who worked at

19    facilities other than Glendale Adventist.  Do you know

20    whether those individuals recorded their time using

21    paper time sheets?

22        A    I don't know.

23        Q    Do you know if any of the -- any AMN travelers

24    who worked at facilities other than Glendale Adventist

25    recorded their time using Kronos?
```

Page 210

C315

1    A    I don't know.

2    Q    Do you have any knowledge of -- say, if we

3  talk about the time period when you were on assignment

4  at Glendale Adventist, do you know how other AMN

5  travelers who worked at different facilities recorded

6  their time?

7    A    I would -- let me think.    Are you asking do I

8  know this personally, how did --

9    Q    Yes.

10   A    Okay.    No.

11   Q    Okay.  And during the time that you were a

12 traveler for AMN, you gave me three different ways that

13 you recorded your time.  I believe it was a paper time

14 sheet, a swipe of your badge, and the Kronos system; is

15 that correct?

16   A    At Glendale?

17   Q    No.  You worked for more than one assignment

18 for AMN right?

19   A    Yes.

20   Q    Okay.  So at Glendale you used a paper time

21 sheet.  At UCLA Santa Monica, how did you record your

22 time?

23   A    Paper, as well.

24   Q    Oh, I see.  But -- so I've got that wrong.  So

25 when you were -- you used your badge to swipe and to

C316

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were reported

4     by me at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to

6     testifying, were placed under oath; that a verbatim

7     record of the proceedings was made by me using machine

8     shorthand which was thereafter transcribed under my

9     direction; further, that the foregoing is an accurate

10    transcription thereof.

11         I further certify I am neither financially

12    interested in the action nor a relative or employee of

13    any attorney of any of the parties.

14         IN WITNESS WHEREOF, I have this date

15    subscribed my name.

16

17    Dated:  April 28, 2017.

18

19

20

21

22

23

24    CATHERINE A-M GAUTEREAUX

25    CSR NO. 3122

Veritext Legal Solutions
866 299-5127

C317

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    ROBERT SHAW, DONNA JENKINS, and  ) Case No.
     SHARON DAVIS, et al.,           ) 3:16-cv-02816 JCS
5                                     )
                    Plaintiffs,       )
6                                     )
            vs.                       )
7                                     )
     AMN HEALTHCARE, INC. and KAISER  )
8    PERMANENTE INTERNATIONAL,        )
                                      )
9                   Defendants.       )
     _____)

10

11

12       **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

13

14       30(B)(6) DEPOSITION OF AMN HEALTHCARE, INC.

15              DESIGNEE: LISA LARSON

16                 Pages 1 - 201

17              SAN DIEGO, CALIFORNIA

18             TUESDAY, APRIL 25, 2017

19

20

21

22

23

24   Reported by:  Karla Meyer Baez,  RPR-CRR, CSR No. 4506

25   Job No. 122204

C318

1

2

3

4

5          April 25, 2017

6          10:02 a.m.

7

8          30(B)(6) DEPOSITION OF AMN HEALTHCARE, INC.,

9    designee LISA LARSON, taken on behalf of the Plaintiffs,

10   held at 4370 La Jolla Village Drive, Suite 400, San

11   Diego, California, before Karla Meyer Baez, Registered

12   Professional Reporter, Certified Realtime Reporter,

13   Certified Shorthand Reporter No. 4506.

14

15

16

17

18

19

20

21

22

23

24

25

C319

1    A P P E A R A N C E S:

2

3

4

5        SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS

6        Attorneys for Plaintiffs

7            2000 Powell Street

8            Emeryville, California 94608

9        BY:  JOSHUA KONECKY, ESQ.

10

11

12

13

14

15        CONSTANGY BROOKS SMITH & PROPHETE

16        Attorneys for Defendants

17            2029 Century Park East

18            Los Angeles, California 90067

19        BY:  SARAH KROLL-ROSENBAUM, ESQ.

20

21

22

23

24

25

**C320**

1    A.  I do.

2    Q.  Do you know if there are facilities in

3    California where the traveling nurses work where the

4    traveling nurses carry pagers?

5    A.  You know, it would be very specific to the

6    facility and, again, potentially to the unit.  I do not

7    know the facilities that require pagers.

8    Q.  But do you know that there are facilities in

9    California where AMN traveling nurses work that require

10   pagers?

11   A.  I believe so.

12   Q.  Is that noted anywhere in the AMIE or other

13   system that AMN uses to track information?

14   A.  That's not something that I've seen tracked in

15   our systems before.  It would be between the facility or

16   unit and the traveler.

17   Q.  The last sentence in the on-call and callback

18   says "The callback rate specified in your Professional

19   Services Agreement is paid for the time worked when

20   called back to the facility after being placed or

21   scheduled on a call."

22        Do you see where I am?

23   A.  I do.

24   Q.  So if somebody is on-call and then called to

25   work at one of these facilities, am I correct that they

1    Q.   Do you know the extent to which traveling

2    nurses for AMN have pagers on them during their meal

3    periods?

4    A.   I am not familiar with that, no.

5    Q.   One way or the other?

6    A.   If it is -- the meal period is their designated

7    time to have their uninterrupted break.  If they did

8    have a pager on them, it would be anywhere in that

9    category of callback or on-call, the on-call section

10   that we referenced in the PSA document earlier.

11        Again, there may be unique circumstances that

12   I'm not aware of that --

13   Q.   So to the extent that a traveler has a pager or

14   a phone that is on and with them during a meal period,

15   that would not be an off-duty meal period?

16   A.   I think it would depend on the situation.  Feel

17   free to clarify what you mean by if someone has a pager

18   or a phone.

19   Q.   I thought that's what you had said before, that

20   you would treat it as not off duty, but maybe I

21   misunderstood.

22        The circumstances where somebody would have a

23   pager or a phone on them that you would treat as off

24   duty.

25   A.   I think it depends.  Is it -- and, you know,

C322

REPORTER'S CERTIFICATE

I, KARLA MEYER BAEZ, Certified Shorthand Reporter No. 4506 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition, LISA LARSON, was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript {X} was { } was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 30th day of April, 2017.

_____

KARLA MEYER BAEZ, CSR NO. 4506

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    ROBERT SHAW; DONNA JENKINS; and

     SHARON DAVIS, et al.,

5

           Plaintiff,

6

     vs.                            No. 3:16-cv-02816 JCS

7

     AMN HEALTHCARE, INC., and KAISER

8    PERMANENTE INTERNATIONAL,

9          Defendants.

     _____/

10

11

12

13           DEPOSITION OF KRISTEN MUSSMAN

14                (PMK for Kaiser)

15

16                Emeryville, CA

17          Taken before NICOLE HATLER

18               CSR No. 13730

19             October 20, 2017

20

21

22

23

24

25   Job No. 130192

I N D E X

PAGE

EXAMINATION BY MR. KONECKY          6

E X H I B I T S

PAGE

PLAINTIFFS'

Exhibit 1  Deposition notice          46

Exhibit 2  Job description for staff nurse in   49
            southern California

Exhibit 3  Kaiser Permanentes's principles of   72
            responsibilities

Exhibit 4  Patient Care Services, Policies and   74
            Procedures Bates stamped Kaiser
            1235 to 1236

Exhibit 5  Medical center-wide policy Bates   75
            Stamped Kaiser 001054 through 1057

Exhibit 6  AMN time card Bates stamped Kaiser   89
            001028

Exhibit 7  Southern California regional   110
            timekeeping policy that is dated
            2013 Bates stamped Kaiser 000001
            through 10

Exhibit 8  AMN 0002743 earning statement from   126
            American Mobile Healthcare, AMN
            Services, for a Candy Fry.  Second
            page is AMN 0003376, a time card
            for Candy Fry

E X H I B I T S

PAGE

PLAINTIFFS'

Exhibit 9  Time card for Jennifer Corona, Bates 135
            stamped AMN 0004058, and the second
            page is the corresponding wage
            statement, AMN 0003578

Exhibit 10  Jennifer Corona time card showing a   136
            date of June 27th

Exhibit 11  Traveler time sheets including Donna 148
            Jenkins

Exhibit 12  Documents regarding floating and   155
            attendance Bates stamped Kaiser
            001301

Exhibit 13  Policy regarding scheduling travel   173
            nurses Bates stamped Kaiser 001239

Exhibit 14  Kaiser 001158 through 1165, traveler 178
            general orientation

Exhibit 15  Policy for San Diego Medical Center   181
            for the intensive care unit, and it
            is guidelines around the assignment
            of patients to travel nurses

Exhibit 16  Kaiser 000863 through 866, Kaiser   183
            Permanente, Contract Nurses and
            Supplemental Staff Orientation and
            Competency Validation Summary

Exhibit 17  Bates stamped Kaiser 845 to Kaiser   185
            856, a series of agreements on
            Kaiser letterhead presented to
            Ms. Jennifer Corona

Exhibit 18  Bates stamped Kaiser 000867 through   186
            1011, a series of training modules
            and competency evaluations bearing
            the Kaiser moniker

Exhibit 19  Justification form for an overtime   201
            missed meal or rest period

DEPOSITION OF KRISTEN MUSSMAN

BE IT REMEMBERED, that pursuant to Notice, and on
the 20th day of October 2017, commencing at the hour of
9:30 a.m., in the offices of Schneider Wallace Cottrell
Konecky Wotkyns, 2000 Powell Street, Suite 1400,
Emeryville, California 94608, before me, NICOLE HATLER,
a Certified Shorthand Reporter, State of California,
personally appeared KRISTEN MUSSMAN, produced as a
witness in said action, and being by me first duly
sworn, was thereupon examined as a witness in said
cause.

---oOo---

APPEARANCES

For the Plaintiffs:

    JOSHUA KONECKY
    Schneider Wallace Cottrell Konecky Wotkyns
    2000 Powell Street
    Emeryville, CA 94608


For the Defendant Kaiser Permanente:

    ANDREW MCNAUGHT
    Seyfarth Shaw
    560 Mission Street
    San Francisco, CA 94105

For the Defendant AMN Healthcare, Inc.:
    SARAH HAMILTON
    Constangy, Brooks, Smith & Prophete
    50 California Street
    San Francisco, CA 94111

1    KRISTEN MUSSMAN
2    sworn as a witness
3    testified as follows:
4    EXAMINATION BY MR. KONECKY:
5    Q. Hi. We met before. My name is Josh Konecky.
6    I'll be taking your deposition.
7    Could you state and spell your name for the
8    record?
9    A. Yes. It's Kristen Mussman, K-I-R-S-T-E-N,
10   M-U-S-S-M-A-N.
11   Q. Got it. And do you work for Kaiser now?
12   A. I do work for Kaiser.
13   Q. What's your position?
14   A. I am the director of Kaiser's contingent talent
15   management program.
16   Q. Contingent talent management?
17   A. Yes.
18   Q. Could you describe that program?
19   A. That is a national Kaiser program that is
20   responsible for the management of the suppliers who
21   provide contingent labor to Kaiser Permanente. I'm
22   responsible for strategy and policy setting related to
23   contingent workers.
24   Q. And what are the contingent workers at Kaiser?
25   A. Contingent workers are inclusive of temporary

1    contractors, independent contractors.
2    Q. And where do the traveling nurses fit into that
3    group?
4    A. Traveling nurses are one subset of temporary
5    workers. They are clinical workers that are provided by
6    suppliers.
7    Q. And are there a set of suppliers that supplies
8    the temporary traveling nurses to Kaiser?
9    A. Yes.
10   Q. What -- what are they or who are they?
11   A. Primarily they are AMN Healthcare, who is
12   contracted with Kaiser to provide the largest amount of
13   temporary nurses.
14   Q. When you say the largest amount, either by
15   number or percentage, can you approximate what that is?
16   A. I can't. It's -- it's difficult to approximate,
17   but it is our only Kaiser national agreement with a
18   travel nursing supplier.
19   Q. Do you know if it's more than 50 percent of your
20   traveling nurses?
21   A. I would think that's a fair estimation.
22   Q. More than 75 percent?
23   A. That would be speculative on my part.
24   Q. Okay. And you probably know from speaking with
25   Andrew or somebody else that I don't want you to

1    speculate.
2    A. Yeah.
3    Q. From time to time, I will ask you to estimate.
4    And sort of, the difference between estimate and
5    speculation is that if I asked you to make an estimate
6    or give a range, even if you don't have a precise
7    number, it's okay to give an estimate as long as it's
8    based on something you know, have seen, observed in your
9    experience with the company, as opposed to just making a
10   guess about something you have no clue about. Does that
11   distinction make sense?
12   A. I understand.
13   Q. Okay. And while we're at the preliminaries, you
14   understand that you're giving your testimony under oath?
15   A. I do.
16   Q. Any reason why you can't give truthful or
17   accurate testimony today?
18   A. No.
19   Q. You haven't taken any medication, alcohol, or
20   anything that would prevent that, right?
21   A. Only your super strong espresso.
22   Q. All right. Hopefully that will improve memory
23   and recollection and all that stuff.
24   So does AMN have -- excuse me.
25   You referenced a contract. Kaiser has a

1    contract with AMN?
2    A. Yes.
3    Q. Does it have -- currently, does it have one
4    contract or more than one contract?
5    A. Nationally, Kaiser has one contract with AMN.
6    Q. And tell me, is there an distinction between
7    nationally and some other subset of the nation?
8    A. There is a distinction between nationally and
9    other subsets.
10   Q. And with respect to the contractual arrangements
11   you have with Kaiser -- or with AMN?
12   A. AMN may hold regional agreements with some
13   regents of Kaiser for specific types of job positions,
14   but the travel nursing agreement is a nationally-held
15   contract.
16   Q. Same contract applies to all the traveling
17   nurses that AMN supplies to Kaiser?
18   A. Yes.
19   Q. And how long has that contract been in place?
20   A. I don't know the first date of origination, but
21   I know that I have been involved with that contract
22   since 2013, and I believe the contract dates back to
23   around the 2010 timeframe.
24   Q. Do you know if that's about when AMN started to
25   contract with Kaiser or Kaiser started to contract with

1    to the travel nurses.
2        Q.  What about the patient care experience?
3        A.  These would all be applicable to travel nursing.
4        Q.  So the first one, "Practices customer service
5    standards as defined by the service area, medical
6    center, and the specified department," that applies to
7    all the traveling nurses?
8        A.  That -- that particular bullet is generally
9    covered in a Kaiser department orientation outlining the
10   customer service experience that is defined by that
11   particular medical center and would be part of the
12   orientation that the traveler receives.
13       Q.  "Promptly answers call lights, alarms, and
14   patient requests," that applies to all the travelers?
15       A.  Yes, it does.
16       Q.  What are call lights?
17       A.  Call lights are when a patient's monitor has a
18   light on it that indicates that they need nursing
19   assistance.
20       MR. KONECKY:  Can I have that read back?
21       (Whereupon the previous answer was read.)
22   BY MR. KONECKY:
23       Q.  So is that something you can just see from
24   inside the room?
25       A.  I believe that call lights are also displayed at

1    the nursing station that's generally in the center of a
2    unit.
3        Q.  How else can patient -- well, alarms -- I guess
4    I should go to alarms first.
5        What -- what are those?  For fear of sounding
6    obvious, what are alarms in the setting -- work setting
7    here?
8        A.  Most of patient monitoring that happens through
9    technology have preprogrammed alarms to indicate if
10   there is some sort of physical event occurring with the
11   patient that would require immediate assistance.  The
12   alarm, it would be the monitor that's attached to the
13   patient that would sound an alarm versus a patient being
14   able to ask for help.
15       Q.  And where would the alarm sound?
16       A.  It -- the alarm would sound likely within the
17   nurses' room as well as a nursing station, and sometimes
18   there is -- I'm forgetting the name of it now, but
19   sometimes there is a -- some sort of device -- is it
20   Spectralight (phonetic) -- that the nurses carry that
21   identifies the status of their patients.
22       Q.  Do traveling nurses carry those devices with
23   them?
24       A.  I'm not sure.  They may.  If they're assigned to
25   specific patients with those monitoring devices, they

1    may have those.
2        Q.  And the patients can make requests directly to
3    the nurses you -- well, maybe I'm -- so an alarm can go
4    directly to the nurses based on the patient's condition?
5        A.  Yes.  I'm not sure if the nurses are able to
6    directly request based on that link, but I do --
7        Q.  You mean the patients?
8        A.  Correct.  Yes.
9        Q.  Okay.  But if there's something that happens
10   that can be detected --
11       A.  Yes.
12       Q.  -- it -- it can automatically notify the
13   traveling nurse --
14       A.  Yes.
15       Q.  -- who's wearing this device?
16       A.  Yes.
17       Q.  And then the traveling nurse is expected to go
18   figure out what's going on with the patient?
19       A.  Yes.
20       MR. MCNAUGHT:  Objection; that's an incomplete
21   hypothetical.
22       THE WITNESS:  The alarm indicates that there is
23   a physical problem happening with a patient that is
24   assigned to a nurse.  So if a nurse is using the
25   wearable that makes that indication, it would be part of

1    their scope of duties to check on that patient.
2    BY MR. KONECKY:
3        Q.  Okay.  And what about patient requests?  How are
4    those made?
5        A.  I'm not sure how patient requests are made other
6    than a patient hitting their call button or a sensor to
7    say I need something.
8        Q.  Does -- what's -- is a call button different
9    from a call light?
10       A.  I think they have the same purpose.  I think
11   that in some medical centers in some units, they may
12   have a different way or process by which a patient can
13   request assistance or make a request.
14       Q.  Are there medical -- Kaiser medical centers that
15   patients can push a call button and that then notifies a
16   nurse wearing a device?
17       A.  I believe that is the case.
18       Q.  Okay.  And that applies to travelers as well?
19       A.  If -- if the travelers are issued those devices,
20   yes.
21       Q.  Do you know if travelers are issued those
22   devices?
23       A.  I don't know for certain, but I would assume
24   that there's a high degree of probability that they are.
25       Q.  Why would you assume that?

1    A. I am not sure that I have or have not. I'm
2  literally unsure.
3    Q. I may have asked this question before. If I
4  did, I apologize.
5    Does Kaiser schedule meal periods -- the times
6  for meal periods for the traveling nurses?
7    A. I'm not involved in scheduling, and I'm not
8  aware of how the scheduling of the meal periods occurs.
9    Q. Do you know whether meal periods are ever
10 scheduled?
11   A. I am unsure.
12   Q. I take it the answer would be the same for rest
13 periods?
14   A. Correct.
15   Q. Do you know the practice of floating?
16   A. I'm familiar with the practice of floating.
17   Q. What is it?
18   A. So floating, in the context of nursing, is when
19 a nurse may, during the course of their shift, work in
20 one department or unit, and before the end of the shift,
21 be working in another unit.
22   Q. And what's the reason for floating?
23   A. Generally, the reason for floating is to provide
24 patient care where it's needed.
25   Q. Do you know if float times are scheduled?

1    A. I'm not aware of scheduling.
2    Q. But I mean just as a basic premise to -- to --
3  does floating get scheduled or is that something just
4  happens as the need arises or something else?
5    A. I'm not sure.
6    (Exhibit 12 was marked for identification.)
7  BY MR. KONECKY:
8    Q. Exhibit 12 is Kaiser 001301. Have you seen this
9  document before?
10   A. I have.
11   Q. And what is it?
12   A. This is a document that speaks to floating and
13 attendance at Kaiser. I don't know who the author of
14 this document is. It is not branded either Kaiser or
15 branded AMN.
16   Q. So it's entitled Kaiser Permanente Float and
17 Attendance Attestation. And it says, "Floating per
18 Kaiser's" [sic] -- "Kaiser Permanentes' Collective
19 Bargaining Agreement, managers must float supplemental
20 staff before floating Kaiser Permanente employees. As
21 the first to float, you may be requested to float to
22 light units or to a lower level care unit for a portion
23 of or the entire shift. Although Kaiser Permanent's
24 goal is to limit the amount of floating, it does happen,
25 the frequency of which varies."

1    Is that an accurate statement of Kaiser's policy
2  with respect to floating?
3    A. No.
4    Q. Okay. How is that not?
5    A. First of all, it does not specify which
6  Collective Bargaining Agreement. The collective
7  bargaining agreements are specific to union.
8    Q. Okay. Do you know if -- well, first of all,
9  what does supplemental staff mean?
10   A. We use the word "supplemental staff"
11 interchangeably with contingent staff or temporary
12 staff.
13   Q. And does that include traveling nurses?
14   A. Yes.
15   Q. All right. Are you aware of a policy at Kaiser
16 or some facilities of Kaiser where traveling nurses are
17 among the individuals who are first to float?
18   A. There is no policy at Kaiser that suggests that
19 workers who are not Kaiser's workers would be floating.
20 However, there is a practice relative to the context of
21 the California Nurses Association Collective Bargaining
22 Agreement. The CNA Collective Bargaining Agreement
23 specifies that Kaiser-employed nurses may not float. As
24 such, there is a practice of floating travel nurses when
25 floating is required.

1    Q. Is there a geographic location for the CNA
2  units?
3    A. There is. California Nurses Association
4  presently is -- is -- the Collective Bargaining
5  Agreement extends to all of our northern California
6  hospitals as well as one of our southern California
7  hospitals.
8    Q. Which southern California hospital?
9    A. I believe it's Los Angeles Medical Center.
10 However, I believe that the Los Angeles Medical Center
11 is under a separate Collective Bargaining Agreement with
12 CNA than our northern California hospitals.
13   Q. Do you know whether this practice via the
14 Collective Bargaining Agreement of staff nurses or
15 members of the union not floating applies to both
16 northern California and Los Angeles?
17   A. I know for sure it applies to -- can you restate
18 your question?
19     MR. KONECKY: Can you read it back, please?
20   (Whereupon the previous question was read.)
21     THE WITNESS: I know that for sure it applies to
22 northern California. I'm unsure on Los Angeles.
23 BY MR. KONECKY:
24   Q. And so, in northern California staff nurses
25 just -- they don't float?

1  missed meal or rest period issues?
2      A. I'm not.
3          MR. MCNAUGHT:  Let me just object to the
4  exhibit.  It lacks foundation.  There's no foundation it
5  applies to AMN travelers, and without that foundation,
6  it's beyond the scope of the topics in the PMK Notice.
7  BY MR. KONECKY:
8      Q. Okay.  But does this appear to be a true and
9  correct copy of a justification form for overtime,
10  missed meal and rest periods that's used at Kaiser, even
11  if not for traveling nurses?
12     A. It appears to be.
13     Q. Okay.  And you're familiar with these forms
14  being used at Kaiser?
15     A. Yes.
16     Q. And it's your understanding that completed
17  versions of these forms are stored somewhere at Kaiser?
18     A. Yes.
19     Q. Okay.  And -- but you don't know where?
20     A. I do not.
21         MR. KONECKY:  Okay.  I don't have any more
22  questions.
23         THE REPORTER:  Who all would like a copy?
24         THE WITNESS:  Like at all, you don't have any
25  more questions?

1          MR. KONECKY:  Nope.
2          MR. MCNAUGHT:  I would like a copy.
3          MS. HAMILTON:  I would like your card.
4          MR. KONECKY:  I'll take a copy.
5      (Whereupon proceedings concluded at 4:53 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21         _____
          Signature of Deponent
22
   SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2017.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

1          REPORTER'S CERTIFICATE
2
3
4      I, NICOLE HATLER, a Shorthand Reporter, State of
5  California, do hereby certify:
6      That KRISTEN MUSSMAN, in the foregoing deposition
7  named, was present and by me sworn as a witness in the
8  above-entitled action at the time and place therein
9  specified;
10     That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17     That before completion of the proceedings,
18 review of the transcript [] was [X] was not requested.
19     IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 4th day of November 2017.
21
22 _____
23     NICOLE HATLER, CSR NO. 13730
       State of California
24
25

1              ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg. No. Now Reads   Should Read  Reason
6  ___ ___ _____   _____ _____
7  ___ ___ _____   _____ _____
8  ___ ___ _____   _____ _____
9  ___ ___ _____   _____ _____
10 ___ ___ _____   _____ _____
11 ___ ___ _____   _____ _____
12 ___ ___ _____   _____ _____
13 ___ ___ _____   _____ _____
14 ___ ___ _____   _____ _____
15 ___ ___ _____   _____ _____
16 ___ ___ _____   _____ _____
17 ___ ___ _____   _____ _____
18 ___ ___ _____   _____ _____
19 ___ ___ _____   _____ _____
20 ___ ___ _____   _____ _____
21         _____
          Signature of Deponent
22
   SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2017.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

_____

4                                        )

ROBERT SHAW, ET AL.,                     )

5                                        )

                                         )

6                    Plaintiff,          )

                                         )

7               vs.                      ) CASE NO.

                                         ) 3:16-CV-02816-JCS

8    AMN HEALTHCARE, INC., ET AL.,        )

                                         )

9                    Defendants.         )

_____)

10

11

12

13

14            CONFIDENTIAL DEPOSITION OF

15                 MARLIESE BARTZ

16              SAN DIEGO, CALIFORNIA

17            TUESDAY, NOVEMBER 7, 2017

18

19

20

21

22   REPORTED BY SANDRA NALLEY, CSR NO. 13607

23   JOB NO. 132190

24

25

C330

1              UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

_____

4                                        )

ROBERT SHAW, ET AL.,                     )

5                                        )

                                         )

6                    Plaintiff,          )

                                         )

7              vs.                       ) CASE NO.

                                         ) 3:16-CV-02816-JCS

8  AMN HEALTHCARE, INC., ET AL.,         )

                                         )

9                    Defendants.         )

_____)

10

11

12          CONFIDENTIAL DEPOSITION OF MARLIESE BARTZ,

13  taken at 530 B Street, Suite 350, San Diego, California,

14  November 7, 2017, on Tuesday, at 9:55 a.m., before Sandra

15  Nalley, Certified Shorthand Reporter, CSR No. 13607.

16

17

18

19

20

21

22

23

24

25

1          A P P E A R A N C E S:

2

3   FOR THE PLAINTIFFS:

4           SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS
            BY:  JOSHUA KONECKY, ESQ.

5           2000 Powell Street
            Emeryville, California 94608

6

7

8   FOR THE DEFENDANT AMN HEALTHCARE, INC.:

9           CONSTANGY, BROOKS, SMITH & PROPHETE
            BY:  MATTHEW SCHOLL, ESQ.

10          2029 Century Park East
            Los Angeles, California 90067

11

12

13  FOR MARLIESE BARTZ:

14          SMALL & SCHENA
            BY:  WILLIAM SMALL, ESQ.

15          1350 Columbia Street
            San Diego, California 92101

16

17

18  FOR THE DEFENDANT KAISER PERMANENTE:

19          SEYFARTH SHAW
            BY:  ERIC RUEHE, ESQ.

20          560 Mission Street
            San Francisco, California 94105

21

22

23

24

25

1      A.    Uh-huh.

2      Q.    Anybody else?

3      A.    No.

4      Q.    What did you and Ms. Iversen end up doing

5    specifically with respect to the project?

6      A.    For what?

7      Q.    What were your functions or roles?

8      A.    So we managed the project from a project

9    management perspective.  We organized workshops that

10   would include Kaiser and AMN personnel to help them come

11   to the table together to agree on process improvements.

12     Q.    Do you know why you wanted both Kaiser and AMN

13   to come together?

14     A.    That is a democratic approach to help them

15   have, I guess, better acceptance of a process

16   improvement, if they come together and agree together

17   versus one or the other, because they both have to --

18   they both have pieces of the process.  AMN has pieces and

19   Kaiser has pieces.

20     Q.    So what pieces, to your understanding, does AMN

21   have and what pieces, to your understanding, does Kaiser

22   have?

23     A.    AMN sends clinicians to the sites, collects

24   their timecards, processes their timecards.  Kaiser

25   approves the timecards, signs off on the timecards, and

1  then AMN pays the clinicians and Kaiser pays AMN.

2          That portion of the project was out of scope

3  for me.  I didn't deal with anything beyond the

4  collection of the timecard.

5      Q.   So you didn't deal with the billing side

6  between AMN and Kaiser?

7      A.   None of the payment to the clinicians, none of

8  the billing to Kaiser.  That was all out of scope.

9      Q.   Okay.  But you did gather information regarding

10  the actual process of clinicians filling out timecards?

11     A.   Yes.

12     Q.   And those timecards being collected?

13     A.   Yes.

14     Q.   And how or whether or not they were approved?

15     A.   Yes.

16     Q.   And is it your understanding from that that to

17  have an effective timecard collection and approval

18  process, there needs to be participation from both Kaiser

19  and AMN?

20     A.   Yes.

21     Q.   They're both stakeholders in the process?

22     A.   Yes.

23     Q.   Okay.  So we were kind of going through what

24  you and Ms. -- I'm sorry.  I forget her name --

25  Ms. Iversen were doing, and two things I have written

1  down so far are project management and organizing the

2  workshops.  Anything else?

3      A.  We would hold steering committee meetings with

4  the sponsors of AMN and Kaiser.

5      Q.  How many of those did you hold, approximately?

6      A.  I really couldn't estimate.  They were set for

7  weekly during the project, but we didn't always hold

8  them.

9      Q.  Well, what was the purpose of the steering

10 committee meetings?

11     A.  The intent was to raise issues that the

12 leadership of AMN and Kaiser would need to agree on.

13     Q.  And what were those issues?

14     A.  For instance, if in a workshop the team had

15 decided on a specific improvement, that improvement would

16 have to go up into the steering committee, and the

17 leaders at AMN and Kaiser would need to agree on whether

18 or not they wanted to implement that process ~~implement~~.  improvement

19     Q.  Were there any specific process improvements

20 that you brought up in the steering committee meetings

21 for this purpose?

22     A.  The main one that we were chartered for was to

23 eliminate the paper timecard.  So the majority of

24 recommendations surrounded the elimination of the paper

25 timecard itself.

**C335**

1     A.   It was he.

2     Q.   Oh, sorry.

3     A.   He was a staffing manager.

4     Q.   Do you know who the project manager was?

5     A.   Ashlinn Shope.

6     Q.   Has AMN paid you for all your work on the

7  project?

8     A.   Not all of it yet.

9     Q.   How much so far?

10    A.   How much have they paid me so far?

11    Q.   Yeah.

12    A.   I don't know exactly.  I would say probably

13  85 percent.

14    Q.   All right.  Somewhere around 70,000?

15    A.   Yeah.  I'm not 100 percent sure.

16    Q.   But in that range?

17    A.   Yeah.

18    Q.   Okay.  And is there -- do you know when -- when

19  or if the other 15 percent is going to be paid?

20    A.   I believe it'll be paid in November.

21    Q.   Do you know why in November?

22    A.   Because that's when I billed them for it.

23    Q.   Okay.  Did you conduct any interviews of any

24  employees, whether clinicians or anyone else, as part of

25  this project?

1    A.   Yes.  I spoke with internal people from AMN and

2 Kaiser.  I spoke with third-party providers of AMN.  I

3 spoke with two clinicians, and I believe that's it.

4    Q.   Do you recall which two clinicians you spoke

5 with?

6    A.   I don't recall the names.

7    Q.   They were clinicians placed by AMN at Kaiser

8 facilities?

9    A.   Yes.

10    Q.   Were they nurses?

11    A.   I don't believe they were RNs.  I believe they

12 were maybe sitters or LPNs or something of that nature.

13    Q.   And how did you choose those -- or did you

14 choose those two particular clinicians?

15    A.   AMN gave me the names.

16    Q.   Did you have any role in deciding who to

17 interview?

18    A.   No.

19    Q.   Who specifically at AMN gave you the names?

20    A.   I believe it was someone from the recruiting

21 team.  I don't recall exactly.

22    Q.   Was it John Magistro?

23    A.   Maybe.  I don't know.

24    Q.   Did you work with John Magistro?

25    A.   I may have spoken with him once or twice.

1     A.   I don't.

2     Q.   And do you know when that recommendation was

3  first made?

4     A.   I don't recall exactly.  It -- I believe it was

5  end of summer time frame.

6     Q.   End of summer 2017?

7     A.   (Witness nods head.)

8     Q.   You gotta --

9     A.   Yes.

10     Q.   Okay.

11     A.   Sorry.

12     Q.   That's okay.  Do -- the Objective 1 "Remove

13  OT/Missed Meals Form," do you know when that objective

14  was first presented?

15     A.   I think that came a little earlier, but I don't

16  recall exactly when.

17     Q.   Do you recall if it was presented before or

18  after you started the project?

19     A.   I believe after.

20     Q.   So some time in 2017?

21     A.   Yes.

22     Q.   Okay.  Page 2 of the PowerPoint.  The title is

23  "Situation."  See where I am?

24     A.   (Witness nods head.)

25     Q.   There's a series of bullet points.  The first

C338

1  bullet point says, "Clinician usually has to walk to and

2  from staffing office to check in and out timecard."  What

3  is your understanding of this -- what's said here in this

4  bullet as it pertains to your project?

5       A.   Kaiser was keeping timecards in a central

6  location at their sites, so clinicians would have to go

7  to that central location, check in, write down their

8  time, go to their location, work, come back, and sign

9  back out.

10      Q.   And was this generally the case at all the

11 Kaiser locations?

12      A.   I can't say all.  I didn't interview all, but

13 the ones that we spoke with, yes.

14      Q.   Was there some -- what was the problem, if any,

15 regarding that -- this process that's bulleted here about

16 walking to and from the staffing office to check in and

17 out?

18      A.   It was burdensome for the clinician.  It was

19 also burdensome for Kaiser, I think, to try and manage

20 these clinicians coming in and out manually, you know,

21 sort of tracking.  And, you know, my understanding is

22 sometimes they would have this location far from where

23 the clinicians would have to be working.

24      Q.   How far would the staffing office for checking

25 in and out the timecard be from the location where the

C339

1    clinician had to work?

2         A.   I can't say.  I've never visited a site.

3         Q.   What was your understanding in terms of how far

4    away it has been?

5         A.   My understanding is that sometimes it can be

6    far for the clinicians, so it was out of their way to

7    have to go there before and after their shift.

8         Q.   Any -- I mean, does "far" mean one minute,

9    five minutes, ten minutes --

10        A.   I can't speculate.

11        Q.   -- a half an hour?

12        A.   I just know that it was brought up as a pain

13   point.

14        Q.   Brought up by who?

15        A.   The staffing managers at Kaiser.

16        Q.   And do you know if this -- or did you learn

17   anything or hear anything about how this particular pain

18   point might have an effect on the accuracy of time

19   keeping?

20        A.   I'm not sure I know what you mean.

21        Q.   Well, do you know -- for example, do you have

22   any understanding in terms of when -- at what point

23   during a shift would a clinician need to go to the

24   staffing office to clock in?  Would they need to be

25   there --

1    A.    They were supposed to go in and -- ~~right~~ <sup>write</sup> in,

2  check in, and then go to their location, and then come

3  back after their shift to check out.  That was the

4  process.

5    Q.    So do you know if they went -- do you know if

6  they were supposed to go -- do you know if they were

7  supposed to get to their location where they're working

8  at the start time of their shift?

9    A.    I don't know that specific.  I mean, I would

10  assume that they're supposed to start on time.

11    Q.    So --

12    A.    But I don't know that specific.

13    Q.    Do you have any understanding as to whether or

14  not the clinicians would be going to the staffing office

15  to clock in before the scheduled start time of their

16  shift at their work location?

17    A.    I don't know that for sure.

18    Q.    Do you have any -- even if it's not -- do you

19  have any indication of that in your work one way or the

20  other --

21    A.    That they would be --

22    Q.    -- even if it's not definitive?

23    A.    -- doing what?

24    Q.    That they -- whether or not the clinicians

25  would need to go to the staffing office to check in

C341

1  before the scheduled start time of their shift?

2         MR. RUEHE:  I'm just going to object it's vague

3  and ambiguous and incomplete hypothetical.

4         MR. SMALL:  Asked and answered.

5         THE WITNESS:  What am I supposed --

6  BY MR. KONECKY:

7     Q.   So they're making their record.  You can still

8  answer.

9     A.   I -- I don't know for sure.

10    Q.   So I guess what I'm -- so to sort of pinpoint

11 what I'm -- you say you don't know for sure.  I

12 understand that.  But do you have -- in any of your

13 conversations or interviews or work in the workshops or

14 elsewhere, did you come to learn or hear about -- even if

15 you don't have a definitive understanding, did you hear

16 anything about when clinicians would need to check in at

17 the staffing office in relation to the start time of

18 their shift at the work location?

19        MR. RUEHE:  Same objections.

20        THE WITNESS:  Again, I can assume that they

21 would have to, but I don't know that.

22 BY MR. KONECKY:

23    Q.   You would assume --

24    A.   What they were doing.

25    Q.   You would assume that they would have to what?

1    A.    Check in before they go to their shift.  That's

2  what they're supposed to be doing.  Whether or not they

3  did that and when they did that, I can't speak to.

4    Q.    Okay.  Can you speak at all or do you have any

5  understanding as to what the clinicians would mark down

6  as their start time on the timecards at the staffing

7  office?

8    A.    I don't -- I have never seen a timecard.

9        MR. RUEHE:  Same objections.

10        THE WITNESS:  Or I should say I have never seen

11  a filled out timecard.  Let me clarify that.

12  BY MR. KONECKY:

13    Q.    Sure.  So the second bullet under

14  "Situation" -- first of all, are all these -- you

15  mentioned, I think for the first bullet, that that was

16  referred to as one of the pain points, in the jargon,

17  right?

18    A.    Uh-huh.

19    Q.    You gotta --

20    A.    Yes.

21    Q.    Okay.  Are all five bullets pain points?

22    A.    One and two are.

23        MR. RUEHE:  Sorry.  Is that the first and

24  second bullet?

25        THE WITNESS:  Sorry.  Yes.  First and second

1  clinician for unscheduled overtime if the timecard was

2  not -- if an approved timecard was not sent to AMN?

3            MR. SCHOLL:  Vague and ambiguous.

4            MR. RUEHE:  Vague and ambiguous.

5            MR. SCHOLL:  Incomplete hypothetical.

6            MR. RUEHE:  Yeah.

7            THE WITNESS:  I don't know that part of the

8  process in detail, because that was out of scope for what

9  we were dealing with, but my understanding is that the

10 clinician was paid regardless.

11 BY MR. KONECKY:

12      Q.  Do you know what the clinician would be paid

13 for?

14            MR. SCHOLL:  Incomplete hypothetical.  Vague

15 and ambiguous.

16            THE WITNESS:  I don't.

17 BY MR. KONECKY:

18      Q.  The next bullet says, "Alleviate congested

19 staffing office and unpaid travel time for clinician."

20 See where I am?

21      A.  Yes.

22      Q.  Do you know what that's referring to?

23      A.  I don't -- I don't know what they mean by

24 "unpaid travel time."

25      Q.  Do you know whether it has anything to do with

1  the -- with the travel or walk from the staffing office

2  to the work location and back?

3      A.  I don't know that.

4          MR. RUEHE:  Vague and ambiguous.  Asked and

5  answered.  Lacks foundation.  Witness has already stated

6  she doesn't understand what "unpaid travel time for

7  clinician" means.

8          MR. KONECKY:  What's that Shakespeare play

9  about the lady doth protest too much?  Which one is that?

10         MR. RUEHE:  I don't know.  You have to look it

11  up.

12  BY MR. KONECKY:

13      Q.  All right.  So this unpaid travel time, that

14  is -- you don't recall any conversations --

15      A.  As I said, I wasn't involved in this particular

16  recommendation directly, so I can't speak to its origin

17  or all of its intent.

18      Q.  But I mean, do you have any knowledge of it,

19  even if you can't speak to it -- all of it?

20         MR. RUEHE:  Asked and answered three times.

21         MR. SMALL:  Join.

22         THE WITNESS:  I -- I don't -- I don't know

23  about this piece.

24  BY MR. KONECKY:

25      Q.  All right.  On Page 10 of this PowerPoint, it's

1    Q.    Okay.

2         MR. KONECKY:  They may or may not have been

3    produced.  Do you know?

4         MR. SMALL:  I can tell you that all the

5    PowerPoints were produced.

6         MR. KONECKY:  Okay.

7         MR. SMALL:  So all -- I mean, if "slide" is a

8    PowerPoint, that's my understanding.

9         THE WITNESS:  Yeah.

10   BY MR. KONECKY:

11   Q.    So slide is a PowerPoint.  It just doesn't

12   happen to be these PowerPoints we've gone over so far?

13   A.    Correct.

14   Q.    Got it.  Do you know what the "Kaiser executive

15   Deck CLN Time Entry Round PPTX" documents are?

16   A.    These are also PowerPoints.  They're dated.  I

17   don't know the content specifically.

18   Q.    Okay.  How long was your interview with

19   Ms. Kelly, approximately?

20   A.    I don't recall specifically, but neither one of

21   them would have been more than 30 minutes.

22   Q.    Was there any -- anything in Ms. Kelly's

23   interview that you -- did you regard her as being

24   truthful and accurate or is there anything that you

25   didn't regard her as being truthful and accurate about?

1          MR. RUEHE:  Vague and ambiguous.

2          THE WITNESS:  I didn't make any assumption on

3    that.

4    BY MR. KONECKY:

5        Q.   There's nothing that stuck out as being

6    untruthful or inaccurate to you?

7              MR. RUEHE:  Vague and ambiguous.

8              THE WITNESS:  I wasn't tasked to make those

9    types of assumptions.

10   BY MR. KONECKY:

11       Q.   Okay.  And I understand that, but I'm --

12   understanding that you weren't tasked with it, was there

13   anything that jumped out at you in either Ms. Kelly's

14   interview or Ms. Jennings' interview as being untruthful

15   or exaggerated or suspect?

16             MR. RUEHE:  Same objections.  Asked and

17   answered.

18             THE WITNESS:  I do feel that they were venting

19   a little bit and were going off topic.

20   BY MR. KONECKY:

21       Q.   What were they venting about?

22       A.   They were going off topic about things that I

23   wasn't asking about.

24       Q.   Okay.

25       A.   And so -- but I can't make an assumption

1          I, SANDRA NALLEY, Certified Shorthand Reporter

2     for the State of California, do hereby certify:

3

4     That the witness in the foregoing deposition was by me first

5     duly sworn to testify to the truth, the whole truth and nothing

6     but the truth in the foregoing cause; that the deposition was

7     taken by me in machine shorthand and later transcribed into

8     typewriting, under my direction, and that the foregoing

9     contains a true record of the testimony of the witness.

10

11    Dated:   This 14th day of November, 2017.

12

13

14

15

16

17              _____

                        SANDRA NALLEY

18                      CSR NO. 13607

19

20

21

22

23

24

25

C348

Confidential

ERRATA SHEET

Case Name: ROBERT SHAW ET. AL VS. AMN HEALTHCARE ETAL.

Deposition Date: Nov. 7, 2017

Deponent: MARLIESE BARTZ

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 19 | 18 | IMPLEMENT | "IMPROVEMENT" | TYPO |
| 29 | 9 | AMN | "AMN'S" | CLARIFICATION |
| 49 | 1 | RIGHT IN | "WRITE IN" | GRAMMATICAL ERROR |
| 72 | 5 | THE TEAM'S | "THE PROJECT TEAM'S" — CLARIFICATION |  |
| 75 | 4 | I CAN'T SPEAK TO THAT | DELETE THE DUPLICATE | TYPO-DUPLICATION |
| 78 | 5 | CENTER'S | "CENTERS" | GRAMMATICAL ERROR |
| 87 | 1 | YOUR AMN | "YOUR AMN REP" — CLARIFICATION |  |
| 40 | 22 | WORKSHOP | "STEERING COMMITEE MEETING" — CLARIFICATION; I MIS-SPOKE |  |
| 40 | 23 | SMES | "LEADERSHIP" CLARIFICATION; I MIS-SPOKE |  |
| 41 | 14 | YES | "NO" | CLARIFICATION; UPON REFLECTION AND REVIEW, I WAS NOT PRESENT |
| 55 | 9 | RIGHT, BUT | "I'M NOT SURE WHO PRESENTED THE DOCUMENT." → CLARIFICATION; UPON REFLECTION AND REVIEW, I WASN'T PRESENT WHEN THE DOCUMENT WAS PRESENTED |  |



OFFICIAL SEAL
LORETTA AGNES HERNANDEZ
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 2063095
SAN DIEGO COUNTY
MY COMM. EXP. MAR. 31, 2018

*Marliese Bartz*

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS 23rd DAY OF December, 2017.

*Loretta Agnes Hernandez*

(Notary Public)    MY COMMISSION EXPIRES: march 31st 2018

C349

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT SHAW, SHARON DAVID,                )
JENNIFER CORONA TEITELBAUM,               )
LORENZO HOLMES, AND CANDY                 )
KUCHARSKI, individually and               )
on behalf of all others                   )
similarly situated, and as                )
a proxy of the State of                   )
California on behalf of                    )
aggrieved employees,                       )
                                           )
                                           )
              Plaintiff,                   )
                                           )
                                           )
        vs.                                )     Case No.
                                           )     3:16-cv-02816-JCS
                                           )
                                           )
AMN SERVICES, LLC, KAISER                 )
FOUNDATION HOSPITALS,                      )
SOUTHERN CALIFORNIA                        )
PERMANENTE MEDICAL GROUP,                  )
INC., AND THE PERMANENTE                   )
MEDICAL GROUP, INC.,                       )
                                           )
                                           )
              Defendants.                  )
                                           )
_____)


        DEPOSITION OF DR. ELSIE CROWNINSHIELD, RNP, NE-BC

                 Los Angeles, California

                 Monday, March 19, 2018

                      10:05 a.m.


By:  Brenda H. Roberts, RMR, CRR, CSR No. 13676

Job No. 25691

C350

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3  ROBERT SHAW, SHARON DAVID,      )
    JENNIFER CORONA TEITELBAUM,     )
 4  LORENZO HOLMES, AND CANDY       )
    KUCHARSKI, individually and     )
 5  on behalf of all others         )
    similarly situated, and as      )
 6  a proxy of the State of         )
    California on behalf of         )
 7  aggrieved employees,            )
                                    )
 8                                  )
               Plaintiff,           )
 9                                  )
                                    )
10      vs.                         )      Case No.
                                    )      3:16-cv-02816-JCS
11                                  )
                                    )
12  AMN SERVICES, LLC, KAISER       )
    FOUNDATION HOSPITALS,           )
13  SOUTHERN CALIFORNIA             )
    PERMANENTE MEDICAL GROUP,       )
14  INC., AND THE PERMANENTE        )
    MEDICAL GROUP, INC.,            )
15                                  )
                                    )
16               Defendants.        )
                                    )
17  _____)

18

19          Deposition of DR. ELSIE CROWNINSHIELD, RNP, NE-BC,

20          taken on behalf of the Defendant at Constangy,

21          Brooks, Smith & Prophete, LLC, 2029 Century

22          Park East, Suite 1100, Los Angeles, California,

23          beginning at 10:05 a.m. and ending at 5:05

24          p.m. on Monday, March 19, 2018 before

25          Brenda H. Roberts, CSR.
```

