UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT SHAW, et al.,<br><br>       Plaintiffs,<br><br>v.<br><br>AMN HEALTHCARE, INC., et al.,<br><br>       Defendants. | Case No. 16-cv-02816-JCS<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION, STRIKING MOTION TO STRIKE AND GRANTING IN PART AND DENYING IN PART ADMINISTRATIVE MOTION FOR LEAVE TO FILE SURREPLY**<br><br>Re: Dkt. No. 105, 122, 125 |

## I.  INTRODUCTION

Plaintiffs in this putative class action are employed by Defendant AMN Healthcare, Inc. ("AMN"), a labor contractor that recruits and places traveling nurses at various healthcare facilities across the United States.  They assert wage and hour claims under California laws governing the payment of overtime and provision of meal and rest periods.  Presently before the Court is Plaintiffs' Motion for Class Certification ("Motion") in which Plaintiffs ask the Court to certify a class under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure of traveling nurses employed by AMN who have worked at Kaiser Foundation Hospitals in California during the proposed class period.   A hearing on the Motion was held on June 8, 2018.  For the reasons stated below, the Motion is GRANTED.[1]

## II.  BACKGROUND

### A.  Factual Background

#### 1.  Nursing Shortages at Kaiser Facilities

In the healthcare industry, nursing shortages are a widespread problem.  *See* Declaration of Joshua Konecky in Support of Motion for Class Certification ("Konecky Decl."), Ex. 9 (May 28,

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

2015 New York Times Article, "We Need More Nurses"). Defendants' expert, Suzanne Boyle, testified at her deposition that there has been a nationwide nursing shortage throughout her entire career and that "every nurse executive [she] know[s] struggles with staffing shortages simply as part of the role." Piller Reply Decl., Ex. 19 (Boyle Depo.) at 24-26. According to news reports, these shortages have affected Kaiser facilities as well, leading to protests at numerous Kaiser facilities led by the California Nurses Association ("CNA"). *See* Konecky Decl., Ex. 11 (September 18, 2017 Santa Rosa Press Democrat article entitled "Kaiser Nurses hold protest rally in Santa Rosa for more staffing"); *id*., Ex. 12 (October 31, 2017 Press Release by CNA entitled "Kaiser Nurses to Hold Information Pickets Across CA Thursday for Safer Care"). Kaiser contracts with companies such as AMN for temporary nurses who work short-term assignments in facilities or units that face staffing challenges. *See* Piller Reply Decl., Ex. 21 (Deposition of Kaiser Manager Elizabeth Carreon) ("Carreon Depo.") at 58.

## 2. The Relationship Between AMN and Kaiser

Defendant AMN is a leading healthcare staffing company that contracts with healthcare facilities to deliver "short-term staffing solutions" by providing skilled healthcare professionals, including Registered Nurses ("RNs") and Licensed Practical Nurses ("LPNs") (collectively, "traveling nurses"). Declaration of Lisa Larson in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Larson Decl.") ¶ 2. Defendants Kaiser Foundation Hospitals, Southern California Permanente Medical Group, Inc. and the Permanente Medical Group, Inc. (collectively, "Kaiser") have a contract with AMN under which AMN supplies traveling nurses to Kaiser hospitals and medical offices throughout California. *Id*. ¶ 3 & Ex. 1 ("Amended and Restated Agreement for the Temporary Staffing of Clinical Services") (excerpt). Under the contract, AMN is considered the "employer" and is responsible for ensuring adherence to California's wage and hour laws with respect to its traveling nurses placed in Kaiser facilities. Konecky Decl., Ex. 13 (Deposition of Kristen Mussman, Kaiser's Rule 30(b)(6) Person Most Knowledgeable ("Kaiser PMK Depo.") at 41; *see also* Konecky Decl., Ex. 2 (Deposition of Lisa Larson, AMN's 30(b)(6) Person Most Knowledgeable ("AMN PMK Depo.")) at 170 (testifying that there is no person or department at Kaiser responsible for ensuring that AMN's traveling

1    nurses do not work off-the-clock at Kaiser facilities). The contract also contains an

2    indemnification provision which insulates Kaiser from "any and all situations related to the nurses

3    that AMN employs and provides to Kaiser."  Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 38.

4         According to AMN, between September 11, 2013 and December 4, 2017, 6,772 clinicians

5    employed by AMN worked at least one assignment at a Kaiser facility in California.  Larson

6    Decl. ¶ 5. On average, an assignment at a Kaiser facility is for thirteen weeks on a schedule of 36-

7    40 hours a week, depending on whether the facility operates on eight or twelve hour shifts.

8    Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 13-16.  Defendants do not dispute that the vast

9    majority of the putative class members in this case work 12-hour shifts.  Kaiser pays AMN at a

10   contractual rate that is based on the hours worked by AMN traveling nurses at Kaiser facilities,

11   which includes a premium rate for overtime hours.  *Id*. at 13, 69.

12        **3.  Scheduling and Supervision of AMN Traveling Nurses at Kaiser Facilities**

13        Kaiser is responsible for setting the schedules of AMN employees who are assigned to its

14   facilities in California.  Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 167;  *see also id*., Ex. 2

15   (AMN PMK Depo.) at 181 (testifying that it is AMN's general policy that its traveling nurses

16   comply with the scheduling policies and practices of the facility to which they are assigned).

17   AMN does not provide scheduling support for traveling nurses assigned to Kaiser facilities.

18   Konecky Decl., Ex. 2 (AMN PMK Depo.) at 12-13.  Similarly, AMN traveling nurses assigned to

19   Kaiser facilities are supervised by Kaiser employees while they work at those facilities.  *Id*. at 147.

20   This supervision includes the provision of meal and rest breaks for AMN traveling nurses and the

21   approval of overtime.  Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 88-89, 98;  *see also id*., Ex.

22   2 (AMN PMK Depo.) at 95-96 (overtime is approved by managers at Kaiser facilities and AMN

23   does not monitor how Kaiser implements its overtime approval process).  AMN traveling nurses

24   who encounter problems can contact its Customer Support line between 5 a.m. and 5 p.m. Pacific

25   time.  *Id*., Ex. 2 (AMN PMK Depo.) at 76-77.  Although there are AMN representatives at some

26   Kaiser facilities, that is the exception rather than the rule.  *Id*., Ex. 13 (Kaiser PMK Depo.) at 56.

27

28

#### 4. Duties of AMN Traveling Nurses at Kaiser Facilities

AMN traveling nurses assigned to Kaiser facilities are expected to meet the same standards as Kaiser nurses and carry out the same core duties. *Id.* at 58. These duties include developing and implementing a plan of care for each patient, responding to patient calls and alarms, communicating at the end of their shift with nurses who are taking over their patients' care ("hand-off"), and entering information about patients' health care picture into Kaiser's electronic healthcare documentation system ("charting"). *Id.* at 58-60, 62, 76-77. The hand-off involves "thorough and complete verbal and written communication" with the oncoming shift about each patient and typically occurs after the next shift completes its start-of-shift "huddle." Konecky Decl., Ex. 2 (AMN PMK Depo.) at 38-39. Ethical and professional standards require that all nurses, including AMN traveling nurses, complete the "hand-off" for their patients, regardless of whether they must work overtime to do so or whether they are compensated for that time. Piller Reply Decl., Ex. 19 (Boyle Depo.) at 127-128.

Plaintiffs offer declarations of putative class members attesting that the overlap between shifts often is not long enough to complete the hand-off during their scheduled shift. *See,* Compendium of Class Member Declarations in Support of Plaintiffs' Motion for Class Certification ("Plaintiffs' Compendium of Declarations"), Corona Teitelbaum Decl. ¶ 11; Kucharski Decl. ¶¶ 14-15, 18; Boyd Decl. ¶ 12; Bridges Decl. ¶¶ 9-10; Broesicke Decl. ¶¶ 9-10; Ciervo Decl. ¶¶ 14-16; Dagasgas Decl. ¶¶ 8-14; Jennings Decl. ¶¶ 10-12; Johnson Decl. ¶¶ 11-12; Jones Decl. ¶ 12; Joiner Decl. ¶¶ 9-12; Lacey Kelley Decl. ¶¶ 9-10; Macey Kelley Decl. ¶¶ 13-16; Kravitz Decl. ¶¶ 11-12; Krouse Decl. ¶¶ 9-10; Landry Decl. ¶¶ 11-13; Lukhi Decl. ¶¶ 9-10; Luzzo Decl. ¶¶ 9-10; Marcellin Decl. ¶¶ 10-11; Morse Decl. ¶¶ 10-12; Mottola Decl. ¶¶ 12-13; Nava Decl. ¶¶ 15-19; Parks Decl. ¶¶ 10-11; Reynosa-Juarez Decl. ¶¶ 11-13; Sampin Decl. ¶¶ 11-12; Smith Decl. ¶¶ 10-11; Stuart Decl. ¶¶ 13-16; Threadgill Decl. ¶¶ 10-11; Varner Decl. ¶¶10-11; Williams Decl. ¶¶ 10-12; Womack Decl. ¶¶ 11-13. The putative class members also offer testimony that the requirement to complete detailed charting causes them to have to perform post-shift work on a regular basis. *Id.*; *see also* Konecky Decl., Ex. 17 (Deposition of Jennifer Corona Teitelbaum ("Corona Teitelbaum Depo.")) at 92-93, 118 (testifying that charting may be

delayed because patient care comes first and that charting sometimes caused her to work after scheduled shift); *id*., Ex. 18 (Deposition of Candy Kucharski ("Kucharski Depo.") at 140 (same); *id*., Ex. 21 (Deposition of Robert Shaw ("Shaw Depo.") at 134 (same). Indeed, AMN's PMK states in her declaration that AMN traveling nurses "regularly" work overtime at Kaiser facilities. Larson Decl. ¶ 39.

AMN traveling nurses also must abide by Kaiser's mission statement and policies, which include putting the patient first. Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 69-70, 180-181, 186. If an AMN traveling nurse fails to meet this requirement, Kaiser will notify AMN that the individual is not performing according to expectations and AMN must remove the individual from the assignment. *Id*. at 57-58; *see also* Konecky Decl., Ex. 2 (AMN PMK Depo.) at 159 (recognizing that violation of facility rules or neglect of duty are grounds for immediate termination of the assignment). Further, if an AMN traveling nurse fails to meet regulatory standards of care, for example, by abandoning a patient, Kaiser notifies AMN that it must file a report with the appropriate licensing agency about that individual and what occurred. Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 71. Such a report jeopardizes the license held by the traveling nurse who is the subject of the report. *Id*. at 72.

Although traveling nurses have many of the same duties and responsibilities as Kaiser nurses, they are treated differently from Kaiser nurses in some respects because they are not covered by the collective bargaining agreement that protect Kaiser nurses. *Id.* at 48. Thus, for example, the collective bargaining agreement requires that traveling nurses are the "first to float" from one hospital unit to another. *Id*. at 155. Plaintiffs present evidence that nurses who are asked to float are likely to have a higher patient load and work under more supervisors during the course of a shift than those who are assigned to a single unit for their shift, which increases the likelihood that they will need to work overtime to complete their duties while making it more difficult for them to obtain the authorizations required for overtime and missed meal or rest breaks (discussed below). *See* Konecky Decl., Ex. 23 (Crowninshield Expert Report) at 4-5; *see also* Plaintiffs' Compendium of Declarations.

Kaiser nurses also are subject to a different overtime policy which permits them to work up

1   to two hours of overtime per week without seeking approval from a supervisor.  Konecky Decl.,

2   Ex. 22 (Deposition of Marliese Bartz ("Bartz Depo.") at 96.  In contrast, traveling nurses are

3   required to obtain approval from two different supervisors for overtime, as discussed below.

4   Kaiser also typically uses electronic timekeeping for its own nurses, rather than the paper forms

5   used for traveling nurses.  *Id.*, Ex. 13 (Kaiser PMK Depo.) at 112.