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3        SCHNEIDER, WALLACE, COTTRELL, KONECKY, WOTKYNS

 4             BY:  JOSHUA G. KONECKY, ESQUIRE

 5                  2000 Powell Street

 6                  Suite 1400

 7                  Emeryville, California  94608

 8                  (415) 421-7100

 9                  Jkonecky@schneiderwallace.com

10

11   FOR THE AMN SERVICES:

12        CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

13             BY:  SARAH KROLL-ROSENBAUM, ESQUIRE

14                  2029 Century Park East

15                  Suite 1100

16                  Los Angeles, California  90067

17                  (310) 912-3411

18                  Skroll-rosenbaum@constangy.com

19

20

21

22

23

24

25
```

C352

```
 1   APPEARANCES CONTINUED:

 2   FOR KAISER ENTITIES:

 3            SEYFARTH SHAW

 4                 BY:  CANDACE BERTOLDI, ESQUIRE

 5                      333 South Hope Street

 6                      Suite 3900

 7                      Los Angeles, California  90071-1406

 8                      (213) 270-9689

 9                      Cbertoldi@seyfarth.com

10

11

12   ALSO PRESENT:  Deanna Moore-Ford

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C353

```
 1
 2                        I N D E X
 3
 4   WITNESS                                    PAGE
 5   DR. ELSIE CROWNINSHIELD, RNP, NE-BC
 6        EXAMINATION BY:
 7            MS. SARAH KROLL-ROSENBAUM           6
 8
 9
10                     E X H I B I T S
11
12   EXHIBIT NO.                               PAGE
13   Exhibit 1  Web Page                         23
14   Exhibit 2  Report                           66
15   Exhibit 3  Code of Ethics ANA               93
16   Exhibit 4  Kaiser Permanente Float
17              And Attendance Attestation      124
18   Exhibit 5  Deposition of Kristen Mussman   172
19   Exhibit 6  AMN0002698-2711                 188
20   Exhibit 7  AMN0003349-3364                 188
21   Exhibit 8  Report of Robert Crandall       192
22
23
24
25
```

C354

```
 1   in Pasadena, and I don't recall any others because it
 2   was very short-lived.
 3        Q    Okay.  Have you worked for any other temporary
 4   health care staffing companies besides HRN and Cross
 5   Country?
 6        A    I have not, huh-uh.
 7        Q    Dr. Crowninshield, what is the highest degree
 8   that you hold?
 9        A    I hold a doctorate in nursing practice.
10        Q    And when did you earn that degree?
11        A    2015 is my graduate date, June, uh-huh.
12        Q    And where did you earn your degree from?
13        A    Loma Linda University.
14        Q    And that's a Doctor of Nursing Practice,
15   correct?
16        A    Right.
17        Q    And you're not a medical doctor, correct?
18        A    I am not a medical doctor.
19        Q    Okay.  What other degrees do you hold?
20        A    Well, I mean, I have my Bachelor's degree,
21   Science of Nursing.
22        Q    When did you earn that degree?
23        A    '90 -- I believe it was '96.
24        Q    And where did you earn that degree from?
25        A    University of Maryland.
```

C355

1    Q    And did any of her analysis or conclusions

2    change your opinions that you have expressed in your

3    report?

4    A    I read through her statement.  And although

5    she makes some good points, it doesn't appear that she

6    has any experience in the State of California with

7    the -- with keeping nurses in ratio at all times and

8    that mandate.

9         California rules and laws surrounding these

10   issues at hand are much different.  And we are the only

11   state that has ratios across the United States.  And I'm

12   sure you know that, but it's much different than working

13   in New York or Connecticut or these other parts of the

14   country.

15   Q    Did any of --

16   A    Because I did -- excuse me.  I did work in

17   other parts of the country.  And some of what she wrote

18   in her report matches the practice in other parts of the

19   country.

20   Q    Did any of her analysis or conclusions change

21   the opinions that you expressed in your report?

22   A    No.  No, not with my experience here in this

23   state.

24   Q    Did you employ any particular methodology to

25   reach the opinions that you described in your report?

C356

```
 1        A     No.
 2        MR. KONECKY:  Hang on.  Vague and ambiguous.
 3   BY MS. KROLL-ROSENBAUM:
 4        Q     Did you make any assumptions in order to
 5   conduct your analysis --
 6        A     No.
 7        Q     -- underlying your report?
 8        A     No.
 9        MR. KONECKY:  Asked and answered.
10   BY MS. KROLL-ROSENBAUM:
11        Q     You did not?
12        A     I did not make any assumptions.  I made
13   connections and I noted things that I know from
14   experience will lead to -- you know, it's not a
15   coincidence.  It will -- if you do things a certain way,
16   if you do A, it's going to lead to B.  So that's what I
17   did do.
18        Q     Okay.
19        A     From my experience.  I don't know if that
20   makes sense to you, but --
21        Q     Okay.  I will ask you more specific questions
22   about this later.
23        A     Yes, okay.
24        Q     But I want to ask you generally.
25        A     Sure.
```

C357

1        MR. KONECKY:  Vague and ambiguous.

2        THE WITNESS:  That's the way things are talked --

3    discussed in health care.

4    BY MS. KROLL-ROSENBAUM:

5        Q    Okay.

6        A    That's what we do.

7        Q    So if you're talking about all Kaiser

8    hospitals across all of California, so I'm estimating,

9    what, something north of 70 hospitals --

10       A    Uh-huh.

11       Q    -- across the entire State of California --

12       A    Uh-huh.

13       Q    -- is that a single community in your mind?

14       A    No.

15       Q    Okay.

16       A    Not completely.  Not completely.

17       Q    Okay.

18       A    Although it is a single system.

19       Q    Okay.  But it's not a single community?

20       A    It is not a single community, of course.

21       Q    Okay.  And is there also a community for

22   traveling nurses?

23       MR. KONECKY:  Vague and ambiguous.

24       THE WITNESS:  The way -- from my experience, the --

25   and I believe I noted this in my report as well.  The

C358

1  management and leadership within an organization is

2  basically responsible for those employees just as much

3  as the company that they are contracted with.  So

4  collaboratively they manage.

5  BY MS. KROLL-ROSENBAUM:

6      Q   I'm trying to understand what you mean by the

7  word "community" in this.

8      A   Uh-huh.

9      Q   And because throughout this report you appear

10  to apply a community standard to all of the AMN

11  travelers at Kaiser facilities.  And so I want to ask

12  you whether you believe AMN travelers are part of a

13  single community.

14      MR. KONECKY:  Vague and ambiguous.

15      THE WITNESS:  I have to think about that.  Not for

16  everything.  Not for everything.  Okay?

17  BY MS. KROLL-ROSENBAUM:

18      Q   What do you mean by "standard"?

19      A   Common practice, expected practice.

20      Q   Does someone define the standard?

21      A   Usually it's the hospital system.  But it's

22  also dependent on what regulations are changed, what

23  laws are created.  It's usually compliance and

24  regulatory driven.

25      Q   Okay.  So when you talk about community

C359

1    standards, you're talking about -- please correct me if

2    I'm misreading you, if I'm misunderstanding you.

3         A    Uh-huh.

4         Q    But you're talking about standards established

5    by a hospital system?

6         A    Standards, there's a lot of different

7    standards.  Okay.  There's standards that are hospital

8    system standards.  There are standards that are

9    professional standards.  There's conduct standards.

10   There's compliance standards.  There's regulatory

11   standards.  There's a lot of different standards.  I

12   think for this report --

13        Q    Uh-huh.

14        A    -- if I'm -- I mean, I'm not sure.  Do you

15   want to show me where you're talking about?

16        Q    I'll ask you further questions about this.

17        A    Okay.

18        Q    But I want to understand generally what you

19   mean by "community standards."

20        A    What I mean is, is that -- I told you, I'll go

21   back to my original statement.  If you walk into any

22   hospital within a 25-mile radius, you know, 25-mile

23   radius -- we consider Los Angeles is very big, so you

24   wouldn't take a 50-mile radius, right?  You would take a

25   smaller radius.  Any community hospital within 25 miles,

C360

 1   what are they doing?

 2        Q    Okay.

 3        A    That's the standard.  That's what I refer to

 4   as the community standard.

 5        Q    Okay.

 6        A    And that's very common in health care to ask,

 7   you know, certain other hospitals, "What do you do in

 8   this case?"  And I'm not talking about for care of

 9   patients.

10        Q    So then would you agree that that's very

11   locality specific?

12        MR. KONECKY:  Objection.  Overbroad.  Vague and

13   ambiguous.  Argumentative.

14        THE WITNESS:  For certain things.  For certain

15   things.

16   BY MS. KROLL-ROSENBAUM:

17        Q    So would I be able to find a written standard

18   that describes the community standards that you're

19   referring to in this report?

20        A    You could on some of them maybe.  Maybe.

21        Q    Okay.  And we'll get into more specifics.  In

22   your opinion, is compliance with community standards

23   necessary to comply with the law?

24        MR. KONECKY:  Vague and ambiguous.  Overbroad.

25        THE WITNESS:  All right.  Can you say that one

C361

1    the moment.

2        A    Okay.  So what I was getting to here is that

3    when someone doesn't have to float, they come into their

4    unit, they work their shift, they receive their

5    handoffs, and -- oh, wait.  I'm going to go back, okay?

6    Because I want to go back.

7             In the reports, there were multiple reports

8    that documented in their statements that they floated to

9    shifts outside of their unit and more than once a shift.

10   That practice will lead to increased handoffs.

11       Q    Okay.  So I just want to be clear so that we

12   are on the same page.

13       A    Okay.

14       Q    Are you expressing an opinion in your report

15   about the practice of floating?  In other words, the

16   practice of one nurse being floated to another unit for

17   the entirety of the shift?

18       MR. KONECKY:  Vague and ambiguous.  Compound.

19   BY MS. KROLL-ROSENBAUM:

20       Q    Let me clarify.  I want to distinguish between

21   whether your concern is about nurses being floated to

22   multiple units during the shift or whether it's about

23   floating at all.

24       A    It's not about just floating at all.

25       Q    Okay.  So is it the case that when you express

C362

```
 1      Q     Okay.

 2      A     -- which would contribute to the increased

 3   number of patients.  And this is really what I'm

 4   referring to.

 5      Q     So there's -- is it fair to say that there's

 6   the potential that floating during a shift could result

 7   in more patients, but it's not necessarily the case?

 8      A     That's right.

 9      Q     Okay.  There are circumstances where floating

10   doesn't necessarily mean you're going to end up -- a

11   nurse is going to end up with more patients, correct?

12      A     Correct.

13      Q     Okay.

14      A     Floating doesn't equal more patients.

15      Q     Okay.  And --

16      A     Automatically.

17      Q     Automatically.  And --

18      A     But the likelihood is very high if you're

19   floating to more than one place on a given 8- or 12-hour

20   shift.

21      Q     Okay.  And, again, just to be clear, you're

22   talking about instances of multiple -- multiple

23   instances of floating within a shift; is that correct?

24      MR. KONECKY:  Vague and ambiguous.  Misstates the

25   testimony.  Potentially misstates the testimony given
```

C363

1      Q     Why is that the case?

2      A     Because they don't have time unless there's --

3 unless there's a system that's set up. And there was no

4 processes that I saw that were set up that has a break

5 relief nurse, you know, built into a system -- into the

6 Kaiser system.

7      Q     Did you -- first of all, do you have any

8 knowledge one way or the other about whether the nurse

9 is provided a meal penalty or rest penalty if she's

10 required to miss her meal and rest break when she

11 floats?