### 5. Policies and Practices Relating to the Payment of Overtime at Kaiser Facilities for AMN Traveling Nurses

Plaintiffs contend "Defendants suppress the reporting of overtime by routinely instructing the traveling nurses that overtime is not permitted, and then requiring them to submit to a burdensome overtime approval process" when they do work overtime.  Reply at 3.  To establish such a policy, Plaintiffs point to the following statement in the AMN Employee Handbook under the heading "Overtime":

> The Company follows federal and state wage and hour laws for payment of overtime worked.  Some facilities do not authorize overtime.  It is very important that you obtain approval from your manager at the Facility prior to working any overtime.  In addition, your manager must also approve the overtime on your timecard.

Larson Decl., Exs. 8-12 (2013-2017 versions of AMN employee handbook).

Plaintiffs also provide copies of assignment paperwork received by AMN traveling nurses that contain similar language.[2]  *See* Piller Reply Decl., Ex. 3A.  For example, some AMN traveling nurses assigned to Kaiser facilities in California received assignment paperwork that stated as follows:

> OT is not permitted at this facility.  If the Healthcare Professional is required to work OT or misses a meal period, then, OT/Missed Meal

---

[2] In their Opposition brief, Defendants contend Plaintiffs "fixate" on the statement in an assignment letter received by Plaintiff Shaw "to falsely assert that AMN does not permit overtime at Kaiser San Diego – and unspecified other facilities."  Opposition at 3.  In fact, at the time Plaintiffs filed their Motion, Defendants had not produced assignment paperwork for other class members.  After they filed their Opposition brief, however, Defendants belatedly produced a sample of such paperwork that revealed that *numerous* class members (approximately 40% of the class members whose assignment paperwork was produced in the sample) were told that overtime was prohibited at the Kaiser facility to which they were assigned.  Reply at 3-4.  It is unclear whether Defendants were aware at the time they filed their Opposition brief that the statements made therein suggesting that only one Kaiser facility told its traveling nurses that overtime was not permitted were, in fact, false.

United States District Court
Northern District of California

> & Rest Period Justification Form must be completed ON THE DAY that the missed meal/rest period or OT occurred. The form can be found in the staff office and is Healthcare Professionals [sic] responsibility to complete, & have signed by the asst. clinical director, nurse manager or charge nurse. Again, this form is MANDATORY.

Piller Reply Decl., Ex. 3A (*see*, *e.g.*, AMN0020985 (assignment to Kaiser – Los Angeles Medical Center), AMN0021011 (assignment to Kaiser Fontana Medical Center), AMN0021015 (assignment to Kaiser- San Diego Medical Center), AMN0021022 (assignment to Kaiser –Santa Clara Medical Center), AMN0021064 (assignment to Kaiser – Riverside Medical Center), AMN0021124 (assignment to Kaiser – Downey Medical Center)). Other AMN traveling nurses received assignment paperwork that stated:

> Please keep in mind that Kaiser is very strict with regard to overtime and meal periods. They do not allow overtime, and require that you take your meal period for each shift. In the event that you accrue overtime or miss your meal period for some reason, please complete the Overtime/Missed Meal Period Justification Form on the day that either the instance occurs, have it signed by the facility, and submit to the staffing office.

*Id.* (*see*, *e.g*,. AMN0021047 (assignment to Kaiser – San Jose Medical Center), AMN0021049 (assignment to Kaiser – Hayward Medical Center), AMN0021060 (assignment to Kaiser – San Francisco Medical Center), AMN0021062 (assignment to Kaiser – Fremont Medical Center), AMN0021080 (assignment to Kaiser – West Los Angeles Medical Center)).

Finally, Plaintiffs have offered declarations of putative class members stating that they were explicitly told that Kaiser does not permit overtime or that they were discouraged from seeking overtime compensation by Kaiser supervisors, who were often unavailable to sign the required form and sometimes refused to approve overtime on the basis that the traveling nurses should have been able to complete their duties during their shift. *See*, *e.g.*, Plaintiffs' Compendium of Declarations, Boyd Decl. ¶¶ 18-19; Broesicke Decl. ¶¶ 18-19; Dagasgas Decl. ¶¶ 16-17; Gordon Decl. ¶¶ 10-12; Jennings Decl. ¶¶ 16-20; Johnson Decl. ¶¶ 17-20; Jones Decl. ¶¶ 17-18; Joiner Decl. ¶¶ 15-16; Lacey Kelley Decl. ¶¶ 13-15; Macey Kelley Decl. ¶¶ 22-26; Kravitz Decl. ¶¶ 16-19; Krouse Decl. ¶¶ 14-15; Landry Decl. ¶¶ 17-19; Lukhi Decl. ¶¶ 14-17; Luzzo Decl. ¶¶ 13-14; Marcellin Decl. ¶¶ 15-18; Morse Decl. ¶¶ 16-20; Mottola Decl. ¶¶ 15-18; Nava Decl. ¶ 24; Parks Decl. ¶ 16; Reynosa-Juarez Decl. ¶¶ 20-23; Smith Decl. ¶ 14; Stuart

Decl. ¶¶ 20-28; Threadgill Decl. ¶¶ 15-19; Turning Decl. ¶¶ 10-11; Varner Decl. ¶ 14; Williams Decl. ¶¶ 16-20.

AMN traveling nurses assigned to Kaiser facilities record their time on paper timesheets, which must be approved and signed by a manager prior to submission. Konecky Decl., Ex. 13 (Kaiser PM Depo.) at 98-99. The same timesheet is used at all Kaiser facilities by AMN traveling nurses. *Id*. at 90. The timesheets are kept in a staffing office, requiring AMN traveling nurses to walk to and from the staffing office to their work stations to record their time. Konecky Decl., Ex. 22 (Bartz Depo.) at 47; *see also id*., Ex. 26 at BARTZ0428, BARTZ0434 (Powerpoint addressing timekeeping by AMN employees at Kaiser facilities, noting that "[c]linician usually has to walk to and from staffing office to check in and out time card" and referring to this time as "unpaid travel time"). When AMN traveling nurses seeks compensation for overtime, they must also obtain approval from a "charge nurse," who must sign a separate "justification form." *Id.*, Ex. 22 (Bartz Depo.) at 54. Overtime is only paid if the traveling nurse submits both the timesheet showing that overtime was worked and a signed justification form approving the overtime. *Id.*

The shortcomings of the procedures for recording time worked by AMN traveling nurses at Kaiser facilities, including the process for approval of overtime, were addressed by a consultant for AMN, Marliese Bartz, who conducted a study of Kaiser's timekeeping in connection with efforts to switch from paper timekeeping to electronic recording of time for traveling nurses. *See* Larson Decl. ¶ 57; Konecky Decl., Ex. 22 (Bartz Depo.) at 11-12. Bartz testified at her deposition that the use of paper timesheets is "very burdensome internally for both AMN and Kaiser." *Id*. at 20. Similarly, she found that the process for obtaining approval of overtime is burdensome not only for AMN and Kaiser but also for the clinicians because it is sometimes difficult for them to get the required signature from a Kaiser manager on the "OT/Missed Meal Form." *Id*. at 43-44 (describing the signature requirement as a "pain point"). She testified that one of the options that was discussed to alleviate this problem was "to align what was happening with the permanent staff to the traveling staff, so that they would both have up to two hours of overtime per week allowed

without a signature." Konecky Decl., Ex. 22 (Bartz Depo.) at 92-94, 96.[3]

Named Plaintiffs also offer testimony describing the difficulties they encountered in obtaining approval for overtime, sometimes resulting in their working unpaid overtime. *See, e.g.,* Konecky Decl., Ex. 17 (Corona Teitelbaum Depo.) at 79-81 (testifying that she worked off the clock numerous times because she was "mentally and physically exhausted" after a twelve-hour shift and it was often "an impossible task" to track down a manager or charge nurse to authorize overtime); *id.*, Ex. 18 (Kucharski Depo.) at 135-136 (testifying that she often didn't get compensated for overtime because no supervisor was available to approve the overtime by the time she left); *id.*, Ex. 21 (Shaw Depo.) at 81-82 (testifying that requirement that he obtain prior approval from two different managers for any overtime "created a very difficult situation" because "if [he was] going to have to work later than expected on [his] shift, how would [he] get preapproval from two different managers?"). Putative class members offered similar statements in their declarations. *See, e.g.*, Plaintiffs' Compendium of Declarations, Broesicke Decl. ¶ 19; Ciervo Decl. ¶¶ 18-19; Dagasdas Decl. ¶¶ 15-17; Johnson Decl. ¶ 18; Joiner Decl. ¶¶ 15-16; Macey Kelley Decl. ¶¶ 20-21; Lukhi Decl. ¶ 15; Luzzo Decl. ¶¶ 12-13; Parks Decl. ¶ 16; Reynosa-Juarez Decl. ¶ 20; Sampim Decl. ¶ 17; Stuart Decl. ¶¶ 20-24; Varner Decl. ¶¶ 13- 14; Williams Decl. ¶¶ 16-20; Womack Decl. ¶¶ 16-17.

An expert retained by Plaintiffs, Dr. Elsie Crowninshield, also opines that the use of paper timesheets and the overtime approval process for AMN traveling nurses does not live up to "the standard in the community" and "predictably leads to inaccurate pay practices for the AMN

---

[3] To show that Kaiser was aware of these problems as early as 2012, Plaintiffs point to the following statement in a 2017 Powerpoint presentation produced by Bartz: "Kaiser made this request in 2012 and since this time competing priorities have impacted our ability to focus on this effort." Konecky Decl., Ex. 25 at 3. This statement refers back to a previous statement on page 2 of the Powerpoint presentation which stated that "In 2012, Kaiser requested that AMN leverage Fieldglass for Worker Time Entry for all AV and AMN TOA." *Id.* at 2. While Kaiser apparently expressed an interest switching AMN employees to electronic timekeeping in 2012, however, this statement may or may not reflect an awareness on Kaiser's part *in 2012*, of the specific problems associated with the use of paper timesheets and approval forms that Bartz addressed in her deposition, such as the difficulty of tracking down managers to sign the overtime authorization forms. For the purposes of the instant motion, the Court declines to make any factual findings on this question.

traveling nurses at Kaiser." Konecky Decl., Ex. 23 (Crowninshield Report) at 5.[4] She notes that Kaiser uses an electronic system for tracking the time of its own employees, which "captures real time hours to the minute." *Id*. at 5-6. In contrast, she says, a system such as the one used for AMN traveling nurses assigned to Kaiser facilities is likely to lead to underreporting of overtime and inaccurate time records because time is not recorded in the first instance unless it has been authorized. *Id*. at 7. Moreover, she opines, nurses are often afraid to report overtime for fear of getting in trouble, and that is particularly likely to be true here because AMN traveling nurses have been told that Kaiser is reluctant to approve overtime. *Id*.

### 6. Policies and Practices Relating to Meal and Rest Breaks for AMN Traveling Nurses

The scheduling of meal and rest breaks for AMN nurses is left to Kaiser to handle; AMN requests that all facilities where its traveling nurses are placed comply with federal and state guidelines related to meal and rest breaks, but it does not monitor to be sure that the facilities actually meet those requirements. Konecky Decl., Ex. 2 (AMN PMK Depo.) at 108-109. Similarly, the Employee Handbook provided by AMN employees to their employees instructs them that "[t]he polices related to the timing and reporting of meal and rest breaks vary by Facility" and to "be sure to check with [their] managers at the Facility to determine any policies relating to scheduling, taking and reporting your meal and rest breaks." Larson Decl., Exs. 8-12

---

[4] After briefing on Plaintiffs' class certification motion was complete, Defendants filed a Motion to Strike Dr Crowninshield's Expert Report pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). *See* Docket No 122. In that motion, Defendants contend "Dr. Crowninshield's report is neither reliable nor relevant, fails to meet the standards for admissible expert opinion, and should be disregarded for purposes of deciding whether a class should be certified in this case." *Id*. at 1. The Court **STRIKES DEFENDANTS' MOTION TO STRIKE.** Civil Local Rule 7-3(a) requires that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum" submitted in the opposition to a motion. Here, Defendants devoted three pages of their Opposition brief to challenging Dr . Crowninshield's opinions but did not assert any evidentiary objection under Rule 702 or *Daubert*. (Defendants' placing of the word "expert" in quotation marks in a footnote in their brief, *see* Opposition at 7 n. 14, does not qualify as an "evidentiary objection"). Instead, they filed an untimely motion that is in violation of the Court's scheduling order requiring that "[t]he opposition memoranda to the Motion for Class Certification shall be filed and served on or before April 3, 2018." Docket No. 98. There is no question that Defendants' Motion to Strike is a challenge to Plaintiffs' class certification motion and that the timing of Defendants' motion was not consistent with the schedule set by the Court with respect to class certification briefing.