12      A     From AMN?

13      Q     Yes.

14      A     Do I have evidence did you say?

15      Q     Correct.

16      A     I have only the documents that I reviewed --

17      Q     Okay.

18      A     -- where it states that they didn't, uh-huh.

19      Q     But are you aware actually of whether they

20 received any meal or rest penalties when they were -- if

21 they were required to miss a meal or rest break because

22 of floating?

23      A     I did not see any records from AMN with, you

24 know, documentation that they paid their nurses for the

25 meals, missed meals or breaks.

C364

1  Q What evidence are you aware of regarding the

2 frequency of floating to multiple units during a shift?

3  A Only from the statements.

4  Q And so do you recall any of the statements

5 going into any specifics about how frequently they

6 floated to multiple units?

7  A Yes, there were quite a few statements that

8 said that they had to float within the same shift

9 multiple times.  I remember reading that.

10  Q And did you review that -- do you believe that

11 that occurs sufficiently frequently that you can draw a

12 generalization for all AMN nurses working Kaiser

13 assignments in California?

14  MR. KONECKY:  Vague and ambiguous.

15  THE WITNESS:  I can say confidently that the

16 frequency of the occurrence was pretty common among the

17 documents and statements from the people that I read.

18 Okay.  That's what I can say.

19 BY MS. KROLL-ROSENBAUM:

20  Q But you're not aware of any statistical

21 evidence showing the frequency of floating to multiple

22 units; is that correct?

23  A I did not see any documents that shows exactly

24 the number of times floating, no.

25  Q Okay.  Okay.  In the second paragraph of the

C365

1   system, an electronic, so they capture every minute that

2   a person is working on or off the clock.

3        Q    And I want to understand whether -- I want to

4   be clear.

5        A    Yes.

6        Q    Do you believe that manual handwritten

7   timekeeping systems are outdated for temporary traveling

8   nurses as distinct from nurses, as permanent nurses at

9   hospitals?

10        A    No, I don't think it's distinct.

11        Q    You don't think it's distinct?

12        A    It's an outdated process for all nursing

13   staff.

14        Q    Okay.  When you talk about --

15        A    The professional staff.  Excuse me.

16        Q    When you talk about the standard, is there a

17   written standard that you're referring to?

18        A    I don't believe there's a law or a written

19   standard anywhere that says that you actually have to.

20   Although from my experiences, it's led to inaccurate pay

21   practices.

22        Q    And when you say in your experience it's led

23   to inaccurate pay, did Glendale and Northridge have

24   electronic timekeeping for the entire time you were

25   working there?

```
 1        A    Yes.  Yes.

 2        Q    Have you had experience in the last 20 years

 3   with the use of paper time cards?

 4        A    Yes.

 5        Q    Where was that experience?

 6        A    Oh, Glendale Adventist.

 7        Q    Glendale Adventist in the '90's?

 8        A    Yes.

 9        Q    Before --

10        A    Yes.

11        Q    So since you started at -- in 2001 I believe

12   was when you started your position at Dignity Health.

13        A    Uh-huh.

14        Q    Did you have any experience while you were at

15   Dignity Health with paper time cards?

16        A    We had some paper processes, yes.

17        Q    And were there -- they were paper time cards?

18        A    They were paper and we converted to

19   timekeeping.

20        Q    Okay.

21        A    Electronic.

22        Q    And was that also true for temporary nurses

23   with assignments?

24        A    Yes.

25        Q    Okay.  And so, to your knowledge, there's no
```

C367

1      Q    So if someone did not decide to report time on

2   their time card, wouldn't we have to ask them

3   individually why they didn't report it?

4         MR. KONECKY:  Incomplete hypothetical.

5             You can go ahead.

6         THE WITNESS:  Yes.  Actually, a process that could

7   be put in place that would avoid that is having the

8   employee sign a declaration at the end of the two-week

9   pay period if that's what hospital -- the hospitals are,

10   is on a bi-weekly system.  They could avoid that by

11   having them sign a declaration that their time card is

12   accurate and complete.

13   BY MS. KROLL-ROSENBAUM:

14      Q    So can I refer you back to Exhibit 7?

15      A    Sure.

16      Q    Which is this document.

17      A    Oh, I'm sorry.  I thought you meant Exhibit 7

18   on this.

19      Q    I apologize.  Exhibit 7 in our deposition.

20      A    Yes.

21      Q    So this is the AMN time card, okay?

22      A    Uh-huh, yes.

23      Q    And at the bottom under "Weekly total," just

24   on the first page you can see, it says,

25             "I affirm that the time recorded above is

C368

 1          accurate and all required approvals have been

 2          obtained."

 3          Do you see that?

 4      A   Yes.

 5      Q   Is that the kind of affirmation that you're

 6   talking about?

 7      A   It is.

 8      Q   Okay.

 9      A   But I didn't see that on all of the time cards

10   I reviewed.

11      Q   No?

12      A   No, I'm saying I didn't see.  It's not that I

13   didn't see that statement.  It's that did I see -- like

14   this is a handful of accurate time cards.  The ones I

15   reviewed were not accurate.

16      Q   Okay.  But you would have not reviewed all of

17   the time cards --

18      A   No.

19      Q   -- for all AMN traveling nurses.

20      A   I have not.

21      Q   Okay.  Okay.  Just to be clear.  Okay.

22          What I'm trying to understand is if you can

23   tell us how we can know why some nurses report time

24   beyond the end of their shifts sometimes but not all the

25   time.

C369

1      Q     Okay.  I'm asking you if, to understand,

2   whether the reason someone didn't get overtime beyond

3   the end of their shift was because the nurse thought it

4   was too cumbersome, we would have to go check with the

5   nurse.  Do you agree with that?

6      A     Yes.

7      Q     And if they didn't get overtime because they

8   couldn't track down a manager, that's something we would

9   have to go talk to the nurse about.  Do you agree with

10   that?

11        MR. KONECKY:  Objection.  Vague and ambiguous.

12   Incomplete hypothetical.

13        THE WITNESS:  Yes.

14        MR. KONECKY:  Okay.  If we are at a good breaking

15   time.

16        MS. KROLL-ROSENBAUM:  Go ahead and pick up.

17        THE WITNESS:  Oh, good.  Let's take a break.

18            (A break was taken.)

19   BY MS. KROLL-ROSENBAUM:

20      Q     Before we go on, I have one follow-up question

21   about timekeeping.

22      A     Okay.  Uh-huh.

23      Q     Are you aware of whether AMN temporary nurses

24   working at Kaiser have Kaiser employee ID numbers?

25      A     I do not know.

C370

1   would have to look back at the reports, but I do

2   remember that AMN had stated that they don't have

3   anybody onsite, which they don't typically have a

4   representative onsite, to resolve problems immediately.

5       Q   How do you know that AMN does not have a

6   representative onsite?

7       A   Because I think they stated it in the report.

8       Q   And why is it necessary for AMN to have a

9   representative onsite?

10      A   I didn't say it was.

11      Q   Okay.

12      A   I did not say it was.  That's what -- I want

13   to make sure I'm clear.  I didn't say that was the

14   standard.

15      Q   Okay.

16      A   That's not.

17      Q   So is it not the standard?

18      A   It's the standard though that they collaborate

19   and work together with the facilities.  So from my

20   experience we were responsible together for the

21   employees.  That's to resolve their issues.

22      Q   When you were at Dignity Health?

23      A   Yes.  And, I mean, we worked with -- I told

24   you, we have worked with travel companies forever.  I

25   mean -- and I don't even know exactly which contracts we

C371

 1   had when I left.

 2        Q    Okay.  Okay.  I just want to make sure I'm

 3   being clear.  You are not suggesting that it is

 4   necessary that there be onsite -- an onsite

 5   representative from AMN at the hospitals; is that

 6   correct?

 7        A    I am not recommending that, no.

 8        Q    Okay.

 9        A    And I would not say that that's -- that's not

10   typical.

11        Q    Okay.  In the next section of your report you

12   say,

13             "Based on" -- this the altering time card

14             section, first paragraph --

15             "Based on my years of experience with pay

16             practices for nursing, the minimum standard

17             practice in the community for nursing units

18             is to pay the nurse what is recorded on the

19             time card and not to alter the time card in

20             any way absent written consent from the

21             nurse."

22             Do you see that?

23        A    Right, that's right.

24        Q    What minimum standard are you talking about?

25        A    That was our -- that was payroll, just general

C372

```
 1                      CERTIFICATION

 2                          OF

 3              CERTIFIED SHORTHAND REPORTER

 4

 5           I, Brenda H. Roberts, a Certified Shorthand

 6     Reporter of the State of California do hereby certify:

 7           That the foregoing proceedings were taken

 8     before me at the time and place herein set forth; that

 9     any witnesses in the foregoing proceedings, prior to

10     testifying, were placed under oath; that a verbatim

11     record of the proceedings was made by me using machine

12     shorthand which was thereafter transcribed under my

13     direction; further, that the foregoing is an accurate

14     transcription thereof?

15           I further certify that I am neither

16     financially interested in the action nor a relative or

17     employee of any attorney of any of the parties?

18           IN WITNESS WHEREOF, I have this date

19     subscribed my name   _____  .

20

21                      Brenda H. Roberts, RMR, CRR, CLR

22     Dated:  March 23rd, 2018.

23     Certification Number:  CSR 13676

24

25
```

C373



# AMN Healthcare Timecard - KFH/Hospital

Fax #: 888-667-7101  Pay Cycle: WEEKLY

Name: Cindy Frey
Facility: SAN DIEGO MEDICAL CENTER
Per Diem?: ☐ Yes ☐ No
Code:

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift ms worked at request of F-Facility HP-Hosp/Comm Pool? | Regular | O.T./HOL (Kaiser Use Only) |
|------|------|------|------|------|------|------|------|
| 10/7/13 | 15:00 | 30 | 23:30 | 0175 | | 8 | |
| 10/8/13 | 15:00 | 30 | 23:30 | 0175 | | 8 | |
| 10/9/13 | 15:00 | 30 | 00:00 | 0175 | | 8 | 1 / 30 |
| 10/10/13 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 |
| 10/11/13 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 / .50 |
| WEEKLY TOTAL | | | | | | 40 | .50 |

Agency: American Mobile
Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature: Cindy G Frey    Dated:

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS
Facility Authorization:
Title: SCHEDULING/PAYROLL    Contact #: 619-528-6279
Facility: KAISER SAN DIEGO    Dated: 10/14/13

Documentation of all hours worked (timecard) must be received by 6:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

Thank you for printing neatly and within the boxes.

DEPOSITION EXHIBIT

Draft

AMN0003349

**C374**



# AMN Healthcare Timecard - KFH/Hospital

Fax #: 888-667-7101

Name: Cindy Frey

Facility: SAN DIEGO MEDICAL CENTER

Pay Cycle: WEEKLY

Per Diem? ☐ Yes ☐ No    Meal Period (mins)

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Code: |
|------|------|------|------|------|------|
| 11/18 | 15:00 | 30 | 23:30 | 0175/0201 | 8-1 |
| 11/19 | 15:00 | 30 | 23:45 | 0102 | 8-1 |
| 11/20 | 15:00 | 30 | 23:30 | 0203/0175 | 8-1 |
| 11/21 | 15:00 | 30 | 23:30 | 0175 (Poster/ PACU) | 8-1 |
| 11/22 | 15:00 | 30 | 23:30 | 0175/5W | 8-1 |

WEEKLY TOTAL: 40 - .75

Shift not worked at request of: F=Facility P=Healthcare Prof

Agency: _____

Primary GL Code: _____

Comments: _____

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature: _____

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Date: 11/18

Print Name: CARLOS SALAS

Title: SCHEDULING/PAYROLL

Facility/ Authorization: KAISER SAN DIEGO

Documentation of all hours worked (timecard) must be received by 6:00 pm PT Monday after the end of the pay period.

Please do not sign in and out at the same time.

AMN0003355

C375

# AMN Healthcare Timecard - KFH/Hospital

Thank you for printing neatly and within the boxes.

Fax #: 888-667-7101

Pay Cycle: WEEKLY

Name: Candy Finn

Per Diem?: ☐ Yes ☑ No   Facility: SAN DIEGO MEDICAL CENTER

Code:

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift not worked or no report at Facility (Indicate Reason/Dept) | WEEKLY TOTAL | Regular | Kaiser Use Only OT/HOLIDAY |
|------|------|------|------|------|------|------|------|------|
| 12/2 | 15:00 | 30 | 23:30 | 0175 | | | 8 | |
| 12/3 | 15:00 | 30 | 23:30 | 0175 | | | 8 | |
| 12/4 | 15:00 | 30 | 23:30 | 0175 | | | 8 | |
| 12/6 | 15:00 | 30 | 23:55 | 0103 | | | 8 | .25 |
| 12/7 | 15:00 | 30 | 23:30 | 0103 | | | 8 | |
| | | | | | WEEKLY TOTAL | | 40 | .42 |

Agency: American Mobile

Primary GL Code: _____

Comments: _____

Please do not sign in and out at the same time.

I affirm that the time recorded above is accurate and that all required approvals have been obtained.

Dated: 12/2/3   Healthcare Professional's Signature: Candy Finn

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS   Title: SCHEDULING/PAYROLL   Contact #: _____

Facility/Authorization: KAISER SAN DIEGO   Dated: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Received DEC 09 2013 by Carlos

AMN0003357

C376

Thank you for printing neatly and within the boxes.

# AMN Healthcare Timecard - KFH/Hospital

Name: Candy Fry
Per Diem?: ☐ Yes ☒ No
Facility: SAN DIEGO MEDICAL CENTER
Fax #: 888-667-7101
Pay Cycle: WEEKLY

Code:

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center / Department | Shift not worked at request of: F=Facility HH=Healthcare Prof | Regular | O.T. (Daily) | Holiday |
|------|------|------|------|------|------|------|------|------|
| 12/16 | 15:00 | 30 | 23:50 | 0102 | | 8 | 1 | |
| 12/17 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 | |
| 12/18 | 15:00 | 30 | 23:30 | 0175 | | 8 | 1 | |
| 12/20 | 15:00 | 30 | 23:30 | Post-P 0302 | | 8 | 1 | 20 |
| 12/21 | 15:00 | 30 | 23:30 | 0175 | | 4 | 1 | |
| | | | | 0201 | | 4 | 1 | |
| WEEKLY TOTAL | | | | | | 40 | | 33 |

Agency: American Mobile

Please do not sign in and out at the same time.

Primary GL Code:

Comments:

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Dated: 12/10    Healthcare Professional's Signature: Candy Fry

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Print Name: CARLOS SALAS    Title: SCHEDULING/PAYROLL    Contact #: 

Facility/Authorization: KAISER SAN DIEGO    Date: 

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Received
DEC 23 2013
by Carlos

AMN0003360

C377

# AMN Healthcare Timecard - KFH/Hospital

Name: Candy Frug

Per Diem?: ☐ Yes ☒ No   Facility: SAN DIEGO MEDICAL CENTER

Code:   Fax #: 888-667-7101

Pay Cycle: WEEKLY

**#Revised 12/23/13**

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/Department | | Regular | OT/HOL | Kaiser Use Only OT/HOL |
|---|---|---|---|---|---|---|---|---|
| 12 22 | 15:00 | 30 | 23:30 | 0201 | | 8:00 | | |
| 12 23 | 15:00 | 30 | 23:45 Revised or Approved by | 0175 | | 8:00 | | .25 |
| 12 24 | 15:00 | 30 | 23:30 | 0106 | | 8:00 | 4:00 | |
| 12 26 | 15:00 | 30 | 23:30 | 0175 | | 4:00 | 4:00 | |
| 12 27 | 15:00 | 30 | 23:30 | 0201 | | 4:00 | 4:00 | |
| | | | | post op | | | | |
| | | | | 0175 | | | | |
| | | | | | WEEKLY TOTAL | 40.00 | | .25 |

Agency: American Mobile

Primary GL Code:

I affirm that the time recorded above is accurate and all rendered approvals have been obtained.

Candy Frug
Healthcare Professional's Signature

The undersigned certifies that he or she is an authorized representative of the client company and that he/she above record of time worked by the named employee is correct. *Payroll cannot process timecards without an authorized signature.

Dated: 12/22   Tiffany Greller
Staff Name:   Title: SCHEDULING/PAYROLL   Contact #: 619-528-6279

Facility: KAISER SAN DIEGO

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Comments:

Thank you for printing neatly and within the boxes.

Please do not sign in and out at the same time.

AMN0003364

C378

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

ROBERT SHAW, et al.,            )
individually and on behalf of )
all others similarly situated,)
and as a proxy of the State of)
California on behalf of        )
aggrieved employees,           )
                               )
          Plaintiffs,          )Case No: 3:16-CV-02816-JCS
               vs.             )
                               )
AMN SERVICES, LLC, KAISER      )
FOUNDATION HOSPITALS, SOUTHERN)
CALIFORNIA PERMANENTE MEDICAL )
GROUP, INC., and THE           )
PERMANENTE MEDICAL GROUP, INC.)
                               )
          Defendants.          )
_____)

DEPOSITION OF BOBBIE ANN JENNINGS

DATE:            THURSDAY, MARCH 8, 2018

TIME:            10:02 A.M.

LOCATION:        CONSTANGY BROOKS SMITH PROPHETE
                 351 Californiq Street, Suite 200
                 San Francisco, California

REPORTED BY:     MARY JACKSON, CSR 8688

JOB:             26096

```
 1                A P P E A R A N C E S

 2    For the Plaintiffs:

 3                 NATHAN PILLER, ESQUIRE
                   SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS
 4                 2000 Powell Street, Suite 1400
                   Emeryville, California 94608
 5                 415.421.7100
                   npiller@schneiderwallace.com
 6

 7    For the Defendant AMN Services, LLC:

 8                 PHILLIP SMITH, ESQUIRE
                   CONSTANGY BROOKS SMITH PROPHETE
 9                 351 California Street, Suite 200
                   San Francisco, California 94104
10                 415.918.3004
                   psmith@constangy.com
11

12    For the Defendants Kaiser Foundation Hospitals, Southern
      California Permanente Medical Group, Inc., and The
13    Permanente Medical Group, Inc.:

14                 ERIC G. RUEHE, ESQUIRE
                   SEYFARTH SHAW
15                 560 Mission Street, Suite 3100
                   San Francisco, California 94105
16                 415.544.1078
                   eruehe@seyfarth.com
17

18

19

20

21

22

23

24

25
```

C380

1      Q.   Do you recall the name of the recruiter?

2      A.   I think it was at that time -- I think it was

3  Betsy at that time.

4      Q.   Do you recall Betsy's last name?

5      A.   I don't.

6      Q.   Do you recall the name of the nurse liaison

7  that you spoke to?

8      A.   I don't.

9      Q.   And what did you tell Betsy?

10     A.   As far as I remember, I remember saying about

11  not getting breaks and not -- the time cards not wanting

12  to be signed.

13     Q.   Anything else?

14     A.   Not that I remember.

15     Q.   How about the nurse liaison, do you recall

16  what you told her?

17     A.   Same thing.

18     Q.   Were you ever disciplined for reporting that

19  you had worked any overtime?

20          MR. PILLER:  Objection; vague.

21          Go ahead.

22          THE WITNESS:  Not disciplined, but lectured,

23  maybe, or spoken to.

24  BY MR. SMITH:

25     Q.   And when was that?

C381

1  Sacramento, do you recall an assistant manager lecturing

2  you there?

3      A.  Yes, maybe -- yeah, I remember that.

4      Q.  Was it an in-person conversation?

5      A.  I don't recall.

6      Q.  Do you -- do you recall whether anyone else

7  was present when you had that conversation?

8      A.  I don't remember that either.

9      Q.  Are you aware of whether any traveling nurse

10  has ever been disciplined for working overtime?

11          MR. PILLER:  Objection; calls for speculation,

12  overbroad, vague as to time.

13          Go ahead.

14          THE WITNESS:  No.

15  BY MR. SMITH:

16      Q.  Are you aware of any traveling nurse being

17  disciplined for recording overtime on their time sheet?

18          MR. PILLER:  Same objections.

19          THE WITNESS:  I remember them being told the

20  same thing I was told.

21  BY MR. SMITH:

22      Q.  Do you recall the names of any of the

23  traveling nurses who you claim were told the same thing

24  you were told?

25      A.  No.

C382

1    Q.    Anything else that he said to you?

2    A.    I can't remember.

3    Q.    Okay.  Was anyone else present when you had

4  that conversation with him?

5    A.    No.

6    Q.    Was that conversation in person?

7    A.    Yes.

8    Q.    How many times did you have that conversation

9  with him?

10    A.    Once.

11    Q.    Have you ever seen a written policy which

12  specifically stated that you would not be paid for any

13  overtime that you worked?

14    A.    No.

15    Q.    Do you recall there ever being a time where

16  you did not get approval to work overtime prior to

17  working the overtime but were still paid for the

18  overtime you worked?

19    A.    No, I don't believe so.

20    Q.    I want to ask this question broadly as to all

21  of your assignments with Kaiser.

22           Were you ever disciplined at any location for

23  working overtime?

24           MR. PILLER:  Objection; vague and ambiguous.

25           Go ahead.

C383

```
 1            THE WITNESS:  Just Stephanie, if you want to
 2   call it discipline, yeah.
 3   BY MR. SMITH:
 4       Q.   And what did Stephanie do that you felt was
 5   disciplinary for working overtime?
 6       A.   Refused to sign it.
 7       Q.   Anything else?
 8       A.   Just the way she talked to me about it, said
 9   that she was not going to sign it, I been there all day,
10   I should have let her know, which I didn't get
11   overtime -- I mean, that I didn't get -- you know, I
12   didn't get a lunch break.
13       Q.   And this conversation that you're describing,
14   do you recall Stephanie saying anything else to you that
15   you felt was disciplinary?
16       A.   I think that was about it.
17       Q.   Is there anything else you haven't already
18   told me about that you felt Stephanie did that was
19   disciplinary towards you for working overtime?
20       A.   I believe that was the one occasion.
21       Q.   And that one occasion, was that a conversation
22   in person?
23       A.   Yes.
24       Q.   And was anyone else present?
25       A.   I don't believe so.
```

C384

1        Q.   Do you know whether any other traveling nurse

2   has ever been disciplined for working overtime?

3        A.   Not in particular, no.

4        Q.   Do you know if any other traveling nurse has

5   been disciplined because they recorded that they had

6   worked overtime on their time sheet?

7             MR. PILLER:  Objection; calls for speculation.

8             You can answer.

9             THE WITNESS:  Hearsay, but I don't know

10   anybody particular.

11   BY MR. SMITH:

12        Q.   Have you heard that from others?

13        A.   I've heard that nurses were gotten rid of

14   because of the overtime.

15        Q.   Do you recall who told you that?

16        A.   No.  I just heard it from the staff, Kaiser

17   staff, and some travelers.

18        Q.   Do you know the names of any of the nurses

19   that were alleged to have been removed from working

20   overtime?

21        A.   No, I don't know who they were.

22        Q.   And you don't recall the names of anyone who

23   told you that?

24        A.   No, because it was just said generally over --

25   yeah.

C385

1   told that you needed to get a manager's signature when

2   you reported this to AMN, do you recall any other

3   responses that AMN gave you when you reported that you

4   had worked overtime and had not been paid for it?

5       A.   From payroll?

6       Q.   Yes.

7       A.   No, except for to get a signature.  And a lot

8   of times I didn't get a signature because I was afraid

9   to get one because I know that they discourage us from

10  getting overtime.  And I didn't want to lose my job, so

11  I just -- a lot of times I just didn't say anything.

12      Q.   Let me ask this question then very broadly.

13           Did anyone -- strike that.

14           Let me ask you as to all the locations you

15  worked at for Kaiser.

16           Did anyone ever specifically communicate to

17  you that you would be fired if you tried to get a

18  signature approving overtime that you had recorded on a

19  time card?

20      A.   Not those particular words, no.

21      Q.   Other than your fear that you would lose your

22  job, was there any other reason why you were, to use

23  your word, afraid to get a manager's signature to

24  approve overtime you had recorded on a time card?

25           MR. PILLER:  Objection; asked and answered

C386

1   STATE OF CALIFORNIA            )

2   COUNTY OF SAN JOAQUIN          )

3          I, MARY JACKSON, hereby certify that the

4   witness in the foregoing deposition was by me duly sworn

5   to testify to the truth, the whole truth, and nothing

6   but the truth in the within-entitled cause; that said

7   deposition was taken at the time and place therein

8   stated; that the testimony of said witness was reported

9   by me, a Certified Shorthand Reporter and disinterested

10  person, and was thereafter transcribed into typewriting,

11  and that the pertinent provisions of the applicable code

12  or rules of civil procedure relating to the notification

13  of the witness and counsel for the parties hereto of the

14  availability of the original transcript of the

15  deposition for reading, correcting and signing have been

16  met.

17         And I further certify that I am not of counsel

18  or attorney for either or any of the parties to said

19  deposition, nor in any way interested in the outcome of

20  the cause named in said action.

21         DATED:  March 14th, 2018.

22

23                 _Mary Jackson_

24         MARY JACKSON, CSR NO. 8688

25

C387

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--------------------------

ROBERT SHAW, SHARON DAVIS
JENNIFER CORONA TEITELBAUM,
LORENZO HOLMES AND CANDY
KUCHARSKI, Individually and
on behalf of all similarly
situated and as a proxy of
the State of California
on behalf of aggrieved
employees,

    Plaintiffs,

vs.                                    Case No.: 3:16-cv-02816-JCS

AMN SERVICES, LLC, KAISER
FOUNDATION HOSPITALS,
SOUTHERN CALIFORNIA
PERMANENTE MEDICAL GROUP,
INC., AND THE PERMANENTE
MEDICAL GROUP, INC.,

    Defendants.
--------------------------


TELEPHONIC AND VIDEO CONFERENCE DEPOSITION OF

CELENA PARKS

March 9, 2018; 1:15 p.m.

Best Western

909 N. Spence Avenue

Goldsboro, North Carolina


Reported by:  Audra M. Smith, RPR, FCRR

Job: 26050

C388

```
 1              APPEARANCES OF COUNSEL

 2   ON BEHALF OF THE PLAINTIFFS:

 3   SCHNEIDER, WALLACE, COTTRELL, KONECKY, WOTKYNS, LLP
     BY:  NATHAN PILLER, ESQUIRE
 4   2000 Powell Street, Suite 1400
     Emeryville, California 94608
 5   Phone:  (415) 421-7100
     npiller@schneiderwallace.com
 6
     ON BEHALF OF DEFENDANTS AMN SERVICES, LLP:
 7
     CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
 8   BY:  MATTHEW SCHOLL, ESQUIRE
     2029 Century Park East, Suite 1100
 9   Los Angeles, California 90067
     Phone:  (310) 909-7775
10   mscholl@constangy.com

11
     ON BEHALF OF DEFENDANT KAISER FOUNDATION HOSPITALS AND THE
12   PERMANENTE MEDICAL GROUP, INC.:

13   SEYFARTH SHAW, LLP
     BY:  ERIC G. RUEHE, ESQUIRE
14   560 Mission Street, 31st Floor
     San Francisco, California 94105
15   Phone:  (415) 544-1001
     eruehe@seyfarth.com
16

17

18

19

20

21

22

23

24

25
```

C389

```
 1                    I N D E X

 2                     * * * * *

 3   CELENA PARKS                                 PAGE

 4        Examination by Mr. Scholl                 4

 5        Examination by Mr. Ruehe                 85

 6

 7                  E X H I B I T S

 8   NUMBER              DESCRIPTION           PAGE

 9   Exhibit 1           Declaration             12

10   Exhibit 2           Time Card 3/2 - 3/7/15   63

11   Exhibit 3           Earnings statement 3/1-3/7/15   64

12   Exhibit 4           Time Card 3/9 - 3/14/15  65

13   Exhibit 5           Earnings statement 3/8-3/14/15   67

14   Exhibit 6           Time card 3/15-3/20/15   68

15   Exhibit 7           Earnings statement 3/15-3/21/15  70

16   Exhibit 8           Time card 3/23-3/28/15   71

17   Exhibit 9           Earnings statement 3/22-3/28   74

18   Exhibit 10          Time card 4/7/15-4/11/15   76

19   Exhibit 11          Earnings statement 4/5-4/11/15   77

20

21

22

23

24

25
```

C390

1  shift?

2         MR. PILLER:  Objection.  Vague.  You can

3     answer.

4         A.   I would record the time.

5  BY MR. SCHOLL:

6         Q.   Okay.  And do you know how the timecards

7  were submitted to AMN?

8         A.   They were faxed by the nurse staff office.

9         Q.   Did you attend a meeting or a huddle at

10  the beginning of your shifts?

11         A.   I -- I would have a huddle, but not the

12  typical huddle because I came in on the middle

13  portion of a shift.  But I would meet with either

14  the charge nurse or the shift supervisor to get my

15  assignment.

16         Q.   Okay.  And what do you mean by a typical

17  huddle?