(AMN Employee Handbooks, 2013-2017) at 13.

On the other hand, Kaiser's PMK testified in her deposition that she was unaware of any "mechanism, practice or procedure" in place at Kaiser facilities that ensures that traveling nurses receive uninterrupted breaks or of "any . . . way . . . in which Kaiser or anybody at Kaiser takes responsibility over ensuring that traveling nurses from AMN at Kaiser have their meal and rest periods." Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 169-170; Piller Reply Decl., Ex. 14 (Kaiser PMK Depo.) at 172. Traveling nurses (like all nurses) must monitor their patients and be available to meet their needs unless they are fully relieved of these duties. *Id.*, Ex. 13 (Kaiser PMK Depo.) at 70. Plaintiff's expert, Dr. Crowninshield, opines that in order to ensure that traveling nurses receive uninterrupted meal and rest breaks, Kaiser facilities should employ dedicated break nurses who have no responsibilities other than providing break coverage. *Id.*, Ex. 23 (Crowninshield Report) at 9. Kaiser's PMK testified, however, that she was unaware of Kaiser employing break nurses. *Id.*, Ex. 13 (Kaiser PMK Depo.) at 168-170. Likewise, named Plaintiffs and putative class members testified that there were no break nurses available at Kaiser facilities and that they frequently were unable to take breaks. *See* Konecky Decl., Ex. 17 (Corona Teitelbaum Depo.) at 102, 131-133; *id.*, Ex. 18 (Kucharski Depo.) at 75, 158, 163; Plaintiffs' Compendium of Declarations, Boyd Decl. ¶ 24; Broesicke Decl. ¶ 22; Ciervo Decl. ¶ 25; Gordon Decl. ¶ 16; Jennings Decl. ¶ 25; Johnson Decl. ¶ 24; Lacey Kelley Decl. ¶ 19; Macey Kelley Decl. ¶ 30; Kravitz Decl. ¶ 22; Luzzo Decl. ¶ 17; Marcellin Decl. ¶ 22; Morse Decl. ¶ 22; Mottola Decl. ¶ 21; Nava Decl. ¶¶ 27, 31-32; Parks Decl. ¶ 21; Reynosa-Juarez Decl. ¶ 26; Stuart Decl. ¶ 30; Williams Decl. ¶ 23.

Plaintiffs also offer evidence that even when AMN traveling nurses were able to take breaks they were required to carry walkie-talkie devices and to respond to calls and alarms they received unless they were engaged in patient care. *See* Konecky Decl., Ex. 13 (Kaiser PMK Depo.) at 62-65 (traveling nurses expected to promptly respond to all call lights, alarms and patient requests received on their walkie-talkie or at nursing stations); *id.*, Ex. 29 at KAISER001197 (written policy re wireless communication system for Kaiser- West Los Angeles Medical System stating that "[c]alls may be denied only when the employee receiving the call is

engaged with patient care"); *id*., Ex. 17 (Corona Teitelbaum Depo.) at 99-102 (testifying that she was always required to take her wireless device on breaks and to respond if something came up with a patient, and that patient care always first); *id*., Ex. 18 (Kucharski Depo.) at 172-173 (testifying that she was required to keep her pager with her at all times and that her break was interrupted because she needed to respond to calls and alarms she received on her pager many times). Similarly, Plaintiff Shaw testified that he was frequently interrupted while taking breaks in the break room by nurses or doctors who came into the break room to ask questions about his patients. *Id*., Ex. 21 (Shaw Depo.) at 200. Class members offered similar testimony in their declarations. *See, e.g*., Plaintiffs' Compendium of Declarations, Boyd Decl. ¶¶ 22, 27; Bridges Decl. ¶¶ 12-15; Broesicke Decl. ¶¶ 21, 23; Ciervo Decl. ¶¶ 22, 26; Dagasdas Decl. ¶¶ 18, 20; Gordon Decl. ¶ 14; Jennings Decl. ¶¶ 21,26; Johnson Decl. ¶¶ 21, 25-26; Jones Decl. ¶ 21; Joiner Decl. ¶¶ 19-20; Lacey Kelley Decl. ¶¶ 16, 19; Macey Kelley Decl. ¶¶ 28, 32; Kravitz Decl. ¶¶ 20, 23-24; Krouse Decl. ¶¶ 15, 18; Landry Decl. ¶ 20; Lukhi Decl. ¶¶ 18, 21; Luzzo Decl. ¶¶ 15, 18-19; Marcellin Decl. ¶¶ 19, 21-22; Morse Decl. ¶ 23; Mottola Decl. ¶ 23; Nava Decl. ¶¶ 26, 33; Parks Decl. ¶ 18; Reynosa-Juarez Decl. ¶¶ 24, 29; Sampin Decl. ¶¶ 20, 23; Smith Decl. ¶¶ 16-17; Stuart Decl. ¶ 29; Threadgill Decl. ¶¶ 20, 23; Turning Decl. ¶ 15; Varner Decl. ¶¶ 15, 18-19; Williams Decl. ¶¶ 21, 24.

Plaintiff's also offer evidence that in order to obtain compensation for missed meal or rest periods traveling nurses must follow a similar approval process as applies to overtime, requiring that they obtain two signatures on two paper documents. In particular, as discussed above, the sample of assignment paperwork produced by Defendants reflects that many AMN traveling nurses assigned to Kaiser facilities were instructed that "[i]f the Healthcare Professional is required to work OT or misses a meal period, then, OT/Missed Meal & Rest Period Justification Form must be completed ON THE DAY that the missed meal/rest period or OT occurred." Piller Reply Decl., Ex. 3A (*see, e.g*., AMN0020985 (assignment to Kaiser – Los Angeles Medical Center), AMN0021011 (assignment to Kaiser Fontana Medical Center), AMN0021015 (assignment to Kaiser- San Diego Medical Center), AMN0021022 (assignment to Kaiser –Santa Clara Medical Center), AMN0021064 (assignment to Kaiser – Riverside Medical Center),

AMN0021124 (assignment to Kaiser – Downey Medical Center)).  Other putative class members were told that the Kaiser facility to which they were assigned "require[s] that you take your meal period for each shift" but that if they "miss[ed] [their] meal period for some reason" they were to "complete the Overtime/Missed Meal Period Justification Form on the day that . . . the instance occurs, have it signed by the facility, and submit to the staffing office."  *Id.* (see, e.g. AMN0021047 (assignment to Kaiser – San Jose Medical Center), AMN0021049 (assignment to Kaiser – Hayward Medical Center), AMN0021060 (assignment to Kaiser – San Francisco Medical Center), AMN0021062 (assignment to Kaiser – Fremont Medical Center), AMN0021080 (assignment to Kaiser – West Los Angeles Medical Center)).

The standardized timecard used by AMN traveling nurses does not include a prompt or instruction to record missed rest periods or a missed second meal periods (for shifts of more than 10 hours).  *See* Konecky Decl., Ex. 30 (standardized timecard).  Rather, there is a single box for each shift that can be checked for a "Missed Meal Break."  *Id.*

## B. Second Amended Complaint

In the Second Amended Complaint ("SAC"), Plaintiffs Robert Shaw, Sharon Davis, Jennifer Corona Teitelbaum, Lorenzo Holmes, and Candy Kucharski assert claims against Kaiser and AMN for alleged wage and hour violations at both Kaiser and non-Kaiser facilities in California.  All of the named Plaintiffs except Sharon Davis worked for AMN at a Kaiser facility in California.  SAC ¶¶ 14-18.  According to Plaintiffs, their "class claims are brought under California wage and hour laws stemming from Defendants' failure to compensate their traveling nurses for all the hours they work, and at their statutorily mandated double-time rate for hours worked in excess of 12 in a day, for failing to provide meal periods in compliance with the applicable Wage Order, and for failing to authorize meal and rest periods in compliance with the applicable Wage Order."  *Id.* ¶ 19.

Plaintiffs assert the following class claims:  1)  Failure to Pay Overtime Compensation (California Labor Code §§ 510, 515.5, 1194, and 1198 *et seq.*, and IWC Wage Order No. 5);  2) Failure to Pay for All Hours Worked (California Labor Code §§ 201, 202, 204, and 221-223);  3) Failure to Keep Accurate Payroll Records (California Labor Code §§ 1174 & 1174.5);  4) Failure

United States District Court
Northern District of California

to Furnish Accurate Wage Statements (California Labor Code § 226); 5) Waiting Time Penalties (California Labor Code §§ 201-203); 6) Failure to Provide Meal Periods, or Compensation in Lieu Thereof (California Labor Code §§ 226.7 and 512; and Cal. Code Regs., Title 8 §11050 ¶¶ 7 & 11); 7) Failure to Provide Rest Periods, or Compensation in Lieu Thereof (California Labor Code §§ 226.7 and Cal. Code Regs., Title 8 § 11050 ¶ 12); and 8) Unfair Competition and Unlawful Business Practices (California Business and Professions Code §§ 17200, *et seq*.). In addition, Plaintiffs assert a claim for statutory penalties pursuant to the Private Attorneys General Act ("PAGA"), Labor Code §§2698, *et seq*.

Because a prior action involving similar claims through September 10, 2013 was settled, Plaintiffs in this action seek to assert claims for alleged violations that began on September 11, 2013. SAC ¶ 19 (citing *O'Sullivan v. AMN Services, Inc*., Case No. C-12-2125 JCS). Plaintiffs included two proposed classes in their SAC – one that includes AMN traveling nurses who worked in any California facility (Class A) and another that includes only AMN traveling nurses who worked at a Kaiser facility (Class B). *Id*. ¶ 59. Plaintiffs ask the Court only to certify Class B (slightly modified, as discussed below), which is defined in the SAC as follows:

> All traveling nurses who worked in the job position(s) of Registered Nurse, Licensed Practical Nurse, or another nursing position(s), for Defendant AMN and/or Defendant Kaiser, in one or more Kaiser facilities in California, at any time from September 11, 2013 to the date of class notice. This definition excludes the job positions of Accounting/Finance, Administrative, Cardiac Monitor Technician, Certified Dialysis Technician, Sterile Processing Technician, and Surgical Technologist.

*Id*.

## C. Motion for Class Certification

In the Motion, Plaintiffs ask the Court to certify the following class under Rule 23(b)(2) and (3) of the Federal Rues of Civil Procedure:

> All traveling nurses who worked in the job position(s) of Registered Nurse, Licensed Practical Nurse, or another nursing position(s), for Defendant AMN and/or Defendant Kaiser, in one or more Kaiser facilities in California during the applicable time period.

Motion at 1. This definition is the same as Class B, in the SAC, except that: 1) it omits the

sentence at the end excluding certain other positions from the class; and 2) it modifies the temporal scope of the class claims, extending the claims to the resolution of the action for the purposes of injunctive relief under Rule 23(b)(2) while preserving the time period in Class B (September 11, 2013 to the date of class notice) for the purposes of the damages class under Rule 23(b)(3).[1]

At oral argument, Plaintiffs explained that they dropped the last sentence of the proposed class definition because they decided it was not necessary. The Court agrees. The Court also notes that Plaintiffs did not respond to Defendants' arguments challenging their proposed Rule 23(b)(2) class in their reply brief and at oral argument conceded that they are primarily seeking certification under Rule 23(b)(3). Accordingly, the Court addresses only the request for class certification under Rule 23(b)(3) in this Order.