18         A.   Like, at the end of my shift, I would have

19  to wait.  The staff nurses that were employed by

20  Kaiser had a huddle, so we typically had to wait to

21  give them report, so they were in huddle.

22         Q.   Okay.  And when you say "we had to wait

23  for the huddle," who are you referring to?

24         A.   Just the current nurses waiting to give

25  report at change of shift.

C391

```
 1        Q.    So a total of 15 to 20 minutes?  Or 15 to
 2   20 minutes for each patient?
 3        A.    I would say 15 to 20 minutes each patient.
 4        Q.    What time would your incoming handoff at
 5   the ICU typically end?
 6        A.    Could you repeat the question?
 7        Q.    Yeah.  So what time would the handoff
 8   typically end?  I understand your shift would begin
 9   at 7:00 p.m.  You would attend a huddle or a brief
10   meeting, and then the handoff would occur.  What
11   time did the handoff typically end?
12        A.    I need to just clarify.  So the huddle was
13   when I was going to be floated to another unit.  The
14   times that I did work in ICU, the assignment was on
15   aboard, so you just looked at the board and went
16   and got your assignment.  So the huddles were when I
17   was going to be floated to another unit.
18        Q.    Okay.
19        A.    And --
20        Q.    So the --
21        A.    Go ahead.  Sorry.
22        Q.    No.  You can finish.  My apologies.
23        A.    So the answer to your question about when
24   it would end, on the occasion that I did stay in
25   ICU, I could get report -- normally finish by 7:30,
```

1    7:35, 7:40.  Around there.

2         Q.   Okay.  So, to clarify, you did not need to

3    attend a huddle or a meeting if you were not being

4    floated outside of the ICU unit, correct?

5         A.   Right.

6              MR. PILLER:  Objection to the extent it

7         misstates testimony but go ahead.

8              THE WITNESS:  Oh, sorry.

9    BY MR. SCHOLL:

10        Q.   Okay.  When you worked or floated to the

11   med-surg unit, how many patients would you typically

12   have handed off to you there?

13        A.   Typically five.  I have had six, but

14   typically five.

15        Q.   And how long did it take, on average, per

16   patient?

17        A.   That would be hard for me to give you an

18   estimation because sometimes you didn't have just

19   one nurse to give report or get report from.  It

20   could be multiple nurses, you know.  Might be two,

21   three.  I've had occasion where it was five

22   different ones.  So, to be honest, that would be a

23   hard estimation.

24        Q.   You don't have a sense of how long it

25   would take to hand off each patient?

C393

```
 1        A.    Two out of the three shifts a week.
 2        Q.    And how many patients would you need to
 3   hand off to the incoming nurses?
 4        A.    Five, sometimes six.
 5        Q.    And how long would it take you to hand off
 6   those patients to the incoming nurses --
 7        A.    45 --
 8        Q.    -- on average?
 9        A.    Oh, I didn't hear you.  45 to 50 minutes.
10        Q.    Did it ever take less than 45 to 50
11   minutes?
12        A.    I don't recall it taking less time.
13        Q.    Did it ever take longer than 45 to 50
14   minutes?
15        A.    Occasionally.  But usually about 45 to 50
16   minutes.
17        Q.    Okay.  So when you ended your shift in the
18   med-surg unit, what time did you typically end your
19   shift?
20             MR. PILLER:  Objection.  Vague.
21        A.    Can you rephrase the question?
22   BY MR. SCHOLL:
23        Q.    Yes.  When you worked in the med-surg
24   unit, at the end of your shift, what time would you
25   typically end your shift?
```

C394

1   recorded on the timecard?

2        A.   That equals 10 minutes.

3        Q.   The .25 hours?

4        A.   I'm not sure because, you know --

5             MR. PILLER:   I'll just object to this line

6        of questioning.   The document speaks for

7        itself.

8             THE WITNESS:   Can I take a break?

9             MR. SCHOLL:   How long do you need?

10            THE WITNESS:   Just to run to the bathroom.

11            MR. SCHOLL:   Yeah, absolutely.   We can

12       take a break.   Off the record.

13            (A recess was taken from 3:08 p.m. to

14       3:11 p.m.)

15  BY MR. SCHOLL:

16        Q.   Back on the record.

17             I'd like to enter as Exhibit 8 the

18  timecard Bates stamped AMN 0020138.

19             (EXHIBIT NUMBER 8

20             WAS MARKED.)

21  BY MR. SCHOLL:

22        Q.   Does this appear to be a timecard from the

23  week -- at least covering the dates March 23 to

24  March 28?

25        A.   Okay.

C395

```
 1        Q.   Did you record any overtime on this time
 2   sheet?
 3        A.   No.
 4        Q.   Okay.  What time did you say that your
 5   shifts typically end?
 6        A.   Anywhere between 7:45, 7:50.
 7        Q.   Okay.  What time did you say that your
 8   shifts -- your scheduled shifts were supposed to
 9   end?
10        A.   7:30.
11        Q.   Okay.  Did you record 7:30 as your out
12   time for both of the shifts recorded on this sheet?
13        A.   No.
14        Q.   What did you record for your out time
15   then, if not 7:30?
16        A.   8:00.
17        Q.   And 8:00 was past the end of your
18   scheduled shift; is that correct?
19        A.   Yes.
20        Q.   Okay.  And how much past the end of your
21   scheduled shift, how much time difference is it
22   between 7:30 and 8:00?
23        A.   30 minutes.
24        Q.   Did you record having missed any meal
25   breaks on here, on this time sheet?
```

C396

1      A.   I wrote it in the comments.

2      Q.   Okay.  And what did you write in the

3   comments?

4      A.   "3/24:  Late leaving due to late report to

5   five different RNs.  Missed 15-minute meal --

6   15-minute break.  3/28:  Missed 15-minute break."

7      Q.   And to be clear, the 15-minute breaks were

8   the rest breaks?

9      A.   The rest breaks.

10      Q.   Not the 30-minute meal breaks?

11      A.   The rest breaks.  That's what I -- I just

12   read what I wrote there.

13      Q.   Okay.  So did you record having missed any

14   meal periods on this timecard?

15      A.   No.

16      Q.   The overtime that you wrote on 3/24 where

17   you recorded you're out time at 8:00 instead of 7:30,

18   was that time approved?

19          MR. PILLER:  Objection, to the extent it

20      calls for speculation.

21          But you can answer.

22      A.   I don't see a signature there.

23   BY MR. SCHOLL:

24      Q.   Do you recognize the writing towards the

25   bottom where it says, "Print Name"?  Is that your

 1   writing?

 2        A.   No.

 3        Q.   Do you know whose writing that is?

 4        A.   No.

 5        Q.   And Exhibit 9, AMN 0020145.

 6             (EXHIBIT NUMBER 9

 7             WAS MARKED.)

 8   BY MR. SCHOLL:

 9        Q.   Does this earnings statement appear to

10   correspond with the time sheet that we just reviewed

11   in Exhibit 8?

12        A.   It does.

13        Q.   And how many hours were you paid for on

14   this time sheet -- or this earnings statement?

15        A.   24.5.

16        Q.   Okay.  And how many hours did you record

17   on the timecard in Exhibit 8?

18             MR. PILLER:  Objection.  Asked and

19        answered.  Documents speak for themselves.

20        Continuing objection to this line of

21        questioning.

22             THE WITNESS:  Do I answer?  I didn't

23        record --

24             MR. PILLER:  You can answer.

25        A.   I didn't record any time on the time

C398

```
 1    sheet.
 2    BY MR. SCHOLL:
 3        Q.    You didn't record any time on the time
 4    sheet?
 5        A.    There's nothing on the time sheet in the
 6    times.  There's nothing recorded there.
 7        Q.    What do you mean there's nothing recorded?
 8    So there's a date that says 3/4, correct?
 9        A.    Right.  But I didn't put a total for the
10    hours.  There's no total, weekly total, listed.
11        Q.    Ah, I understand what you mean, the hours
12    were not totaled up on the time sheet?
13        A.    Right.
14        Q.    It just has your start time and end time
15    that you wrote down, correct?
16        A.    Yes, sir.
17        Q.    Okay.  Can you tell from looking down
18    at -- looking at that time sheet, how many hours
19    would appear in that column if you were to total the
20    difference between the start and end time that you
21    recorded?
22        A.    24.5.
23        Q.    Back to the earnings statement at Exhibit
24    9, were you paid for the .5 hours of overtime that
25    you recorded on the time sheet?
```

C399

1           MR. PILLER:  Same objection.  Go ahead.

2        A.   I was paid, yes.

3     BY MR. SCHOLL:

4        Q.   And can you tell, from looking at this

5     earnings statement, whether you were compensated in

6     any way for the two missed rest periods -- the two

7     missed 15-minute breaks that you recorded on the

8     timecard?

9        A.   Yes.

10       Q.   Okay.  And how can you tell that you were

11    compensated for those?

12       A.   It says California rest period.

13       Q.   Okay.  And you received two California

14    rest periods?

15       A.   It's got a total of two hours.

16       Q.   Okay.  To be clear, does the hours -- let

17    me look at this.  Let's move on.  Exhibit 10, AMN

18    0020140.

19            (EXHIBIT NUMBER 10

20            WAS MARKED.)

21    BY MR. SCHOLL:

22       Q.   Does this appear to be a timecard for

23    Kaiser-Walnut Creek from the dates ranging from

24    April 7, 2015, to April 11, 2015?

25       A.   Yes.

C400

1      Q.   Did you record any overtime on this

2   timecard?

3      A.   15 minutes.  I left at 7:45.

4      Q.   And that was on April 7?

5      A.   Yes.

6      Q.   Did you record having missed any meal

7   periods on this timecard?

8      A.   I wrote in the comments, "Did not receive

9   any breaks.  No lunch break."

10      Q.   Okay.  And then I'd like to enter, as

11   Exhibit 11, AMN 0020147.

12           (EXHIBIT NUMBER 11

13           WAS MARKED.)

14   BY MR. SCHOLL:

15      Q.   Does this earnings statement appear to

16   correspond with the same pay period or workweek from

17   the time sheet we just received as Exhibit 10?

18      A.   Yes.

19      Q.   Were you paid for any overtime on this

20   time sheet?

21      A.   .25.

22      Q.   Okay.  And does that .25 in overtime

23   correspond with the .25 that you recorded on the

24   time sheet?

25      A.   Yes.

```
 1    signatures from the assistant nurse managers.  Just

 2    as I was -- just as I was changing shifts or

 3    handoff, they were also in handoff with the next

 4    assistant manager coming on.  So a lot of times when

 5    you were done with your handoff, those managers were

 6    already gone, and the oncoming assistant manager

 7    would refuse to sign.

 8         Q.   Would they tell you why they would refuse

 9    to sign?

10         A.   Because it didn't happen on their shift.

11         Q.   Again, looking at Exhibit 8, did you

12    record overtime on this time sheet?

13              MR. PILLER:  Objection.  Asked and

14         answered.  Document speaks for itself.

15              THE WITNESS:  Do I go ahead and answer?

16              THE COURT REPORTER:  She asked if she can

17         go ahead and answer.

18              MR. PILLER:  You can answer.  I think this

19         line is getting pretty repetitive, but you can

20         go ahead and answer.

21         A.   I think I stated before, I didn't total

22    any hours for overtime, but I stayed over 30 minutes

23    on 3/24.

24    BY MR. SCHOLL:

25         Q.   As we discussed, you were paid for that
```

C402

```
 1   time despite not receiving a signature, correct?

 2        A.   Yes.

 3             MR. PILLER:  Same objection.  Asked and

 4        answered.  It's getting kind of harassing.

 5   BY MR. SCHOLL:

 6        Q.   Are you familiar with any policies or

 7   practices pertaining to recording time at Kaiser

 8   facilities besides Kaiser at Walnut Creek?

 9        A.   No.

10        Q.   Are you familiar with any policies or

11   procedures pertaining to taking meal breaks at any

12   facilities other than Kaiser-Walnut Creek?

13        A.   No.

14        Q.   Are you familiar with any policies or

15   procedures pertaining to meal breaks at units at

16   Walnut Creek besides the three units that you worked

17   in?

18        A.   I'm not sure about that question

19   because -- other units?  Can you rephrase?

20        Q.   Yes.  At Kaiser-Walnut Creek, were there

21   units that you did not work in, ever?

22        A.   Yes.

23        Q.   Are you familiar with the meal breaks

24   policies and practices in those units that you did

25   not work in?
```

C403

1        A.    No, I'm not familiar with those.

2        Q.    Okay.  Are you familiar with rest break

3    policies at any Kaiser -- aside from Kaiser-Walnut

4    Creek?

5        A.    No.

6        Q.    Are you familiar with the rest break

7    policies and practices at any of the units at

8    Kaiser-Walnut Creek beside, again, the units that

9    you worked in?

10        A.    No.

11        Q.    Are you aware of any means with which you

12    could have contacted AMN to discuss any issues that

13    you had regarding overtime or meal or rest breaks?

14        A.    Repeat that?

15        Q.    Yeah.  During your assignment at

16    Kaiser-Walnut Creek, were you aware of any way that

17    you could communicate with AMN regarding the

18    overtime approval issues that you've referenced and

19    discussed?

20        A.    Yes.

21        Q.    And how could you contact AMN?

22        A.    By phone.  Or they had an online chat

23    person you could talk to, but pretty much it was by

24    phone.

25        Q.    And by phone, who at AMN would you call?

C404

```
 1        A.   I would call my recruiter.  And I spoke to
 2   the liaison between Kaiser and AMN as well.
 3        Q.   What is the name of your recruiter?
 4        A.   Her name was Kristin Jennings.
 5        Q.   Do you know the name of the what you
 6   described as the liaison between AMN and Kaiser that
 7   you spoke with?
 8        A.   No.
 9        Q.   Okay.  And did you contact your recruiter
10   regarding your alleged issues of getting approval
11   for overtime?
12        A.   Yes.
13        Q.   And what did she tell you?
14        A.   Overtime would not be paid unless I had a
15   signature.
16        Q.   Did you ever contact her regarding your
17   meal -- alleged meal or rest break issues?
18        A.   Yes.
19        Q.   And what did she tell you?
20        A.   Again, I needed to obtain a signature for
21   overtime to be paid.
22        Q.   Are you aware of an AMN customer support
23   line you can call with any questions or issues?
24        A.   I thought that was the liaison.  But --
25        Q.   Are you aware of any AMN traveler ever
```

C405

1  being disciplined for reporting overtime on his or

2  her time sheet that wasn't approved?

3          MR. PILLER:  Objection.  Vague and

4      ambiguous.  Calls for speculation.

5          Go ahead.

6      A.   No, I'm not aware of anybody.

7  BY MR. SCHOLL:

8      Q.   Okay.  Were you ever disciplined for

9  having reported overtime on any of your time sheets?

10          MR. PILLER:  Objection.  Vague and

11      ambiguous.

12          Go ahead.

13      A.   No.

14          MR. SCHOLL:  Okay.  I don't think I have

15      anything else.  Eric, do you have anything?

16          MR. RUEHE:  Can we take about a 10-minute

17      break or do we -- does the witness need to get

18      some food?  I only have about maybe a half hour

19      to an hour.  So maybe instead of taking a lunch

20      break, we'll just take a short break right now

21      so everybody can go to the bathroom and then we

22      can wrap this up pretty quickly.

23          THE WITNESS:  I'm fine.  I don't need to

24      get anything to eat or use the bathroom.

25          MR. RUEHE:  Let's just take a 10-minute

1    STATE OF NORTH CAROLINA )

2    COUNTY OF FORSYTH        )

3                    REPORTER'S CERTIFICATE

4                        I, Audra Smith, Registered Professional

5    Reporter in and for the above county and state, do hereby

6    certify that the deposition of the person hereinbefore named

7    was taken before me at the time and place hereinbefore set

8    forth; that the witness was by me first duly sworn to testify

9    to the truth, the whole truth and nothing but the truth; that

10   thereupon the foregoing questions were asked and the

11   foregoing answers made by the witness which were duly

12   recorded by me by means of stenotype; which is reduced to

13   written form under my direction and supervision, and that

14   this is, to the best of my knowledge and belief, a true and

15   correct transcript.

16                        I further certify that I am neither of

17   counsel to either party nor interested in the events of this

18   case.

19                        IN WITNESS WHEREOF, I have hereto set my

20   hand this 13th day of March 2018.

21   Audra Smith

22

23

24
        Audra Smith, RPR, FCRR
25   Notary Number:  201329000033

C407

EXHIBIT
Park 8
3/9/15

AMN0020138

# AMN Healthcare Timecard

**Name:** Nelona M Park RN

**Facility:** Kaiser - Walnut Creek

**Fax #:** 888-667-7101

**Pay Cycle:** WEEKLY

Thank you for printing neatly and within the boxes.



| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | | Cost Center |
|------|---------------|--------------------|----------------|---|-------------|
| 3/23 | | | | | |
| 3/24 | 19:00 | 30 | 08:00 | | Cmu 35 |
| 3/28 | 19:00 | 30 | 07:30 | | 35 |

Please do not sign in and out at the same time.

**Agency:** Medical Express

**Required Field

**Primary GL Code:**

**Comments:**
3/24- Date leaving due to
late report + 5 unpaid min
- missed 15 min break
3/28- missed 15 min break

WEEKLY TOTAL

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Healthcare Professional's Signature: Nelona m Park, RN    Dated: 3/30

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Signed timecards or timesheets attest an authorizing signature.

Print Name: _____  Title: _____  Dated: _____

Facility Authorization: _____

Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.

Draft


**medical express**
an AMN Healthcare Company

CO    FILE #    PID    000000-000000
PCSXG9 000550152 3837623

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Taxable Marital Status: Single

Exemptions/Allowances  Add'l
Fed: 00
CA: 00

# Earnings Statement

| | |
|---|---|
| Period Beginning: | 03/22/2015 |
| Period Ending: | 03/28/2015 |
| Advice Date: | 04/03/2015 |
| Advice Number: | 0002502910 |
| Batch Number: | 000000003416 |

**CELENA PARKS**

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 45.5000 | 24.50 | 1114.75 | 5628.63 |
| OT Premium | 22.7500 | 8.00 | 182.00 | 705.25 |
| DT Premium | 45.5000 | 0.50 | 22.75 | 34.13 |
| Lodg PDN | | | 506.31 | 1952.91 |
| M&I PerDiemN | | | 245.00 | 945.00 |
| CA Rest Peri | 45.5000 | 2.00 | 91.00 | 91.00 |
| NT Travel | | | 0.00 | 300.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Vision | 1.90 | 1.90 |
| | | |
| Total Additional | 1.90 | 1.90 |
| *Excluded from Taxable Wages | | |
| Net Pay | 1695.73 | 7429.63 |

## Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXXXXX1987 | 1,695.73 |
| Net Check | | | 0.00 |

## Customer Name          Facility
Kaiser - Walnut Creek Medical Cente  405118

## Other Balances

| | | | |
|---|---|---|---|
| Gross Pay | | 2161.81 | 9656.92 |

## Tax Deductions

| Fed Withholdng | 260.20 | 1252.35 |
|---|---|---|
| Fed MED/EE | 20.43 | 93.63 |
| Fed OASDI/EE | 87.33 | 400.34 |
| CA Withholdng | 83.55 | 420.96 |
| CA OASDI/EE | 12.67 | 58.11 |
| Total Tax Deductions: | 464.18 | 2225.39 |

Federal Taxable Wages are    $1,408.60

**Message**

2002 Automatic Data Processing (PCSUV2)


**medical express**
an AMN Healthcare Company

**AMN Services, LLC**
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002502910

Advice Date:    04/03/2015

Deposited to the account of          Account Number  Transit-ABA       Amount
CELENA PARKS              Checking                              1695.73

THIS IS NOT A CHECK

## NON-NEGOTIABLE

EXHIBIT 9
Parks
3/9/18

AMN0020145

**C409**



AMN Health__re Timecard

**Name:** Celena m Parks
**Facility:** Kaiser – Walnut creek

Fax #: 888-667-7101
Pay Cycle: WEEKLY

Thank you for printing neatly and within the boxes.

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center / Unit (Hospital Use Only) | | | | | | | | WEEKLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/7/15 | 19:00 | 30 | 07:45 | 30, 35 | | | | | | | | |
| 4/8 | 19:00 | 30 | 07:30 | ICU | | | | | | | | |
| 4/11 | 19:00 | 30 | 07:30 | | | | | | | | | |

Please do not sign in and out at the same time.

**Agency:** medical Express

*Required Field
**Required Field

**Primary GL Code:**

**Comments:** 4/11: did not receive any break
(if lunch breaks)

I affirm that the time recorded above is accurate and all required approvals have been obtained.

HealthCare Professional's Signature: Celena m Parks, RN

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecard's without an authorized signature.

Dated 4/11/15

Print Name: _____ Title: _____

Facility/ Authorization _____ Dated: _____

Contact #: _____

**Documentation of all hours worked (timecard) must be received by 5:00 pm PT Monday after the end of the pay period.**

2015-04-11 18:05 ICUA

>> 925295483↑

P 1/1

AMN0020140

EXHIBIT
Part 10
3/2/16

C410



CO    FILE #  PID   000000-000000
PCSXG9 000550152 3837623

**medical express**
at AMN Healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA 92130

Taxable Marital Status: Single

Exemptions/Allowances  Add'l
  Fed: 00
  CA:  00

# Earnings Statement

Page 001 of 001
Period Beginning: 04/05/2015
Period Ending:  04/11/2015
Advice Date:    04/17/2015
Advice Number:  0002512732
Batch Number:  000000003428

**CELENA PARKS**

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 45.5000 | 24.25 | 1103.38 | 7824.01 |
| OT Premium | 22.7500 | 8.00 | 182.00 | 1069.25 |
| DT Premium | 45.5000 | 0.25 | 11.38 | 45.51 |
| Lodg PDN | | | 506.31 | 2965.53 |
| CA Lunch Pen | 45.5000 | 1.00 | 45.50 | 45.50 |
| M&I PerDiemN | | | 245.00 | 1435.00 |
| NT Travel | | | 0.00 | 300.00 |
| Ins Reimb | | | 0.00 | 147.60 |
| CA Rest Peri | | | 0.00 | 91.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| *Vision | 1.90 | 5.70 |
| M&I ADJ NT | 81.67 | 163.34 |
| Lodging Adj NT | 168.77 | 337.54 |
| | | |
| Total Additional | 252.34 | 506.58 |
| *Excluded from Taxable Wages | | |
| Net Pay | 1406.92 | 10288.07 |

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXXXXX1987 | 1,406.92 |
| Net Check | | | 0.00 |

**Customer Name**    **Facility**
Kaiser - Walnut Creek Medical Cente  405118

**Other Balances**

| Gross Pay | | 2093.57 | 13923.40 |
|---|---|---|---|

### Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 243.14 | 1758.47 |
| Fed MED/EE | 19.44 | 133.65 |
| Fed OASDI/EE | 83.10 | 571.46 |
| CA Withholdng | 76.57 | 582.22 |
| CA OASDI/EE | 12.06 | 82.95 |
| | | |
| Total Tax Deductions: | 434.31 | 3128.75 |

Federal Taxable Wages are    $1,340.36
**Message**

2002 Automatic Data Processing (PCSUVC)

---

**medical express**
at AMN healthcare company

AMN Services, LLC
(800) 282-0300
12400 High Bluff Drive
San Diego, CA  92130

Advice Number:  0002512732

Advice Date:    04/17/2015

THIS IS NOT A CHECK

**Deposited to the account of**    **Account Number**  **Transit-ABA**  **Amount**
CELENA PARKS    Checking    1406.92

**NON-NEGOTIABLE**



AMN0020147

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Civil Action No. 3:16-cv-02816-JCS

_____

VIDEOCONFERENCE DEPOSITION OF:  KIMBERLY SAMPIM
                                 March 9, 2018

_____

ROBERT SHAW, et al.,

Plaintiffs,

vs.

AMN SERVICES, LLC, et al.,

Defendants.

_____



          PURSUANT TO SUBPOENA, the

videoconference deposition of KIMBERLY SAMPIM was

taken on behalf of the Defendants at 1900 Grant

Street, Suite 1025, Denver, Colorado 80203, on

March 9, 2018, at 1:13 p.m., before Connie S. Dyke,

Certified Realtime Reporter, Registered Merit

Reporter, Registered Professional Reporter, and Notary

Public within Colorado.


Job: 25989

```
 1              A P P E A R A N C E S

 2    For the Plaintiffs:

 3              JOSHUA C. KONECKY, ESQ.
               Schneider Wallace Cottrell Konecky Wotkyns
 4              2000 Powell Street
               Suite 1400
 5              Emeryville, California 94608

 6
      For the Defendant AMN Services, LLC:
 7
               FABIAN A. RUIZ, ESQ.
 8              Constancy, Brooks, Smith & Prophete, L.L.P.
               1801 Northeast 123rd Street
 9              Suite 314
               Miami, Florida 33181
10              (Appeared via videoconference)

11
      For the Defendant Kaiser Foundation Hospitals:
12
               PRITEE K. THAKARSEY, Esq.
13              Seyfarth Shaw, L.L.P.
               560 Mission Street
14              Suite 3100
               San Francisco, California 94105
15              (Appeared via telephone)

16

17

18

19

20

21

22

23

24

25
```

C413

1    timecards.  I'm only asking about the ones that have

2    been introduced at this deposition as an exhibit.

3    Okay?  You can respond when you're ready.")

4           Q.   (BY MR. RUIZ)  Did you include all of

5    your meal periods in these time records?

6           A.   Yes.

7           Q.   Would you agree that they're all written

8    in on the box that's marked "meal period (minutes)"?

9           A.   Yes.

10          Q.   Thank you very much.  You mentioned

11   before you typically take your meal breaks on site; is

12   that correct?

13          A.   Yes.

14          Q.   Did you ever leave the facility for any

15   reason during a meal period?

16          A.   Not Los Angeles.  It's downtown.

17          Q.   Did you know whether or not you were

18   allowed to leave the facility during a meal period?

19          A.   No.  I wouldn't have thought to ask.

20          Q.   So you had no idea whether or not you

21   were permitted to leave during a meal break; is that

22   correct?

23          A.   To leave the hospital, no.

24          Q.   Okay.  Did you ever hear of any AMN

25   travelers being disciplined for leaving the facility

1    during a meal period?

2         A.   No.  But, remember, I work night shift.

3    This is a large hospital in downtown LA.  I generally

4    would stay to my area.

5         Q.   Okay.  Do you remember taking rest

6    breaks during your time with AMN?

7         A.   No, I don't remember taking rest breaks.

8         Q.   You don't remember taking any rest

9    breaks during your shifts?

10        A.   No.  I didn't know that we were allowed

11   rest breaks, and they were not provided.  So nobody

12   came up to me and said am I ready to take my rest

13   break.

14        Q.   Can you just refer back to the first

15   exhibit, which is your Declaration?

16        A.   Which page?

17        Q.   Page 4, paragraph 21.  Can you just read

18   that for me, please?

19        A.   I'm sorry.  Which paragraph?

20        Q.   21.

21        A.   21?

22        Q.   Yes.

23        A.   21 says, "Likewise, I often was not

24   authorized or permitted to take rest breaks of at

25   least ten minutes by the end of every fourth hour of

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF COLORADO          )
                                 )  ss.
 3    DOUGLAS COUNTY             )

 4
               I, CONNIE S. DYKE, Certified Realtime
 5    Reporter, Registered Merit Reporter, Registered
      Professional Reporter, and Notary Public ID
 6    20024020937, State of Colorado, do hereby certify that
      previous to the commencement of the examination, the
 7    said KIMBERLY SAMPIM was duly sworn or affirmed by me
      to testify to the truth in relation to the matters in
 8    controversy between the parties hereto; that the said
      deposition was taken in machine shorthand by me at the
 9    time and place aforesaid and was thereafter reduced to
      typewritten form; that the foregoing is a true
10    transcript of the questions asked, testimony given,
      and proceedings had.
11
               I further certify that I am not employed
12    by, related to, nor of counsel for any of the parties
      herein, nor otherwise interested in the outcome of
13    this litigation.

14
               IN WITNESS WHEREOF, I have affixed my
15    signature this 14th day of March, 2018.

16

17            Connie S. Dyke
              Certified Realtime Reporter
18

19            My commission expires July 1, 2018.

20

21    __X__ Reading and Signing was requested.

22    _____ Reading and Signing was waived.

23    _____ Reading and Signing is not required.