Plaintiffs ask the Court to designate three of the named Plaintiffs as class representatives: Robert Shaw, Jennifer Corona Teitelbaum, and Candy Kucharski. All three worked for AMN at Kaiser facilities in California, and Plaintiffs contend they were subject to the same policies that are the basis for the class claims. *Id*. at 32-33.[5] Plaintiffs also ask the Court to appoint the firm of Schneider Wallace Cottrell Konecky Wotkyns LLP to serve as class counsel pursuant to Rule 23(g)(1) & (4). *Id*. at 33.

## III.    ANALYSIS

### A.    Legal Standards Under Rule 23

A class action may be maintained under Rule 23 of the Federal Rules of Civil Procedure if all of the requirements of Rule 23(a) are satisfied and the plaintiff demonstrates that one of the requirements of Rule 23(b) is met as well. Rule 23(a) requires that a plaintiff seeking to assert claims on behalf of a class demonstrate: 1) numerosity; 2) commonality; (3) typicality; and (4) fair and adequate representation of the interests of the class. Fed. R. Civ. P. 23(a). Rule 23(b)(3) allows a class action to be maintained where "the court finds that the questions of law or fact

---

[5] Plaintiff Sharon Davis did not work at a Kaiser facility and therefore has not been designated as a proposed class representative. *Id*. at 32 n. 17. As she falls outside the proposed class definition, the Court severs Davis's claims, which are stayed until the class claims have been resolved.

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation marks omitted)).

### B. Numerosity

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all the class members is impracticable." While there is no set number cut-off, the number of individuals who will satisfy the requirements for membership in the proposed class in this case easily satisfies the numerosity requirement. *See Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994) (noting that courts have certified classes as small as 14 and have often certified classes with 50 to 60 members). In response to Plaintiffs' interrogatory asking Kaiser to disclose the number of "traveling nurses" employed by Kaiser facilities in California between September 11, 2013 and October 10, 2016, Defendants state "5,355 healthcare professionals employed by AMN had assignments at Kaiser facilities in California" during that period. Konecky Decl., Ex. 31 (Interrogatory Responses) at 8. To the extent there is any question as to whether all of these "health care professionals" are class members – Kaiser does not define "health care professionals" – Plaintiffs also have offered declarations by 33 traveling nurses who were employed by AMN and worked at Kaiser facilities during the proposed class period. *See* Plaintiffs' Compendium of Declarations. [6] Furthermore, Defendants do not dispute that the numerosity requirement is satisfied. The Court therefore concludes that the proposed class is sufficiently numerous that joinder of all class members is impracticable.

---

[6] Although Plaintiffs provide 34 declarations, one of them is from Sharon Davis, who was not assigned to a Kaiser facility. The remaining declarations are all from AMN traveling nurses who were assigned to Kaiser facilities.

### C.    Commonality and Predominance

#### 1.   Legal Standards Governing Commonality and Predominance

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'" *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).   Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'"   *Id*. (quoting *Wal-Mart*, 564 U.S. at 350 (internal quotation and citation omitted)).   "[C]ommonality only requires a single significant question of law or fact." *Id*. at 589 (citation omitted).   "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).  So long as there are common questions of law or fact that are susceptible to resolution by common proof, Rule 23(a)(2)'s commonality requirement is met. *Cf. Wal–Mart*, 564 U.S. at 353 (finding insufficient commonality where "significant proof that Wal–Mart operated under a general policy of discrimination" was "entirely absent").

The predominance test of Rule 23(b)(3) is "far more demanding" than the commonality test under Rule 23(a)(2).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id*. at 623.  It is not a matter of "nose counting." *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1134 (9th Cir. 2016). "Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Id*.

In determining whether the requirements of Rule 23 are met, the court must take into account the legal theories on which the plaintiffs' claims are based. *United Steel v. ConocoPhillips Co.,* 593 F.3d 802, 808-10 (9th Cir. 2009);  *see also Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1165 (9th Cir. 2014) ("Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised."); *Alberts*

17

*v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 410 (2015) ("In determining whether a class should be certified, a trial court must examine all of the evidence presented by the parties and must do so 'under the prism of the plaintiff's theory of recovery.'") (quoting *Department of Fish & Game v. Superior Court* 197 Cal. App. 4th 1323, 1349, 129 (2011)). Further, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (quotation marks and citation omitted). "'[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" *Id*. (quoting *Miller v. Mackey International*, 452 F.2d 424 (5th Cir. 1971)). On the other hand, the Supreme Court has recognized that courts must conduct a "rigorous analysis" to determine that the requirements of Rule 23 have been met and that sometimes that inquiry will "overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351 (internal quotations and citations omitted).

### 2. Plaintiffs' Contentions Related to Whether there are Common Issues that Predominate

Plaintiffs assert that Defendants suffer and permit AMN traveling nurses to work overtime at Kaiser facilities without compensating them and fail to provide required meal and rest breaks under a variety of policies and deficiencies that apply to the entire class. First, they contend Kaiser has a policy of telling AMN traveling nurses that no overtime is permitted, pointing to statements in AMN employee handbooks, assignment paperwork for AMN traveling nurses assigned to Kaiser facilities, and anecdotal evidence from class members. Motion at 25; Reply at 4. Their argument is not that Kaiser does not, in fact, allow the traveling nurses to work overtime; it is undisputed that they "regularly work hours outside their scheduled shift." *See* Larson Decl. ¶ 39. Rather, Plaintiffs argue that this policy is used to "suppress the reporting of overtime." Reply at 3.

Second, Plaintiffs assert, Kaiser further discourages reporting of overtime through the use of a burdensome procedure required of all traveling nurses for obtaining approval of overtime at

Kaiser facilities. Motion at 25; Reply at 4-5. They point to the use of a uniform (paper) timesheet stored at an often inconvenient location for all AMN traveling nurses at Kaiser facilities and evidence that two signatures are required to obtain approval of overtime. Motion at 25. Kaiser's policy is even more burdensome, they assert, because overtime must be pre-approved (according to the Kaiser assignment paperwork received by many class members and the testimony of some class members). *Id*. Plaintiffs contend, "the very concept of requiring traveling nurses to obtain pre-approval to perform tasks they are duty-bound to perform at the end of their shifts anyway, such as 'hand-offs,' has no purpose other than to prevent traveling nurses from seeking compensation for the critical patient care they perform." *Id.*

Another common policy, Plaintiffs argue, is the failure of either AMN or Kaiser to take responsibility for addressing the problems that give rise to underreporting of overtime by AMN traveling nurses, even though they have been aware of it since at least 2012. Reply at 5. Plaintiffs point to the contractual arrangement between AMN and Kaiser, which treats AMN as the employer but leaves it to Kaiser to manage the overtime approval process while absolving it of legal responsibility for any defects in the process, even though Kaiser has a financial incentive to reject overtime requests. *Id*. at 5. They point to the Bartz Powerpoint presentations in support of their assertion that Defendants have been aware of the problem since 2012. *Id*. In other words, they contend, the *absence* of a policy to identify all hours worked and prevent off-the-clock work is itself a common policy to which all class members are subjected. Motion at 25-26. The same is true as to Defendants' failure to implement any policies or procedures to ensure that AMN traveling nurses receive timely and uninterrupted meal and rest breaks, Plaintiffs assert. Motion at 27. Such a "policy not to have a policy" generates common questions that make Plaintiffs' claims suitable for class treatment. *Id*. at 28.

Plaintiffs also assert that they will prove their claims through use of common proof. Motion at 29. Such proof, Plaintiffs contend, includes evidence that Kaiser's own nurses use electronic timekeeping and are allowed up to two hours a week of overtime without approval, reflecting Kaiser's awareness of the shortcomings in the procedures used for the AMN traveling nurses. *Id*. at 29. Plaintiffs also point to the "patient first mandate" that applies to all nurses at

Kaiser facilities and results in regular overtime, Kaiser's failure to employ dedicated "break nurses" to ensure that AMN traveling nurses receive their meal and rest breaks, evidence that traveling nurses must respond to alarms and other communications about patients during their breaks, and the absence of any policy or procedure adopted by Kaiser (or AMN) to ensure that breaks are uninterrupted. *Id.* at 29-31. Finally, Plaintiffs say in a footnote in the Motion that "AMN and Kaiser appear to have a blanket policy of having traveling nurses 'waive' one of their two meal periods when they scroll through various online forms before the start of their assignment." *Id.* at 20 n. 14.

### 3. Defendants' Challenges to Commonality and Predominance

In their Opposition brief, Defendants contend Plaintiffs' claims raise no common issues under Rule 23(a) and that even if they did, Plaintiffs have not demonstrated that the predominance requirement of Rule 23(b)(3) is met. Opposition at 17-26, 29-35.

First, Defendants contend, Plaintiffs' assertion that Defendants have a policy of prohibiting overtime is "abjectly false." *Id*. at 18. Defendants argue that it is "absurd" for Plaintiffs to argue that they have a "blanket no-overtime policy" when the assignment paperwork upon which they rely states not only that the facility has a no-overtime policy but also goes on to describe the procedure for obtaining approval of overtime. *Id*. at 19.[7] According to Defendants, there is no evidence that a "no overtime policy" was "applicable to any clinician at all, much less the entire putative class." *Id*. Instead, Defendants assert, the evidence is clear that AMN traveling nurses regularly work overtime at Kaiser facilities and that they are "consistently" compensated for that time. *Id*. Defendants also point out that the AMN employee handbook affirmatively prohibits off-the-clock work. *Id*. at 5 (citing Larson Decl., Ex. 9 at 13).

Defendants further contend that a policy of requiring approval of overtime is legal and that

---

[7] As noted above, Plaintiffs had only received one assignment email, sent to named Plaintiff Shaw, at the time they filed their motion and even when Defendants filed their Opposition brief (which is dismissive of Plaintiffs' reliance on a single email to demonstrate the existence of a policy "for thousands of assignments in hundreds of units worked at over 70 Kaiser facilities during the putative class period"). Defendants had not produced the sample emails that showed that similar language was contained in emails sent to class members assigned to numerous Kaiser facilities throughout California.

the evidence shows that class members were paid for overtime, citing class member declarations and evidence that named Plaintiffs Shaw, Kucharski and Corona Teitelbaum worked overtime at Kaiser facilities and were paid for it. *Id*. at 20 (citing Compendium of Evidence in Support of Defendants' Objections to Plaintiffs' Motion for Class Certification ("Defendants' Compendium of Evidence"), Ex. 3 (Shaw Depo. at 88-99) & Depo. Ex. 13; Larson Decl. ¶ 41, Exs. 16-17 (timecards of Kucharski and Corona Teitelbaum showing approved overtime); Defendants' Compendium of Evidence, Exs. 22, 24 and 25 (Declarations of class members Emily Giffin, Victoria McMurrain and Rakiya Johnson)). They state, "In fact, between September 11, 2013 and December 4, 2017, 33.9% of workweeks completed by clinicians at Kaiser facilities included payment of doubletime, and 71.3% of the putative class received payment for unscheduled overtime (doubletime) during workweeks completed at Kaiser facilities." *Id*. (citing Larson Decl. ¶ 40). According to Defendants, the amount of doubletime paid at Kaiser facilities varies significantly from one facility to another and within facilities as well. *Id*. (citing Defendants' Compendium of Evidence, Ex. 36 (Expert Report of Robert W. Crandall, MBA ("Crandall Report") ¶ 43). Defendants argue that "[n]one of the Plaintiffs testified to receiving any explicit or implicit instruction not to record or request payment of unscheduled overtime." *Id*.