24

25
```

C416

1              UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4                      --o0o--

5

6   ROBERT SHAW, ET AL.,          )
                                  )
7               Plaintiff,        )
                                  )
8          vs.                    ) 3:16-CV-02816-JCS
                                  )
9   AMN HEALTHCARE, INC., ET AL., )
                                  )
10              Defendants.       )
    _____ )
11

12

13

14

15                DEPOSITION OF

16                 OLIVIA NAVA

17     _____
                 March 13, 2018
18

19

20

21

22

23

24  REPORTED BY: BRANDON D. COMBS, RPR, CSR 12978

25  JOB NO: 138631

1                    INDEX

2                                              Page

3   Examination by MR. SMITH                    6

4   Examination by MR. RUEHE                   131

5

6               --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C418**

1                         EXHIBITS

2

3    Number                 Description                Page

4

5    Exhibit 1    Declaration of Olivia Nava              16

6

7    Exhibit 2    Professional Services Agreement         19

8

9    Exhibit 3    Time Card, 7/21                        101

10

11   Exhibit 4    Earnings Statement, 7/20              103

12

13   Exhibit 5    Time Card, 8/11                        106

14

15   Exhibit 6    Earnings Statement, 8/10              107

16

17   Exhibit 7    Time Card, Sep 8                       108

18

19   Exhibit 8    Earnings Statement, 9/7               110

20

21   Exhibit 9    Time Card, Jul 6                       111

22

23   Exhibit 10   Earnings Statement, 7/5               114

24

25

C419

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4                      --o0o--

 5

 6   ROBERT SHAW, ET AL.,            )
                                     )
 7                 Plaintiff,        )
                                     )
 8            vs.                    )  3:16-CV-02816-JCS
         -CV-02816-JCS              )
 9                                   )
     AMN HEALTHCARE, INC., ET AL.,   )
10                                   )
                   Defendants.       )
11   _____ )

12

13                      --o0o--

14         BE IT REMEMBERED THAT on Tuesday,

15   March 13, 2018, commencing at 1:04 P.M. thereof, at

16   351 California Street, Second Floor, San Francisco,

17   California, before me, BRANDON D. COMBS, a Certified

18   Shorthand Reporter, personally appeared

19                    OLIVIA NAVA,

20   called as a witness by the Defendants being first

21   duly sworn, testified as follows:

22                      --o0o--

23

24

25
```

1

2    CONSTANGY BROOKS SMITH & PROPHETE

3    351 California Street

4    San Francisco, CA 94104

5    PHILIP SMITH, ESQ.

6    appeared as counsel on behalf of the Defendant

7    AMN Healthcare, Inc.

8

9    SCHNEIDER WALLACE COTTRELL KONECKY & WOTKYNS

10   2000 Powell Street

11   Emeryville, CA 94608

12   NATHAN PILLER, ESQ.

13   appeared as counsel on behalf of the Plaintiffs.

14

15

16   SEYFARTH SHAW

17   560 Mission Street

18   San Francisco, CA 94105

19   ERIC RUEHE, ESQ.

20   appeared as counsel on behalf of the Defendant

21   Kaiser Permanente.

22

23                        --o0o--

24

25

**C421**

1     Q.  Did you believe that you could not leave

2  the hospital during your meal break when you were at

3  San Francisco?

4     A.  It's way too dangerous to leave.  You

5  won't get back in 30 minutes.

6     Q.  And so let me ask you this:  Did anyone

7  ever specifically communicate to you that you could

8  not leave the hospital during your meal break at

9  San Francisco?

10     A.  No.

11     Q.  Did anyone ever specifically communicate

12  to you that you could not leave the hospital during

13  your meal break at any of the Kaiser locations you

14  worked at?

15     A.  No.

16     Q.  Ms. Nava, during your Kaiser employments,

17  were you ever disciplined because of something that

18  happened in the hospital due to you not being

19  present because you were on a break?

20        MR. PILLER:  Objection, vague.

21        Go ahead.

22        THE WITNESS:  I don't recall.

23  BY MR. SMITH:

24     Q.  Ms. Nava, do you have any knowledge

25  whether any other traveling nurse was disciplined

C422

1  because of something that occurred due to them not

2  being present at work because they were on a break?

3      A.  Yes.

4      Q.  And what knowledge do you have about that?

5      A.  Another traveler had something come up

6  with her patient, and when she came back from break,

7  there was finger-pointing and it was pointed at her.

8      Q.  And do you recall the nurse who had

9  something come up, who was the nurse?

10     A.  She was a traveler at Redwood City.

11     Q.  Do you recall her name?

12     A.  I don't.

13     Q.  And do you recall what it was that had

14 happened to her patient while she was on break?

15     A.  There was some issue with the patient's

16 level of consciousness.

17     Q.  When you say there was finger-pointing

18 when the nurse returned from break, do you know if

19 the nurse was disciplined?

20     A.  I do not.

21     Q.  Did you yourself take any action with

22 regard to that nurse because she was on break when

23 something happened to her patient?

24     A.  I was not involved in that.  I only knew

25 of it peripherally.

C423

BY MR. SMITH:

    Q.   Ms. Nava, is there any reason that you

feel that you can't continue with your deposition

right now?

    A.   No.

            MR. SMITH:   Next document I want to

introduce as an exhibit appears to be one of

Ms. Nava's timecards from San Francisco.

            (Whereupon, Exhibit 3 was marked for

            identification.)

BY MR. SMITH:

    Q.   Okay.   Ms. Nava, have you seen this

document before?

    A.   Yes.

    Q.   And let me ask you, there are handwritten

portions for the entries for each date.

            Is this your handwriting?

    A.   Yes.

    Q.   Let me draw your attention to the entry,

second entry for looks like it's Tuesday, 7/22/14,

and if you go to the right side of that entry,

appears to be time entered in the columns for

OT1/HOL.

            Do you see that?

    A.   Yes.

1    Q.   Is that your handwriting?

2    A.   No.

3    Q.   Do you know whose handwriting that is?

4    A.   No.

5    Q.   Do you know what that handwriting

6  signifies?

7            MR. PILLER:  Objection, calls for

8  speculation.

9            Go ahead.

10           THE WITNESS:  Well, I look at it, and it

11  apparently is the hours worked and the overtime

12  hours.

13  BY MR. SMITH:

14    Q.   But you don't know who wrote that in?

15    A.   I don't.

16    Q.   Now, is it your understanding that viewing

17  this timecard that at least someone documented you

18  had worked 1.5 hours of overtime?

19    A.   Yes.  I started the documentation, and

20  whoever followed continued the documentation.

21    Q.   Right, and it's -- to be clear, the

22  handwriting that documents the date of the shift,

23  the start time of the shift, the amount of the meal

24  period, and the end of the shift, that's your

25  handwriting; is that correct?

1    A.    Correct.

2    Q.    Okay.  And, Ms. Nava, these entries appear

3 to be for July 21 through July 25 of 2014.

4         Is that your understanding as well?

5    A.    Yes.

6         MR. SMITH:  Okay.  The next document I

7 want to introduce is what appears to be Ms. Nava's

8 earning statement for the time period of July 20,

9 2014, to July 26 of 2014.

10        (Whereupon, Exhibit 4 was marked for

11         identification.)

12 BY MR. SMITH:

13   Q.    Ms. Nava, let me draw your attention back

14 to the earlier exhibit.

15        Understanding that that's not your

16 handwriting marking the overtime worked, do you

17 yourself know why someone documented that you'd

18 worked overtime?

19        MR. PILLER:  Objection, calls for

20 speculation.

21        THE WITNESS:  (Shakes head left to right.)

22 BY MR. SMITH:

23   Q.    Do you recall whether you requested that

24 the overtime be documented by someone else?

25   A.    According to my note, there was a second

1    page here that I don't see here.

2        Q.   And what note is that that you're

3    referring to?

4        A.   "See sheet number 2 for approved

5    overtime."

6        Q.   You wrote that yourself?

7        A.   That looks like my writing.

8        Q.   And do you know what you were referring to

9    when you wrote the phrase "approved OT"?

10       A.   Presumably a signature, but I don't

11   remember.

12       Q.   Do you have a recollection whether you

13   asked for approval for overtime for that date?

14       A.   I don't.

15       Q.   Going back to the next exhibit, this

16   earnings statement that is Bates numbered in the

17   bottom right-hand corner, 20237, Ms. Nava, have you

18   seen this document before?

19       A.   Yes.

20       Q.   And let me draw your attention, in the

21   upper left quadrant of the document you will see

22   that there is a table.  The first heading of the

23   table is Earnings, and then the second entry below

24   that is OT Premium.  Do you see that?

25       A.   Uh-huh.

C427

1    Q.    And it shows that you received payment for

2    overtime premium for 1.5 hours.  Do you see that?

3    A.    Yes.

4    Q.    Do you know what "OT premium" signifies?

5    A.    Overtime, and I'm not sure what the

6    "premium" is.

7    Q.    But it's your understanding that that

8    payment indicates a payment for overtime worked;

9    correct?

10    A.    Correct.

11    Q.    Would you agree that this pay statement

12    shows that you were paid for overtime that was

13    recorded for you on your timecard at the

14    San Francisco location?

15         MR. PILLER:  Just object, the document

16    speaks for itself.

17         But go ahead.

18         THE WITNESS:  As I said, I initiated it

19    and someone else continued it.

20    BY MR. SMITH:

21    Q.    Right, and is it your understanding that

22    this page -- earning statement shows that you were

23    paid for that overtime that was recorded?

24    A.    Yes.

25         MR. SMITH:  Okay.  The next document I

C428

1   STATE OF CALIFORNIA         )
                                    )  ss.

2   COUNTY OF SAN FRANCISCO    )

3

4                 CERTIFICATE OF REPORTER

5         I, BRANDON D. COMBS, a Certified Shorthand

6   Reporter, hereby certify that the witness in the

7   foregoing deposition was by me duly sworn to tell

8   the truth, the whole truth, and nothing but the

9   truth in the within-entitled cause;

10        That said deposition was taken in

11   shorthand by me, a disinterested person, at the time

12   and place therein stated, and that the testimony of

13   the said witness was thereafter reduced to

14   typewriting, by computer, under my direction and

15   supervision;

16        I further certify that I am not of counsel

17   or attorney for either or any of the parties to the

18   said deposition, nor in any way interested in the

19   event of this cause, and that I am not related to

20   any of the parties thereto.

21        DATED: March 15, 2018

22

23

24   _____

25      BRANDON D. COMBS, RPR, CSR 12978



AMN0020188
AMN0020188

EXHIBIT
3
nava
3/3

**AMN Healthcare Time card - KFH/Hospital**

Thank you for printing neatly and within the boxes.

Name: Olivia Navin

Facility: KP San Francisco Medical Center   Code: 03061   Fax #: 888-667-7101   Pay Cycle: WEEKLY

Per Diem?: ☐ Yes ☐ No

| Date | Time In (24h) | Meal Period (mins) | Time Out (24h) | Cost Center/ Department | Shift not worked at request of: F-Facility H-Healthcare Prof | Regular | OT1/HOL | OT2 | Kaiser Use Only |
|------|------|------|------|------|------|------|------|------|------|
| 7/21/14 | 10:00 | 30 | 18:30 | 034-PACU | | | | | |
| 7/22/14 | 10:00 | 30 | 18:30 | 034-Pacu | | 08:00 | | | |
| 7/22/14 | | | 20:00 | 368 Short + Prepped bf | | | | | |
| 7/23/14 | 10:00 | 30 | 18:30 | 034-Pacu | | 08:00 | | | |
| 7/24/14 | 10:00 | 30 | 18:30 | 034-Pacu | | 08:00 | | | |
| 7/25/14 | 10:08 | 30 | 18:30 | 034-Pacu | | 08:00 | | | |
| | | | | | | | | | |

WEEKLY TOTAL: 40 1.5

Agency: KP STAFFING

Primary GL Code: 0201 - 03061

I affirm that the time recorded above is accurate and all required approvals have been obtained.

Date: 7/25/14   Healthcare Professional's Signature:

The undersigned certifies that he or she is an authorized representative of the client company and that the above record of time worked by the named employee is correct. Payroll cannot process timecards without an authorized signature.

Facility Authorization

Print Name: John MacLellan   Title: PCS Manager   Contact: (415) 833-3503   Date:

Comments:

DRAFT

Per Diem?: ☐ Yes ☐ No

Please do not sign in and out at the same time.

# Earnings Statement



**AMN Services, LLC**
*(800) 282-0300*
*12400 High Bluff Drive*
*San Diego, CA  92130*

Page 001 of 001
Period Beginning:  07/20/2014
Period Ending:    07/26/2014
Advice Date:     08/01/2014
Advice Number:  0002347644
Batch Number:   000000003219

Taxable Marital Status: Single

Exemptions/Allowances  Add'l
  Fed: 18
  CA: 18

**OLIVIA NAVA**

San Diego, CA  92115

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Hrs | 30.6000 | 41.00 | 1254.60 | 10392.60 |
| OT Premium | 15.3000 | 1.50 | 22.95 | 22.95 |
| NT Subsidy | | | 530.77 | 4625.28 |
| M&I PerDiemN | | | 245.00 | 2170.00 |
| Comp Bonus | | | 0.00 | 500.00 |
| Comp Bonus D | | | 0.00 | 2.43 |
| Comp Bonus O | | | 0.00 | 5.42 |
| Sign-on Bonu | | | 0.00 | 285.00 |
| Time Off Sbs | | | 0.00 | 75.83- |
| Write Off No | | | 0.00 | 35.00 |

| Additional Deductions | This Period | Year-to-Date |
|---|---|---|
| Missed Shift Adj | 18.00- | 270.00 |
| Missed Shift Adj | 0.00 | 70.00 |
| | | |
| | | |
| Total Additional | 18.00- | 340.00 |

*Excluded from Taxable Wages

| Net Pay | 1929.73 | 16303.93 |
|---|---|---|

### Direct Deposit Summary

| Trans. | Type | Account | Amount |
|---|---|---|---|
| Deposit | Che | XXXXXXXX2712 | 1,929.73 |
| Net Check | | | 0.00 |

### Customer Name     Facility

Kaiser - San Francisco Medical Cent  434355

### Other Balances

| Gross Pay | 2053.32 | 17962.85 |
|---|---|---|

### Tax Deductions

| | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 0.00 | 90.93 |
| Fed MED/EE | 18.52 | 162.52 |
| Fed OASDI/EE | 79.21 | 694.92 |
| CA Withholdng | 31.09 | 258.47 |
| CA OASDI/EE | 12.77 | 112.08 |
| Total Tax Deductions: | 141.59 | 1318.92 |

Federal Taxable Wages are    $1,277.55
**Message**

2002 Automatic Data Processing (PCSUVO)

---



**AMN Services, LLC**
**(800) 282-0300**
**12400 High Bluff Drive**
**San Diego, CA  92130**

Advice Number:  0002347644

Advice Date:   08/01/2014

| Deposited to the account of | Account Number | Transit ABA | Amount |
|---|---|---|---|
| OLIVIA NAVA | Checking | | 1929.73 |

*THIS IS NOT A CHECK*

## NON-NEGOTIABLE

**EXHIBIT**
3/3
4
Nava

AMN0020237

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


ROBERT SHAW, SHARON DAVIS,             ) Case No.:
JENNIFER CORONA TEITELBAUM,            ) 3:16-cv-02816-JCS
LORENZO HOLMES, and CANDY              )
KUCHARSKI, individually and on        )
behalf of all others similarly        )
situated, and as a proxy of the       )
State of California on behalf of      )
aggrieved employees,                  )
                                      )
        Plaintiffs,                   )
                                      )
   vs.                                )
AMN SERVICES, LLC, KAISER             )
FOUNDATION HOSPITALS, SOUTHERN        )
CALIFORNIA PERMANENTE MEDICAL         )
GROUP, INC., and THE PERMANENTE       )
MEDICAL GROUP, INC.,                  )
                                      )
        Defendants.                   )
_____)




            VIDEOCONFERENCE DEPOSITION OF HOWARD J. KRAVITZ

                       March 14, 2018

                         10:03 a.m.

                     Phoenix, Arizona




Prepared by:
Marcella Daughtry, RPR
Arizona CR No. 50623

Job: 26199

C432

1            VIDEOCONFERENCE DEPOSITION OF HOWARD J.

2    KRAVITZ was taken on March 14, 2018 at the offices

3    of Regus Business Center, 2375 East Camelback Road,

4    Suite 600, Phoenix, Arizona, commencing at the hour

5    of 10:03 a.m. before Marcella Daughtry, a Registered

6    Professional Reporter and Arizona Certified Reporter,

7    in and for the State of Arizona.

8

9    APPEARANCES:

10

11       For the Plaintiffs:

12          Schneider Wallace Cottrell Konecky Wotkyns LLP
            MS. LESLIE H. JOYNER, ESQ.
13          2000 Powell Street, Suite 1400
            Emeryville, California 94608
14          ljoyner@schneiderwallace.com
            415.421.7100
15

16       Appearing via videoconference for the Defendant AMN
         Services, LLC:
17
            Constangy, Brooks, Smith & Prophete, LLP
18          MR. MATTHEW SCHOLL, ESQ.
            2029 Century Park East, Suite 1100
19          Los Angeles, California 90067
            310.909.7775
20          mscholl@constany.com

21

22

23

24

25

C433

1    Appearing via videoconference for the Defendants
     Kaiser Foundation Hospitals and the Permanente
2    Medical Group, Inc.:

3         Seyfarth Shaw LLP
          MS. PRITEE THAKARSEY, ESQ.
4         560 Mission Street, 31st Floor
          San Francisco, California 94105
5         415.544.1001
          pthakarsey@seyfarth.com
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C434

```
 1      Q     Are you familiar with the term floating within
 2   the context of nursing?
 3      A     Yes, I certainly am.
 4      Q     Okay.  And how would you define floating?
 5      A     Floating is that if they need you to go to a
 6   different unit, you can work in a different unit.
 7      Q     Okay.  And did you ever float to any other
 8   units while you were working at Kaiser LA?
 9      A     Well, you asked -- you asked me that question
10   already, and I answered it, but to repeat myself, no.
11      Q     Okay.  Are you aware of other nurse --
12   traveling nurses in the ER unit floating to other units
13   at Kaiser LA?
14      A     Not from the emergency room that I -- that I
15   knew of.
16      Q     And how many patients were you assigned during
17   a typical shift?
18      A     You would have a total of -- oh, during -- for
19   the whole shift?
20      Q     How about any given time.
21      A     Well, usually each nurse had four rooms
22   assigned to them, okay.  The nice thing about
23   California is they have ratios, and they can't use more
24   than -- or they can't assign any nurse more than four
25   patients.
```

C435

1 huddle?

2     A    You would go out to your -- you would go out

3 to your assignment, and then you would take report from

4 the nurse that was there, and she would tell you about

5 the patients that she's going to turn over into your

6 care.

7     Q    And how many patients were typically handed

8 off to you at the beginning of your shift?

9     A    Three or four.

10     Q    And how many patients would you typically hand

11 off at the end of your shift?

12     A    Usually two or three.

13     Q    Would you hand off those two to three patients

14 to the same nurse or different nurses?

15     A    It all depends who had that assignment.

16     Q    And who made the assignments?

17     A    The charge nurse.

18     Q    And how long did it typically take to hand off

19 one patient?

20          MS. JOYNER:  Objection, overbroad.

21          Go ahead.

22          THE WITNESS:  One patient, usually five to ten

23 minutes.

24     Q    BY MR. SCHOLL:  And how long on average would

25 it take you to hand off all of your patients?

C436

```
 1      A    Usually at least 15 minutes depending --
 2   depending on how -- how critical the patient was and
 3   what the acuity was.  The acuity is -- the acuity is
 4   how -- how -- I can't think of the words right
 5   now -- how sick the person is.
 6      Q    Okay.  Okay.  And what was the longest that
 7   the hand-off could take?
 8           MS. JOYNER:  Objection, vague and ambiguous.
 9           THE WITNESS:  If you had three patients, it
10   could wind up taking you at least 20 minutes, and, you
11   know, again, if the -- if the acuity was high, it could
12   take longer than 15 minutes.
13      Q    BY MR. SCHOLL:  Okay.  Okay.  After you
14   completed a hand-off at the end of your shift, did you
15   have any further responsibilities?
16      A    You had to finish up any charting that needed
17   to be finished up.  You know, you'd never want to leave
18   a hospital with a chart that's not fully done.
19      Q    Okay.  And were the charts something you were
20   expected to hand over to the nurse who is taking over
21   your patients under a hand-off?
22      A    Everything is computer generated, and yeah,
23   you would give them -- what do you call it?  You would
24   give them report, and then you would finish your
25   charting.
```

C437

```
 1  patients.
 2      Q   BY MR. SCHOLL:  Okay.  But at Kaiser Los
 3  Angeles, was there a break nurse during all of the
 4  shifts that you worked?
 5      A   I will not say that the break nurse was there
 6  all the shifts.
 7      Q   Okay.  To your recollection, was there a break
 8  nurse there most of the shifts?
 9      A   Per my recollection, on most of the shift,
10  there was one.
11      Q   And is your recollection when there was not a
12  break nurse for whatever reason, would the charge nurse
13  then take your patients when you went on break?
14      A   Yes, or one of the other nurses would cover
15  for you.
16      Q   Okay.  Did you ever cover other nurses'
17  patients while they took breaks?
18      A   Yes.
19          MS. JOYNER:  And I'm just going to object to
20  this line of questioning that it calls for a legal
21  conclusion as to breaks.
22      Q   BY MR. SCHOLL:  Okay.  How often would you
23  break other nurses -- would you break other nurses?
24      A   The -- the -- the dinner break would usually
25  be for -- or lunch, however you want to put it, would
```

C438

1    be for 30 minutes.

2        Q    All right.  That would -- let me clarify.

3    About how frequently would you break other nurses?  By

4    that I mean take care of their patients while they

5    would take their breaks.

6        A    Probably 20 percent of the time, maybe 30.

7        Q    20 to 30 percent of your shifts?

8        A    Yes.

9        Q    And to your knowledge, was there a policy in

10   the unit where you worked at Kaiser that nurses were

11   supposed to break each other if there wasn't otherwise

12   a designated break nurse or charge nurse available?

13       A    Yes.

14       Q    Did you sometimes have your 30-minute break

15   earlier than around 1 o'clock?

16       A    Yes.

17       Q    By your recollection, what's around the

18   earliest that you ever took your 30-minute break?

19       A    I don't remember.

20       Q    Do you recall when the latest might have been?

21       A    I don't remember that either.

22       Q    You also referenced 15-minute breaks.  How

23   many 15-minute breaks did you get during a shift?

24            MS. JOYNER:  I'm just going to renew the

25   objection that these call for a legal conclusion as to

C439

```
 1      Q    And there you are referring specifically to
 2  additional overtime shifts or overtime worked past the
 3  end of a scheduled shift?
 4      A    I'm talking overtime shifts.
 5      Q    Okay.  Did you ever contact AMN about issues
 6  receiving overtime approval?
 7      A    No.
 8      Q    Did you ever discuss with your recruiter
 9  issues you had receiving any overtime approvals?
10      A    No.
11      Q    Were you ever disciplined by a supervisor or
12  anyone at Kaiser for requesting overtime?
13      A    No.
14      Q    Were you ever disciplined for working
15  overtime?
16      A    No.
17      Q    Were you aware of other AMN travelers working
18  in the unit where you worked?
19      A    Yes.
20      Q    And how do you know that?
21      A    Because I went through orientation with them.
22      Q    Are you familiar with the time-keeping
23  policies at any of the Kaiser hospitals aside from
24  Kaiser Los Angeles?
25      A    No.
```

C440

1    Q    Are you familiar with the timekeeping

2    policies, the policies at any of the units at Kaiser

3    Los Angeles besides the unit where you worked?

4    A    No.

5    Q    Are you familiar with any of the break

6    policies at Kaiser besides Los Angeles?

7    A    No.

8    Q    Okay.  Are you familiar with any of the break

9    policies for units at Kaiser Los Angeles besides the

10   unit where you worked?

11   A    No.

12   Q    And are you familiar with any of the overtime

13   policies at any of the Kaiser hospitals aside from the

14   Kaiser Los Angeles?

15   A    No.

16   Q    And are you familiar with any of the overtime

17   policies at any of the other units at Kaiser Los

18   Angeles besides the unit where you worked?

19   A    No.

20         MR. SCHOLL:  Okay.  I think that's all I have.

21   I don't know if Kaiser's counsel has any questions.

22         MS. THAKARSEY:  No questions.  Thank you.

23         MR. SCHOLL:  Okay.

24         MS. JOYNER:  All right, thank you.

25         MR. SCHOLL:  Off the record and we can discuss

C441

1            I HEREBY CERTIFY that the foregoing deposition

2    was taken before me; that I was then and there a

3    Registered Professional Reporter, and an Arizona

4    Certified Reporter, Certificate No. 50623, in and for

5    the State of Arizona; that the witness before

6    testifying was duly sworn by me to testify to the whole

7    truth; that the questions propounded by counsel and the

8    answers of the witness thereto were taken down by me in

9    shorthand and thereafter transcribed under my

10   direction; and that the foregoing pages contain a full,

11   true, and accurate transcript of all deposition

12   testimony and proceedings had, all done to the best of

13   my skill and ability.

14           I FURTHER CERTIFY that I am in no way related

15   to nor employed by any of the parties hereto, nor am I

16   in any way interested in the outcome.

17

18           DATED at Phoenix, Arizona, this 16th day of

19   March, 2018.

20

21

22           *Marcella Daughtry*

23           _____
             MARCELLA L. DAUGHTRY, RPR
                  Certified Reporter
24               Certificate No. 50623

25

C442

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

ROBERT SHAW, et al.,            )
individually and on behalf of  )
all others similarly situated, )
and as a proxy of the State of )
California on behalf of         )
aggrieved employees,           )
                               )
            Plaintiffs,         )Case No: 3:16-CV-02816
                vs.             )        -JCS
                               )
AMN SERVICES, LLC, KAISER      )
FOUNDATION HOSPITALS, SOUTHERN )
CALIFORNIA PERMANENTE MEDICAL  )
GROUP, INC., and THE           )
PERMANENTE MEDICAL GROUP, INC. )
                               )
            Defendants.         )
_____)


DEPOSITION OF SHARON BOYD


DATE:              WEDNESDAY, MARCH 28, 2018

TIME:              1:02 P.M.

LOCATION:          MARRIOTT COURTYARD
                   1350 Holiday Lane
                   Fairfield, California


REPORTED BY:       MARY JACKSON, CSR 8688

JOB:               26580

```
 1                  A P P E A R A N C E S

 2    For the Plaintiffs:

 3              NATHAN PILLER, ESQUIRE
                SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS
 4              2000 Powell Street, Suite 1400
                Emeryville, California 94608
 5              415.421.7100
                npiller@schneiderwallace.com
 6

 7    For the Defendant AMN Services, LLC:

 8              MATTHEW SCHOLL, ESQUIRE
                CONSTANGY BROOKS SMITH PROPHETE
 9              2029 Century Park East, Suite 1100
                Los Angeles, California 90067
10              310.909.7775
                mscholl@constangy.com
11              (Appeared via videoconference)

12    For the Defendants Kaiser Foundation Hospitals, Southern
      California Permanente Medical Group, Inc., and The
13    Permanente Medical Group, Inc.

14              ERIC G. RUEHE, ESQUIRE
                SEYFARTH SHAW
15              560 Mission Street, Suite 3100
                San Francisco, California 94105
16              415.544.1078
                eruehe@seyfarth.com
17              (Appeared via telephone)

18

19

20

21

22

23

24

25
```

C444

1     Q.   Yes.

2     A.   No.  I wasn't a Kaiser employee.

3     Q.   Okay.  But their overtime policy as applied to

4  you, or traveling nurses?

5     A.   I understood the overtime policy is stated in

6  my contract.

7     Q.   Which was only that you would be paid

8  double-time if you worked in excess of 12 hours in a

9  day, correct?

10    A.   Correct.

11    Q.   Okay.  Did you ever work past the end of your

12  scheduled shift at Kaiser Roseville?

13    A.   Yes.

14    Q.   Okay.  Is your understanding that overtime is

15  time worked past the end of your scheduled shift?

16    A.   Can you repeat that?

17    Q.   Yeah.  When you reference overtime, what do

18  you mean by "overtime"?  Do you mean time in excess of

19  12 hours in a day or time worked in excess of your

20  scheduled shift or something else?

21    A.   Time in excess of my scheduled shift.

22    Q.   Okay.  When you worked past the end of your

23  scheduled shift at Kaiser Roseville, did you report that

24  time?

25    A.   Not always.

C445

1      Q.    On your time sheet?

2            Okay.

3      A.    There were instances where a manager approved

4    my overtime, and I recorded it on my time sheet.  If I

5    didn't get manager approval for working overtime, I did

6    not mark it on my time sheet.

7      Q.    Okay.  So you understood at Kaiser Roseville

8    there was a policy that you needed to have overtime,

9    which has been defined as time in excess of your

10   scheduled shift, approved by some kind of supervisor; is

11   that correct?

12     A.    That's my understanding, yes.

13     Q.    Okay.  And where did you get that

14   understanding?  Did someone tell you that?  Did you read

15   that somewhere --

16     A.    I never read it anywhere --

17     Q.    -- how do you know that was their --

18     A.    -- I was told that.

19     Q.    Okay.  And who told you that?

20     A.    I don't remember specifically who told me

21   that.