Defendants also argue that Plaintiffs "incorrectly contend that a policy requiring clinicians to obtain preapproval of overtime and clinicians' use of paper timecards and justification forms" do not justify class treatment because "AMN's overtime policy states that clinicians should obtain preapproval of overtime if possible." *Id*. at 21 (citing Larson Decl. ¶ 16 ("The overtime policy requires clinicians to seek approval in advance of working overtime, if possible"); Defendants' Compendium of Evidence, Ex. 37 (Expert Report of Suzanne M. Boyle ("Boyle Report")) ¶ 19 (stating that it is "standard practice for a hospital to have a preapproval process for overtime"). According to Defendants, preapproval is preferred but not actually required and approval of overtime after the fact is common. *Id*. (citing Larson Decl. ¶¶ 18, 54). Defendants further contend that even when approval is not obtained, unscheduled overtime that is reported is paid. *Id*. (citing Larson Decl. ¶ 54). Defendants also assert that procedures for obtaining approval vary from one facility to another, with some permitting the approval signature for overtime to be submitted on

the timesheet rather than a separate form. *Id.* (citing Larson Decl. ¶ 47). Likewise, Defendants

state that "other members of the putative class attest the practice within their unit is to not require

preapproval or signature for unscheduled overtime, unless it exceeds a specified daily limit." *Id.*

(citing Larson Decl. ¶ 47 ("in some facility units, no approval signature is needed for unscheduled

overtime if it does not exceed a certain limit."); Giffin Decl. ¶ 26;[8] Williams Decl. ¶ 25[9]). Based

on the statements in the Larson Declaration cited above (and the two class member declarations),

Defendants argue that "Plaintiffs' claim that a 'common policy' requiring preapproval and

submission of an Overtime/Break Form was uniformly applied to even the named plaintiffs, let

alone the entire putative class, lacks evidentiary support." *Id.* They further assert there is no

evidence that the need to obtain preapproval for unscheduled overtime resulted in class members'

not being paid for overtime. *Id.* at 22.

Defendants also challenge Plaintiffs' argument that class members must be on call during

breaks. *Id.* They contend Plaintiffs' assertion that AMN traveling nurses must carry

communications devices during breaks is false, pointing to deposition testimony by named

Plaintiffs Shaw, Corona Teitelbaum and Kucharski. *Id.* According to Defendants, Shaw testified

that he was not required to carry a cell phone or device during breaks when he worked at a Kaiser

facility. *Id.* (citing Defendants' Compendium of Evidence, Ex. 3 (Shaw Depo.) at 224).[10]

Similarly, they contend, Corona Teitelbaum and Kucharski testified that no one instructed them to

---

[8] Paragraph 26 of the Giffin Declaration states, "I am not required to carry a radio, pager or cell phone with me during my meal periods or rest breaks." Paragraphs 23-25 (which Defendants did not cite) address overtime. In those paragraphs, Giffin states that she is "not required to get preapproval before [she] can work overtime" and that she can "work the additional time, and obtain an approval signature from a manager or house supervisor the same day." She does *not* state that an approval signature is not required in her unit if overtime does not exceed a certain limit, even though Defendants cite her declaration for that proposition.

[9] Paragraph 25 of the Williams Declaration states, "I am not required to carry a radio, pager or cell phone with me during my meal periods or rest breaks." Paragraphs 22-24 (which Defendants did not cite) address overtime. Williams states that when she is required to work overtime, she "[has] to get preapproval before [she] can work overtime" but that so long as she has obtained the preapproval, she is not required to get an approval signature. She does not state that this practice is related to any cut-off as to the amount of overtime worked, even though Defendants cite her declaration for that proposition.

[10] Shaw testified, "Q: During your assignment at Kaiser San Diego, were you required to carry a pager, cell phone, or other device so that you could be reached? A: I don't believe we did carry anything."

carry a cell phone or device during breaks. *Id.* (citing Defendants' Compendium of Evidence, Ex. 4 (Corona Teitelbaum Depo.) at 100;[11] *id.*, Ex. 5 (Kucharski Dep.) at 176-177.)[12]

Defendants also offer declarations of Kaiser managers who said traveling nurses at their facility were not required to carry or respond to devices during meal periods and breaks. *Id.* (citing Heading Decl. ¶ 8 ("When nurses are relieved for breaks they must leave their . . . device with the relieving nurse. I ensure that the practice . . . is strictly followed"); Carreon Decl. ¶ 5 ("When nurses go on break they are not required or expected to respond to any calls. Nurses typically leave their Cisco phones with the charge nurse, or if they choose to take their Cisco phones with them on break, they are expected to silence their phones, or have them automatically forward calls to the charge nurse"); Kelly Decl. ¶ 6 ("When nurses are relieved for breaks they are expected to leave their . . . device with the relieving nurse, or forward their calls to the relieving nurse. Even if nurses forget, they are not expected to respond to their . . . devices while on break"); Mira Decl. ¶ 7 ("When nurses are relieved for breaks they must leave their Cisco phone with the relieving nurse. I ensure that the practice . . . is strictly followed")). Defendants also offered testimony by class members stating that they were instructed to turn off their device or give it to someone else during breaks. *Id.* (citing Giffin Decl. ¶ 26; Williams Decl. ¶ 25; McMurrain Decl. ¶ 28; Johnson Decl. ¶ 23; Litz Decl. ¶ 17; Boyd Depo. at 87; Mottola Depo. at 54).

Defendants argue further that Plaintiffs' reliance on the Kaiser PMK's testimony in support of their contention that AMN traveling nurses are required to carry and answer devices

---

[11] Defendants highlight the following testimony in the Corona Teitelbaum deposition excerpt: "Q: Were you required to carry the [device]? A: It was always insinuated by the staff to take the [device] with you." Corona Teitelbaum's response continued (in a section that Defendants did not highlight), "When I had removed – when I had a battery die before, I had gotten spoken to regarding, why haven't I changed the battery out before when the situation happened."

[12] Kucharski testified as follows: "Q: And were you required to carry the device with you during your entire shift? A: Yes; Q: Who told you you were required to carry your device? A: Nobody told me. This is my patients in here. It's programmed for my patients. And so they were my patients that I needed to take care of. And since – if no one is taking care of them while I'm on my break, I went and took care of them. Q: So did the charge nurse tell you you needed to carry the pager during your breaks? A: No one ever took it from me. Q: Or did anyone ever ask you for it? A: No. Q: Did anyone at AMN tell you to carry a pager during your breaks? A: I don't know that AMN knows what each facility uses for their call system."

during breaks is a "bald misrepresentation of testimony." *Id*. at 22-23.[13] Similarly, they assert,

AMN's PMK, Lisa Larson, testified that whether traveling nurses carry devices is "very specific to

the facility and . . . potentially to the unit." *Id*. at 23 (quoting Defendants' Compendium of

Evidence, Ex. 7 (Larson Depo.) at 101. Defendants also point Larson's testimony that she was not

"familiar with" the "extent to which traveling nurses for AMN have pagers on them during meal

period" in support of their assertion that there is no common policy that traveling nurses are

required to carry and respond to communication devices during breaks and meal periods. *Id*.

(citing Defendants' Compendium of Evidence, Ex. 7 (Larson Depo.) at 175).

According to Defendants, even named Plaintiffs and class members testified that they

received "duty-free breaks during their shifts." *Id*. (citing Defendants' Compendium of Evidence,

Ex. 3 (Shaw Depo.) at 132, 210, 212;[14] Thai Decl. ¶¶ 20-21; Giffin Decl. ¶ 19; Johnson Decl. ¶

---

[13] Defendants do not specifically identify any particular statement in Plaintiffs' brief that they
contend is false or point to the page where the alleged misrepresentation is made. The Court
interprets this accusation to apply to page 19 of the Motion, where Plaintiffs point to the testimony
of the Kaiser PMK that "[a]t Kaiser facilities, there is a 'high degree of probability' that traveling
nurses will be issued devices akin to walkie-talkies or pagers, which allow patients and healthcare
professionals to contact the nurse at any time during the shift." Motion at 19 (quoting Konecky
Decl., Ex. 13 (Kaiser PMK Depo.) at 65). The quoted testimony came from the following
exchange: Q: Are there . . . Kaiser medical centers that patients can push a call button and that
then notifies a nurse wearing a device? A: I believe that is the case. Q: Okay. And that applies to
travelers as well? A: If . . . the travelers are issued those devices, yes. Q: Do you know if
travelers are issued those devices? A: I don't know for certain, but I would assume that there's a
high degree of probability that they are. Q: Why would you assume that? A: Because nurses are
. . . utilized to care for patients. And if patients' means of communication includes the usage of
that device, then I would assume that Kaiser would issue that electronic asset to travel nurses also,
who are caring for those patients." Contrary to Defendants' assertion, Plaintiffs do not cite to the
testimony of the Kaiser PMK as evidence that traveling nurses are required to carry and respond to
device during breaks. *See* Motion at 19-20. Rather, Plaintiffs cite to testimony of class members
in support of that argument. *See id*. As to the Kaiser PMK, they contend that her testimony was
that "Kaiser has no procedure to protect traveling nurses from being interrupted during breaks." *Id*.
at 20 (citing Kaiser PMK Depo.) at 169. Defendants also criticize Plaintiffs for relying on the
PMK's testimony on this subject because she "does not work in a medical role providing patient
care in Kaiser facilities, nor does she manage nurses in any facilities" but is, instead, "a high level
manager who oversees Kaiser's relationships and contracts with companies like AMN."
Opposition at 23 n. 49. Given that Defendants designated Ms. Mussman as the "person most
knowledgeable" as to Plaintiffs' claims, which include meal and rest break claims, Plaintiffs'
reliance on her testimony as to Kaiser's practices and procedures is entirely reasonable.
[14] Page 132 of the Shaw Deposition excerpt contains the following exchange: "Q: Were there
ever times when you did not receive a meal period at all . . . A: I believe I was able to get every
lunch period." Page 212 contains the following exchange: "Q: And how many times during a
shift would a breaker provide you coverage for a rest break? A: I believe it was three times
throughout a shift, but that wasn't always the case. Q: And how long were the rest breaks
supposed to be? A: Fifteen minutes." Page 212-213 contains the following exchange: "Q: Were

18;  Litz Decl. ¶¶ 18-19).  They also testified that they were permitted to leave their units during breaks and sometimes did so, Defendants contend.  *Id.* (citing Thai Decl. ¶ 20; Demirovic Decl. ¶ 14;  McMurrain Decl. ¶ 27; Litz Decl. ¶ 18; Foster Decl. ¶ 25).

Defendants do not dispute that they have no uniform policy requiring the use of dedicated relief nurses.  *Id.* at 24.  They contend, however, that there is no requirement that they use such nurses.  *Id.* (citing Boyle Report ¶ 28 ("Various methods exist in hospitals to ensure staff have a break beyond the use of a 'dedicated' break nurse")).  Defendants further assert that the evidence shows that breaks are provided by "various personnel, including charge nurses and administrative nurses," when facilities do not have break nurses.  *Id.* (citing Mira Decl. ¶ 5 ("Each 12-hour shift is staffed with nurses, who are assigned patients, along with break nurses and charge nurses. Charge nurses are not assigned patients, but do assist with break relief.  The break nurses are also not assigned patients, and are responsible only for relieving nurses during breaks");  Hasinsky Decl. ¶ 6 ("Charge or break nurses relieve nurses on the break schedule that is determined at the beginning of each shift")).  To the extent that Plaintiffs point to "understaffing" in support of their claims, Defendants contend, their argument fails because nurse-patient ratios are established by state law.  *Id.* (citing Larson Decl. ¶ 26).

### 4.  Plaintiffs' Reply

In their Reply brief, Plaintiffs contend there is no evidentiary dispute that Kaiser has a policy of instructing traveling nurses that overtime is not permitted at Kaiser facilities and of requiring them to follow a "burdensome overtime approval process" to put in for overtime.  Reply at 3.  With respect to Defendants' assertion in their Opposition brief that the "no overtime" instruction was limited to a single facility, Plaintiffs point to Orientation materials obtained from an AMN traveling nurse who they contend was assigned to a *different* Kaiser facility – and produced to Defendants more than three weeks before they filed their Opposition brief – stating that "[a]s a general rule, Travelers are **not** to work any overtime hours and are only to work the

there occasions where you were relieved for a rest break, and your rest break was interrupted? . . . A: You know, rest breaks are so short.  I couldn't recall if I've ever been interrupted or not.  Q: So you don't have a specific recollection of anyone coming to interrupt you while you were taking a rest break;  is that fair to say?  A:  That's fair to say."