22     Q.    Okay.  Do you recall if it was some type of

23   Kaiser manager or fellow AMN traveler or someone else?

24     A.    It was definitely an ANM -- I'm sorry, it was

25   definitely a Kaiser assistant nurse manager, ANM, a

C446

1      A.   Yeah.  You had asked me if I remembered any

2   manager's names --

3      Q.   Oh, yeah, sorry.  That's right.

4      A.   -- and the only managers I could remember at

5   Vacaville were Jasons.

6      Q.   Okay.  I was looking at your unit names.

7   Jasies, okay.

8      A.   So --

9      Q.   Were you ever disci -- go ahead.

10      A.   So if you ever get let go from a Kaiser

11   facility, you can't work for a Kaiser again.  So there's

12   a lot of pressure, I felt, to, you know, not make any

13   noise about things as much as possible.

14           There were times where I asked for overtime,

15   but for the most part, I was really just trying to keep

16   my head down and not be on anybody's radar screen.

17      Q.   Okay.  Were you ever disciplined for

18   requesting overtime?

19           MR. PILLER:  Objection; vague and ambiguous.

20           THE WITNESS:  I was spoken to and felt a

21   little humiliated that somebody would imply that I had

22   poor time management skills.

23   BY MR. SCHOLL:

24      Q.   Okay.  Aside from that instance, do you feel

25   you were ever -- at any other times you were disciplined

C447

```
 1   for requesting overtime?

 2        A.   I felt like managers would give -- would give

 3   the okay for me to stay over and they weren't happy

 4   about it.

 5        Q.   When you say they would give you the okay to

 6   stay over, that means they would approve you for

 7   overtime, correct?

 8        A.   Yes.

 9        Q.   Are you aware of any other traveling nurses

10   for AMN ever being disciplined for requesting or working

11   overtime?

12             MR. PILLER:  Calls for speculation.

13             THE WITNESS:  I observed a traveler once who

14   would not float to another unit until she finished her

15   charting on the unit that she was on.  There were a lot

16   of angry assistant nurse managers making phone calls

17   about her at that moment.

18   BY MR. SCHOLL:

19        Q.   Okay.  But did that instance have anything to

20   do with a traveler nurse requesting overtime?

21        A.   No, that's a floating issue.

22        Q.   Are you aware of any instance -- any other

23   instances in which a traveling nurse from AMN may have

24   been disciplined for requesting or working overtime?

25        A.   No.  But we pretty much all knew that we
```

C448

1    should either not ask for overtime or keep it to a very

2    bare minimum if we wanted to keep our jobs.

3         Q.   Are you aware of any other AMN travelers

4    being -- having an assignment ended prematurely for

5    requesting or working overtime?

6         A.   I am aware of a lot of travelers having their

7    assignment ended prematurely.  I don't know the reasons

8    why.

9         Q.   Okay.  But to your knowledge, none of those

10   assignments were ended prematurely because of overtime?

11             MR. PILLER:  Object to the extent it misstates

12   testimony and the record.

13             But go ahead.

14             THE WITNESS:  Could you repeat that again?

15   BY MR. SCHOLL:

16        Q.   Yeah.  So you know of some nurses for AMN who

17   have had assignments ended earlier than scheduled, but

18   to your knowledge, none of those assignments were ended

19   because of anything having to do with overtime; is that

20   correct?

21             MR. PILLER:  Same objection; misstates

22   testimony.

23             Go ahead.

24             THE WITNESS:  I don't know why their

25   assignments ended.

C449

 1          MR. PILLER:  Objection to the extent it calls

 2     for speculation.

 3          But go ahead.

 4          THE WITNESS:  Nobody ever told me that I had

 5     to take my breaks somewhere or that I couldn't take my

 6     break somewhere.

 7     BY MR. SCHOLL:

 8          Q.   Okay.  And how about at Kaiser Morse Avenue,

 9     where did you typically spend your breaks there?

10          A.   Also in the break room.

11          Q.   Okay.  And to your knowledge, was there any

12     rules about where you could or couldn't go during your

13     breaks?

14          A.   To my knowledge, nobody told me there was

15     someplace I shouldn't go or only one place I could go

16     for my break.

17          Q.   Okay.  At Kaiser Roseville, did you carry a

18     phone, a pager, any other communications device with you

19     during your shift?

20          A.   I believe so.

21          Q.   Okay.  Do you recall what that communications

22     device was or what it was called?

23          A.   I believe it was a Spectralink phone.

24          Q.   Sentralink?

25          A.   Spectralink.

C450

1      Q.   Oh, Spectra?

2      A.   Spectralink.

3      Q.   Okay.  And would you carry that in all four of

4   the different types of units that you worked in at

5   Roseville?

6      A.   Yes.

7      Q.   Okay.  And when you would take your 30 or,

8   what was it, ten- or 15-minute breaks there, would you

9   hand the Spectralink off to the break nurse?

10      A.   Yes, but I typically only handed off my phone

11   if I was taking a lunch -- a meal break, or if I was

12   leaving the unit, say, to go to the vending machine or

13   cafeteria to pick up a snack.

14      Q.   Okay.  So you would -- did you sometimes,

15   then -- were there situations where you didn't hand off

16   the Spectralink when you would take a break?

17      A.   I believe the policy was I was supposed to

18   hand off the phone, but sometimes the nurse wouldn't ask

19   for it or I would forget to give it to them.

20      Q.   Okay.  Were you ever interrupted while you

21   were taking your breaks at Kaiser Roseville?

22      A.   Somebody might come in to ask me a question

23   about a patient, but as far as I can remember, that was

24   just the extent of a question.

25      Q.   Okay.  And would that be -- I guess you said

C451

1   someone would come in.  Does that mean when you would

2   take your breaks in the break room on the unit?

3       A.   Yeah.

4       Q.   Okay.

5       A.   I mean, in general, we try not to -- when

6   someone is on break, we try not to interrupt them.  It's

7   sort of general practice, but -- common courtesy.

8       Q.   Okay.  How about at Vacaville, did you carry

9   any communications devices with you at Vacaville?

10      A.   Yeah, the same, the Spectralink phones.

11      Q.   Okay.  And did you hand that off to the break

12  nurses at Vacaville as well?

13      A.   Actually, I'm sorry.  I believe on the tele

14  units, we had pagers.

15      Q.   Okay.  So at Vacaville, you had pagers on the

16  tele unit, and did you have Spectralink phones then on

17  the med-surg units?

18      A.   I believe so.  I just remember programming

19  pagers on the telemetry floor.

20      Q.   Okay.  And when you were working on the

21  telemetry floor, did you hand the pager off to the break

22  nurse when you would take a break?

23      A.   That was customary, yes.

24      Q.   Okay.  You say "customary."  To your

25  knowledge, was the policy that you were supposed to hand

C452

1    it off?

2        A.   Yes, but I -- not in all cases did the nurse

3    ask for it or I remember to give it.

4        Q.   Okay.  And then how about in the med-surg

5    unit, did you typically hand off the Spectralink phones

6    to the break nurse when you would take a break?

7        A.   Yes.

8        Q.   Okay.  So to your knowledge, there was no

9    requirement at Vacaville that you had to keep your pager

10   or Spectralink with you during your breaks; is that

11   correct?

12       A.   That's my understanding.

13       Q.   Okay.  And were you ever interrupted during

14   your breaks at Vacaville?

15       A.   Again, I can't be certain because all my

16   assignments sort of blend together, but somebody might

17   have walked in and asked me a very simple question about

18   a patient and walked right back out of the break room.

19       Q.   Okay.  And how about, finally, at Morse

20   Avenue, did you carry any communication devices with you

21   in the units there?

22       A.   Yeah, I believe there were phones again.

23       Q.   The Spectralinks?

24       A.   Yes.

25       Q.   Okay.  And did you hand off the Spectralink to

C453

 1    the break nurses in the different units at Morse Avenue

 2    when you went on a break?

 3        A.   Yes.

 4        Q.   Okay.  And to your knowledge, was there any

 5    policy at Morse Avenue that required you to keep your

 6    phones with you during your breaks?

 7        A.   No, not aware of a policy like that.

 8        Q.   Okay.  And were you ever interrupted during

 9    any of your breaks at Morse Avenue?

10        A.   Again, sort of all the assignments blend

11    together.  Maybe somebody might have come in and asked

12    me a simple question about a patient going to a

13    procedure.

14        Q.   Okay.  At any of the Kaiser facilities, did

15    you ever end your 30-minute break early back to your

16    unit to take care of patients?

17        A.   I don't recall if I did or didn't.

18        Q.   When you were taking your ten- or 15-minute

19    break at any of the facilities, do you recall ever

20    returning back to your unit early to take care of

21    patients?

22        A.   I don't recall if I did or didn't.

23        Q.   You mentioned that sometimes you would miss a

24    meal or a rest break due to staffing issues; is that

25    correct?

C454

1  units?

2          MR. PILLER:  I'll object it calls for

3  speculation.

4          You can answer.

5          THE WITNESS:  Can you repeat the question?

6  BY MR. SCHOLL:

7      Q.   Yeah.  So other than -- so today we discussed

8  the units that you've worked in at Roseville, Vacaville

9  and Sacramento and some of the policies in those units.

10          Are you aware of any Kaiser overtime policies

11  in any facilities besides the three facilities that you

12  worked at?

13      A.   I think you asked me this question, and I

14  answered it twice.

15      Q.   I have not asked this question, no.

16          MR. PILLER:  You can answer it again.  I think

17  we've covered this ground in some form multiple times

18  today, but you can answer the question once more.

19          THE WITNESS:  You're asking if I'm aware of

20  Kaiser's overtime policy?

21  BY MR. SCHOLL:

22      Q.   No.  I'm asking you if you're aware of Kaiser

23  overtime policies in units other than the units where

24  you worked?  For example, there's a Kaiser facility in

25  Los Angeles.  Do you know what the policies are for the

```
 1    Kaiser Los Angeles units?

 2         A.   No.

 3         Q.   Okay.  That's what I'm trying to get at here.

 4              So are you aware of any overtime policies at

 5    Kaiser facilities besides the three facilities that you

 6    worked at?

 7         A.   No.  I'm not even sure I'm aware of the Kaiser

 8    policies on overtime at the procedure -- at the

 9    facilities that I worked at.

10         Q.   Okay.  And are you aware of Kaiser's meal and

11    rest break policies at any of the facilities besides the

12    three facilities where you worked?

13              MR. PILLER:  Calls for speculation, objection,

14    and I believe this question has been answered in some

15    form previously.

16              But go ahead.

17              THE WITNESS:  I -- no, no.

18    BY MR. SCHOLL:

19         Q.   Okay.  And are you aware of any of the meal

20    and rest break policies in the units at the facility --

21    units in the facilities where you worked but where you

22    didn't work?  So, for example, Vacaville you worked in

23    telemetry and med-surg unit.  Are you aware of meal and

24    rest break policies in other units at Kaiser Vacaville?

25         A.   What I'm aware of is that Kaiser has a meal
```

C456

 1   and rest policy that I believe is applicable to all of

 2   its hospitals in Northern California and nurses who work

 3   in those units.

 4        Q.   Okay.  And why do you believe that?

 5        A.   Because I saw the Kaiser policy and procedure.

 6        Q.   And by "saw the Kaiser policy and procedure,"

 7   you mean in the units where you worked in practice?

 8        A.   Not all of the units.  At one of the units.

 9        Q.   Okay.  And did you see a written policy

10   regarding the meal and rest breaks?  What policy are you

11   referring to that you saw in one of the units?

12        A.   I saw a written policy, but it's a Kaiser

13   policy not an AMN policy.

14        Q.   Okay.  And where did you see this written meal

15   or rest break policy, which unit?

16        A.   I don't recall.

17        Q.   And do you recall what this written policy

18   stated?

19        A.   The policy stated that if you missed a rest

20   break, you would be compensated for one hour.  If you

21   missed a meal break, you would be compensated for one

22   hour.  If you missed one rest and one meal, you would be

23   compensated for that, or two rests, you'd be compensated

24   for that.  But if you missed all three breaks, you'd

25   only be compensated for two.

1      Q.   Okay.  And why do you believe that that policy
2   applies to all Kaisers in Northern California?
3      A.   I don't know.  Maybe it doesn't apply anymore.
4   Maybe it did apply then.  I don't know.
5            MR. SCHOLL:  Okay.  I don't have any more
6   questions.
7            Eric, did you have anything?
8            MR. RUEHE:  Yes.
9            MR. SCHOLL:  All right.  I'm going to pop off
10  here.
11                    EXAMINATION
12  BY MR. RUEHE:
13     Q.   Hello, Ms. Boyd.  My name is Eric Ruehe.  I
14  represent Kaiser in this case.  I am sorry, my video is
15  giving me issues so I'm not able to port in.  So I'm
16  going to try my best not to duplicate any questions
17  you've already had to answer, but please bear with me.
18  I apologize in advance.
19            Are you aware -- do you know -- one second.
20            Are you familiar with a program called
21  HealthConnect?
22     A.   Yes.  Or Epic?
23     Q.   Can you say that again?
24     A.   Yeah, I -- yes, I'm familiar with
25  HealthConnect.

C458

1  STATE OF CALIFORNIA          )

2  COUNTY OF SAN JOAQUIN          )

3          I, MARY JACKSON, hereby certify that the

4  witness in the foregoing deposition was by me duly sworn

5  to testify to the truth, the whole truth, and nothing

6  but the truth in the within-entitled cause; that said

7  deposition was taken at the time and place therein

8  stated; that the testimony of said witness was reported

9  by me, a Certified Shorthand Reporter and disinterested

10  person, and was thereafter transcribed into typewriting,

11  and that the pertinent provisions of the applicable code

12  or rules of civil procedure relating to the notification

13  of the witness and counsel for the parties hereto of the

14  availability of the original transcript of the

15  deposition for reading, correcting and signing have been

16  met.

17          And I further certify that I am not of counsel

18  or attorney for either or any of the parties to said

19  deposition, nor in any way interested in the outcome of

20  the cause named in said action.

21          DATED: March 29th, 2018.

22

23                    _Mary Jackson_

24          MARY JACKSON, CSR NO. 8688

25

C459

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

ROBERT SHAW and SHARON          )
DAVIS, et al.,                  )
                                )
        Plaintiffs,             )
                                )
vs.                             ) Case No. 3-16-cv-02816
                                ) JCS
AMN HEALTHCARE, INC. and        )
KAISER PERMANENTE               )
INTERNATIONAL,                  )
                                )
        Defendants.             )
_____)


DEPOSITION OF AMBER MOTTOLA

Los Angeles, California

Friday, March 30, 2018


Job: 26696

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  _____

4    ROBERT SHAW and SHARON          )
     DAVIS, et al.,                  )
5                                    )
             Plaintiffs,             )
6                                    )
     vs.                             ) Case No. 3-16-cv-02816
7                                    ) JCS
     AMN HEALTHCARE, INC. and        )
8    KAISER PERMANENTE               )
     INTERNATIONAL,                  )
9                                    )
             Defendants.             )
10   _____)

11

12

13

14

15

16

17

18

19           The deposition of AMBER MOTTOLA, taken

20   on behalf of Plaintiffs, at 523 West Sixth Street,

21   Suite 219, Los Angeles, California; commencing

22   at 9:43 a.m. and ending at 11:52 a.m., on Friday,

23   March 30, 2018, before Kathy Mannlein, a Certified

24   Shorthand Reporter in the State of California,

25   License No. 13153.

C461

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   SCHNEIDER WALLACE COTTRELL KONECKY & WOTKYNS, LLP
     BY:  LESLIE H. JOYNER, Attorney at Law
 4   2000 Powell Street, Suite 1400
     Emeryville, California  94608
 5   415-421-7100
     415-421-7105  Fax
 6   ljoyner@schneiderwallace.com

 7   For the Defendant Kaiser Foundation Hospitals and the
     Permanente Medical Group, Inc.:
 8
     SEYFARTH SHAW, LLP
 9   BY:  ERIC G. RUEHE, Attorney at Law
     560 Mission Street, 31st Floor
10   San Francisco, California  94105
     415-544-1001
11   415-397-8549  Fax
     eruehe@seyfarth.com
12
     For the Defendant AMN Services, LLC:
13
     CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
14   BY:  MATTHEW SCHOLL, Attorney at Law
     2029 Century Park East, Suite 1100
15   Los Angeles, California  90067
     310-909-7775
16   424-276-7410  Fax
     mscholl@constangy.com
17

18

19

20

21

22

23

24

25
```

C462

1  Presbyterian, then, the UCLA Ronald Reagan Medical

2  Center?

3  A.     And that was my last one.

4  Q.     Okay.  So aside from the Kaiser West Los Angeles

5  location, have you worked at any Kaiser facilities for

6  AMN in California since 2013?

7  A.     I have not.

8  Q.     Okay.  So at Kaiser West Los Angeles, what

9  primary unit were you assigned to work in?

10  A.     Emergency department.

11  Q.     And did you work at any other units at Kaiser

12  West Los Angeles?

13  A.     I did not.

14  Q.     Okay.  Are you familiar with the term

15  "floating"?

16  A.     Yes.

17  Q.     Okay.  And how would you define floating?

18  A.     Floating is when you are taken from your

19  designated assigned unit to another unit.

20  Q.     Okay.  Were you ever floated outside of the

21  emergency department at the West Los Angeles medical

22  center?

23  A.     No, I was not.  Generally, people do not take

24  people out of the ER -- any hospital.

25  Q.     Okay.  So people in the ER at West Los Angeles

C463

1    typically didn't float?

2    A.      No.

3    Q.      And how do you know that?

4    A.      This is based on my experience.

5    Q.      Okay.  Is this from speaking to other nurses you

6    work with, or what you observed, or --

7    A.      Yes, other nurses I've worked with and myself.

8    Usually ER is the most understaffed.  So we do not pull

9    from the ER.

10   Q.      Okay.  And who supervised you in ER?

11   A.      I had several different charge nurses, a nurse

12   manager, and there was an ER director at the time.

13   Q.      Okay.  Approximately how many different charge

14   nurses would you estimate that you worked with?

15   A.      Four or five.

16   Q.      Okay.  Do you recall the names of any of the

17   charge nurses?

18   A.      I remember Cecelia.

19   Q.      Do you remember Cecelia's last name?

20   A.      No, I definitely do not remember anyone's last

21   name.  I know the director, her name was Pat.  And I

22   want to say -- no, I'm not -- you know, I'm not sure.  I

23   can't remember specific names.  If you read off a list,

24   I can tell you, but I don't remember.

25   Q.      I don't have a list.  Okay.

C464

```
 1    requesting overtime at Kaiser West Los Angeles?
 2              MS. JOYNER:  Objection, calls for speculation.
 3              THE WITNESS:  No.
 4    BY MR. SCHOLL:
 5    Q.        Are you aware of any traveling nurse ever being
 6    disciplined for requesting overtime at Kaiser West Los
 7    Angeles?
 8              MS. JOYNER:  Objection, calls for speculation.
 9              THE WITNESS:  No, not that I -- not that I know
10    of.
11    BY MR. SCHOLL:
12    Q.        Okay.  And are you aware of any traveling nurse
13    ever having an assignment terminated or requesting
14    overtime at Kaiser West Los Angeles?
15              MS. JOYNER:  Calls for speculation.
16              THE WITNESS:  Sorry, I didn't hear the first --
17    the first part of the sentence.
18    BY MR. SCHOLL:
19    Q.        Yeah, are you aware of any traveling nurse ever
20    having an assignment terminated for requesting overtime
21    at Kaiser West Los Angeles?
22    A.        For requesting overtime, no.
23    Q.        Are you aware of any AMN policies pertaining to
24    taking breaks during assignments?
25              MS. JOYNER:  Objection, calls for a legal
```

C465

```
 1   small, and carry individual numbers.

 2   Q.      Okay.  Is Void, is that the name of, like, a

 3   brand, or is that like the type of device?

 4   A.      I believe so.  I believe it's the name of the

 5   company.

 6   Q.      The brand?  Okay.

 7           And did you hand your Void phone off to the

 8   breakers when you would take your 45-minute breaks?

 9   A.      Yes.

10   Q.      Did you always hand off your Void phone when you

11   would take your 45-minute break to the charge nurse?

12   A.      Not to the charge nurse, to the nurse relieving

13   me.

14   Q.      Oh, excuse me, yes.  To the break nurse.  My

15   mistake.

16           And would the break nurse, then, return the Void

17   phone at the end of your 45-minute break?

18   A.      Yes.

19   Q.      Were you required to hand off your Void phone to

20   the break nurse when you would take your 45-minute

21   break?