United States District Court
Northern District of California

regular scheduled hours." *See* Declaration of Sarah Reynosa-Juarez in Support of Reply in Support of Plaintiffs' Motion for Class Certification ("Reynosa-Juarez Decl."), Ex. A (Orientation excerpt) (emphasis in original).

Plaintiffs also submit assignment paperwork that Defendants produced after they filed their Opposition brief showing that many class members, assigned to numerous different Kaiser facilities, were instructed that overtime was prohibited, or that Kaiser had a "strict" policy against overtime. *See* Piller Reply Decl., Ex. 3A. According to Plaintiffs, out of the sample assignment paperwork that was produced, 33 of 79, or 40%, included such instructions. Reply at 4. Plaintiffs further point out that virtually *all* of the sample paperwork produced by Defendants instructed traveling nurses that any overtime had to be preapproved by obtaining a signature on the Overtime/Missed Meal Period justification form. *Id.* (citing Piller Reply Decl., Exs. A & B). Plaintiffs note that this evidence is consistent with the class member declarations they submitted in support of the motion and even the deposition testimony of Anna Thai, a class member whose declaration was offered by Defendants in support of their Opposition brief. *Id.* (citing Piller Reply Decl., Ex. 4 (Thai Depo.) at 22-24, 95 (testifying that "it was stressed many times . . . that we weren't supposed to work overtime, that we needed to let management know and get it cleared specifically" and that the "person doing [her] orientation said, 'We don't want travelers working overtime. . . . So if you need to work over your hours, you need to get it approved.'").

Plaintiffs also supply a declaration by expert David Breshears in support of their reply brief to refute Defendants' representation in their Opposition brief that "between September 11, 2013 and December 4, 2017, 33.9% of workweeks completed by clinicians at Kaiser facilities included payment of double time." *See* Reply at 15-16; Opposition at 1 (citing Larson Decl. ¶ 40). That statement was attributed to AMN PMK Larson in Defendants' brief, but appears to be based on the following statement of Defendants' expert, Robert Crandall, in his expert report:

> In addition to the showing variation in experiences, the data simply does not support several of Plaintiffs' allegations. First, Plaintiffs' claim that Traveling Nurses were systematically denied overtime and double-time compensation is not supported by the record. Specifically, Plaintiffs claim that "lead Nurses and supervisors at Kaiser and other hospitals to which Traveling Nurses have been assigned routinely have refused to approve this overtime and

> double-time…" If this were the case, one would expect to observe very few instances of overtime and double-time hours recorded and paid. Instead, the data shows that 91.8% of all weeks have recorded overtime time and 33.9% have recorded double-time hours. In total, 104,114 hours of double-time were paid to 8,655 Traveling Nurses, or 78.3% of the putative class in the data. Clearly, these statistics do not support the contention that Traveling Nurses were systematically not allowed to record double-time.

Defendants' Compendium of Evidence, Ex. 36 (Crandall Report) ¶ 6. However, the figures in Paragraph 6 of Crandall's Report were based on weeks worked at *both* Kaiser and non-Kaiser facilities; Crandall testified at his deposition that he made no attempt to conduct such a calculation for Kaiser facilities only. *See* Piller Reply Decl., Ex. 26 (Crandall Depo.) at 119.

Plaintiffs asked Breshears to "review time punch data and meal and rest break premium files" upon which Defendants' expert, Robert Crandall, relied in his expert report and which were not produced by Defendants until February 13, 2018, after Plaintiffs had filed their class certification motion. Breshears Decl. ¶ 4; Piller Reply Decl., Ex. 34 (cover letter accompanying February 13, 2018 production). Previously, Defendants had refused Plaintiffs' request to produce such data on the grounds that it "[sought] information pertaining to putative Class Members prior to the certification of any class." Pillar Reply Decl., Ex. 33 (AMN's Responses to Plaintiffs' Requests for Production, Set One) at 6. Based on his analysis of the data produced by Defendants, Breshears concludes that the data set produced by AMN, when limited to the actual proposed class of AMN traveling nurses working in Kaiser facilities, shows that double time has been recorded in only 21.6% of work weeks. Breshears Decl. ¶ 11. Breshears further concludes that the data produced by Defendants shows the rate of double time pay at non-Kaiser facilities is 44.3% of shifts while the rate at Kaiser facilities is only 24.8% of shifts. *Id*. ¶¶ 12-13.[15]

In their Reply, Plaintiffs also expand upon their argument that Defendants' blanket meal waiver policy is invalid and point to deposition testimony of specific Kaiser managers (all of whom were deposed after Plaintiffs filed their motion) attesting to the existence of such a policy. Reply at 14-15.

---

[15] At oral argument, Defendants stipulated that they do not dispute the accuracy of Breshears' calculations.

### 5. The Surreply Request and Plaintiffs' Response

Following the submission of Plaintiffs' Reply brief, Defendants requested leave to file a surreply. They contend Breshears was not timely disclosed as an expert and that submission of his declaration was improper. They do not dispute that the statement in their Opposition brief that "33.9% of workweeks completed by clinicians at Kaiser facilities included payment of double time" was incorrect, however. They also complain that Plaintiffs submitted in support of their Reply the assignment paperwork that was produced to them by Defendants after the motion was filed and contend Plaintiffs raised for the first time the claim that Defendants' blanket meal waiver policy is facially invalid. Plaintiffs filed a response to Defendants' request (and their own proposed response to the surreply) in which they contend the Breshears Declaration was proper as rebuttal to Defendants' statements discussed above and pointing to the late production of the assignment paperwork and the data on which Crandall relied to justify the fact that these materials were not submitted in support of their motion. They concede that their argument based on Defendants' alleged blanket waiver policy was not adequately briefed in the motion (even though it was raised in a footnote) and do not oppose allowing Defendants to address new arguments on that claim in their surreply.[16]

The Court **DENIES** Defendants' request except with respect to Section II.D. of the Sur-Reply. First, the Court finds that the Breshears Declaration is proper rebuttal to an admittedly incorrect representation of the facts in Defendants' Opposition brief. The Court assumes that Defendants' false statement was merely a careless error that was made in good faith, as Defendants contend. Nonetheless, it was entirely reasonable for Plaintiffs to submit a declaration responding to the misstatement. Defendants' complaint that the Breshears Declaration is improper rings hollow given that they refused to produce the class data on which his opinions are based until *after* the motion was filed because it was purportedly irrelevant to class certification and then offered the opinions of its own expert based on that very data in opposition to class certification.

---

[16] Defendants asked Plaintiffs to stipulate to the filing of the surreply; Plaintiffs, in turn, proposed to Defendants that both sides submit short supplemental briefs addressing the issues raised in the surreply, Neither side agreed to these proposed stipulations. *See* Docket No. 28-1.

Similarly, Defendants may not now complain that Plaintiffs supplied the assignment paperwork along with their Reply brief when it was Defendants' own delayed production of the assignment paperwork that necessitated that they do so. Given that Kaiser's alleged policy against overtime is obviously one of the linchpins of Plaintiffs' case, Defendants' failure to produce these documents until after the motion was filed – and even after they had filed an Opposition brief ridiculing Plaintiffs' arguments on this subject – is troubling.

Second, the Court's preliminary review of Defendants' proposed surreply indicates that the vast majority of the brief consists of arguments that were already made – or could have been made – in their opposition brief. This includes the arguments made in Section II.E. of the surreply, in which Defendants attempt to distinguish *Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388 (2015), in connection with their meal and rest period policy even though Plaintiffs relied on that case in their opening brief.

Third, the question of whether Defendants paid overtime to AMN traveling nurses or the rate at which overtime was paid is not dispositive of the Court's conclusions as to whether Plaintiffs' claims are suitable for class certification. While it was reasonable for Plaintiffs to offer evidence to rebut Defendants' misrepresentation on that question, the Court would reach the same result even if it were to disregard both Defendants' statement on this question and the opinions offered in the Breshears Declaration.

Therefore, the Court will consider only Section II.D. of Defendants' surreply. The Court notes that while Plaintiffs have stipulated to the consideration of that section, Defendants could have made the same argument in their Opposition brief given that Plaintiffs did, in fact, raise their facial challenge to Kaiser's waiver policy in their motion. The Court will excuse the shortcomings on both sides with respect to the briefing of this issue and will consider both the arguments in the proposed surreply and in Plaintiffs' proposed response on this issue only.

In the surreply, Defendants argue that it is permissible under California law for an employee who works a shift of over ten hours to waive one of the two meal periods to which they are entitled. Surreply at 11. Defendants note that this question is currently before the California Supreme Court. *Id.* In their surreply, Defendants do not address whether they do, in fact, have a

policy of asking AMN traveling nurses to waive their second meal period.  Plaintiffs counter that

this facial challenge can be resolved for the entire class because it presents a pure question of law,

namely, whether Defendants' blanket waiver policy complies with California wage and hour law.

Response to Sur-Reply at 5-6.  At oral argument, they also pointed to deposition testimony of four

Kaiser managers that shift lengths for traveling nurses were twelve or twelve and a half – but not

thirteen – hours, indicating that Kaiser has a policy of *not* providing traveling nurses two half-hour

meal breaks.  *See* Piller Reply Decl., Ex. 18 (Mira Depo.) at 34; *id*., Ex. 20 (Hassinsky Depo.) at

42; *id*. at Ex. 21 (Carreon Depo.) at 25; *id*. at Ex. 22 (Alexopoulos Depo.) at 38-39. Plaintiffs also

pointed out that the standard time card used by traveling nurses has a space for only one meal

period.

### 6.  Discussion

To determine whether the commonality and predominance requirements are satisfied as to

the classes Plaintiffs seeks to certify, the Court applies the standards set forth above, looking to the

legal requirements of Plaintiffs' claims under the theories advanced by Plaintiffs and the factual

record that has been developed thus far in this case.   As set forth below, the Court concludes that

the commonality and predominance requirements are satisfied as to all of Plaintiffs' substantive

claims.

### a.  Whether Commonality and Predominance Requirements are Met as to Overtime Claims

Under California law, employers must compensate their employees for "all the time the

employee[s] [are] suffered or permitted to work, whether or not required to do so." Cal. Code

Regs. tit. 8, § 11050 ("Wage Order 5"), subd. 2(K).  In interpreting the "suffered or permitted to

work" standard, California courts have looked to the Fair Labor Standards Act, which makes clear

that "'it is the duty of the management to exercise its control and see that the work is not

performed if it does not want it to be performed.'" *Morillion v. Royal Packing Co*., 22 Cal. 4th

575, 585 (2000), as modified (May 10, 2000) (quoting 29 C.F.R. § 785.13)).  Thus, "[t]he mere

promulgation of a rule against [uncompensated] work is not enough. Management has the power

to enforce the rule and must make every effort to do so."  29 C.F.R. § 785.13; *see also Lillehagen*

v. *Alorica, Inc.*, No. SACV 13-0092-DOC, 2014 WL 6989230, at *19 (C.D. Cal. Dec. 10, 2014) ("The prohibition against 'sitting back' or 'standing idly by' requires the employer to take reasonable steps to investigate the suspected non-compensation, to ensure that the employee is paid for the work that has already occurred, and to stop future non-payment for work or compensable breaks from occurring.").

Plaintiffs' overtime claims are based on the theory that Kaiser instructs class members that it has a strict policy against overtime by AMN traveling nurses and has a burdensome approval policy even though the core duties required of all nurses at Kaiser facilities make it all but impossible to avoid working overtime, resulting in underreporting of overtime. Rather than taking reasonable steps to prevent this underreporting, Plaintiffs contend, Kaiser has sat idly by, allowing the uncompensated overtime to occur, to its own financial benefit. The Court finds that this theory raises a number of common issues that are susceptible to common proof.