22   A.      Yes.

23   Q.      Aside -- are you aware of any Kaiser's policies

24   regarding overtime approval at any unit Kaiser West Los

25   Angeles besides the ER department?
```

C466

1    A.      No, I do not.

2    Q.      Okay.  Are you aware of Kaiser's overtime

3    policies and procedures at any facility besides Kaiser

4    West Los Angeles?

5    A.      No.

6    Q.      Are you aware of any of the breaks that nurses

7    received in other units at Kaiser West Los Angeles

8    besides the ER?

9    A.      No.

10   Q.      And are you aware of the breaks that nurses

11   received in any of the facilities besides Kaiser West

12   Los Angeles?

13   A.      No.

14   Q.      I think that's all I have for now.

15           MR. SCHOLL:  Eric, do you have questions?

16           MR. RUEHE:  Yeah, can we take a five-minute

17   break?

18           MS. JOYNER:  Sure, works for us.

19           MR. SCHOLL:  That's fine with me.  Okay.  Off

20   the record.

21                   (Off the record.)

22           MR. RUEHE:  Let's go back on the record.

23           MS. JOYNER:  We can't see anyone here.  The

24   video seems to have cut.

25           MR. RUEHE:  Yeah, I'm having -- my computer

C467

1   State of California      )

2   County of LOS ANGELES    )

3

4        I, Kathy Mannlein, Certified Shorthand Reporter,

5   do hereby certify:

6        That prior to being examined, the witness in the

7   foregoing proceeding was by me duly sworn to testify to

8   the truth, the whole truth, and nothing but the truth;

9        That said proceedings were taken before me at the

10  time and place therein set forth and were taken down by

11  me in shorthand and thereafter transcribed into

12  typewriting under my direction and supervision;

13       I further certify that I am neither counsel for,

14  nor related to, any parties to said proceedings, nor in

15  anywise interested in the outcome thereof.

16       In witness whereof, I have hereunto subscribed my

17  name.

18

19  Dated: March 30th, 2018.

20

21

22

23  *Kathy E. Mannlein*

24  Kathy E. Mannlein
    CSR No. 13153

25

C468

## <u>DECLARATION OF ANNA THAI</u>

I, Anna Helena Thai, do hereby swear and affirm as follows:

1.     I am a Registered Nurse and I obtained my Associate's Degree in Nursing from Saddleback College in 2013.  I received my Bachelor's Degree in Nursing from Grand Canyon University in 2015.  I make this declaration of my own personal knowledge.  If called upon to testify as a witness, I could and would competently testify to these facts.

2.     I understand that this Declaration is being provided to attorneys for AMN, and may be filed in court to support AMN's defense in the lawsuit filed by Robert Shaw and Sharon Davis ("Plaintiffs") (*Robert Shaw, Sharon Davis, et al. v. AMN Healthcare, Inc.*, United States District Court, Northern District of California, Case No. 3:16-cv-02816).

3.     I hold certifications in Basic Cardiac Life Support, Advanced Cardiac Life Support, Pediatric Advanced Life Support, and the NIH Stroke Scale.

4.     I currently work for AMN Services, LLC ("AMN") as a traveling nurse. I am on assignment at the MedStar Washington Hospital Center ("MedStar D.C.") in Washington, D.C ("MedStar Assignment").  At MedStar D.C., I am assigned to the electrophysiology lab, or "EP Lab."  In that unit, I work with cardiac patients who are undergoing procedures like cardiac ablations or pacemaker insertions.

5.     I completed one other assignment for AMN which was at Kaiser San Diego Medical Center, where I worked from November 14, 2016 to May 13, 2017.

6.     My assignment at Kaiser San Diego was originally scheduled to last for 13 weeks. The assignment was extended twice and I worked at Kaiser San Diego for a total of about 6 months.  During the assignment I worked in a surgical unit at the hospital.

7.     Before I started my assignment at Kaiser San Diego, I was provided with access to an AMN online portal through which I could access my Professional Services Agreement ("PSA") and the AMN employee handbook.  Once I began to

receive pay for my assignment, I was also able to access my pay stubs through the online portal. During the time I have been employed by AMN, the employment policies for AMN have always been available to me in the online portal.

8.      Before I began the assignment, I participated in additional orientation for Kaiser San Diego. The Kaiser San Diego orientation consisted of online training modules and in-person training that took place in the unit where I would be assigned to work. The online training portion of the orientation provided instructions for tasks I would perform during the assignment including, blood transfusions and monitoring patients' vital signs.

9.      To the best of my recollection the online portion of the orientation took about 12 hours to complete. AMN provided me with a timesheet to record my time for the online training and I filled it out and sent it directly to AMN. I believe the in-unit training part of the orientation took place over three, 12-hour shifts. I also reported these hours on an AMN timesheet and sent it directly to AMN. I was paid for all of the hours I recorded for orientation.

10.     My schedule at Kaiser San Diego consisted of three, 12-hour shifts per week. When I began the assignment, my shifts were from 11:00 a.m. to 11:30 p.m. At some point during the assignment, I requested an earlier shift and began working the 7:00 a.m. to 7:30 p.m. shift instead.

11.     For the duration of my assignment at Kaiser San Diego, I reported my hours on a paper AMN timesheet. I filled out the timesheet and faxed it directly to AMN each week. Before I submitted my timesheet for the week, the charge nurse or unit manager would review the timesheet and sign it. Each time I requested that a charge nurse or unit manager sign my timesheet, he or she did so. No one at AMN or Kaiser San Diego questioned the hours I recorded on the timesheet or changed the hours I had entered.

12.     I recorded my start and end times accurately during my assignment. I was never asked by anyone to start working before the scheduled start time for my shift. I

C470

never started working before the start time I recorded on the timesheet and the end time I recorded on my timesheet was always the time that I stopped working.

13.     During the time I was assigned to work at Kaiser San Diego I participated in huddles.  The huddles usually took place around 7:15 a.m. or 7:30 a.m. and lasted about 10 minutes. Whatever staff was present in the unit at the time would attend.  This usually meant that managers, nurses, and surgical technicians would attend.  Doctors were not included in the huddle.  Every huddle I attended took place after the start time I recorded on my timesheet and was on-the-clock.

14.     The surgery unit I was assigned to at Kaiser San Diego handled all kinds of surgeries – partial lung removals, kidney removals, wound debridements, ovary removals, laparoscopic hysterectomies, finger and toe amputations, hip and joint replacements, and a host of other procedures.  A patient having surgery goes through pre-op (preparation for surgery), recovery (critical care directly after surgery), and then post-op (preparation for discharge).  Each day, I was assigned to pre-op and post-op or recovery.

15.     When I was assigned to recovery on the 11:00 a.m. to 11:30 p.m. shift, sometimes I would need to hand off one or more patients to the night shift nurses. These "hand offs" took place on the clock.  When I was assigned to recovery on the 7:00 a.m. to 7:30 p.m. shift, I rarely had to receive a hand-off from the prior nurse shift. Very few patients from the previous night were still in the unit by the time my shift started at 7:00 a.m.

16.     When I was assigned to the pre-op and post-op unit, I worked the 7:00 a.m. to 7:30 p.m. shift and generally did not need to do any hand offs. In pre-op, I was receiving the first patient of the day and getting them from the waiting room myself. As such, I did not need to receive a hand off for these patients. I would prepare the pre-op patients for surgery; immediately after surgery they went to recovery; and then they came back to the pre-op and post-op unit when they were stable. Typically, I discharged all post-op patients before the end of my shift. If for some reason I still had

C471

a patient in post-op at 7:30 pm, I would do a hand off with the night nurse. The hand-off occurred on the clock and usually lasted about five minutes per patient. It never took more than fifteen minutes in total to complete the hand-off process.

17.    On each shift I worked at Kaiser San Diego, I received a 30 minute meal break and two 15 minute rest breaks. I recorded my meal breaks on the timesheet, but did not record the paid rest breaks on my timesheet.  I remember signing a meal period waiver and I received one meal period per 12 hour shift.

18.    I learned when to take my breaks during the orientation I attended at Kaiser San Diego. I was told to take my 30 minute meal period within 6 hours of starting my shift and two 15 minute breaks. I was also instructed to tell my supervisor if I failed to take a meal break or a rest break. I was further instructed to complete a form if I was unable to take a complete, uninterrupted meal break and the forms were kept at the charge nurse desk. I believe my charge nurse and unit manager referred to these as missed meal period forms. I never had to use one but I understood that a charge nurse or unit manager would need to sign off on the form if I used it.

19.    During the assignment, the charge nurse or the "break nurse" scheduled nurses' meal and rest breaks to make sure we took them. Either the assigned "break nurse" or the charge nurse would decide when each nurse would get their meal and rest breaks.  My meal and rest break times were written next to my name on the unit assignment board.  If for some reason no break nurse was assigned for the shift, the charge nurse would relieve us for breaks.

20.    I always got my full 30 minute meal break at Kaiser San Diego. No one ever interrupted me on my break or told me to keep a pager or cell phone on me in case of emergency. I never missed my meal break – not even once. During my meal break, I often walked to the Vons grocery store next door to get lunch. Sometimes I would eat in the employee break room where there were multiple refrigerators and microwaves. Sometimes I would sit outside and eat at the picnic tables.  There was also a cafeteria inside the hospital that was open during my shifts, but I don't think I

C472

ever ate in the cafeteria because I was worried I'd be tempted to eat unhealthy food. The hospital cafeteria closed at 7 pm so when I worked the 11 am – 11:30 pm shift, it was not open during my entire shift.

21.    On my rest breaks, I would snack and read. Sometimes I would spend the time talking on my cell phone. I took my breaks outside when the weather was nice and inside when it wasn't. If I was inside, I was in the break room/lounge. During my assignment, I always got my rest breaks and I never failed to take them. No one ever told me I couldn't take a rest break or asked me to keep my phone on me during a rest break. I was never interrupted on my rest break.

22.    While on assignment at Kaiser San Diego, I was provided with a phone that clipped to my scrubs. These phones were intended to provide a form of communication for staff. I was told that I could use it to reach the charge nurses or other staff as needed when I was on duty. I do not believe that anyone ever called me on it, but I used it to reach staff from time to time. I was not required to have the phone on me or to respond to any calls during my meal or rest breaks, and I was told to turn on the phone's do not disturb function to ensure I would not be interrupted. I used the do not disturb function during my breaks when I first started the assignment, but because no one ever called me on it, I eventually stopped turning it on during my breaks.

23.    I don't believe I ever worked more than 12 hours at Kaiser San Diego, and I never requested or was asked to work extra shifts during the week.  I recorded all the time I worked during my assignment at Kaiser San Diego, and was paid for those hours.

24.    I was told during my Kaiser orientation that any overtime had to be approved by the charge nurse or unit director in advance. If I couldn't notify them in advance, I was instructed to notify them as soon as possible.

25.    My AMN recruiter is Rolando Alanzaro. I haven't worked with any other recruiters. Rolando introduced me to Susana Milan, who is a Senior Customer

C473

Account Manager with AMN and now I contact her with any pay questions.

26.    I have always checked my timesheets against my paystubs.  If I see a discrepancy, I contact Susana and she makes sure it is corrected.  I think this has only happened about 3-4 times total during my employment with AMN. Only 1 of these 3-4 instances occurred while I was on assignment at Kaiser San Diego. To the best of my recollection, I did not get paid for a couple of hours and emailed Susana to let her know. The discrepancy was promptly fixed.


Signed this  26     day of  November, 2017 at Washington, D.C.


Anna Thai
_____
Anna Thai

C474

scheduled nurses' meal and rest breaks to make sure we took them. Either the assigned "break nurse" or the charge nurse would decide when each nurse would get their meal and rest breaks. My meal and rest break times were written next to my name on the unit assignment board. If for some reason no break nurse was assigned for the shift, the charge nurse would relieve us for breaks.

20.     I always got my full 30 minute meal break at Kaiser San Diego. No one ever interrupted me on my break or told me to keep a pager or cell phone on me in case of emergency. I never missed my meal break – not even once. During my meal break, I often walked to the Vons grocery store next door to get lunch. Sometimes I would eat in the employee break room where there were multiple refrigerators and microwaves. Sometimes I would sit outside and eat at the picnic tables. There was also a cafeteria inside the hospital that was open during my shifts, but I don't think I ever ate in the cafeteria because I was worried I'd be tempted to eat unhealthy food. The hospital cafeteria closed at 7 pm so when I worked the 11 am – 11:30 pm shift, it was not open during my entire shift.

21.     On my rest breaks, I would snack and read. Sometimes I would spend the time talking on my cell phone. I took my breaks outside when the weather was nice and inside when it wasn't. If I was inside, I was in the break room/lounge. During my assignment, I always got my rest breaks and I never failed to take them. No one ever told me I couldn't take a rest break or asked me to keep my phone on me during a rest break. I was never interrupted on my rest break.

22.     While on assignment at Kaiser San Diego, I was provided with a phone that clipped to my scrubs. These phones were intended to provide a form of communication for staff. I was told that I could use it to reach the charge nurses or other staff as needed when I was on duty. I do not believe that anyone ever called me on it, but I used it to reach staff from time to time. I was not required to have the phone on me or to respond to any calls during my meal or rest breaks, and I was told to turn on the phone's do not disturb function to ensure I would not be interrupted. I used the do not disturb function during my breaks when I first started the assignment, but because no one ever called me on it, I eventually stopped turning it on during my breaks.

23.     I don't believe I ever worked more than 12 hours at Kaiser San Diego, and I never requested or was asked to work extra shifts during the week. I recorded all the time I worked during my assignment at Kaiser San Diego, and was paid for those hours.

24.     I was told during my Kaiser orientation that any overtime had to be approved by the charge nurse or unit director in advance. If I couldn't notify them in advance, I was instructed to notify them as soon as possible.

25.     My AMN recruiter is Rolando Alanzaro. I haven't worked with any other recruiters. Rolando introduced me to Susana Milan, who is a Senior Customer Account Manager with AMN and now I contact her with any pay questions.

26.     I have always checked my timesheets against my paystubs. If I see a discrepancy, I contact Susana and she makes sure it is corrected. I think this has only happened about 3-4 times total during my employment with AMN. Only 1 of these 3-4 instances occurred while I was on assignment at Kaiser San Diego. To the best of my recollection, I did not get paid for a couple of hours and emailed Susana to let her know. The discrepancy was promptly fixed.

Signed this     29     day of November, 2017 at Washington, D.C.

_____
Anna Thai

C476

## <u>DECLARATION OF LINDSEY FOSTER</u>

I, LINDSEY FOSTER, do hereby swear and affirm as follows:

1.     I am currently employed by AMN Services, LLC ("AMN") as a traveling nurse.  I received my bachelors of science in nursing from the University of Minnesota in Minneapolis and Saint Paul, Minnesota.  I also hold certifications in Life Support and Stroke Scale from the American Heart Association.

2.     I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support their defense in the lawsuit filed by Robert Shaw, Jennifer Corona Teitelbaum, Candy Kucharski, Lorenzo Holmes, and Sharon Davis ("Plaintiffs") (Robert Shaw, et al. v. AMN Services, LLC, et al, United States District Court, Northern District of California, Case No. 3:16-cv-02816).

3.     Since September 2013, I have completed a total of three (3) assignments with AMN.  I completed my first AMN assignment at Providence Holy Cross—Kaiser Permanente in Mission Hills, California ("Providence").  My assignment at Providence ran from March 2017 to June 2017.  I worked my second AMN assignment at Kaiser Downey Medical Center in Downey, California ("Downey"). My assignment at Downey ran from June 2017 through October 2017.  I am currently on my third AMN assignment, at Kaiser Woodland Hills in Woodland Hills, California ("Woodland Hills").  I started my current assignment at Woodland Hills in November 2017, and it is scheduled to end on April 2018.

*Training*

4.     Before starting each of my assignments with AMN, I was required to complete both in-person and online training for AMN and for the hospitals where I was assigned to work.  Trainings were done both on-site during working hours, and online.  Every time training was done during working hours, I recorded that time on my daily timesheet and I was paid along with my other hours for that workday.  I also

completed online training for AMN during hours when I was not scheduled to work at the facilities. I also recorded that time on my daily timesheets and was paid for that time.

5. The trainings were required by AMN or by the hospital where I was assigned to work. I specifically remember training on specific hospital policies such breaks and overtime, receiving training on infection prevention and using equipment, and reviewing AMN's employee handbook.

6. I also remember learning the correct way to properly sign in and out on in at each of the hospital where I have been assigned, and I actually signed in and out each day during each of my training sessions. I was paid for all of the time I spent in training at each of the facilities where I have worked.

7. During each of the training sessions I completed at the individual AMN facilities, I received several documents electronically, through an online AMN portal. I specifically remember that among those documents I received AMN's electronic employee handbook and had to sign the handbook acknowledgment of receipt before every assignment.

8. During each of the training sessions I attended for the particular facilities, the orientation leaders talked to me about meal periods and rest breaks, and overtime. Specifically, we always discussed the frequency and length of my breaks, how to sign up for breaks at that particular facility, where the break rooms and cafeterias at each particular facility are located, and how to properly report a missed meal or rest break.

9. At Downey and Woodland Hills we also discussed that I had to put all of my hours on the timesheet, and had to write in the time I spent taking a lunch break, as well as any missed meal periods or rest breaks. Providence had an electronic timekeeping system, so I simply had to clock out during my meal period and clock back in once I was done taking my meal period.

10. At Providence, I was also trained on the sort of approval I had to obtain in order to work overtime. Specifically, I was told that I had to obtain pre-approval

C478

from the charge nurse prior to working overtime at Providence.  I was told that I needed to obtain that pre-approval on a separate overtime form that was found in the staffing office, and that I would have to explain to the charge nurse the reason why I had to work beyond my scheduled shift.  In addition to obtaining this approval on a separate form, I also had to make sure that I remained clocked in to the electronic timekeeping system during all hours worked, including overtime hours worked.  I never had any issues obtained approval to work overtime during my time at Providence.  The training I received with regard to working overtime at Downey was different because I did not have to seek pre-approval in order to work beyond my regularly scheduled shift, and I simply had to write down all of the time that I worked on my timesheet in order for AMN to review and approve the time.  I was never questioned about the time I wrote down on my timesheet during my time working at Downey, and I was always paid all hours worked.  In order to work beyond the scheduled end of my shift at Woodland Hills I had to obtain approval from my charge nurse and write down all hours worked on my timesheet.  However, I have never needed to work past the scheduled end of my shift at Woodland Hills.

11.   It is my understanding that I could always access AMN's policies or any policy updates on the AMN portal, and use AMN's portal to have 24-7 access to the employee handbook, and earning statements.  I have referred to the employee handbook online on numerous occasions.

*Work Schedule and Time Reporting*

12.   I regularly worked three, 12 hour shifts per week during my Kaiser assignments for AMN.  During my first assignment at Providence, my shift started at 7:15 a.m. and ended at 7:15 p.m.  During my second assignment at Downey my shift also started at 7:15 a.m. and ended at 7:15 p.m.  I also have the same schedule in my current assignment at Woodland Hills.

13.   During my assignments at Downey and Woodland Hills, I recorded the time that I worked on a paper timesheet.  The timesheets were located in the facilities'

C479

respective staffing offices.  It took me around one (1) minute to walk from the staffing office in Downey to my unit.  Likewise, it takes me around thirty (30) seconds to one (1) minute to walk from the staffing office in Woodland Hills to my unit. In Providence, every unit has a timekeeping machine where you are supposed to clock in and out, so I did not need to leave my unit to sign in or out.  Since I walked to and from the staffing office and my unit during my shifts at Downey and Woodland Hills, that time was always included in the hours I worked, and I was compensated for that time as a part of the hours I included in my timesheets.

*Huddles*

14.    I have attended "huddles" at different points during my time as a traveling nurse for AMN.  During my assignment at Providence, I attended huddles an average of once per week.  During my employment at Downey, I attend huddles during nearly every shift.  During my current assignment at Woodland Hills, I only attend huddles an average of once per week.

15.    Every huddle that I have attended has occurred at the beginning of my shift, after I have singed in on my timesheet.

16.    Huddles at Providence were attended by all CNA's and RN's on shift.  Huddles at Downey were attended by all RN's on shift.  Huddles at Woodland Hills are attended by all CNA's and RN's on shift.

17.    Huddles at Providence typically lasted an average of 5 minutes.  Huddles at Downey typically lasted an average of 10 minutes.  Huddles at Woodland Hills typically last an average of 5 minutes.  All of these times varied, of course, depending on whether how much information was covered and what was happening in the unit that day.  The time I spent in the huddle was always reflected on my timecard.

*Meal Periods and Rest Breaks*

18.    The scheduling of my rest or meal breaks varied by facility.  During my time working at the Providence and Downey facilities, all of the nurses, including me, would fill out a form located in the staffing office at the start of each shift.  A charge

C480

nurse and a relief nurse would relieve me at the time I signed up for. The charge and relief nurse would were both available to cover nurses, and it was rare for me to not be relieved for my break at the time I requested.

19. At Woodland Hills, I fill out a form with the time I wish to take my breaks. The form is available in the unit. At Woodland Hills a charge nurse at the time nurses had signed up for.

20. The length of my breaks varied by facility. During my time working at the Providence facility, meal periods were 30 minutes in length. Likewise, meal periods in Woodland Hills are also 30 minutes in length. However, meal periods in Downey we 45 minutes in length. During all three assignments, my lunch break was generally 11:00 a.m. and 2:00 p.m

21. I do not recall ever missing a meal break during any of my Kaiser assignments. My meal breaks were always a full 30 uninterrupted minutes at Providence and now at Woodland Hills, and a full 45 uninterrupted minutes at Downey.

22. On occasion, I have covered other nurses while they went on their meal period or rest breaks because the relief nurses needed help providing the coverage. At Providence, I believe that this occurred maybe once every other week. At Downey, I believe that this happened maybe once per week, on average. At Woodland Hills, this has only happened approximately once per month.

23. I always recorded my meal breaks on my time sheet in Downey and Woodland Hills, and clocked in and out for lunch in Providence. My rest breaks are not recorded on my time sheets at Downey and Woodland Hills, and I did not clock in and out for rest breaks at Providence.

24. There was a break room and a cafeteria available for me to use during both meal periods and rest breaks at each Kaiser facility where I have worked assignments. Additionally, there were several areas outside of the hospitals where I

C481

1  could take my breaks.  During my current assignment, weather permitting, I like to

2  sit and eat outside of the hospital on one of the picnic tables, and frequently do so.

3      25.  No one at AMN or at Kaiser has ever discouraged me from taking a meal

4  period or rest break.  I always take my breaks and no one at AMN or Kaiser has ever

5  said or suggested to me that I needed to be available to assist patients or hospital staff

6  during a break.  However, I sometimes voluntarily choose to forgo my final rest break

7  of the day because I do not feel like taking it.  I would say that did this no more than

8  1 or 2 times during my time at Providence, 2 or 3 times during my time at Downey,

9  and have done it no more than 2 or 3 times during my time at Woodland Hills.

*Pagers/Radios*

11      26.  I was always required to carry a company cell phone with me while I

12  worked on the floor.  However, I was not required to carry the cell phone during a

13  meal period or rest break.  Despite this, during my time at Woodland Hills,

14  Providence, and Downey, I was not in the habit of leaving my cell phone with the

15  nurse that relieved me, and I would just leave the cell phone in my pocket instead.  I

16  can recall fewer than five occasions total during my Woodland Hills and Providence

17  assignments when a break was interrupted by a call.  I was never interrupted by a call

18  while working at Downey.

*Floating*

20      27.  I have "floated" during all three of my Kaiser assignments.  I would

21  estimate that I have floated about once per week.

22      28.  The charge nurse at my original unit generally made sure that I took a

23  break before I floated to any other units.

*Overtime*

25      29.  I never began working or performing job tasks before the scheduled start

26  time of my shift and I never performed duties after I clocked out for the day.

27  Throughout my employment with AMN I have never worked off the clock.

28

6
**DECLARATION OF LINDSEY FOSTER [Case No. 3:16-cv-02816-JCS]**

C482

30.   While I was on assignment at Providence and Downey, I sometimes performed certain duties past the time that my regularly scheduled shift was supposed to end, but it was not the norm.  I have never worked beyond the regularly scheduled end of my shift at Woodland Hills.  I always reported the time that I worked, including the time beyond the regularly scheduled end of my shift, and never had any issue getting payment for all of the time I worked.  As I described, at Downey I do not need approval to work past the end of my shift.

31.   I have never been discouraged from working or reporting overtime during any of my assignments with AMN.

32.   I have been assigned a recruiter during my employment at AMN.  I typically contact him regarding things such as contract negotiations prior to the start of an assignment, but he is available to answer other questions that might come up.

*Compensation*

33. I believe that AMN has compensated me for all time that I have worked.

I declare under penalty of perjury under the laws United States and the State of California that the foregoing is true and correct.

Signed this ___ day of March 2018 at _____, California.

LINDSEY FOSTER

## <u>DECLARATION OF SELMA DEMIROVIC</u>

I, SELMA DEMIROVIC, hereby swear and affirm as follows:

1.  I am employed by AMN Services, LLC ("AMN") as a Registered Nurse. I received my nursing degree and Bachelors' Degree in Accounting, with a Minor in Human Resources from Oakland University in Auburn Hills, Michigan. I also have earned my NIHSS certification in working with stroke patients. I began working for AMN in approximately September 2014.

2.  I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support the Defendants' defense in the lawsuit filed by Robert Shaw and Sharon Davis ("Plaintiffs") (Robert Shaw, Sharon Davis, et al. v. AMN Healthcare, Inc., United States District Court, Northern District of California, Case No. 3:16-cv- 02816).

3.  When I was first hired by AMN in September 2014, I received many documents electronically, through a portal. The documents I received included employment policies and new hire paperwork. An Employee Handbook was sent to me electronically. I signed an acknowledgement stating that I received the handbook.

4.  Throughout my employment, I was aware that I could access any policies or policy updates via the AMN portal home page and that my Employee Handbook was accessible online. Via the portal, I also had 24-7 access to my pay check information, my employment history, my assignment contracts, and various other personnel documents.

5.  As I mentioned, I have worked over ten assignments for AMN. Since December 15, 2014, all of my assignments have been at Kaiser facilities in Southern California. These include Kaiser facilities at Kaiser Downey, Kaiser South Bay, and the Los Angeles Medical Center (LAMC). Since June 23,

1   2015, I have been working at the LAMC facility and renew my contract
2   periodically at the same location. My current contract runs from October 2017-
3   April 14, 2018. My next contract is set to start on April 15, 2018 and will end
4   on July 7, 2018.  I currently work three 12-hour shifts per week. My shifts are
5   usually scheduled from 7:30am – 8:00pm, but the days I work vary from week
6   to week.

7   6.    I completed at least one day of in-person training at each clinic before starting
8   my assignments. I completed online training as well. I did not complete
9   additional training before each assignment at LAMC since I was just extending
10  my contract at the same facility.  I completed a timesheet for the time I spent
11  completing all of my trainings at every facility I worked at through AMN. I
12  was paid for that time as well.

13  7.    During my Kaiser assignments, I have been required to record the hours that I
14  worked on a paper timecard.  These timecards are kept in the staffing office.
15  At the beginning of each shift, I am required to write the time of my arrival
16  and at the end of each shift, I am required to write the time of my departure.  I
17  am also required to record the number of minutes I take for my meal period. I
18  have consistently followed this practice.

19  8.    I never perform any work before signing in at the beginning of my shift.  After
20  signing in at the beginning of my shift, the first thing I do is report to my unit.
21  My shifts begins with a "huddle," during which a charge nurse or manager
22  briefly reviews the patient load in the unit and issues pertaining to patient care
23  and safety. Specifically, we address any issues that require our focus such as
24  full-risk patients, patients to keep an eye on, modifications to charting etc.
25  Everyone scheduled that day including nurses, nursing assistants, and
26  secretaries attend the huddle. Throughout my assignments at the LAMC
27  facility, my huddles have begun shortly after 7:30am. These huddles typically
28  last around seven minutes.

1

9. After a huddle, I am approached by nurses on their outgoing shift who "hand-off" the patients that I will be caring for during my shift. In these hand-offs, we utilize a tool NKE Smile which contains a brief summary of the patient's care history. In my current assignment, at approximately 7:30pm the incoming nurses working the next 12-hour shift have a huddle and the handoff starts usually around 7:40pm.

10. The length of time for the hand-off process depends on the complexity of the patients and the report provided by the hand-off nurse. Most nurses are efficient and can provide an excellent report on each patient in about 5-7 minutes.

11. Since working at the LAMC facility, I am required to receive a manager's approval when I worked past the end of my scheduled shift. On occasion I have worked about 5-10 minutes past the end of my scheduled shift but this is rare.

12. Often times during our shifts, the mid-shift manager checks in with the nurses to assist us with timely completion of our job duties. My manager knows that if I ever stay past the end of my shift, it was out of sheer necessity, and my overtime is approved. No one has ever discouraged me from working past the end of my scheduled shift or told me that I was not allowed to do so if necessary to finish my work. If anything, I have just been asked to provide reasoning for any overtime worked and I am often asked if I need help. I have never had to contact AMN about obtaining a signature for overtime approval.

13. In each of my Kaiser assignments, I have received timely 30-minute meal breaks and 15-minute rest breaks. My unit currently follows a meal and rest break schedule written up by the Relief Nurse. The term "Relief Nurse" refers to break nurses who are responsible for taking care of my assigned patients when I take my breaks.

DECLARATION OF SELMA DEMIROVIC [Case No. 3:16-CV-02816-JCS]

C486

14. My current manager gives me some latitude as to the times in which I wish to take my breaks since I devote my breaks to pumping milk for my seven month old baby. My breaks are very important to me for this reason. I typically spend my meal periods and rest breaks in the break room. In the past, I spent my breaks in the break room or the cafeteria relaxing until I had to return to my shift. I have never been told that I needed to stay in my unit or near my unit during breaks. It is my understanding that I am free to go wherever I want so long as I return from my break on time. It is my choice and I simply prefer to stay near my unit during my breaks.

15. My schedule at the LAMC facility always consists of three twelve (12) hour shifts from 7:30am-8:00pm, although the days of the week may vary.

16. I do not arrive before 7:30am and I have never been asked to arrive earlier than my shift.

17. There is only one time that I can recall having an issue with my AMN paycheck. A few weeks ago, I learned that Kaiser lost my timesheet. I knew that I had filled it out. I normally take a picture of it but I had forgotten to do so on this occasion. The representative from Kaiser asked me for my hours and said he would contact my unit and take care of it. I contacted AMN, and a Payroll specialist reached out to me right away. I was told AMN received the information from Kaiser and they corrected the error immediately.

18. At my current assignment, the patient- nurse ratio is 4-1 approximately 90% of the time.

19. I have "floated" to another unit in my current assignment, however has not been common for me for my assignments at Kaiser. In the past six months, I floated approximately four times. Previously, I went nearly two years without floating one time.

//

//

DECLARATION OF SELMA DEMIROVIC [Case No. 3:16-CV-02816-JCS]

C487

20. I enjoy working for AMN and think they are amazing. I love the recruiter I work with and have really never had any issues with them. I believe that I have been compensated for all time that I worked.

I declare under penalty of perjury under the laws United States and the State of California that the foregoing is true and correct.

Signed this 29th day of March, 2018 at Los Angeles, California.

SELMA DEMIROVIC

**DECLARATION OF SELMA DEMIROVIC [Case No. 3:16-CV-02816-JCS]**

C488

# DECLARATION OF VIVI NGUYEN

I, Vivi Nguyen, do hereby swear and affirm as follows:

1. I am a Registered Nurse and currently employed by AMN Services, LLC ("AMN") as a traveling nurse. I received my associates degree in nursing from Seminole State College in 2013, and my bachelors of science in nursing from the University of Central Florida in 2016.

2. I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN, and may be filed in court to supports AMN's defense in the lawsuit filed by Robert Shaw, Sharon Davis, Jennifer Teitelbaum, Candy Kucharski, and Lorenzo Holmes ("Plaintiffs") entitled *Robert Shaw, et al., v. AMN Healthcare, Inc., et al.*, United States District Court, Northern District of California Case No. 3:16-cv-02816.

3. I have worked for AMN since approximately November 2016. I have worked a total of four assignments for AMN and am currently on assignment as a traveling nurse at Kaiser Permanente's ("Kaiser") San Leandro facility, located at 2500 Merced Street, San Leandro, California 94577 (the "San Leandro Assignment").

4. Prior to starting my first assignment, I attended and completed orientation training. I prepared and submitted a timesheet for my time in attendance at that training and was paid for my time.

5. During my employment with AMN, I have received many documents electronically, including new hire paperwork and AMN's employment policies and handbook. Each time I start an assignment, I received an email containing links to employment documents I need to review and I acknowledge receiving and reviewing these documents by electronic signature. I am also aware that I could access any of AMN's policies or policies updates through AMN's online portal.

C489

6.     My San Leandro Assignment began on December 4, 2017 and is scheduled to end on March 3, 2018. I am scheduled to work three, 12 hour shifts each week. My shifts are from 7 a.m. to 7:30 p.m.

7.     I never perform any work before starting my shift at 7 a.m. I've also never been asked to start working before the scheduled start time for my shift. At the beginning of my shift, I almost always attend a morning huddle meeting with other nurses and our managers. The longest morning huddle I've attended lasted 10 minutes and most have been shorter than 10 minutes. At these morning huddles, managers will cover various issues such as patient developments or concerns, things we can do to better our department, hospital events, and continuing education opportunities.

8.     After the morning huddle, I receive a report for each of the patients I've been assigned to care for during my shift. I receive the report from the nurse or nurses who cared for these patients during the shift immediately preceding mine. I'm usually assigned to care for between four and five patients each shift and during this morning report we will discuss my patient's admitting diagnosis, lab history, total medical assessment, and any other matters relating to patient care. The longest it has even taken me to receive the whole morning report is 40 minutes and most of the time it lasts between 25 to 30 minutes.