First, Plaintiffs have offered evidence of a common policy, reflected in assignment communications that were sent to AMN traveling nurses assigned to at least ten different Kaiser facilities in California conveying to them that Kaiser does not permit overtime, or has a "strict" policy on overtime. As noted above, approximately 40% of the class members whose assignment paperwork was produced in the sample produced by Defendants were explicitly told that overtime was prohibited at the Kaiser facility to which they were assigned. Such a policy also seems to be referenced in the AMN handbook, which states that some facilities do not authorize overtime and describes the approval process that must be followed. This common evidence is buttressed by class member testimony and testimony of an AMN consultant indicating that the approval process is burdensome to class members, who sometimes are unable to obtain the signature required for approval.[17]

_____

[17] Defendants assert that Bartz's opinions and recommendations should not be considered because she did not conduct a quantitative analysis of purported off-the-clock work, unscheduled overtime, or meal period and rest break violations." Opposition at 12. They note that Bartz did not review clinician timesheets or survey clinicians or their staff. *Id*. at 12-13; *see also* Opposition at 14 (referring to "irrelevant business process improvements analyzed by Bartz"). The Court rejects these arguments as Plaintiffs do not rely on Bartz to quantify violations but rather, to establish the existence of policies and procedures that tend to discourage the reporting of overtime, a subject which she analyzed and upon which she made affirmative recommendations The Court concludes

Second, evidence that Kaiser applies a different overtime policy to its own nurses even while expecting all nurses at Kaiser facilities (including traveling nurses) to perform the same core duties with respect to hand-offs and charting and adhere to the same ethical and professional obligations with respect to patient care constitutes common proof that may reflect Kaiser's awareness of the structural problems that result in failure to compensate unscheduled overtime.

Third, the financial incentives and contractual arrangements between Kaiser and AMN are common factors that result (under Plaintiffs' theory) in Defendants' failure to take reasonable measures to prevent underreporting of overtime.

Defendants devote a significant portion of their brief to arguing about what the statements in the assignment emails mean, asserting Kaiser's policy does not prohibit overtime outright. That is not Plaintiffs' theory, however. Rather, they contend Defendants discourage the reporting of overtime by warning AMN traveling nurses that it is disfavored. There is sufficient evidence of such a practice to demonstrate a common issue as to the policy. Likewise, Defendants' argument that pre-approval of overtime is only "preferred" but not actually required under Kaiser's policy misses the mark. Again, even assuming Defendants correctly characterize Kaiser's overtime approval policy, the question is whether the policy gives rise to common issues that can be decided on a classwide basis, not whether it is lawful.

The Court further concludes these common issues predominate over any individualized inquiries with respect to Plaintiffs' overtime claims. First, Defendants' reliance on nine declarations by current AMN employees to demonstrate that individualized issues predominate as to payment of overtime is unpersuasive.[18] As a preliminary matter, the Court is reluctant to place significant weight on declarations of current AMN employees to deny class certification given the "risk of bias and coercion" inherent in such testimony. *See Morden v. T-Mobile USA, Inc*., No. C05-2112RSM, 2006 WL 2620320, at *3 (W.D. Wash. Sept. 12, 2006) (citing *Jenson v. Eveleth Taconite Co*., 139 F.R.D. 657, 664 (D. Minn. 1991)). While Defendants have provided evidence

---

that Bartz's findings are relevant to Plaintiffs' theory of the case.

[18] *See* Demirovic Decl. ¶ 12; Foster Decl. ¶¶ 29-31; Giffin Decl. ¶ 23-25; Johnson Decl. ¶ 20-22; Litz Decl. ¶ 14; McMurrain Decl. ¶¶ 11-17; Nguyen Decl. ¶ 12; Thai Decl. ¶ 23; Williams Decl. ¶¶ 22-24.

that they advised the declarants of the fact that they might be class members who could benefit if Plaintiffs prevailed, *see* Docket No. 132, two of the three declarants who Plaintiffs deposed offered testimony suggesting they did not understand that their interests were in conflict with Defendants' interests in this litigation. *See* Piller Reply Decl. Ex. 27 (Nguyen Depo.) at 15-16; *id.,* Ex. 30 (McMurrain Depo.) at 47).

The Court's concern is heightened by the fact that of the three employee declarants who Plaintiffs deposed, two gave testimony that directly contradicted the statements in their declarations that they were always paid for all overtime they reported on their timesheets. *See* Piller Reply Decl., Ex. 27 A (Nguyen Depo.) at 89-97 & Ex. 27B (Nguyen timecards); *id.*, Ex. 30 (McMurrain Depo.) at 73-77. For example, Ms. Nguyen, when shown numerous timecards and pay records reflecting overtime that she had recorded had been rejected (apparently because she had not submitted signed justification forms) agreed that the statement in her declaration that she had "always been paid for all overtime [she reported] on [her] timesheets," Nguyen Decl. ¶ 12, was not accurate. Piller Reply Decl., Ex. 27A (Nguyen Depo.) at 97. Likewise, Ms. McMurrain, who also stated in her declaration that "every time [she] submitted overtime, it has been approved," McMurrain Decl. ¶ 14, agreed at her deposition that at least one timecard that was shown to her included overtime for which she was *not* compensated. Piller Reply Decl., Ex. 30 (McMurrain Depo.) at 73-78.

Second, even if the Court gives some weight to the class member declarations submitted by Defendants, these declarations do not defeat predominance. *See* Opposition at 27-28. "[A] well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct." *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1136 (9th Cir. 2016) (citing Newberg on Class Actions § 2:3; *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification.")). Where, as here, there is evidence of a common policy that applies to all class members with respect to the payment of overtime, and all class members are subject to the same core duties that tend to give rise to unscheduled overtime, the fact that some class members may

not have worked unscheduled overtime or were compensated for it is not sufficient to defeat predominance. *Id*. Further, "damages determinations are individual in nearly all wage-and-hour class actions" and yet the Ninth Circuit has held that this does not preclude class treatment. *See Leyva v. Medline Indus. Inc*., 716 F.3d 510, 513–14 (9th Cir. 2013).

The Court also rejects Defendants' reliance on evidence of minor variations in how Kaiser's policies were implemented at different facilities, such as allowing approval to be obtained *after* overtime was worked so long as it was on the same day, or allowing approval signatures to be placed on the timesheet rather than a separate justification form. As discussed above, the predominance inquiry is not "nose counting" and these minor variations are not likely to overwhelm the common issues. The Court also notes that Defendants' reliance on variations in the testimony of class members as to *why* they did not record overtime worked is not sufficient to defeat predominance as these reasons have little bearing on the applicable legal standards discussed above.

Therefore, the Court finds that common issues predominate over individualized inquiries as to Plaintiffs' overtime claims.

> b. Whether Commonality and Predominance Requirements are Met as to Meal and Rest Break Claims

California employers must provide meal periods and authorize and permit rest periods to all employees during their shifts. *See*, *e.g*., Wage Order 5, subds. 11[19] & 12.[20] The California

---

[19] Subsection 11 of Wage Order 5 provides, in relevant part, as follows:

> A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

> (B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period

34

Supreme Court has held that the required meal and rest periods must be "off-duty," which means that employees must be relieved of "all work-related duties," including the duty to remain "on call," and they must be "free from employer control" over how they "spend their time." *Augustus v. ABM Security Services, Inc.*, 2 Cal.5th 257, 264, 269-270 (2016); *see also Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004, 1038-39 (2012) (holding that employees must have the freedom to use meal and rest periods for their own purposes). "[A]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Brinker*, 53 Cal. 4th at 1040.

Under some circumstances, employees may waive their meal break or agree to an "on

_____

is not provided.

(C) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

(D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one (1) day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect.

. . .

Cal. Code Regs., tit. 8, §11050, subd. 11.

[20] Subsection 12 of Wage Order 5 provides, in relevant part, as follows:

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted, as hours worked, for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

. . .

Cal. Code Regs., tit. 8, §11050, subd. 12.

duty" meal period. *See* Cal. Labor Code section 512; Wage Order 5, subd. 11(A) & (D). Labor Code section 512(a) provides as follows:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

Cal. Labor Code section 512(a). Wage Order 5 also contains a waiver provision in subsection 11(D) (quoted above). The question of whether the waiver provision in Wage Order 5, subd. 11(D) is valid is the subject of a petition for review before the California Supreme Court. *See Gerard v. Orange Coast Memorial Medical Center*, 397 P.3d 249 (2107). In that case, the Court of Appeal initially concluded that the waiver provision in the Wage Order was invalid to the extent that it created a broader waiver right than is contained in California Labor Code section 512(a), but reached the opposite conclusion upon reconsideration. *See Gerard v. Orange Coast Mem'l Med. Ctr.*, 9 Cal. App. 5th 1204, 1210 (2017).

Plaintiffs advance two main theories as to their meal and rest break claims. First, they contend Defendants have a "no policy" policy as to the provision of uninterrupted meal and rest breaks and that this absence of a policy, in combination with Kaiser's "patient first" and "on call" policies, results in missed meal and rest breaks and failure to provide uninterrupted meal and rest breaks. Second, they assert Defendants' blanket waiver policy violates California wage and hour laws.[21] As Plaintiffs raise a pure question of law as to Defendants' blanket waiver policy, there is

---

[21] As to the second theory, Defendants suggested at oral argument that Kaiser does not have a blanket waiver policy as to the second meal period for traveling nurses who work shifts longer than eight hours even though they did not dispute the existence of such a policy in their surreply. However, Defendants pointed to no evidence in the record to counter the deposition testimony of Kaiser managers cited by Plaintiffs that supports a contrary conclusion. This testimony, in combination with the standardized timesheet used by AMN traveling nurses assigned to Kaiser facilities with space for only one meal period is sufficient to demonstrate the existence of a blanket policy of requiring putative class members to waive their second meal period. The Court notes that if further discovery reveals that there is no such policy, it may need to decertify the class as to any claims that are based on the existence of such a policy.

36

clearly a common issue that predominates as to the claims Plaintiffs assert based on that theory. The Court also concludes as to the remaining theory that Plaintiffs have demonstrated the existence of common issues that predominate over individualized inquiries for the reasons discussed below.

Plaintiffs have offered the testimony of named Plaintiffs and class members that they sometimes missed meal and rest breaks because there was no one available to relieve them and they could not abandon their patients. These class members have also testified that their breaks are interrupted on a regular basis, whether because of alarms, communications on Kaiser-issued devices or other staff seeking them out in the break room to answer questions about patients. In addition, Plaintiffs have offered evidence that Kaiser typically does not employ dedicated break nurses, relying instead on a variety of ad hoc methods for providing breaks. Indeed, the class member declarations offered by Defendants describe the process for scheduling breaks as "fluid" and informal, with nurses sometimes covering for each other. *See, e.g.,* Giffin Decl. ¶¶ 14-15; Williams Decl. ¶ 13; Foster Decl. ¶ 22. More generally, Plaintiffs offer testimony of the PMKs that neither Kaiser nor AMN has any policies or procedures in place to ensure that AMN traveling nurses are relieved for breaks or that their breaks are uninterrupted (as Defendants do not appear to dispute). They also offer expert testimony that Kaiser's failure to preschedule breaks or use dedicated break nurses "will cause nurses to consistently have to work through breaks and/or not receive breaks in a timely fashion." Konecky Decl., Ex. 23 (Crowninshield Report) at 9.[22] Finally, they offer evidence that Kaiser has a patient-first policy and that both Kaiser rules and the professional obligations of nurses prohibit them from going on break without another nurse taking over the care of their patients.

This evidence is sufficient to demonstrate a common question as to whether traveling nurses do not take breaks to which they are entitled because of the pressures imposed by Kaiser's

---

[22] In their Opposition brief, Defendants attack a number of opinions offered by Crowninshield, including her opinions concerning "community standards" and "best practices," the use of paper timesheets, and the practice of "floating" traveling nurses. However, they do not address her opinions concerning the failure to preschedule breaks or use dedicated break nurses. *See* Opposition at 13-15.

policies and Defendants' failure to adopt policies and procedures to ensure that they receive
compliant breaks, which other courts have found to be sufficient to warrant certification under
*Brinker*. *See Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 406 (2015) ("the
mere existence of a lawful break policy will not defeat class certification in the face of actual
contravening policies and practices that, as a practical matter, undermine the written policy and do
not permit breaks") (citing *Brinker*, 53 Cal.4th at 1040 (an "employer may not undermine a formal
policy of providing meal breaks by pressuring employees to perform their duties in ways that omit
breaks")). In *Alberts*, for example, the court of appeal found that the trial court had erred in
refusing to certify a class of nurses who worked in a psychiatric hospital who asserted meal and
rest break claims based on policies and procedures that made it difficult for them to take breaks.
241 Cal. App. 4th at 302. In that case, "the [h]ospital . . . stressed that patient safety is its
'number one' priority, and management regularly and repeatedly instruct[ed] employees that it
[was] critical that nursing staff remain vigilant and that patients be constantly monitored." *Id*.
Nurses were not permitted to leave their unit for any break unless they were relieved and a nurse
"who abandons patients without being properly relieved of duty, places his or her professional
license in jeopardy." *Id.* Although a nurse was employed "to 'float' among units to provide meal
break relief for members of the nursing staff" no such staff was available for rest breaks, and
employees were expected to "arrange for any rest breaks on their own." *Id*. at 403.