9.     During each of my shifts, there is a 15-30-15-15 break system under which I take three, fifteen minute paid rest breaks and one thirty minute unpaid meal break. I usually take my first rest break in the mornings between 8:30 am and 9:15 am and then normally take my lunch break around 11:30 am. I don't take a second meal break because I agreed in writing to waive my second meal break. I'll take my second and third rest breaks in the afternoon. There is a break nurse who normally relieves me for each of my breaks so I can take my break but I still take my breaks even if the break nurse cannot relieve me.

C490

10.     No one has ever communicated to me that I could not take any break or prevented me from taking any break. I recall not being able to take my morning break approximately 1 to 3 times because I felt too busy with work and I decided myself not to take my morning break. Once, when I missed my morning break, I combined it with my lunch break later that day and took a 45 minute break. Throughout my employment with AMN, I've understood that if I miss a break I needed to report it and I would be paid for the missed break. If I missed a morning break that I did not combine with another break later in the day, I recorded the missed break on my timesheet and was paid for the missed break. I always take my lunch breaks and afternoon breaks. There are break rooms located on the floors I work on and during my breaks I would eat and drink and attend to personal matters. Sometimes, other nurses or hospital staff have asked me questions about my patients while I was on break because I was the only person who could answer the question because I was the patient's primary caregiver. If I was ever asked a question on break, it was always a very short, quick exchange and after I answered I always took the full remaining amount of my break left before I was asked the question.

11.     Towards the end of my shift, around 7 pm, I will give a patient report to the oncoming nurses who are taking over patient care for the patients I was responsible for during my shift. My whole evening report usually lasts around 20 minutes and but never more than 30 minutes.

12.     Over the course of all my assignments with AMN, I can only recall working past the scheduled end of my shift approximately six or seven times. Throughout my employment with AMN I understood that if I worked any overtime, I am required to report all my time worked so that I can be paid for all my time worked. No one has ever communicated to me that I could not report overtime I worked and no one has ever prevented me from reporting any overtime I worked. I have always been paid for all overtime I reported on my timesheets.

C491

1    13.    I record all my time worked on a paper timesheet which I submit each
2    Monday to the staffing office located at Kaiser's San Leandro facility.

3    14.    Once, while I was on assignment at Stanford University Medical Center,
4    I noticed some of my hours worked were missing on my pay statement.  I contacted
5    AMN's Customer Service Department to notify them of the missing hours.  The error
6    was promptly corrected by AMN and I was paid for all the hours I worked.  AMN has
7    paid me for all my time worked.

8          I declare under penalty of perjury under the laws United States and the State of
9    California that the foregoing is true and correct.

10         Signed this 1st day of March, 2018, at San Leandro, California.

13                                          Vivi Nguyen

C492

# DECLARATION OF EMILY GIFFIN

I, EMILY GIFFIN, do hereby swear and affirm as follows:

1.     I am currently employed by AMN Services, LLC ("AMN") as a traveling nurse assigned to the Pediatrics unit at Kaiser Permanente San Diego Medical Center in San Diego, California ("Kaiser San Diego"). I received my nursing degree from Hannibal-LaGrange University. Additionally, I am a Registered Nurse, Certified in Medical Surgical Nursing (Med-Surg).

2.     I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support their defense in the lawsuit filed by Robert Shaw, Jennifer Corona Teitelbaum, Candy Kucharski, Lorenzo Holmes, and Sharon Davis ("Plaintiffs") (Robert Shaw, et al. v. AMN Services, LLC, et al, United States District Court, Northern District of California, Case No. 3:16-cv-02816).

3.     I am currently on my fifth (5th) assignment with AMN. Between September 2013 and April 2018, I will have completed a total of two (2) AMN assignments in California. In March 2017, I began my assignment at Kaiser Permanente in San Luis Obispo, California. In October 2017, I began my current assignment at Kaiser San Diego in San Diego, California. My current AMN contract at Kaiser San Diego is scheduled to end on April 14, 2018.

*Training*

4.     Before starting my AMN assignment at Kaiser San Diego in October 2017, I was required to complete an online AMN training. Whenever AMN requires me to complete online training during hours when I am not scheduled to work, I fill out a timesheet and am paid for that time. The hourly rate that I receive for training is the same as my normal hourly rate of pay.

5.     During my AMN training, I received many documents electronically, through an online portal. The documents I received included employment policies

1 and new hire paperwork.  One of the online AMN training modules included a
2 discussion about breaks and overtime.  I remember signing an electronic
3 acknowledgment of the handbook.

4   6. In addition to the online AMN training I completed, I also completed a
5 training on-site at Kaiser San Diego.  During this training, I recall Kaiser staff
6 emphasizing the importance of taking breaks, and complying with state law.  It was
7 made abundantly clear to me that nurses should always take our breaks.  On
8 occasions where we may miss a rest or meal break due to patient acuity or any other
9 reason, we were told that we should always record any missed meal or rest breaks.

10   7. I am aware that I can access any policies or policy updates via the AMN
11 portal home page.  Via the portal, I also have 24-7 access to my paycheck
12 information, my employment history, my assignment contracts, and various other
13 personnel documents.

14       *Work Schedule and Time Reporting*

15   8. At my current AMN assignment at Kaiser San Diego, I regularly work
16 three shifts per week. Each shift normally begins at 7:00 p.m. and ends at 7:30 a.m.

17   9. I attend a "huddle" at the hospital at the beginning of every single shift.
18 The "huddles" normally last between five to ten minutes, and always begin after the
19 start of my scheduled shift.

20   10. At the beginning and end of each shift, I record my time on a paper time
21 sheet in the staffing office, which is two floors below my unit.  It takes
22 approximately five minutes to get from the staffing office to my unit.

23   11. To my knowledge, the staffing office approves the hours I enter, signs
24 my time card, and then sends the time card to AMN for processing and payroll.

25         *Breaks*

26   12. I normally take one thirty minute meal break and three fifteen minute
27 rest breaks during my 12-hour shifts at Kaiser San Diego.

28   13. I always take my meal break within the first five hours of my shift.

1

C494

14. On occasion, a break nurse may come around at the beginning of my shift, and I may sign up for a specific meal break time slot. However, more commonly, break times are informally worked out during the shift between the traveling nurse and the charge nurse. Other nurses are normally available to cover my patients while I am on break. The process is pretty fluid, and Kaiser hospital staff are always encouraging and enabling nurses to take their breaks.

15. I sometimes provide coverage for other nurses while they take their breaks. During these times, I am not specifically assigned to be the break nurse. The process is more informal.

16. I record my meal breaks on my time sheet.

17. There is a break room and cafeteria available for nurses to use during both meal and rest breaks. Although I have never left the hospital during a break, I believe I could leave the hospital during my breaks if I wanted to. I usually choose to spend my meal periods and rest breaks in the break room or cafeteria.

18. No one at AMN or at Kaiser San Diego has ever discouraged me from taking a meal or rest break. I always take my breaks and have never skipped a break because I did not feel like taking it.

19. I have never been interrupted during a meal or rest break. No one has ever said or suggested to me that I need to be available to assist patients or hospital staff while on a break.

20. Missing a meal break is extremely rare for me because the charge nurses or break nurses are very focused on making sure staff take their breaks. On occasion, I have missed a rest break due to patient acuity, or high patient volume.

21. If I miss a meal or rest break, I document the missed break on my time sheet. I have done this in the past, and have been compensated for the missed break on my paycheck. For example, on one occasion, multiple patients were arriving at the hospital all at once. A nurse was not available at the time to cover my rest

C495

break. My shift ended, and I did not receive one of my rest breaks. However, I documented the missed break and received compensation for it on my paycheck.

22. I have "floated" to other units during my shifts at Kaiser San Diego. In fact, at the beginning of my contract, I would "float" to the Neonatal Intensive Care Unit (NICU) approximately two out of three shifts. "Floating" has never caused me to work overtime or miss any breaks.

*Overtime*

23. I never begin working or performing job tasks before the scheduled start time of my shift. I never perform duties after I clock out for the day, either. In fact, throughout my employment with AMN, I have never worked off the clock at all.

24. I am sometimes required to work additional time after my usual clock out time. I am not required to get preapproval before I can work overtime. I can work the additional time, and obtain an approval signature from a manager or house supervisor the same day. I have never had any issues getting overtime approved, and I have never had to contact AMN about any issues getting an overtime approval signature.

25. I have never been discouraged from reporting overtime by anyone at AMN or Kaiser San Diego. Also, I have never been told I was not allowed to work overtime.

*Pagers/Radios*

26. I am not required to carry a radio, pager or cell phone with me during my meal periods or rest breaks.

27. I always hand my cell phone off to the person covering my breaks.

*Compensation*

28. I believe that AMN has compensated me for all time that I have worked.

3

C496

I declare under penalty of perjury under the laws United States and the State of California that the foregoing is true and correct.

Signed this 18 day of March 2018 at _San Diego_ , California.

_EMILY GIFFIN_

# DECLARATION OF KISHA WILLIAMS

I, KISHA WILLIAMS, do hereby swear and affirm as follows:

1.     I am currently employed by AMN Services, LLC ("AMN") as a traveling nurse assigned to the Labor and Delivery unit at Kaiser Medical Center in Downey, California ("Kaiser Downey").  I received my nursing degree from Hampton University.  Additionally, I am a Registered Nurse, Certified in Inpatient Obstetrics (RNC-OB).

2.     I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support their defense in the lawsuit filed by Robert Shaw, Jennifer Corona Teitelbaum, Candy Kucharski, Lorenzo Holmes, and Sharon Davis ("Plaintiffs") (Robert Shaw, et al. v. AMN Services, LLC, et al, United States District Court, Northern District of California, Case No. 3:16-cv-02816).

3.     Between February 2005 and May 5, 2018, I will have completed a total of three (3) assignments with AMN.  In February 2005, I began my first AMN assignment in Las Vegas, Nevada.  Shortly thereafter, I completed an AMN assignment in Pomona, California.  In July 2017, I began my current AMN assignment at Kaiser Downey, which is the only AMN assignment I have held since September 11, 2013.  Since July 2017, I have renewed my current AMN contract twice.  My current AMN contract at Kaiser Downey is scheduled to end on May 5, 2018.

*Training*

4.     Before starting my AMN assignment at Kaiser Downey in July 2017, I was required to complete an online AMN training.  Whenever AMN requires me to complete online training during hours when I am not scheduled to work, I am paid for that time.  The hourly rate that I receive for training is the same as my normal hourly rate of pay.

C498

5.     During my AMN training, I received many documents electronically, through an online portal. The documents I received included employment policies and new hire paperwork.  One of the online training modules included a discussion about breaks and overtime. I remember signing an electronic acknowledgment of the handbook.

6.     I am aware that I can access any policies or policy updates via the AMN portal home page.  Via the portal, I also have 24-7 access to my paycheck information, my employment history, my assignment contracts, and various other personnel documents.

*Work Schedule and Time Reporting*

7.     At my current AMN assignment at Kaiser Downey, I regularly work three shifts per week. Each shift normally begins at 7:15 a.m. and ends at 7:45 p.m.

8.     As a traveling nurse, I do not attend the "huddles" at the hospital because they begin at 7:15 a.m., and I am required to clock in at exactly 7:15 a.m.

9.     At the beginning and end of each shift, I record my time on a paper time sheet in the staffing office, which is two floors directly above my unit.  It takes approximately 2-3 minutes to get from the staffing office to my unit.

10.    To my knowledge, the staffing office approves the hours I enter, signs my time card, and then sends the time card to AMN for processing and payroll.

*Breaks*

11.     I normally take one thirty minute meal break and two fifteen minute rest breaks during my 12-hour shifts at Kaiser Downey.

12.     I sometimes do not take my meal break within the first five hours of my shift, but that is entirely due to my own preference since I normally work a 12-hour shift, and would prefer to take a later lunch.  If I want to take an earlier meal break I can do so by signing up for an earlier meal break time slot. I have worked shifts during which I have chosen to take an earlier meal break that is before the end of my fifth hour of work.

1

13. Other nurses are normally available to cover my patients while I am on break. There is no formal sign-up sheet or schedule that lists when everyone will be going on a break. The process is pretty fluid. A charge or break nurse may tell us it is a good time to go, or we can just ask another nurse to watch our patients while we are on break.

14. I regularly provide coverage for other nurses while they take their breaks. During these times, I am not specifically assigned to be the break nurse. The process is more informal.

15. I record my meal breaks on my time sheet.

16. There is a break room and cafeteria available for nurses to use during both meal and rest breaks. I could leave the hospital during my breaks if I want to. In fact, I did leave the hospital once during a break. However, I usually choose to spend my meal periods and rest breaks in the break room or cafeteria.

17. No one at AMN or at Kaiser Downey has ever discouraged me from taking a meal or rest break. I always take my breaks and have never skipped a break because I did not feel like taking it.

18. . No one has ever said or suggested to me that I need to be available to assist patients or hospital staff while on a break.

19. Missing a meal break is extremely rare for me because the charge nurses or break nurses are very focused on making sure staff take their breaks. On occasion, I have missed a rest break due to patient acuity, or high patient volume.

20. If I miss a meal or rest break, I document the missed break on my time sheet. I have done this in the past, and have been compensated for the missed break on my paycheck. For example, a few weeks ago, seventeen of eighteen labor rooms were occupied, and additional patients were arriving at the hospital. A nurse was not available at the time to cover my rest break. My shift ended, and I did not receive my second rest break. However, I documented the missed break and received compensation for it on my paycheck.

**C500**

21.  I have rarely "floated" to other units during my shifts at Kaiser Downey. On the two or three occasions I have floated to other units, it has not caused me to work overtime or miss any breaks.

*Overtime*

22.  I never begin working or performing job tasks before the scheduled start time of my shift.  I never perform duties after I clock out for the day, either.  In fact, throughout my employment with AMN, I have never worked off the clock at all.

23.  I am sometimes required to work additional time after my usual clock out time.  Although I have to get preapproval before I can work overtime, I am not required to obtain an approval signature from anyone at the hospital.  When my finish my work, I just record my time on a paper time sheet in the staffing office, like normal. I have never had to contact AMN about any issues getting an overtime approval signature.

24.  I have never been discouraged from reporting overtime by anyone at AMN or Kaiser Downey.  Also, I have never been told I was not allowed to work overtime.

*Pagers/Radios*

25.  I am not required to carry a radio, pager or cell phone with me during my meal periods or rest breaks.

26.  Normally, I hand my cell phone off to the person covering my breaks.

*Compensation*

27.  I believe that AMN has compensated me for all time that I have worked.

    I declare under penalty of perjury under the laws United States and the State of California that the foregoing is true and correct.

**DECLARATION OF KISHA WILLIAMS [Case No. 3:16-cv-02816-JCS]**

**C501**

Signed this 23 day of March 2018 at _DOWNEY_, California.



KISHA WILLIAMS

Scanned by CamScanner
C502

**<u>DECLARATION OF VICTORIA MCMURRAIN</u>**

I, VICTORIA MCMURRAIN, do hereby swear and affirm as follows:

1.     I am currently employed by AMN Services, LLC ("AMN") as a traveling nurse. I received an associate's degree in nursing from the Northwest Arkansas Community College in Bentonville, Arkansas, and a bachelor's degree from the University of Central Florida in Orlando, Florida. I hold certifications in Basic Life Support and Advanced Cardiovascular Life Support, as well as NIH Stroke Scale Certification.

2.     I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support their defense in the lawsuit filed by Robert Shaw, Jennifer Corona Teitelbaum, Candy Kucharski, Lorenzo Holmes, and Sharon Davis ("Plaintiffs") (*Robert Shaw, et al. v. AMN Services, LLC, et al.,* United States District Court (Northern District of California) Case No. 3:16-cv-02816).

3.     I am currently working an assignment for AMN in the Telemetry unit at Kaiser San Diego. The assignment started in July 2017, and is scheduled to end in May of 2018. This is the only assignment I have worked for AMN, but I have worked as a traveling nurse before.

### *<u>Training</u>*

4.     I completed online and in person training before starting my AMN assignment. The online portion took two to three hours to complete. I was paid for that time. There were two full days of onsite training one each at the Kaiser San Diego, and Kaiser Zion facilities. I included the time I spent in the onsite training on my timesheet, and was paid.

5.     Among the topics that were covered during training was how to use the Epic system that is used for charting. I also remember learning that I would receive three rest breaks and a meal period during my 12-hour shift, and discussion of the meal period waiver I signed.

6.     Part of my training time was spent shadowing a staff nurse in the Telemetry department.

7.     I received a handbook electronically before I started my assignment, and electronically signed an acknowledgement.

C503

8. I am assigned AMN recruiter. I can reach my recruiter by phone during regular business hours. I usually contact her by text message, and she is responsive to any questions I have had during my assignment.

### *Work Schedule and Time Reporting*

9. I work three 12 hour shifts per week that begin at 7:00 a.m. and end at 7:30 p.m. I record the start and end time for each shift on a paper timesheet, along with the length of my meal period.

10. My timesheet is kept in the staffing office, which is located on the same floor as the Telemetry unit.

11. If I need to work overtime (past the end of my shift), I need to get approval from a nurse manager or another supervisor. The nurse manager is on the unit pretty frequently, and so usually knows the reason why overtime is needed. If the nurse manager does not know, she will speak to the charge nurse.

12. I do not ask for overtime approval before I work the time. Instead, I get the approval after I have completed my work.

13. I record any overtime on my timesheet, and also on a separate overtime/break form that is kept on the unit. This is the same form that is used to record any missed meal periods or rest breaks.

14. If the nurse supervisor is not available, or is too busy to sign the overtime/break form when I am finished with my shift, I do not have to wait for him or her to be available. The nurse supervisor signs it later and the signed form is kept in the staffing office. Every time I have submitted overtime, it has been approved.

15. I estimate that during my assignment, I have worked overtime two to three times a month. I was more likely to need to work overtime during flu season because the unit was very busy. Now that flu season is winding down, the unit is not as busy.

16. The reasons I work overtime vary. Sometimes it is because the handoff is not finished by the time my shift is scheduled to end. I also work overtime if the unit has been particularly busy and I did not have time to finish all of my charting.

2

**DECLARATION OF VICTORIA MCMURRAIN**

C504

17.     I have never been told that I shouldn't work overtime, or pressured not to request approval for overtime.

### *Huddles*

18.     I attend huddles at the start of each shift. The huddle lasts around 5 minutes. It is led by a charge nurse or a nurse manager. My experience is that a charge nurse usually leads the huddle during my weekend shifts.

19.     After the huddle, I receive my patient assignment and participate in a handoff from the nurse or nurses who took care of them during the overnight shift.

20.     The nurse patient ratio for my unit is 1 to 4. The number of patients I care for at one time during a shift or over the course of shift varies, depending on how busy the unit is.

### *Handoffs*

21.     At the end of my shift, I handoff my patients to the nurse or nurses who will be caring for them on the oncoming shift. The number of nurses I hand off my patient to varies – it can be as few as one or as many as four.

22.     The amount of time the handoff takes also varies depending on patient acuity. Patients with more complex issues take longer, while a patient who is in for observation, for example, takes much less time. I spend between 1 minute and 10 minutes handing off each patient. It really depends on each patient's individual circumstances.

### *Meal Periods and Rest Breaks*

23.     During my 12 hour shift, I receive three 15-minute breaks and a 30-minute meal period. At the start of the shift, a breaker will often ask me what time I would like to take my breaks and fill in my preferred times on a schedule. On other shifts a breaker will simply arrive at different times during my shift to ask if I am ready for a break, and relieve me if I am. How the breaks are handled depends on who the break nurse is and what procedure they like to follow.

24.     Break nurses start relieving nurses for meal periods on my unit around 11:30 a.m. I usually select a time slot around 1:00 or 2:00 p.m. to take my lunch. I like to take my lunch break around that time because I find it splits up my shift nicely.

25.     I have never missed a meal period during my assignment. There have been a handful

3

C505

of times when I decided not to take one of my rest breaks by my own choice.

26.   I can recall a few times when a doctor has interrupted my rest break with a question. I would estimate that it has happened 4 or 5 times in the eight months I have been on assignment. They were extremely brief interruptions – maybe a minute or two. I have never been asked to return to the floor during a break. I have never been told that I need to be on-call or that I have to be available to staff or patients during my breaks.

27.   During my breaks I usually go to the break room or to the café in the hospital. Although I rarely leave the hospital during my breaks, I have done so from time to time – for instance, to get something from my car. No one has ever said or suggested that I cannot leave the hospital while I am on my break.

### *Pagers/Radios/Phone*

28.   I am assigned a portable phone during my shift. I do not carry it during breaks. Instead I hand it over to the break nurse while I am away from the floor.

### *Floating*

29.   I have been floated on one occasion during my assignment at Kaiser San Diego. When I floated, the charge nurse in the Telemetry Department made sure that I received my first 15-minute break before I floated. I was floated to the Med-Surg Department, and received the rest of my breaks there.

I declare under penalty of perjury under the laws United States and the State of California that the foregoing is true and correct.

Executed this **2** nd day of April 2018 at San Diego, California.

VICTORIA MCMURRAIN
Declarant

4

DECLARATION OF VICTORIA MCMURRAIN

## **DECLARATION OF RAKIYA JOHNSON**

I, RAKIYA JOHNSON, do hereby swear and affirm as follows:

1.     I am currently employed by AMN Services, LLC ("AMN") as a traveling nurse assigned to the Med-Surg Unit at Kaiser Permanente San Diego Medical Center in San Diego, California ("Kaiser San Diego").  I received my nursing degree from Gordon State College.  Additionally, I am a Registered Nurse, Certified in Medical Surgical Nursing (Med-Surg).

2.     I make this declaration of my own personal knowledge. If called upon to testify as a witness, I could and would competently testify to these facts. I understand that this Declaration is being provided to attorneys for AMN and Kaiser, and may be filed in court to support their defense in the lawsuit filed by Robert Shaw, Jennifer Corona Teitelbaum, Candy Kucharski, Lorenzo Holmes, and Sharon Davis ("Plaintiffs") (Robert Shaw, et al. v. AMN Services, LLC, et al, United States District Court, Northern District of California, Case No. 3:16-cv-02816).

3.     I am currently on my second (2nd) assignment with AMN.  Between September 2013 and June 2018, I will have completed a total of two (2) AMN assignments in California.  In February 2017, I began my first assignment at Kaiser Permanente in Downey, California.  That assignment ended in July 2017.  In December 2017, I began my current assignment at Kaiser San Diego in San Diego, California.  My current AMN contract at Kaiser San Diego is scheduled to end in June 2018.

*Training*

4.     Before starting my AMN assignment at Kaiser Downey in February 2017, I was required to complete an online AMN training.  Whenever AMN requires me to complete online training during hours when I am not scheduled to work, I fill out a timesheet and am paid for that time.  The hourly rate that I receive for training is the same as my normal hourly rate of pay.

---

5. During my AMN training, I received many documents electronically, through an online portal. The documents I received included employment policies and new hire paperwork. One of the online AMN training modules included a discussion about breaks and overtime. I remember signing an electronic acknowledgment of the handbook.

6. In addition to the online AMN training I completed, I also completed a training on-site at Kaiser.

7. I am aware that I can access any policies or policy updates via the AMN portal home page. Via the portal, I also have 24-7 access to my paycheck information, my employment history, my assignment contracts, and various other personnel documents.

*Work Schedule and Time Reporting*

8. At my current AMN assignment at Kaiser San Diego, I regularly work three shifts per week. Each shift normally begins at 7:00 a.m. and ends at 7:00 p.m.

9. I attend a "huddle" at the hospital at the beginning of every single shift. The "huddles" normally last between five to ten minutes, and always begin after the start of my scheduled shift.

10. At the beginning and end of each shift, I record my time on a paper time sheet in the staffing office. It takes no more than five minutes to get from the staffing office to my unit. I include the time I spend going to and from the staffing office on my timesheet.

11. To my knowledge, the staffing office approves the hours I enter, signs my time card, and then sends the time card to AMN.

*Breaks*

12. I normally take one thirty minute meal break and three fifteen minute rest breaks during my 12-hour shifts at Kaiser San Diego.

13. I regularly take my meal break within the first five hours of my shift.

**C508**

14. A break nurse is present during each "huddle" with a sign-up sheet, so that nurses, including myself, can sign up for specific rest break and meal break time slots. When it is time for my break, the break nurse or charge nurse will come by and relieve me. The process is pretty fluid, and Kaiser hospital staff are always encouraging and enabling nurses to take their breaks.

15. I record my meal breaks on my time sheet.

16. There is a break room and cafeteria available for nurses to use during both meal and rest breaks. Although I have never left the hospital during a break, I could leave the hospital during my breaks if I wanted to. I usually choose to spend my meal periods and rest breaks in the break room or cafeteria.

17. No one at AMN or at Kaiser San Diego has ever discouraged me from taking a meal or rest break. I always take my breaks and have never skipped a break because I did not feel like taking it.

18. I have never been interrupted during a meal or rest break. No one has ever said or suggested to me that I need to be available to assist patients or hospital staff while on a break.

19. I regularly "float" to other units during my shifts at Kaiser San Diego. Floating has never caused me to work overtime or miss any breaks.

*Overtime*

20. I never begin working or performing job tasks before the scheduled start time of my shift. I never perform duties after I clock out for the day, either. In fact, throughout my employment with AMN, I have never worked off the clock at all.

21. I am sometimes required to work additional time after my usual clock out time. I am required to obtain an approval signature from a manager before working overtime, but I have never had any issues getting overtime approved, and I have never had to contact AMN about any issues getting an overtime approval signature.

DECLARATION OF RAKIYA JOHNSON [Case No. 3:16-cv-02816-JCS]

1  22.  I have never been discouraged from reporting overtime by anyone at
2  AMN or Kaiser San Diego.  Also, I have never been told I was not allowed to work
3  overtime.

*Pagers/Radios*

5  23.  I am not required to carry a radio, pager or cell phone with me during
6  my meal periods or rest breaks.

7  24.  I always hand my cell phone off to the person covering my breaks.

*Compensation*

9  25.  I believe that AMN has compensated me for all time that I have worked.

I declare under penalty of perjury under the laws United States and the State of
California that the foregoing is true and correct.

Signed this 29 day of March 2018 at 6919 San Diego, California.

RAKIYA JOHNSON

C510

**DECLARATION OF ROBERT HASINSKY**

I, Robert Hasinsky, declare:

1.      I have personal knowledge of the matters stated below and, if called as a witness, could and would testify competently about these matters.

2.      I am currently employed by Kaiser Foundation Hospitals ("Kaiser") as the Manager of the Telemetry Unit in Kaiser's San Diego Medical Center Zion. I have held this position since April 2017.

3.      The Telemetry Unit has 36 beds. However, there is usually an average of 16 patients per day, which requires staffing of approximately four (4) nurses. Telemetry nurses are staffed with Kaiser-employed nurses, as well as traveling nurses on assignment from AMN Services, LLC ("AMN"). The ratio for nurse to patient is 1 to 4 (1 nurse to 4 patients). However, because some patients may be discharged throughout a 12-hour shift, one nurse may care for more than three patients.

4.      The Telemetry Unit is routinely staffed with traveling nurses. Prior to working on the Telemetry Unit floor, each traveling nurse is provided an orientation to the Telemetry Unit, which lasts approximately three days. During the orientation, each traveling nurse is instructed on how to sign in and out, and the meal/rest break and overtime policies.

5.      The Telemetry Unit traveling nurses work either the day shift or evening shift. The day shift is from 7:00 a.m. to 7:30 p.m. and the evening shift is from 7:00 p.m. to 7:30 a.m. Each shift is staffed with nurses, who are assigned patients, along with charge nurses. Charge nurses are not assigned patients and are responsible for relieving nurses during breaks. If extra coverage is needed to ensure that nurses receive breaks, break nurses are called into the unit to provide coverage. In addition, if needed, I am available, as are other managers and supervisors, to cover for nurses during their breaks.

6.      Charge or break nurses relieve nurses based on the break schedule that is determined at the beginning of each shift. At the start of each shift, the Charge nurse talks with the nurses to see

1

45313672v.1

**C511**

1    when each nurse would prefer to take their breaks. Accordingly, each nurse, whether a Kaiser nurse

2    or a traveling nurse, has an assigned break time, every shift.  Since there are always Charge nurses

3    available to relieve nurses for their breaks, as well as other break nurses who are not assigned

4    patients, it would be highly unusual for a nurse not to be able to take all of his/her assigned breaks in

5    a timely manner.

6         7.      While on shift, all nurses carry a pager called a Vocera device in order to stay in

7    communication with the charge nurse or supervisor on duty.  When nurses are relieved for breaks

8    they must leave their Vocera device with the relieving nurse  I ensure that the practice of leaving

9    Volcera phones with the relieving nurse is strictly followed, so that nurses receive uninterrupted

10   breaks.

11        8.      On occasion, Telemetry Unit traveling nurses are floated to another unit that needs

12   coverage.  However, the traveling nurses are usually floated at the beginning of the shift, and told

13   that they will be floating for the day during the team huddle that occurs at the beginning of each

14   shift, on the clock.  If a traveler is floated, they would normally be floated only to one other unit.  It

15   is extremely uncommon for travelers to be floated to multiple different units on any one shift.

16        9.      The team huddle lasts five to ten minutes, and takes place on the clock.  The huddle

17   occurs for travelers at the beginning of each 12-hour shift.  Therefore, there is a morning huddle at

18   7:00 am and an evening huddle at 7:00 pm.  During the huddle, the Telemetry Unit nurses are

19   provided their assignments. The manager conducting the huddle also uses the brief time to update

20   the staff on the status of the Telemetry Unit.

21

22        10.     After the huddle, Telemetry Unit nurses then begin their assignments by receiving

handoffs from nurses who are finishing their shifts.  Each incoming Telemetry Unit nurse receives a

23   handoff for every patient assigned to him/her, which is anywhere from one to four patients.  During

24   the handoff, the incoming Telemetry Unit nurse receives a report on the patient from the previous

25   nurse assigned to the patient.

26

27

28

**DECLARATION OF ROBERT HASINSKY**

45313672v.1

1    11.    Handoff times per patient can vary greatly depending on the sickness level of the

2  patient, and the number of patients assigned to each Telemetry Unit nurse.  On some occasions, a

3  handoff may take less time because the incoming Telemetry Unit nurse had previously cared for the

4  patient and is already aware of most of the patient's history and needs.  The entire handoff could

5  take 10-20 minutes. On occasion, Telemetry Unit nurses need to work overtime to finish a handoff.

6  However, it is rare for a Telemetry Unit nurse to stay more than 10-20 minutes past their assigned

7  shift time to finish a handoff.  In these situations, the overtime is always approved.

8

9        12.    AMN traveling nurses are required to sign in and out on their timesheets located at

10  the staffing office.  If a traveling nurse is unable to take a break in a timely manner, or at all, or is

11  interrupted during a meal or rest break, they must note the missed or interrupted break on a separate

12  form and obtain a signature from an Assistant Nurse Manager, myself, or the House Manager.

13  Traveling nurses must note any overtime on a separate form and obtain a signature from one of us.

14  The traveling nurse must also record their missed/late break, or overtime on their time sheets at the

15  staffing office. The timesheet and any overtime or missed break forms are submitted to the staffing

16  office and the information is provided to AMN to ensure that the nurse receives penalty pay for the

17  missed/late break, and is paid for any overtime they work.

18        13.    The practice is for traveling nurses to have only one manager sign the form and

19  approve the overtime or missed break - they do not need to get two separate signatures.  However, if

20  a traveling nurse cannot locate myself, or an Assistant Manager to approve their overtime, they can

21  always contact a House Manager.  At San Diego Zion, a House Manager is on shift twenty-four

22  hours every day.  Overtime is always approved.  Regardless of whether the overtime/missed break

23  form is signed by a manager, the timesheet indicating the overtime and/or missed break is still

24  submitted to AMN with the expectation it will be paid by AMN.

25        14.    The preferred practice is for both traveling nurses and Kaiser nurses to have any

26  overtime approved by a manager, but that is not always possible for various reasons.  Kaiser does

27  not prohibit any nurse from receiving overtime pay for failure to secure approval of the overtime

28  _____

3

**DECLARATION OF ROBERT HASINSKY**

45313672v.1

**C513**

1   worked. Also, I am not aware of any policy permitting Kaiser nurses to work two hours of overtime
2   without any manager approval.

3
4          15.     Travelers are not discouraged from recording overtime or missed breaks on their
5   timesheets. If a Kaiser nurse or traveling nurse regularly incurs significant overtime (with or without
6   approval), myself or an Assistant Manager will address that issue with the nurse to find out why it is
7   happening, and offer solutions to try and ameliorate the need for consistent overtime being worked.

8          16.     I have provided this Declaration of my own free will. I have not been threatened,
9   coerced, or pressured to sign this Declaration in any way. I have not been promised anything in
10  exchange for signing this Declaration. I was given ample opportunity to review this Declaration and
11  to make any changes that I wished before signing it.

12          I declare under penalty of perjury under the laws of the United States of America and the
13  State of California that the foregoing is true and correct and that this declaration was executed on
14  March 23, 2018, at San Diego, California.

15                                                      Robert Hasinsky
16                                                                      3/23/18

17

18

19

20

21

22

23

24

25

26

27

28

---
                                        4
                        **DECLARATION OF ROBERT HASINSKY**