The court in *Alberts* found that the hospital's policies and procedures were sufficient to
warrant certification and that the trial court had erred in concluding that the plaintiffs were
required to demonstrate that there was a "universal practice" on the part of management to deny
nursing staff their breaks. *Id*. at 407. It further held that evidence that staff sometimes were able
to take breaks did not support the trial court's conclusion that individual issues would
predominate. *Id*. The court explained, "In *Brinker*'s wake, courts have repeatedly found that a
defendant employer's evidence of an inconsistent application of an illegal policy to be insufficient
on its own to defeat class certification." *Id*. The Court reaches the same conclusion here.

### D. Typicality

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be]

38

typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998). Because all three of the proposed class representatives were subject to the common policies and practices discussed above and performed the same work, the Court concludes that this requirement is met.

The Court rejects Defendants' assertion that the typicality requirement is not met because of variations in the experiences of the proposed class representatives. *See* Opposition at 26-28. Defendants rely heavily on testimony of Shaw, for example, that at Kaiser San Diego "breakers" were used for meal and rest breaks. *See* Defendants' Compendium of Evidence, Ex. 4 (Shaw Depo.) at 76. In contrast, Plaintiffs Kucharski and Corona Teitelbaum testified that at the Kaiser facilities where they worked, break nurses were not used. *See* Defendants' Compendium of Evidence, Ex. 4 (Corona Teitelbaum Depo.) at 133; *id.*, Ex. 5 (Kucharski Depo.) at 161-162, 210. Defendants also point to declarations by other class members (Giffin, Foster, Thai and Litz) that break nurses were used at Kaiser facilities where they worked. *See* Opposition at 27. However, neither Shaw nor the other class members state that these break nurses were dedicated *only* to providing breaks and had no other duties, or that their breaks were provided exclusively by break nurses. *See, e.g.,* Giffin Decl. ¶ 20 ("the charge nurses or break nurses are very focused on making sure staff take their breaks"); Foster Decl. ¶ 18 (stating that breaks were provided by "a charge nurse and a relief nurse"). In any event, as discussed above, variations among facilities are not inconsistent with Plaintiffs' theory, which is based on Defendants' failure to adopt policies and procedures to ensure that Plaintiffs were consistently provided timely and uninterrupted breaks. Therefore, the Court concludes that these variations do not defeat typicality as to the rest and meal break claims.

Likewise, the Court finds unpersuasive Defendants' reliance on "divergent situations" as to Plaintiffs' overtime claims. *See* Opposition at 27-28. To illustrate these purported divergences, Defendants point to Shaw's testimony that it is "nursing culture" to arrive before the start time of a shift "to be prepared before you get your assignment," and that he did not record overtime on his

1   timesheet when he had not obtained an authorization signature because he understood that such

2   time could not be included on the time sheet unless he had received authorization for it.

3   Defendants' Compendium of Evidence, Ex. 3 (Shaw Depo.) at 102,169.  In contrast, Defendants

4   assert, Kucharski and Corona Teitelbaum testified that they did not seek overtime because the

5   approval process was too burdensome, and some class members stated that they were afraid to

6   request overtime.   Opposition at 27 (citing Defendants' Compendium of Evidence, Ex. 4 (Corona

7   Teitelbaum Depo.) at 114-117;  *id*., Ex. 5 (Kucharski Depo.) at 137, 145;  Jennings Decl. ¶ 27,

8   Joiner Decl. ¶ 18;  Luzzo Decl. ¶ 14).

9          The "divergences" Defendants point out are inconsequential. As to Shaw, his testimony

10  about "nursing culture" was not offered to explain why he did not claim overtime but instead, why

11  he worked overtime, and supports Plaintiffs' theory that nurses' professional obligations

12  contribute to the pressure to work overtime.  Further, his testimony as to why he didn't claim

13  overtime was that he understood that he was required to obtain an approval signature in order to

14  claim the time *and* the process of obtaining that approval was extremely burdensome.  *See*

15  Konecky Decl., Ex. 21 (Shaw Depo.) at 86-87.  Finally, as to the testimony of some class

16  members that they did not claim overtime because they did not want to get in trouble, that

17  testimony is entirely consistent with Shaw's testimony that he was instructed that preapproval was

18  required and came to the understanding that it would be "better for [him] to go with the flow than

19  to ask questions and possibly rock the boat."  *Id*. at 82.

20         In sum, Plaintiffs' theory is that a variety of policies and practices at Kaiser facilities, in

21  combination, led to underreporting of overtime.  There is nothing in the testimony of the named

22  Plaintiffs that Defendants have cited that suggests that their claims are not typical of the class

23  claims.

24         **E.     Adequacy**

25         Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the

26  interests of the class."  "Determining whether the representative parties adequately represent a

27  class involves two inquiries:  (1) whether the named plaintiff and his or her counsel have any

28  conflicts of interest with other class members and (2) whether the named plaintiff and his or her

counsel will act vigorously on behalf of the class." *Calvert v. Red Robin Int'l, Inc*., No. C 11-03026 WHA, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).   The Court finds that these requirements are met.

With respect to the proposed class representatives, Shaw, Kucharski and Corona Teitelbaum, there is no evidence that there is any conflict of interest with other class members. Further, these individuals worked for AMN at a variety of Kaiser facilities in California during the class period and are familiar with the policies and practices there.  Defendants argue in their Opposition brief that these individuals are not adequate class representatives because none of them worked at a Kaiser facility in Northern California, but they offer no explanation of why such representation is important. *See* Opposition at 28.  Nor do they point to any regional variations in Kaiser's or AMN's policies or practices that might necessitate the appointment of a class representative from Northern California.  Their argument that the proposed class representatives are inadequate because they are only familiar with the practices of the specific facilities where they were assigned also fails. *See id.*  As discussed above, Plaintiffs' claims are based on policies and practices that are common to all Kaiser facilities in California and there is significant common proof of the impact of these policies and practices on class members with respect to overtime and rest and meal breaks, notwithstanding some variations in practices from one facility to another. Therefore, the proposed representatives will be able to represent the interests of the class based on their common experience.

The Court also finds that class counsel have no conflicts of interest and that they are well-qualified to represent Plaintiffs. The Court rejects Defendants' argument that class counsel have a conflict of interest because they entered into a "class carve-out" agreement with plaintiffs' counsel in a separate class action involving a class of AMN employees who asserted different claims, *Clark v. AMN Services, LLC*, Case No. 2:16-cv-04132-DSF-KS.  *See* Opposition at 28-29; Defendants' Compendium of Evidence, Ex. 1 (Declaration of Tazamisha Imara) & Ex. 1 attached thereto (Carve-Out Agreement).   This agreement recognizes that the two actions involve "distinct alleged underlying wrongs" and different claims and factual predicates.  It merely promises that

1    class counsel will not enter into any settlement agreement that purports to settle claims asserted in

2    the other case without the consent of class counsel in that case. *Id.* In other words, counsel in this

3    case have promised not to settle claims that they are not asserting in this case but that the class in

4    *Clark* is asserting without the consent of *Clark*'s counsel (and class counsel in *Clark* have made a

5    reciprocal promise of the same nature). Defendants' novel assertion that this agreement creates a

6    conflict of interest is unsupported by any authority and makes no sense as a practical matter as it is

7    clear on the face of the agreement that it is intended to *protect* the interests of the putative class in

8    this case.

9          Therefore, the Court concludes that the adequacy requirement is met as to both the

10   proposed class representatives and class counsel.

11        **F.      Superiority of Class Mechanism**

12         The Court also finds that a "class action is superior to other available methods for fairly

13   and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors considered in

14   making this determination include "(A) the class members' interests in individually controlling the

15   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

16   the controversy already begun by or against class members; (C) the desirability or undesirability

17   of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties

18   in managing a class action." Fed. R. Civ. P. 23(b)(3)(A) – (D). In addition, the Ninth Circuit has

19   explained that "[w]here recovery on an individual basis would be dwarfed by the cost of litigating

20   on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land*

21   *Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). An overriding

22   concern of the "superiority" inquiry is judicial economy which, in turn, is related to the question

23   of commonality. *Id.*

24         Here, the Court finds that individual class members are unlikely to have an interest

25   controlling the litigation and that it is desirable and in the interests of judicial efficiency to

26   concentrate the litigation in a single judicial forum. The Court further notes that the likely cost of

27   litigating any particular class member's claims vastly exceeds the class member's potential

28   recovery, a factor that further supports the conclusion that the class mechanism is superior to

requiring that each class member bring a separate action to pursue the claims raised in this case.

Finally, the Court rejects Defendants' assertion that the superiority requirement is not met because class treatment of Plaintiffs' claims will not be manageable.  *See* Opposition at 36-37. Defendants argue that Plaintiffs have failed to offer any trial plan showing how they will prove their claims on a classwide basis and raise the specter of a "trial by formula," which the Supreme Court has disapproved. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (holding that trial court erred in certifying a class where plaintiffs relied on statistical evidence to prove that pay and promotion disparities were the result of gender discrimination and not other neutral factors).  Yet far from relying on statistical evidence from a class sample to establish liability on their claims, as the plaintiffs in *Wal-Mart* sought to do, Plaintiffs here have pointed to numerous non-statistical sources of common proof to support their overtime and meal and rest break claims. Further, to the extent Plaintiffs intend to rely on statistical studies to prove their claims, that approach is permissible so long as "the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action."  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016).  Moreover, as even Defendants' expert opined, it is likely Plaintiffs will be able to estimate unpaid overtime using statistical studies of overtime worked in combination with records reflecting time that was actually paid.  *See* Piller Reply Decl., Ex. 26 (Crandall Depo.) at 100-102.   A similar approach can be taken as to meal and rest breaks. Accordingly, the Court concludes that the class mechanism is superior to individual litigation of Plaintiffs' claims.[23]

## IV.    CONCLUSION

For the reasons stated above, the Motion is GRANTED.  The Court certifies the following class under Rule 23(b)(3):

All traveling nurses who worked in the job position(s) of Registered

---

[23] Of course, a district court's order granting class certification is subject to later modification, including class decertification. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment").  If Plaintiffs are unable to offer a reliable method for estimating on a classwide basis the amount of unpaid overtime or the number of missed or noncompliant meal or rest breaks, the Court may need to revisit the question of whether those claims should be addressed on a classwide basis.

1    Nurse, Licensed Practical Nurse, or another nursing position(s), for
2    Defendant AMN and/or Defendant Kaiser, in one or more Kaiser
     facilities in California between September 11, 2013 and the date of
     class notice.

3    The Court appoints named Plaintiffs Shaw, Kucharski and Corona Teitelbaum as class

4    representatives and appoints the law firm of Schneider Wallace Cottrell Konecky Wotkyns LLP to

5    serve as class counsel.

6            The Court vacates the dispositive motions and trial dates previously set in this case, as well

7    as all related dates.  The parties are instructed to meet and confer and submit a proposed schedule

8    for the remainder of the case no later than **August 10, 2018**.  A Case Management Conference is

9    set for **August 17, 2018** at **2:00 p.m.**

10           **IT IS SO ORDERED.**

11

12   Dated: July 5, 2018

13

14   _____

15   JOSEPH C. SPERO
     Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28